# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

     *Plaintiff,*

     *vs.*                                    Case No. 16-CR-21 (WED)

SAMY M. HAMZEH,

     *Defendant.*

---

## OMNIBUS MEMORANDUM IN SUPPORT
## OF PRETRIAL MOTIONS 1–3

Samy Hamzeh, by counsel, files this consolidated memorandum in support of the first three pretrial motions. These are Hamzeh's motion to dismiss the Indictment because § 5861 is unconstitutional; Hamzeh's motion to dismiss Count three of the Indictment as multiplicitous; and Hamzeh's motion to compel disclosure of *Brady* and *Giglio* material ninety days in advance of trial.

### I.    The Charges

According to the complaint sworn out by FBI Agent Jonathan Adkins, on January 25, 2016, Samy Hamzeh met with two undercover FBI employees to purchase machine guns and a silencer. Hamzeh paid the undercovers an agreed-upon price and took possession of a bag containing two guns, one of which had an attached silencer. Moments later, FBI agents arrested Hamzeh for possessing the unregistered weapons they just had delivered to him.

Based on these allegations, a grand jury returned a three-count indictment against Hamzeh on February 9, 2016. Count One charges Hamzeh with knowingly receiving and possessing an unregistered H & K MP-5 SD 9mm machine gun, with serial number S93040 in violation of 26 U.S.C. s. 5861(d). Count Two alleges the same offense for Hamzeh's receipt and possession of a different machine gun. Count Three alleges the same offense for Hamzeh's receipt and possession of an H & K silencer with the same serial number as the machine gun in Count One.

## II.    The statute that Hamzeh is charged under is an unconstitutional use of Congress's taxing power and the indictment must be dismissed.

The charges surrounding Hamzeh's possession of machine guns were brought under Title 26 of the U.S. Code—otherwise known as the tax code. There is another statute that generally prohibits the possession of machine guns, but it requires additional elements, it can be more difficult for the government to prove, and it only allows for a single conviction for the possession of two firearms. *See* 18 U.S.C. § 922(*o*); *Rogers v. United States*, 522 U.S. 252, 254 n.1 (1998). In contrast, the unit of prosecution under § 5861 is tied to the failure to register the firearm and pay the tax, not the possession, *Haynes v. United States,* 390 U.S. 85, 93 (1968). So a court can impose consecutive sentences for each firearm. *United States v. Moses*, 513 F.3d 727, 732 (7th Cir. 2008). That is, under the government's charging decision, Hamzeh's exposure stands at 30 years' imprisonment; instead of the 10 years he'd face with charges under § 922(*o*).

2

*Federal Defender Services of Wisconsin, Inc.*

While the government has its own reasons for electing to charge Hamzeh under Title 26, the defense submits that the prohibition and penalties contained in § 5861 are beyond Congress's taxing power. Thus, it has acted unconstitutionally, and the Indictment must be dismissed. To understand the defense's argument and grasp the problems with this statute, it's helpful to (briefly) sketch out the statute's history, how earlier challenges to it differ from the defense's argument here, and why two recent Supreme Court decisions both control the analysis and establish that § 5861 is an unconstitutional regulation.

> A.    Congress used its taxing power to implement the National Firearm Act, and at the time it was a permissible use of that power but that changed.

In the mid-thirties, Congress passed the National Firearm Act. Among other things, it taxed the sale of machine guns. The tax was $200. At the time, Congress's power under the Commerce Clause was not as expansive as its presently accepted form. *Compare Nigro v. United States*, 276 U.S. 332, 353-54 (1928) (regulating narcotics under the taxing power), *with Raich v. Gonzalez,* 545 U.S. 1, 22 (2005) (regulating them under the commerce power). And so, Congress used its taxing power to regulate machine guns—hence, Congress placing the regulation in Title 26.

The tax was soon challenged as too burdensome and a pretext for Congress's otherwise-prohibited desire to regulate certain firearms. In *Sonzinsky v. United States*, the Supreme Court looked at the statute and began with the obvious:

*Federal Defender Services of Wisconsin, Inc.*

> Every tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed. But a tax is not any the less a tax because it has a regulatory effect, and it has long been established that an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed.

300 U.S. 506, 513 (1937) (citation omitted). The Court in *Sonzinsky* also noted that Courts should not speculate about Congress's hidden motives under the taxing authority—if it raises revenue then it's a tax, even if Congress hopes to accomplish something more with it. *Id.* at 514.

In the case of the National Firearm Act, the Court reasoned that it produced revenue that was collected by the Internal Revenue Service and thus it operated as a tax: "As it is not attended by an offensive regulation, and since it operates as a tax, it is within the national taxing power." *Id.* With that decision, it stood beyond question that Congress was acting within its taxing power when it imposed a tax and attendant registration requirements on machine guns. If you want a machine gun, have the transferor pay a $200 tax and register it—end of discussion. And that was the way it was for almost fifty years.

Then in 1986, Congress passed a new law: it provided that it was illegal to possess *any* machine gun manufactured after 1986. *See* 18 U.S.C. § 922(*o*). That law was passed under Congress's commerce clause power, so to convict the government had to prove that it was a machine gun and that it involved interstate commerce. *See United States v. Kenney*, 91 F.3d 884, 888 (7th Cir. 1996) (noting "if 922(*o*) is constitutional it must bear

*Federal Defender Services of Wisconsin, Inc.*

more than a generic relationship several steps removed from interstate commerce."). Additionally, the Supreme Court's holding in *United States v. Lopez*, 514 U.S. 549 (1995), changed the way courts looked at the interstate commerce element—before *Lopez*, it was little more than a formality; afterwards there had to be an actual nexus between the regulated item and interstate commerce. *United States v. Morrison,* 529 U.S. 598, 608–17 (2000); *Jones v. United States*, 529 U.S. 848, 855-58 (2000) (finding federal arson needed more than that the materials moved in interstate commerce).

After Congress passed the ban in 1986, the ATF and the IRS refused to allow anyone to pay the firearm tax. *See* 27 C.F.R. § 179.105. So to comply with the law and have a machine gun under § 5861, a person had to pay the $200 tax, but the transferor couldn't pay the tax—the ATF refused to collect that revenue and register the firearm. That scenario of obligation-and-impossibility spawned two legal challenges to § 5861. First, that the law was unconstitutional because it was impossible for a person to comply with it; and second, that Congress implicitly repealed § 5861 when it passed § 922(*o*). *See United States v. Carmel*, 548 F.3d 571, 577-79 (7th Cir. 2008) (discussing both).

i.    **The initial attacks made on § 5861 were focused on fundamental fairness and the idea that Congress implicitly repealed the statute.**

The impossibility argument has some natural appeal. To convict someone for failing to do something that isn't even possible certainly violates notions of fundamental fairness—it's Kafka-esque. The Tenth Circuit seized on this reasoning when it held that § 5861 was unconstitutional. *See United States v. Dalton*, 960 F.2d 121, 126 (10th Cir. 1992)

*Federal Defender Services of Wisconsin, Inc.*

("As a result of section 922(*o*), compliance with section 5861 is impossible."). Six appellate courts, however, disagreed and held that the statute could be complied with in one simple way: just don't possess a machine gun. *See Carmel*, 548 F.3d at 579 (collecting cases).

The second argument was slightly different and a bit more technical. The basic premise was that § 5861 was a valid law — the Supreme Court had said so. But with § 922(*o*) Congress had implicitly repealed the law. *See Dalton*, 960 F.2d at 126; *United States v. Rock Island Armory*, 773 F. Supp. 117, 126 (C.D. Ill. 1991); *United States v. Ardoin*, 19 F.3d 177, 172–84 (Wiener, J., dissenting). This argument has been rejected on the principle that Congress is presumed to know how the laws interact and to pass them accordingly. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 696–97 (1979) (noting "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law"). In addition, it is only in the rare case where the Court will find a statute repealed by implication. *See Morton v. Mancari*, 417 U.S. 535, 549–50 (1974) (noting "repeals by implication are not favored"). So courts reasoned that § 922(*o*) did not repeal § 5861. It's under those two bases that the statute in a majority of circuits has been upheld. *See Carmel*, 548 F.3d at 579.

Hamzeh maintains that *Dalton* and *Rock Island Armory* were correctly decided and that § 5861 is unconstitutional for the reasons outlined in those cases. Hamzeh notes as much to preserve both of the arguments, but won't waste the Court's time with a fuller explication of what, in this Circuit, amounts to a dead point.

*Federal Defender Services*
*of Wisconsin, Inc.*

**B.      The defense's argument and reasoning differ from the attacks previously made on the statute and instead rely upon recent case law that articulate the test for when a tax is actually a tax and not an impermissible regulation.**

At the time that *Sozinsky* examined § 5861, it was a legitimate revenue raising measure, and so it constituted a valid exercise of Congress's taxing authority. But that has changed. It is now a pure prohibition of behavior that is traditionally reserved for the states, namely the regulation of firearms not in or affecting interstate commerce. It cannot therefore be justified as an expression of Congress's taxing (or commerce) authority.

This argument rests on different cases than those used by defendants to argue that § 922(*o*) silently overruled § 5861. Instead in 1991. Rather, the cases that give the clearest understanding of what separates a permissible tax from an impermissible regulation are *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012), and *Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 767 (1994). Significantly, *Sebelius* breathed new life into precedent from a century ago when courts regularly invalidated laws passed under Congress's taxing power. 132 S.Ct. at 2578–80 (surveying cases). The decisions in *Sebelius* and *Kurth Ranch* set out the proper analysis for Courts to determine what is a "tax," (that is, a permissible use of Congress's taxing power), and what is simply an impermissible regulation under the guise of a tax. *See Kurth Ranch,* 511 U.S. at 780 (noting "at some point, an exaction labeled as a tax approaches punishment, and our task is to determine whether Montana's drug tax crosses that line.").

*Federal Defender Services of Wisconsin, Inc.*

### i. Congress's taxing power is not without limits—a tax must operate like a tax.

To understand the test that *Sebelius* and *Kurth Ranch* set out and why § 5861 fails that test, it's important to return to some first principles of constitutional law. One, Congress does not have unlimited power; its powers are enumerated and well-defined. *Sebelius*, 132 S. Ct. at 2577. Significant among these is the power to tax and spend. *See* U.S. Const., Art. I, § 8, cl. 1. The taxing power gives Congress considerable influence in areas of life that it could not otherwise regulate directly—Congress "may enact a tax on an activity that it cannot authorize, forbid, or otherwise control." *Sebelius,* 132 S.Ct. at 2579. That is, it can use the taxing power to encourage certain behavior (buying houses) and it can use it to discourage certain behavior (smoking). But the primary purpose and the attendant means of effecting that behavior (getting people to buy houses or stop smoking) has to be taxing—raising revenue or giving a tax break. Two, a tax is not just anything that the government calls a tax. Rather, a tax is a "charge imposed by the government on persons, entities, transactions, or property to yield public revenue." *Black's Law Dictionary* 1685 (10th ed. 2014); *see also United States v. Mississippi Tax Comm'n*, 421 U.S. 599, 606 (1975). So a legitimate tax will have behind it the purpose of raising revenue. And three, Congress can't simply label a regulation or penalty a tax, when it is anything but. *See United States v. Kahriger*, 345 U.S. 22, 29–31 (1953), *overruled in part by Marchetti v. United States*, 390 U.S. 39, 41 (1968). The issue then turns on how courts are supposed to

8

*Federal Defender Services of Wisconsin, Inc.*

determine where a challenged law stands—is it a legitimate tax as opposed to a prohibited regulation under the guise of a tax?

The more recent cases from the Supreme Court have provided clear criteria on this issue—criteria that were used in cases a century ago but were given force recently. *See* Ruth Mason, *Federalism and the Taxing Power*, 99 Cal. L. Rev. 975, 994–1008 (2011). To that end, the Supreme Court has instructed courts to disregard "the designation of the exaction, and view[] its substance and application." *Sebelius,* 132 S.Ct. at 2573 *(*quotation omitted); *see also Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (noting in "passing on the constitutionality of a tax law, we are concerned only with its practical operation"). Focusing on the measure's practical operation and not simply the words Congress invoked, the Court in *Sebelius* looked back to the *Child Labor Tax Case* for three practical considerations that separate a tax from a penalty. *Id.* (discussing *Bailey v. Drexel Furniture Co.*, 259 U. S. 20, 38 (1922) (referred to as *Child Labor Tax Case*)).

> **First**, the tax imposed an exceedingly heavy burden—10 percent of a company's net income—on those who employed children, no matter how small their infraction.

> **Second**, it imposed that exaction only on those who knowingly employed underage laborers. Such scienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law.

> **Third**, this "tax" was enforced in part by the Department of Labor, an agency responsible for punishing violations of labor laws, not collecting revenue.

*Sebelius*, 132 S.Ct. at 2595. Those three considerations were at the heart of invalidating the statute at issue in the *Child Labor Tax Case* and bore on how all tax statutes should be

*Federal Defender Services of Wisconsin, Inc.*

analyzed. *Drexel Furniture Co.*, 259 U.S. at 36-39; *Nigro*, 276 U.S. at 341–42; *A. Magnano Co. v. Hamilton,* 292 U.S. 40, 44–45 (1934); *Kurth Ranch*, 511 U.S. at 779. And those three considerations are the guide posts courts use to delineate a legitimate tax from an impermissible regulation: "A tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act." *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996).

In *Sebelius,* the Supreme Court used those three considerations to evaluate the tax at issue in the Affordable Care Act cases and found they passed muster because: the amount due was "less than the price of insurance," "the individual mandate contains no scienter requirement," and the "payment is collected solely by the IRS through the normal means of taxation." *Sebelius*, 132 S.Ct. at 2595–96. It didn't matter that the Act called the "tax" a "penalty"; it operated as a tax and that was all that mattered – the "constitutional question was not controlled by Congress's choice of label." *Id*. at 2595.

In *Kurth Ranch,* the Supreme Court analyzed a Montana tax that the petitioners claimed was a penalty and not a tax. 511 U.S. at 771–73. Like it did in *Sebelius*, the Supreme Court looked to the *Child Labor Tax Case* for guidance in distinguishing between the two: we have "recognized that there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment." *Kurth Ranch,* 511 U.S. at 780-81. The Court then looked first at the tax rate: the tax "assessment was more than eight times the

*Federal Defender Services
of Wisconsin, Inc.*

drug's market value—a remarkably high tax." *Id.* at 780. Second, the tax only came about when there was illegal behavior—a fact that changed its character. *Id.* at 782 ("Taxes imposed upon illegal activities are fundamentally different from taxes with a pure revenue-raising purpose that are imposed despite their adverse effect on the taxed activity."). Third, the tax was supposed to be a species of property tax, but it was "levied on goods that the taxpayer neither owns nor possesses when the tax is imposed." *Id.* at 783. Finally, the Court made this observation which bears heavily on the question at hand:

> A tax on "possession" of goods that no longer exist and that the taxpayer never lawfully *possessed has an unmistakable punitive character*. This tax, imposed on criminals and no others, departs so far from normal revenue laws as to become a form of punishment.

*Id.* at 783 (emphasis added). Indeed, that was among the "concoction of anomalies, too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment." *Id.*

The decisions in *Sebelius* and *Kurth Ranch* stand as re-affirmations of principles that had seemingly been retired for the past half-century as Congress primarily invoked its commerce power to justify laws. *See* Mason, *Federalism and the Taxing Power*, 99 Cal. L. Rev. at 1006. But when Congress doesn't use its commerce clause power and turns to its taxing power, the question comes front center: is this really a tax or an impermissible regulation? In *Sebelius,* the Commerce Clause wasn't a legitimate avenue for such legislation. 132 S. Ct. at 2587 (noting the "individual mandate, however, does not regulate existing commercial activity"). And in *Kurth Ranch,* the Montana tax was challenged

*Federal Defender Services of Wisconsin, Inc.*

under double-jeopardy principles, so the Court had to return to the seminal cases and evaluate the tax against the principles set down a hundred years ago. *Kurth Ranch,* 511 U.S. at 778 (listing cases). Those older cases have the same force today as they did when they were decided.

### ii. Section 5861 exceeds Congress's taxing power because it doesn't operate like a tax.

This point has to be clear: under the criteria set out in *Sebelius* and *Kurth Ranch*, if the original National Firearm Act from 1936 was challenged today, the Supreme Court would reach the same decision it did in *Sonzinsky*. Remember: the 1936 Act raised revenue, it didn't have a scienter requirement, and the tax was collected by the IRS. The ATF would not be created for another 36 years. *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82. Stat. 1213. But since the tax was upheld in *Sonzinsky*, the statute and its practical operation have changed. Again, when "passing on the constitutionality of a tax law, we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Nelson*, 312 U.S. at 363 (internal quotation marks omitted). Under the test in *Sebelius,* the court need only ask three questions to determine whether § 5861 is, in fact, a taxing measure or a prohibited regulation. First, does it raise any revenue? Second, does it have a scienter requirement? And third, who is collecting the tax? In the last eighty years, each of those essential aspects of § 5861 has changed.

12

12

First, unlike it was in 1936, the measure does not raise any revenue. As noted earlier, after 1986, the ATF refused to accept taxes for the transfer of machine guns. *Dalton,* 960 F.2d at 125 ("The government does not assert that it taxes the illegal possession or transfer of a machinegun."). Second, while the statute has no express scienter requirement, the Supreme Court has held that § 5861 contains an implicit scienter requirement. *Staples v. United States*, 511 U.S. 600, 605 (1994) ("Nevertheless, silence on this point by itself does not necessarily suggest that Congress intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal."). That is, the Court held that "to obtain a conviction, the Government should have been required to prove that petitioner knew of the features of his AR–15 that brought it within the scope of the Act." *Id.* at 619.

It is worth pausing here for a second to address the logic of *Staples* a little more. There, the decision was not focused on this being a tax violation and thus because we're dealing with "a tax" violation there is no scienter requirement. That was, in fact, the government's argument before the Supreme Court: "in the Government's view, any person who has purchased what he believes to be a semiautomatic rifle or handgun, or who simply has inherited a gun from a relative and left it untouched in an attic or basement, *can be subject to imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun turns out to be an automatic.*" *Id.* at 615 (emphasis added). The Supreme Court didn't buy that § 5861 operated like a tax statute; instead, the Court looked at the statute for what it was: a regulation on certain dangerous firearms. *Id.* Thus,

13

*Federal Defender Services of Wisconsin, Inc.*

as the statute operates after *Staples* there is a definite scienter requirement—one that makes the statute look like and operate as a regulation. *Id.* at 616.

The final feature under *Sebelius* (echoing the *Child Labor Tax Cases*) that dooms § 5861 concerns who collects the tax. Again, no one factor is determinative but this weighs heavily in the mix; it speaks to the practical effects of the tax and focuses in on what is really happening. *Sebelius*, 132 S. Ct at 2595. Here, the tax and the regulation is not controlled by the IRS but the ATF—that agency is in charge of collecting (or refusing to collect) the taxes. And that is the same federal agency that enforces the federal firearm laws. *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82. Stat. 1213.

Looking at all three points outlined in *Sebelius* and quoted above, they establish that § 5861 is a regulation and not a legitimate tax. This statute raises no revenue; the statute has a scienter requirement; and it's overseen by the ATF. That is, this is a pure prohibition and the taxing power is just a guise for an otherwise prohibited use of congressional power. And under the reasoning in *Sebelius,* it must be struck down as unconstitutional.

That's a powerful statement, few laws are deemed unconstitutional. Yet the argument's logic is irrefutable. Still, it's worth checking the analysis provided under the *Sebelius* factors against the Supreme Court's analysis in *Kurth Ranch.* Again, in *Kurth Ranch,* the Supreme Court drew from *The Child Labor Tax Case* and focused on the remarkably high tax rate; that it attended to only illegal behavior; and that it was levied on goods that the taxpayer never lawfully possessed. *Kurth Ranch,* 511 U.S. at 782–83.

*Federal Defender Services of Wisconsin, Inc.*

And those qualities removed the Montana "tax" from normal revenue raising measures and made it a penalty. *Id.*

All three of those factors are present here and support what the analysis in *Sebelius* demands: that this is a regulation beyond Congress's taxing power because it's not a tax. Here, the stated tax rate is $200, but it can't be paid. So it might as well be a billion dollars. The tax rate is, in essence, so high that no one can pay it because (again) the ATF won't allow anyone to pay it. Impossibility of paying even a nominal sum is akin to a high sum that also can't be paid—the "practical operation" is the same. Like the regulation in *Kurth Ranch,* § 5861 only attains to illegal behavior. While the statute in 1936 could be complied with, eighty years later the regulation only applies to illegal behavior—possessing an otherwise-prohibited firearm. And third the regulation is levied on goods that Hamzeh could never legally possess. That point is further enforced by the realities of this case. As spelled out above, Hamzeh is charged with possessing a gun that he didn't register and he didn't buy. Count 2 pertains to a gun that the first confidential human source bought and Hamzeh carried for all of ten feet. There is no excise tax that provides a similar penalty for someone engaging in a *non*-taxable event—simply carrying the chattel.

In sum, all the criteria laid out in *Sebelius* and *Kurth Ranch* support the conclusion that the "concoction of anomalies, too far-removed in crucial respects from a standard tax assessment" present in § 5861 establish this as a regulation and not a tax. *See Kurth Ranch,* 511 U.S. at 783. To be clear, while the defense is not abandoning old arguments that the courts have thus far rejected: we are arguing something different here. This is not a case

15

*Federal Defender Services
of Wisconsin, Inc.*

where Congress has silently repealed § 5861 or that this statute isn't fair, so it is unconstitutional. The argument posited above is new; it's based on how § 5861 has evolved and how the practical points of the statute have changed from being a tax and are now a pure regulation. It would be hard to imagine the Court in *Sonzinsky* looking at the three facets of the statute that were licit then and have all changed—namely, no revenue being drawn, a scienter requirement, and the ATF not the IRS collecting these taxes—and sustaining the statute. Indeed, if *Kurth Ranch* and *Sebelius* stand for anything, it's that this is not a tax but an impermissible regulation that is beyond Congress's power under its taxing power.

### III. Count 2 and 3 of the Indictment are multiplicitous and must be dismissed.

#### A. Count Three

Instead of focusing on Congress's power to implement § 5861, pretrial motion number three attacks the government's power to indict Hamzeh for two counts concerning the same gun and for two counts for the simultaneous possession of multiple weapons. It's important to recall that there are only two guns at issue here—including the one with serial number S93040. This firearm was actually manufactured with the silencer. According to the FBI 302 report from January 25, 2016, the entire firearm (machine gun and silencer together) fall under one serial number.

16

*Federal Defender Services of Wisconsin, Inc.*

```
   Item #2 is a Heckler & Koch 9mm MP5 SD fully automatic rifle with a
factory manufactured sound suppressor.  The suppressor is not a separate
item for the weapon.  As described by a FBI Firearms Instructor familiar
with the weapon, the suppressor is manufactured as a part of that serial
number weapon, not a separate item.
```

Another Circuit has dealt with this question and held: that "section 5861(d) expresses an unambiguous congressional intent to make each firearm a unit of prosecution. Similarly, we have held that "it was not Congress's intent to impose multiple punishments for possessing a single firearm even if that firearm violates different subsections of 26 U.S.C. § 5861." *United States v. Zalapa*, 509 F.3d 1060, 1062 (9th Cir. 2007). Thus, as the defense spells it out below, this Court should follow *Zalapa* and find that Hamzeh can only face charges for one violation of § 5861 for each firearm he possessed.  That is, breaking the firearm into multiple firearms means that he's being prosecuted twice for what Congress intended to be one offense.

Those are the basic facts and logic of the argument, here's the law. The double jeopardy clause of the 5th Amendment provides "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend V.  The Supreme Court has interpreted that single sentence to have three separate constitutional protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *United States v. DiFrancesco*, 449 U.S. 117, 129 (1980) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). That final protection serves to prevent double punishment for the same offense. *United States*

*Federal Defender Services
of Wisconsin, Inc.*

*v. Snyder*, 189 F.3d 640, 647 (7th Cir. 1999). Such challenges can be raised before trial and courts normally call such challenges multiplicity challenges. *See* Fed. R. Crim. P. 12.

Multiplicity occurs when the government charges a single offense in separate counts. *See United States v. Cassano*, 372 F.3d 868, 881 (7th Cir. 2004). To decide whether an indictment has charged the same offense into multiple counts, courts analyze whether "each provision requires proof of an additional fact which the other does not." *United States v. Schiro*, 679 F.3d 521, 525 (7th Cir. 2012) (*citing Blockburger v. United States*, 284 U.S. 299, 304 (1932)). This is typically referred to as the *Blockburger* test. *Id.* If each count demands an additional fact then there is no problem; but if both counts demand identical proof then one of the charges must be dismissed. *United States v. Conley*, 291 F.3d 464, 470 (7th Cir. 2002) ("If one element is required to prove the offense in one count which is not required to prove the offense in the second count, there is no multiplicity."). And the focus remains on the statutory elements of the charged offenses and the unit of prosecution.

When it comes to § 5861, courts have held that the crime is not the possession of the firearm but possessing a firearm that the individual has failed to register with the transferor paying the tax. *See United States v. Moses*, 513 F.3d 727, 732 (7th Cir. 2008) (noting "although a violation of § 5861(d) necessarily involves the possession of a firearm, the crime is more aptly characterized as a form of tax evasion."). Again, working on the fiction that Congress is exercising its taxing authority, each separate firearm becomes a unit of prosecution—the "tax is evaded each time a firearm is not registered, each non-

*Federal Defender Services
of Wisconsin, Inc.*

registered firearm deprives the federal government of the proper tax due on that weapon; simply put, each non-registered firearm represents a separate instance of tax evasion that may be prosecuted separately." *Id.* So each firearm is taxed and registered and the failure to register it and pay the tax is the offense Congress has sought to punish. *Id.* ("We agree with the several courts of appeals that there is one unit of prosecution under § 5861(d) for each nonregistered firearm possessed, and that an individual accordingly may be prosecuted for each non-registered firearm he is alleged to have possessed.").

When it comes to the gun charged in Counts one and three, only one gun was possessed, though it had two qualities that demanded registration. The gun was a machine gun but it also had built on to it a silencer—a silencer that according to the FBI, fell under the same serial number and could not be removed. So looking at the statutory provisions, the question is whether the weapon was registered: not the distinct characteristics of it that demanded registration. Put differently, the unit that had to be registered was the gun, identified with a single serial number, and not the different means that would dictate its registration. Again, the *Blockburger* test focuses on whether "each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304; *see also United States v. Mann*, 701 F.3d 274, 285 (8th Cir. 2012) (quoting *Blockburger*, 284 U.S. at 304).

Here, Hamzeh momentarily possessed a single weapon that he had to register and pay the tax on; and for that single weapon, he would only have to register it once. Indeed, the ATF's regulations seem to treat the purchase of a gun with component parts as

19

*Federal Defender Services
of Wisconsin, Inc.*

includible in the price and constituting one taxable event. *See* 27 C.F.R. § 53.61. That sentence is qualified with the term "seems" because the non-exclusive list of component parts that the regulation gives does not include silencers but it does include "flash hiders." *Id.* § 53.61(b)(5)(ii). And at the end of the list of examples the regulation provides that "[c]omponent parts also include any part provided with the firearm that would affect the tax statute of the firearm. . . ." *Id.* So the tax that is owed and that Hamzeh would be charged with evading does not go to each part of the gun but to the indivisible gun itself and its single serial number.

As noted above, this almost identical question was addressed in *Zalapa*. There the defendant possessed a machine gun that also had a barrel less than 16" in length. 509 F.3d at 1062. So like Hamzeh, the single gun violated two provisions of § 5861(d). Looking at the statute, the Court noted that "section 5861(d) expresses an unambiguous congressional intent to make each firearm a unit of prosecution." *Id.* at 1063 (quoting *United States v. Alverson*, 666 F.2d 341, 347 (9th Cir. 1982)). And importantly, it held that it was not Congress's intent to impose multiple punishments for possessing a single firearm even if that firearm violates different subsections of 26 U.S.C. § 5861. *See id.* Thus, the court held that the single gun, with multiple characteristics that violated § 5861 could sustain only one count. *Id.* (noting "convicting and sentencing Zalapa for both firearm counts resulted in multiplicitous sentences and convictions and violated the Double Jeopardy Clause"). The same conclusion must follow here.

*Federal Defender Services
of Wisconsin, Inc.*

Under § 5861(d), the issue is whether this weapon, with its serial number, was registered. The failure to do so is the criminal offense. The answer to that question is tied to the gun that isn't registered, and not to the various, irremovable component parts that might violate separate sections of § 5861(d). As far as the second gun is concerned (the one with the attached silencer) the failure to pay that tax is one single offense, yet the government has charged it in two separate counts and exposed Hamzeh to multiple punishments for that single offense. That is, Count 3 is multiplicitous and must be dismissed.

## B. Count Two

The defense also asserts that Count Two must be dismissed as multiplicitous because the simultaneous possession of multiple unregistered firearms should only give rise to a single count. That is the permissible unit of prosecution under 18 U.S.C. § 922 for the simultaneous possession of multiple firearms *See Moses*, 513 F.3d at 731–32. But as noted above, in *Moses*, the Seventh Circuit held that each non-registered firearm unlawfully possessed under § 5861(d) supports a separate count. *Moses* explained that in contrast to § 922 offenses, § 5861(d) is a form of tax evasion. *Id.* at 732. And each time a firearm is not registered, each non-registered firearm deprives the federal government of the tax due on the weapon. Thus, "separate offenses for each firearm . . . provide incentive for sellers and buyers to declare their weapons and pay the tax." *Id.* at 733.

But this rationale falls apart as applied to machine guns because they cannot be registered and no taxes are collected. Rather, as applied to machine guns, § 5861(d)

21

operates as a regulation that bars the possession of machine guns, just like § 922(*o*), and not as a form of tax evasion. Thus, the proper unit of prosecution should be the possession and not the number of guns involved. Accordingly, Hamzeh's simultaneous possession of multiple weapons only should give rise to a single count and the others must be dismissed as multiplicitous.

### IV.    To ensure that Hamzeh receives a fair trial the defense needs the *Brady* and *Giglio* materials ninety days in advance of trial.

The defense is, of course, entitled to all *Brady* and *Giglio* material, the issue is when it will be turned over. In this district, the disclosure usually comes 15 days before trial, but this is not a usual case---it was a four month investigation with two informants meeting almost daily with Hamzeh. And when Hamzeh withdrew from their putative plan to hurt anyone, the informants ensured that Hamzeh still purchased a firearm. Two factors in this case dictate that the *Brady* and *Giglio* material be disclosed three months before trial: the first concerns his trial rights, and the second concerns his right to effective counsel during plea negotiations.

Concerning Hamzeh's trial rights, the defense has to be allowed to prepare for trial in a manner that makes use of this material. This is not a case where Hamzeh can claim that this is a simple misunderstanding and the government has the wrong guy, or that the government can't prove the jurisdictional hook. Instead, the defense at trial (as it likely stands) is that Hamzeh was entrapped. To that end, two pieces of information are

22

*Federal Defender Services of Wisconsin, Inc.*

operates as a regulation that bars the possession of machine guns, just like § 922(*o*), and not as a form of tax evasion. Thus, the proper unit of prosecution should be the possession and not the number of guns involved. Accordingly, Hamzeh's simultaneous possession of multiple weapons only should give rise to a single count and the others must be dismissed as multiplicitous.

### IV.    To ensure that Hamzeh receives a fair trial the defense needs the *Brady* and *Giglio* materials ninety days in advance of trial.

The defense is, of course, entitled to all *Brady* and *Giglio* material, the issue is when it will be turned over. In this district, the disclosure usually comes 15 days before trial, but this is not a usual case---it was a four month investigation with two informants meeting almost daily with Hamzeh. And when Hamzeh withdrew from their putative plan to hurt anyone, the informants ensured that Hamzeh still purchased a firearm. Two factors in this case dictate that the *Brady* and *Giglio* material be disclosed three months before trial: the first concerns his trial rights, and the second concerns his right to effective counsel during plea negotiations.

Concerning Hamzeh's trial rights, the defense has to be allowed to prepare for trial in a manner that makes use of this material. This is not a case where Hamzeh can claim that this is a simple misunderstanding and the government has the wrong guy, or that the government can't prove the jurisdictional hook. Instead, the defense at trial (as it likely stands) is that Hamzeh was entrapped. To that end, two pieces of information are

22

*Federal Defender Services of Wisconsin, Inc.*

critical: one, what was said to Hamzeh; and two, what incentives did the informants have and what undermines their credibility.

One of the informants was Hamzeh's long-time friend and his motivations for setting up Hamzeh have to be known well before trial. Cross-examinations have to be tailored and further investigation done depending on his precise motivation—was it money, legal problems, or help with immigration that the informant needed help with from the FBI. The precise incentive to set up his friend have to be known for Hamzeh to receive a fair trial. The other informant previously had worked for the FBI and apparently was directed by that agency to get close to Hamzeh. His motivations are similarly germane. Without knowing his incentives and whether he's been deemed dishonest before, the defense cannot present the trial that the Sixth Amendment assures Hamzeh.

The other reason for ordering such an early disclosure stems from Hamzeh's right to effective representation in plea negotiations. *Lafler v. Cooper,* 132 S.Ct. 1376, 1384 (2012); *Missouri v. Frye,* 132 S.Ct. 1399, 1408 (2012). That right is beyond question. But counsel cannot advise Hamzeh on his defenses, whether they're any good, and whether he should pursue them at trial or seek a plea bargain, until we know the informants' motivation and what undercuts their credibility. In a case like this, where motivation and impeachment are the key to establishing an entrapment defense few sound decisions about trial strategy can be made without that information. Thus, the defense asks that the Court order the government to turn over all *Giglio* and *Brady* material 90 days before trial.

*Federal Defender Services of Wisconsin, Inc.*

## CONCLUSION

Hamzeh faces some very serious criminal charges, but the charges that the government has pursued have problems that cannot be pushed aside. Congress's ability to regulate firearms through the taxing power necessitates that it's actually taxing something. When it comes to § 5861, Congress isn't taxing machine guns, it is regulating them. That fact is inescapable under the analysis set out in *Sebelius* and *Kurth Ranch,* and thus this Court must hold that the indictment is infirm and the charges against Hamzeh dismissed. The problems don't, of course, end there: the charges are multiplicitous and the offending counts must be dismissed. Finally, for Hamzeh to get a fair trial and competent counsel in plea negotiations, the defense must have the *Brady* and *Giglio* material turned over at least ninety days before trial.

Dated at Milwaukee, Wisconsin this 24th day of February, 2017.

Respectfully submitted,


/s/      *Joseph A. Bugni*
Joseph A. Bugni, WI #1062514
Craig W. Albee, WI Bar #1015752
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee,  WI   53202
Tel.: (414) 221-9900

*Counsel for Defendant,* Samy M. Hamzeh

24