# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

       *Plaintiff,*

  *vs.*                               Case No. 16-CR-21

SAMY M. HAMZEH,

       *Defendant.*

---

## MEMORANDUM IN SUPPORT OF BOND

> *I'm going to speak a few words, if you want to listen to me, listen to me. If you don't, that's your decision and wait until I'm done before you start talking. The word hesitant, the word being afraid or scared, I don't want to hear it.*
>
> ***
>
> *Because I told [you] what will happen here. I told you this operation will be considered Haram [religiously forbidden]. He the Sheikh told me this plan will be forbidden because people will not trust and they will kill and slaughter Muslims and all this will be because of what you did and it will be your fault.*
>
> ***
>
> *This country let you in, and have taken a pledge from you that nothing happens here unless they become hostile to you, and no one has become hostile or enemy [to] you, in this country.*

Those are Samy Hamzeh's words the night before his arrest, when he told

the two FBI informants, who'd been working on him for months, that he wouldn't

participate in their plan to attack a masonic temple.

The complaint in this case was tailor made for newspaper headlines: FBI FOILS TERROR PLOT AGAINST MASONS. To be fair, Hamzeh's own words, such as "if I get out after killing thirty people, I will be happy 100%," quoted in the criminal complaint provided ample fodder for a sensational news story. But what the complaint does not reveal is that the day before his arrest, Hamzeh sought advice from two Imams. And even as his informant friends persisted in trying to convince him to go along with their plan, he refused to participate and insisted they abandon any plan for violence. Thus, by the time undercover FBI agents delivered two machine guns and a silencer to Hamzeh for $570, he'd already (and adamantly) declared that he wasn't going to be involved with any attack against the Masons.

So while Hamzeh accompanied the informants to obtain the guns, this was only after the two informants had been meeting with him almost daily for four months—manipulating him in hopes of pressuring him into a FBI-orchestrated terrorism plot that he would be prosecuted for. Indeed, the transcripts reveal that Hamzeh repeatedly told one informant that he did not want a machine gun, but only a handgun to protect himself while making deliveries to rough neighborhoods or in the event of hate crimes against Muslims. Since Hamzeh had no criminal record, a handgun wouldn't allow for criminal charges. So the

*Federal Defender Services
of Wisconsin, Inc.*

informant repeatedly pressed Hamzeh to get a machine gun, telling Hamzeh he could get one for $300 or less. That wasn't even enough for a handgun, let alone an illegal weapon that might fetch $10,000. And even after four months of pressure, Hamzeh lacked the initiative and resources to buy himself a legal handgun. Beyond those basic facts and as explained more fully below, the transcripts of the Arabic conversations reveal that at trial Hamzeh has a strong case for entrapment.

That trial is not scheduled until mid-February, and Hamzeh has been locked up for sixteen months and counting. So, if not released on bond, he will have sat in a county jail for almost 25 months by the time the jury is sworn. To put that time in perspective, Hamzeh's guidelines are 24–30 months. So if he is denied bond and sits until his trial, regardless of whether he's convicted, he will have already served a guideline sentence. It's worth noting that 98% of cases in this district result in sentences within or below the guidelines. [1]

Putting aside the equities of having a man who is presumed innocent sitting an additional eight months in county jail until his trial, this is not a presumption case. And Hamzeh does not present as the sort of person who should be detained: he has no record, he has a supportive family that he can live with, and he has a job

---

[1]  http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2015/wie15.pdf.

3

*Federal Defender Services of Wisconsin, Inc.*

waiting for him. He also has a significant employment history, and he is an American citizen. Beyond the basic (and objective) facts that usually support release, a psychiatrist from the University of Wisconsin evaluated Hamzeh. Based on that doctor's review, Hamzeh is considered low risk; he doesn't have the traits of someone who would commit this sort of violent act. Instead, Hamzeh's short-lived involvement can best be ascribed to the effect of having two FBI informants working on him for months. The discovery discloses nothing to suggest that Hamzeh engaged in prior acts of violence, nor does it contain any communications with extremist groups. And he has no history of weapon possession or any significant anti-social behavior. Indeed, absent the FBI's influence on his life, the extent of his criminal behavior appears limited to smoking marijuana.

That limited criminal conduct weighs heavy among the other objective factors that also favor releasing Hamzeh—including, community ties, work history, and lack of violence—but the complaint's allegations threaten to drown them out. To be clear, the complaint's fragmentary allegations are alarming, but Hamzeh is not charged with terrorism; and the complaint gives little in the way of the full story—even the basic facts are missing. It doesn't bother to mention that Hamzeh refused to participate in the plot; that he did so despite the informants' efforts to isolate him, bait him, and pressure him to move forward; or that he didn't

*Federal Defender Services of Wisconsin, Inc.*

just refuse to participate in light of such pressure but that he also tried to convince his friends to abandon their violent plans. On the night before his arrest, Hamzeh became so frustrated with the informants' refusal to listen to him and to the advice he received from the Imam that he screamed, "What do you want me to do, God damn your religion, go talk to the Sheikh," and then: "Why are you talking like this (UI)? I can't have you do this, then we all go to hell." His ultimate resistance to the informants' overtures, even while under the psychological duress created by a four-month campaign of manipulation by *two* informants, is a strong indication he will abide with all bail conditions given the scrutiny he will be under and the support he will have from friends and family. Added to that support, GPS location monitoring mitigates any minimal risk of flight and protects the community.

Ameliorating the risk of flight and threat to the community are the principal concerns of the Bail Reform Act, and it demands that facts, not fear, control the decision to release. That is why doubts regarding the propriety of release must be resolved in the defendant's favor. *E.g., United States v. Hammond*, 204 F. Supp. 2d 1157, 1161 (E.D. Wis. 2002). Here, the government cannot show by clear and convincing evidence that Hamzeh currently poses a danger to the community if released. *E.g., United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (noting

5

"this finding cannot be based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct"). Given that the only charge here is gun possession (not a crime of violence), that there is a strong entrapment defense, that the guidelines for this offense are 24–30 months, and that release is necessary to allow Hamzeh to participate in his defense and prevent irreparable harm to him, release upon the proposed conditions is appropriate.

The first section of this memorandum contains a lengthy discussion of the facts gleaned from transcripts of translated Arabic conversations, summary translations, and other discovery. Because the government will rely on Hamzeh's words to ask for detention, it is essential that the Court have the context for these words. Unfortunately, that requires an extended factual summary, but that summary shows how someone who is not presently a danger to the community could utter such despicable words, that the case for entrapment is strong, and that Hamzeh's true character was revealed when he adamantly refused to take part in the informant's plan. It also is our hope that this (admittedly) lengthy brief will allow for a much shorter bail hearing. Following the facts, this memo discusses Hamzeh's psychological evaluation, his release plan, and why release is required under the Bail Reform Act.

*Federal Defender Services of Wisconsin, Inc.*

## I. Introduction.

In the fall of 2015, Samy Hamzeh was 24 years old and working in Milwaukee as a restaurant delivery driver. A U.S. citizen, he was born in New Jersey, but when he was three, his family returned to Jordan. Despite living in Jordan, he and his family identified as Palestinian—his family was displaced from there. So for the first part of his life, Hamzeh called Jordan home and even graduated from high school there.

In 2011, when Hamzeh was 19, he moved back to the U.S. After a few months in Chicago, Hamzeh moved to Milwaukee, found a job, and began making friends. Two years later, his parents and younger sister joined him in Milwaukee, and the four of them rented an apartment together. In Milwaukee, Hamzeh bounced from job to job, but was always employed, sometimes at more than one job at a time. His work ranged from bus boy to a delivery man, a valet to a clerk at a gym. The family relied on Hamzeh's wages to make ends meet. He turned each paycheck over to his dad, who, in turn, would give Hamzeh a small allowance for cigarettes and coffee.

One of Hamzeh's friends in Milwaukee was Steve.[2] ███████████

████████████████████████████████████████

---

[2] To comply with the protective order, the informants' names have been changed.

*Federal Defender Services of Wisconsin, Inc.*

██████████████████████████████████████████████

███████████████████████████████████████████████ As

young men often do, they frequently socialized and gossiped, joked, made up

stories, and tried to sound more important than they were.

### A. September/October: Hamzeh boasts of traveling overseas, but does nothing.

When Steve first met with FBI agents on September 16, 2015, he claimed that

Hamzeh was talking about traveling to Egypt for terrorist training, obtaining a

commercial driver's license to conduct a terrorist attack in the name of ISIS, and

that he had obtained a .45 caliber pistol.[3] Steve's motives for meeting with the

agent are unclear. In later conversations, he indicated that he no longer had papers

allowing him to work in the United States. During this same conversation, Steve

told the FBI he did not consider Hamzeh an immediate threat.[4] Steve also reported

more mundane details about his friend: Hamzeh had recently been fired from his

last job at Casablanca cafe for serving alcohol to a minors. Although Steve's initial

report was uncorroborated, the FBI decided to begin recording conversations

between Steve and Hamzeh.

---

[3] R. 1.
[4] R. 1.

8

*Federal Defender Services of Wisconsin, Inc.*

Steve's initial report to the FBI and the early recorded conversations provided little corroboration for his suggestion that Hamzeh was a terrorist-in-waiting. In fact, a week later, Steve reported that Hamzeh had "changed his mind about doing stupid things," and was saying that it was a "bunch of bullshit."[5] The only criminal activity discussed in Steve's first recorded call with Hamzeh is when Samy asked Steve to get him some pot for a barbecue.[6]  A week later, Steve noted that one of Hamzeh's flaws is that he "lies all the time."[7]

While Steve reported that Hamzeh changed his mind about doing stupid things and was saying this all was a bunch of bullshit, the FBI brought in a second, seasoned informant—Mike. We don't yet know his motivation, ███████████ ████████████████████████ frequently the FBI employs paid informants in these types of stings.[8]  We'll know more 90 days before trial when all the *Giglio* and *Brady* material is turned over to the defense. ███████████████████

---

[5]  R. 4.

[6]  R. 105.

[7]  R. 11.

[8]  Evan Osnos, Do FBI Stings Help the Fight Against ISIS?, The New Yorker (Jun. 10, 2016), available at http://www.newyorker.com/news/news-desk/do-f-b-i-stings-help-the-fight-against-isis; see also Eric Lichtblau, FBI Steps Up Use of  Stings in ISIS Cases, The New York Times (Jun. 7, 2016), https://www.nytimes.com/2016/06/08/us/fbi-isis-terrorism stings.html?rref=collection%2Fsectioncollection%2Fus&action=click&contentCollection=us&region=rank&module=package&version=highlights&contentPlacement=2&pgtype=sectionfront&_r=1; see also Trevor Arenson, How the FBI Conceals Its Payments to Confidential Sources, The Intercept (Jan. 31, 2017), https://theintercept.com/2017/01/31/how-the-fbi-conceals-its-payments-to-confidential-sources/.

9

*Federal Defender Services of Wisconsin, Inc.*

The initial FBI reports relating to Mike show that ████████████████ ████████████████ he quickly moved to befriend Hamzeh and steer the conversation toward extremism and guns.[9] These initial conversations between Mike and Hamzeh were not recorded. But after having only known Hamzeh for only a few days, Mike proclaimed, during an October 1 FBI interview, that Hamzeh, "in the short time [he] has associated with him, [Hamzeh] has become more serious and more religious."[10] That same day Mike (not Hamzeh) began talking about guns.[11] While Hamzeh and Steve sat in Mike's car ████████ Mike showed them his gun and said they should all go to a shooting range together.[12]

In the early part of October, Hamzeh met frequently with Steve and Mike but few conversations were recorded and there was little of note. Then on October 13, four weeks after first contacting the FBI, Steve reported that Hamzeh was planning to fly to Jordan. Hamzeh was going to leave a week later and travel to Palestine to buy a weapon and shoot civilians or military personnel. Steve added that Hamzeh expected to be killed in the attack.[13] Additionally, Steve reported that

---

[9] R. 10.
[10] R. 10.
[11] R. 12; R.13.
[12] R. 12; R. 13.
[13] R. 14.

*Federal Defender Services of Wisconsin, Inc.*

during this conversation Hamzeh became very emotional and began crying. Like many of the others, this conversation was not recorded.[14]

But during another conversation later that day, Hamzeh says he will be going to Bethlehem where he will shoot as many Israeli soldiers as he can.[15] He then goes on at length about other ideas he has for causing mayhem in the Middle East.[16] None of these are shown to be anything more than pure bravado.[17] And during this conversation, Hamzeh repeats his claim that he is traveling on October 21 on Jordanian Airlines.[18] Over the next few days Steve engaged in a number of recorded conversations and meetings with Hamzeh. During these, Hamzeh first boasts of his plans to travel to Jordan, but then begins making excuses for why he can't.[19] Notably, he tells Steve that he had already bought his tickets to fly to Jordan on October 21.[20] The discovery in this case is exhaustive but it doesn't include any evidence indicating that Hamzeh ever purchased a ticket, and there is no reason to believe he did so.

---

[14] R. 14.
[15] R. 106.
[16] R. 106.
[17] R. 106.
[18] R. 106.
[19] R. 15, 16, 18, 106, 107, 108.
[20] R. 108.

*Federal Defender Services of Wisconsin, Inc.*

Two days after this conversation, Hamzeh and Steve have a recorded telephone conversation. In it, Steve repeatedly accuses Hamzeh of lying to him.[21] The two then argue about Hamzeh's inconsistent statements about whether there is a group from Chicago assisting him and what his family knows about his putative plans. Like the airline tickets, nothing in the discovery indicates that Hamzeh is part of any group from Chicago. He ultimately admits to Steve that he made up his claim about there being a Chicago group.[22]

Later that day, FBI agents instructed Steve to meet with Hamzeh and "clarify travel plans for the following week."[23] But there were no actual plans. When Steve meets with Hamzeh and presses him, Hamzeh claims his mom got sick and went to the hospital.[24] He even describes going to see her in intensive care.[25] Hamzeh says he still is going to Jordan because he reserved the flight, paid for it, and didn't want to lose his money; but he also doesn't want to hurt his mom by leaving.[26] Following this, the two repeatedly argue about whether Hamzeh is lying—whether he is with a group from Chicago and what he has told his family about his alleged plans.[27] Hamzeh also says that if he cancels his flight he will lose

---

[21]  R. 107.
[22]  R. 16.
[23]  R. 108.
[24]  R. 108.
[25]  R. 108.
[26]  R. 108.
[27]  R. 108.

*Federal Defender Services of Wisconsin, Inc.*

$1100 because the airlines will only refund $500.[28] Again, there is no evidence he ever booked a flight so this claim about losing money appears entirely fabricated — all to save face with Steve.

During these conversations, Hamzeh suggested that Steve talk to Hamzeh's brother-in-law, Osama, who was staying at Hamzeh's home. Ultimately, Hamzeh and Steve meet with Osama. Until this meeting, Steve and Osama had never met.[29] The purpose of this meeting is up for debate (at trial both sides will have their own interpretation) but it appears that it was Hamzeh's juvenile attempt to provide some credence to his lies and save face with Steve. And that's because throughout the conversation Steve continues to accuse Hamzeh of lying about traveling. Ultimately, Osama tells Steve that Hamzeh cannot go to Jordan because his mom is in the hospital and his dad is upset.[30]

Of course, Hamzeh never leaves on October 21. His sister and brother-in-law, who are visiting from Jordan, do return that day. And a week later, Steve claims that Hamzeh says he still wants to go to Jordan and join Hamas, but will let things calm down with his family.[31] Steve also reports that Hamzeh had not discussed going to any local mosques.[32] That is how things were left with the

---

[28] R. 108.
[29] R. 108 at 22.
[30] R. 108.
[31] R. 22.
[32] R. 22.

*Federal Defender Services*
*of Wisconsin, Inc.*

investigation in October—Hamzeh boasts a lot, but there is nothing to suggest that it's true; after all, his biggest boast was that he'd be traveling to Jordan, something he completely made up.

> **B.  November and December: Hamzeh discusses traveling overseas and getting a handgun, but never attempts to do either.**

In November, there are numerous meetings between Hamzeh and his informant friends. During the first part, they boast about plans to travel to the Middle East to attack Israeli soldiers. Mike reported that on at least five occasions (November 2, 4, 12, 19, and 23) Hamzeh discussed going to the Middle East.[33] In these conversations, Hamzeh claims he wants to travel to attack soldiers, but from conversation to conversation his alleged plans change significantly. On one occasion, he says he will join Hamas and strap on a suicide vest to prove his loyalty.[34] On another, he says that he will travel to Israel as a tourist to gain Israel's trust.[35] And another time he says he will stay with family in Jerusalem and then go to Palestine to conduct attacks. Despite his claims about wanting to travel, Hamzeh always had an excuse for not doing it.

---

[33]  R. 24, 25, 26, 32, 35, 36.
[34]  R. 24.
[35]  R. 35.

*Federal Defender Services*
*of Wisconsin, Inc.*

The particulars of these conversations reveal that he had no plan and that Hamzeh was just making up stories to impress or entertain his friends. For instance, on November 12, Hamzeh claimed to have $7,000 saved for the trip.[36] Yet the investigation, which turned over every detail of Hamzeh's life, did not reveal him to have any savings of consequence. And by mid-January, he was struggling to come up with $300 for the gun. There is also no evidence that Hamzeh ever made any plans or was doing anything other than making empty boasts to express his resentment about Israel or to gain attention. That's not to say the conversations aren't unsettling, but there is nothing to show an intent to take the leap from pontificating within the comfort of Milwaukee's coffee shops about Palestine and the treatment of Muslims to Hamzeh risking his life in Gaza.

Beyond that topic, the other prominent point of the discussions in November and early December centered on Hamzeh buying a gun. On November 2, he told Mike he wanted a gun for training.[37] On November 11, Hamzeh told Steve he wanted to buy a pistol because he was seeking a new job delivering on the north side and needed protection.[38] That same day he also asked Mike to get him a pistol for the same reason.[39] The next day, in a recorded

---

[36] R. 32.
[37] R. 24.
[38] R. 30.
[39] R. 31.

*Federal Defender Services of Wisconsin, Inc.*

conversation, Mike asked Hamzeh why he wants a pistol. When Hamzeh says for work, Mike says he thought it was to kill Jews, but Hamzeh again says it's for work.[40] Later in the same conversation Hamzeh reiterates he wants a legal pistol for a new job.[41] Hamzeh was working as a delivery driver. And at least one of his co-workers was robbed while driving on the job, so wanting a pistol was not unreasonable. This was not Hamzeh's only mention of getting a handgun for protection. In addition to November 11 and 12, he also mentioned getting a pistol for protection in conversations on November 19 and perhaps in other conversations—since many were not recorded we can't know for sure.[42]

As the case stretched into December, Mike began pressing Hamzeh to get a machine gun. Hamzeh, however, never expressed that he wanted a machine gun. The only reason for Mike's focus on a machine gun is because possession of a machine gun is illegal while a pistol is not. In that vein, on December 4, Mike reported that "Hamzeh wanted to accompany Mike to Gander Mountain in three days to purchase a pistol."[43] Following that meeting, when Hamzeh sought a pistol for protection, Mike claimed that Hamzeh no longer planned to travel overseas, but would conduct Jihad in the United States.[44] This alleged conversation where

---

[40] R. 114 at 3.
[41] R. 114.
[42] R. 34, 35.
[43] R. 38.
[44] R. 38; On December 4, Steve also reported that Hamzeh wanted to obtain a firearm. (R. 39).

*Federal Defender Services*
*of Wisconsin, Inc.*

Hamzeh would have spoken about Jihad in America was not recorded. So we can't test the veracity of Mike's claim or see how he formed that belief. The lack of a recording of that meeting is important because three days later—in the very next recorded conversation—there became ample reason to question whether any allusions to Jihad were Hamzeh's words or Mike's.

### C. December 7: Mike lobbies Hamzeh to get a machine gun, but Hamzeh just wants a handgun—for protection.

More than two months after the FBI had planted Mike in the same restaurant where Hamzeh worked, and more than two months after Mike had first introduced the subject of guns with Hamzeh, the two had a conversation which revealed that Mike had been persistently questioning Hamzeh about traveling to the Middle East and that he was frustrated by Hamzeh's transience or in the words of the other informant: Hamzeh's bullshit.[45]

On December 7, Mike drove Hamzeh to shop at Burlington Coat Factory and to Gander Mountain to look at guns. On the way there, the two discussed recent political events and the presidential election that was still nearly a year away. They raised the specter of bans on Muslims flying or owning firearms—a frequent topic in the news.[46] At this point, Mike brought up purchasing a machine

---

[45] Defense Translation for disk 45. The full translation is Exhibit A.
[46] *Id.* at 26-27.

*Federal Defender Services of Wisconsin, Inc.*

gun, although Hamzeh had never expressed a desire for anything more than a handgun for protection:

> **CHS2:** I still don't know why you want a handgun.
> **Samy:** I need it. It is getting serious.
> **CHS2:** What do you want? A handgun or a machine gun?
> **Samy:** Just a handgun, don't need a machine gun.[47]

The first time a machine gun is mentioned it is by Mike and Hamzeh tells him he's not interested.

As the two wander around Gander Mountain, Mike shows Hamzeh a pistol that costs $1,000 and then a Smith & Wesson revolver, but tells Hamzeh to "[c]heck out the big guns."[48] They leave the store without purchasing anything, but Mike continues to steer Hamzeh to machine guns:

> **CHS2:** Which gun you want, do you want a machine gun? [49]
> **Samy:** I want a handgun; a machine gun is too much for me.
> **CHS2:** So that I would know.
> **Samy:** Just a handgun, that's it.[50]

Knowing the conversation was being recorded, Mike pushed Hamzeh to say more, but Hamzeh's angry response reveals that he is tired of Mike pressuring him:

---

47  *Id.* at 28.
48  *Id.* at 29.
49  The implication of Mike's question, asking Hamzeh which gun he wants, is that Gander Mountain is selling machine guns. On the way to Gander Mountain, Mike told Hamzeh that he would "go crazy" when he saw the machine guns. *Id.* at 26. At various points, machine gun is used interchangeably with other military style guns, including the AK-47 that Mike tells Hamzeh he owns. *See* R. 94 at 7 (Hamzeh referring to the machine gun that Mike owns). On January 21, Mike told them he had made arrangements to buy the AK-47s for $300-$400, and Hamzeh responded that he'd prefer a semi-automatic weapon. R. 54.
50  *Id.* at 32.

*Federal Defender Services of Wisconsin, Inc.*

> **CHS2:** So what is next? No Palestine? You told me that we will go to Palestine.
>
> **Samy:** You keep asking me the same stupid questions again and again. You are stupid and a mother fucker and you keep on asking the same stupid questions over and over again. I told you be patient. You want to go, then go. I will pray for you.[51]

Hamzeh then tells Mike it's not realistic to travel to Palestine, emphasizing that "I told you to forget about Palestine."[52] After some back and forth about the Middle East, the two continue:

> **Samy:** It's going to ignite man. No plan or anything, just wait till the new president takes over. Racism will be all over. You will see. All I want is a handgun in case they attack us or attack our mosque. What if someone starts to shoot at us just because we are Muslims? I want to be able to fire back, like a real world man.
>
> **CHS2:** Man, in the past, you wanted a gun and I thought you meant it. Because you are expecting and thinking that this to happen?
>
> **Samy:** I want to buy a handgun before they introduce any legislation banning Muslims from buying weapons. And then I may get fucked up.
>
> **CHS2:** If you do not want to shoot everyone around and you just want a handgun as a precaution, that's fine, man.
>
> **Samy:** Of course, to protect yourself Mike, if someone approaches us and starts to bother us you can defend yourself. I want to be a man; not like others who are not.[53]

Despite Hamzeh's protests that Mike keeps asking him the same stupid questions over and over again, during the remainder of their conversation Mike repeatedly inquires whether Jihad would be better here. Hamzeh's responses generally are

---

51 *Id.* at 33.
52 *Id.*
53 *Id.* at 34-35.

*Federal Defender Services
of Wisconsin, Inc.*

flippant, non-responsive, disinterested, or placating—all the while, the responses are intermingled with a mundane discussion about what kind of pants Hamzeh should buy.

After Mike asks five separate times about conducting Jihad here, in America, the following takes place:

> **Samy:** Be patient, man. Why are you in a hurry?
> **CHS2:** I am not in a rush man. I am depressed. We should do something. Do you think ▋▋▋▋▋▋ and the rest of the guys are ready?
> **Samy:** You can't start Jihad because you are depressed, it doesn't work that way. Maybe the two of us can do an operation, but not here.
> **CHS2:** Not in this state?
> **Samy:** Not in America as a whole.[54]

Mike then chides Hamzeh for only wanting a handgun. Hamzeh says he doesn't have the money for anything else, but Mike claims he can buy cheap "Kalishnikovs" in Texas. Mike taunts Hamzeh by asking whether if attacked, he wants to hunt people "down with a tiny revolver." Hamzeh reiterates he "just want[s] to protect [himself]."[55]

As Mike approaches Hamzeh's home to drop him off, he makes one last effort to ensnare Hamzeh, telling him he'll be getting guns with no serial numbers. Hamzeh tells Mike that he will get "fucked up" if he buys illegal guns and tells

---

[54] *Id.* at 46.
[55] *Id.* at 49.

*Federal Defender Services of Wisconsin, Inc.*

him to "leave the matters for now until it gets really serious" (again referring to the political climate).[56] Mike persists, asking yet again whether Jihad here would be better. Hamzeh relents, saying of course it is, but he gets out of the car without saying anything more.[57]

So three days after Mike reports that Hamzeh has given up on doing Jihad overseas and will focus his efforts in the United States, Mike's claim is anything but apparent from the recording. All the talk about conducting Jihad was initiated by Mike who, as Hamzeh said, asked the same questions over and over again. Now, the FBI agents who handled this investigation never had this transcript but one can't help but wonder if this was a conversation recorded in English whether they'd have had some doubts about Mike's veracity or, at the very least, his methods.[58] And that worry isn't a random outlier, it's frequent in these types of cases and has drawn a significant amount of criticism from scholars and courts.[59] And, in fact, this sort of tactic is repeated the very next week with both Mike and Steve.

---

[56] *Id.* at 59.

[57] *Id.* at 60.

[58] *Compare* R. 40 (summarizing Mike's version) *with* Ex. A (defense translation).

[59] Human Rights Watch, *Illusion of Justice*: *Human Rights Abuses in U.S. Terrorism Prosecutions* (Columbia Law School Human Rights Institute 2014). Jesse J. Norris, *Why the F.B.I. And The Courts Are Wrong about Entrapment and Terrorism*, 84 Miss. L.J. 1257, 1259 (2015) ("I believe beyond a shadow of a doubt ... that there would have been no crime here except [that] the government instigated it, planned it, and brought it to fruition." (quoting U.S. District Court Judge Colleen McMahon, in *United States v. Cromitie*).

*Federal Defender Services of Wisconsin, Inc.*

### D. December 14: Hamzeh isn't interested in machine guns or violence.

According to the FBI's summary translation, on December 14 Mike and Hamzeh met to go to the shooting range. On the way there, the two talk about Steve's excessive use of hashish and Hamzeh says he too smokes a few times a week. Hamzeh also wonders why Mike did not bring his Kalashnikov for the range (one of many times Hamzeh reveals his ignorance about firearms) and Mike informs him the gun is too strong to use there.[60]

After shooting, Mike diverts Hamzeh's attention to firearms that are on display at the range.[61] Once again Mike begins promoting the merits of high-powered firearms, saying one can kill 15 to 20 people with a Kalashnikov and one person with a pistol. Hamzeh says five people with a handgun and 50 with a machine gun.[562]

Mike then asks Hamzeh about what kind of operation they will carry out. As on December 7, Hamzeh complains about Mike asking him the same question every day. And Hamzeh remains firm that he just wants a pistol, even as Mike tries to turn it into something more:

> **CHS2:** Yeah, what the fuck man. I got to put gas in the car [SE]. Such an operation, when we do it, we have to know.

---

[60]  R. 122.

[61]  R. 122.

[62]  R. 122.

*Federal Defender Services
of Wisconsin, Inc.*

> **Samy:** Hush
> **CHS2:** Kiss my ass, turn this shit off man.
> **Samy:** It's not your time man.
> **CHS2:** Why?
> **Samy:** Everyday, you talk about the same stuff. Get in my ass man.
> **CHS2:** We want to know man, instead of keeping me wondering. Get into my ass, no you get into my ass. Each day, you have a different mentality.[63]

This comment sets off some tension, and the two go back-and-forth.

> **Samy:** I'm the one that is with a different mentality each day? You're the one, I swear to God, that doesn't know what you want to do!
> **CHS2:** I'm the one waiting for you, you say this, then a week later or two weeks later.
> **Samy:** I tell you something, then go, go do it.
> **CHS2:** No, I'm not going to go.
> **Samy:** What with the stupidity, you tell me each day, with a different mentality, and my ass.
> **CHS2:** You tell me, we need to do the operation right, like what.
> **Samy:** Will see, when time comes.[64]

Whether it was Hamzeh's tone or just his general apathy, Mike presses harder, and chides Hamzeh for maintaining that all he wants is a pistol.

> **CHS2:** Seriously, what the fuck. You said, you will bring me weapons. I don't know the operation man, if will go back to the homeland or stay here, need weapons.
> **Samy:** It's not clear yet.
> **CHS2:** Every weapon has its use, there are millions of weapons, and you are asking me to get a pistol, for . . .
> **Samy:** A pistol for me, for home.
> **CHS2:** Ok.
> **Samy:** Just for me, for home.
> **CHS2:** Why don't you buy one?

---

[63] Exhibit B (Defense Translation) at 76-77.
[64] *Id.* at 77-78.

*Federal Defender Services of Wisconsin, Inc.*

> **Samy:** Will buy.
> **CHS2:** Yeah.
> **Samy:** How much did you get yours for? [Pistol]
> **CHS2:** 550.
> **Samy:** Yeah.
> **CHS2:** Yeah.[65]

Just as in the conversation from a week earlier, Mike is driving the gun discussion. Yet Hamzeh maintains that he wants a pistol for protection and nothing else.

After some conversation about Hamzeh's womanizing, and a mention of eagles, Mike says there are lots of eagles in Texas.[66] Hamzeh claims he saw an eagle by Colectivo the day before with a rat in its mouth.[67] And to that, Mike states:

> **CHS2:** They have strong teeth man. There are plenty of them in Texas. You feel like it's a cloud above you.
> **Samy:** Serious?
> **CHS2:** Yeah.
> **Samy:** Because Texas is a desert.[68]

The very next line after Hamzeh states, "because Texas is a desert" is Mike circling back to weapons:

> **CHS2:** Yeah, the weapons are expensive.[69]

And Hamzeh continues on about eagles and falcons.

> **Samy:** Is it eagles or falcons?[70]

---

[65] *Id.* at 80-82.
[66] *Id.* at 89.
[67] *Id.*
[68] *Id.* at 90-91.
[69] *Id.* at 91.
[70] *Id.*

*Federal Defender Services
of Wisconsin, Inc.*

Talk about various raptors continues for a while until Hamzeh suggests that they go to Texas on vacation.[71]

And without missing a beat, Mike brings the discussion back to weapons:

> **CHS2:** Just vacation, no. I have to go do things and come back.
> **Samy:** Do what?
> **CHS2:** Our weapons man.
> **Samy:** What?
> **CHS2:** Our weapons man.
> **Samy:** Is there a sea there?
> **CHS2:** Yes, but it's far. I don't go all areas of Texas, just go to one area and try to avoid anything man. That is a problem man. You think it's a breathe? You hear me?
> **Samy:** We go get some fresh air, change scenery. We go to the desert, and do some practice shooting in the desert. Hunt eagles [laughter by Samy][72]

Mike then mentions that the guns aren't clean. Hamzeh ignores the comment while singing and then exclaims: "I am bored."[73]

They then talk about Hamzeh's interest in helping a struggling restaurant owner who Hamzeh said he was going to give $20,000 to. Hamzeh claims to have $15,000 in savings and Mike confronts him about his earlier statement that he only had $6,000 to use to go to Palestine (again, there is no evidence that Hamzeh has any savings to speak of).[74] Hamzeh then says that maybe he'll go to Jerusalem in

---

[71] *Id.* at 92.
[72] *Id.* at 92-93.
[73] *Id.* at 95.
[74] *Id.* at 96-99.

*Federal Defender Services of Wisconsin, Inc.*

February "just for a visit."[75] So the last major conversation in December ends with that—Hamzeh's expressed desire is getting a pistol, but he doesn't even do that, and he doesn't seem the least bit motivated to actually do anything violent.

### E. Early January: The investigation is looking like a waste of time and money.

On January 4, Mike told agents that he didn't believe that Hamzeh had acquired a weapon and he had made no further mention of a plan to attack overseas or in the United States.[76] Hamzeh's expressed interest in getting a gun still focused on protecting himself as a delivery driver. Mike reported that Hamzeh had recently requested that Mike obtain a weapon for him and a co-worker because the co-worker had been carjacked.[77] Mike told the FBI that Hamzeh also said he wanted a weapon because "the war will be soon . . . you'll see."[78] Hamzeh also told Mike that he had been chastised by a friend for partying on New Year's Eve at Casablanca and smoking marijuana.[79] Again, that conversation wasn't recorded. Meanwhile four days later, Steve reported that Hamzeh still speaks about going to Jordan, but not about Jihad. He says he wants to go on vacation in Jordan and relax because he is stressed out and his life isn't going anywhere.[80]

---

[75] *Id.* at 101.
[76] R. 43.
[77] R. 43.
[78] R. 43.
[79] R. 43.
[80] R. 44.

*Federal Defender Services of Wisconsin, Inc.*

Steve also says he has been with Hamzeh every day for two weeks, but there are no recorded conversations of their meetings.[81] If anything, at this point Hamzeh seems focused on smoking weed and relaxing, not Jihad.

Then on January 11 (still with nothing recorded), Mike reported that Hamzeh asked him to go the Shooter's Shop to look at guns. Mike told the FBI that he believed this was because he had been talking to Hamzeh about the AK-47 he owned.[82] (Another example of Mike pushing semi or fully automatic weapons). Mike also told the agents that he had had no recent conversations about traveling for Jihad.[83]

Thus, here are how things stood as of January 11, 2016: Hamzeh had engaged in frequent conversations with Mike and Steve about their dislike for Israel in which he boasted about traveling overseas to attack Israeli soldiers and citizens, but there was no evidence that this was anything more than talk. Hamzeh had lied about purchasing a ticket to Jordan and at various times had made other excuses for why he was not currently planning to travel to the Middle East. There is no evidence of him making any specific travel arrangements or even preparing to make travel arrangements. To the contrary, Hamzeh expressed irritation over

---

[81]  R. 44.
[82]  R. 45.
[83]  R. 45.

*Federal Defender Services*
*of Wisconsin, Inc.*

Mike's repeated questions about travel. The conversations reveal resentment towards Israel that certainly was not uncommon among young Palestinians, nor surprising given the never-ending conflict between Israel and the Palestinians. And by early January both informants had indicated that Hamzeh had abandoned any overseas plans. The investigation also had shown that Hamzeh worked regularly, was close to his family, and was prone to exaggeration. The investigation also revealed no evidence that Hamzeh was affiliated with or in touch with any radical groups.

Further, Hamzeh did not own a gun, but he had expressed a desire on several occasions to obtain a pistol because he was a delivery driver and feared for his safety. He also worried about the possibility of attacks against Muslims in America given the Islamophobia that exists in some quarters. Mike showed Hamzeh his gun within days of first meeting him; he also talked to Hamzeh about the AK-47 he owned. On two occasions after that, Hamzeh and Mike went to a range for target shooting, which was perfectly legal. Although Hamzeh had expressed a desire to buy a gun, and could lawfully do so, he had not actually made an effort to buy a gun other than to reportedly profess his interest to his gun-loving friend Mike. And while Mike had repeatedly asked Hamzeh about an AK-47 or machine gun, Hamzeh had repeatedly expressed interest only in buying a

28

handgun. Reduced to two paragraphs, that is precisely what the closing memo of this investigation would have read on January 11, 2016.

**F.    January 19-25:  During unrecorded conversations an alleged plot against the Masons is hatched, but Hamzeh ultimately wants no part of it.**

After the conversation on December 14, where Hamzeh shows no interest in Mike's talk beyond the eagles, there are no recordings with Mike until January 19.[84] That is, for 35 days there is nothing to document what Hamzeh's talking about or, for that matter, what Mike's talking about. Then the recordings suddenly begin again on January 19. Seemingly out of the blue, the three men are now discussing an attack on the Masonic Center.[85] This was a sudden development and must have been surprising for the agents, since early January was only marked by Steve reporting that Hamzeh had not been discussing any sort of attack.[86] And the Masons (of all groups) had never been mentioned in any recording or report.

But on January 19, Mike met with the FBI and claimed that on January 17 and 18 Hamzeh was talking about an attack on the Masonic Center in Milwaukee.[87]  These conversations with Hamzeh weren't recorded. Mike reported that Steve, Hamzeh, and a fourth person watched videos about the Masons on

---

[84]  During this same period, a number of telephone calls between Hamzeh and Steve are recorded, but nothing of any substance is said. R. 123.
[85]  R. 94.
[86]  R. 44–45.
[87]  R. 46.

*Federal Defender Services of Wisconsin, Inc.*

YouTube on Mike's and the other person's phone and were planning to attack the Masonic Center.[88] Mike also reported that Hamzeh said he had saved up $7,000 to travel to Texas with Mike to purchase "AK-47s, silencers, and bullet proof vests."[89]

The discovery reveals little about what happened during the lengthy period from December 14 to January 19 in which Mike stopped recording conversations, but there are indications that he was spreading misinformation about the Masons and that this continued until Hamzeh's arrest. As noted above, Mike reported to the FBI on January 19 that the three men had watched videos on the previous days about the Masons on YouTube.[90] And during a conversation on January 21 with Mike and Steve, Hamzeh alluded to a YouTube video that showed the Masons eating hearts and said that the Masons created ISIS to destroy Islam and kill Muslims.[91] That same night there also are discussions about a video linking the Masons with ISIS fighters.[92] Hamzeh stated his belief that the Masons created ISIS to kill Muslims around the world.[93] And when interviewed by the FBI after his arrest, Hamzeh described watching videos depicting Masons as "people who talked to the devil," who "kidnaped, grabbed some people" and "cut them to

---

[88] R. 46.
[89] R. 46.
[90] R. 46.
[91] R. 97 at 12.
[92] *Id.*
[93] R. 54.

*Federal Defender Services of Wisconsin, Inc.*

pieces," and "eat their heart."[94] Hamzeh's exposure to this idea all started with Mike.

The recordings from January 19 also back this up. Hamzeh told Steve and another man that Mike had come to him about two weeks earlier and started talking about the Masonic temple and how the Masons spread negative propaganda about Islam and the Prophet Muhammad.[95] As the conversation continued into the early morning hours of January 20, Hamzeh again described how Mike had approached him a week or two earlier and begun denigrating the Masons.[96] Hamzeh reported that Mike, after baring his soul about his life being in ruins, had told Hamzeh that the Freemasons were ISIS, "our enemies," anti-Islam, and always tarnishing the Prophet's image.[97] That same night, following a dispute with Mike, Hamzeh complained to Steve that Mike was not to be trusted, and saying that "the guy brainwashes you."[98] Hamzeh also told Steve that Mike was the one who came up with the idea of attacking the Masonic Center.[99]

As laid out in the complaint, on January 19, 2016, the three men toured the Masonic Center and discussed plans to attack it. The complaint identifies a number

---

[94] CD #99 1 of 2, MVI_0023, Recorded interrogation of S. Hamzeh.
[95] R. 94 at 11.
[96] R. 95 at 8.
[97] *Id.*
[98] R. 95 at 5.
[99]  R. 95 at 8.

*Federal Defender Services
of Wisconsin, Inc.*

of statements attributed to Hamzeh on January 19–20 about obtaining machine guns and silencers; about entering the Masonic Center and shooting everyone there; about the attack becoming known all over the world; that the attack would be to defend Islam; and about how if he gets out after killing 30 people, he will be happy because everyone will know that nobody can play with Muslims.[100] The complaint also quotes Hamzeh as saying that the Masons are "playing with the world like a game, and that these are the ones who are against us, these are the ones who making living for us like hell."[101] So something happened in early- to mid-January that caused Hamzeh, who had never before discussed the Masons with the informants, to believe they were affiliated with ISIS and were a danger to Muslims. The contemporaneous evidence indicates that what happened is that Mike did, in fact, "brainwash" Hamzeh about the Masons. Indeed, Mike was the one who supplied the idea, fostered it, and provoked these conversations.

While the criminal complaint is shocking in the details it alleges, what is not set forth in the complaint and what was never discussed at Hamzeh's arraignment is that before his arrest, after all the pressure that was exerted, Hamzeh (at a point of moral crisis) sought guidance from a spiritual leader. And he adamantly refused to participate in any attack against the Masons, telling his informant friends that it

---

[100] Complaint ¶ 3K.
[101] *Id*. at ?? 3j.

*Federal Defender Services
of Wisconsin, Inc.*

was "Haram"—against Islam. And when Steve and Mike protested his decision and pressured him to continue with their plan, Hamzeh resisted their overtures. Although he was adamant about refusing to participate in any attack, unfortunately Hamzeh joined them in obtaining the guns that Mike had arranged for them to buy. The January 24 conversations have been transcribed by the defense translator and are attached as Exhibit C. Because they are important, they are discussed at length below.

### G. Hamzeh backs out and says he won't do anything violent; it would be Haram.

On Sunday the 24th of January, Hamzeh went to Steve's hotel room to forcefully announce he wasn't going through with the plan and that he didn't want them claiming he was backing out because he was scared:[102]

> **Samy:** I'm going to speak a few words, if you want to listen to me, listen to me. If you don't, that's your decision and wait until I'm done before you start talking. The word hesitant, the word being afraid or scared, I don't want to hear it.[103]

Hamzeh then proceeded to tell Steve and Mike that he went to the temple and talked to the Imam.[104] The Imam told him that all Muslims would be hurt by the plan and that it was forbidden. The Imam advised him not to be hostile unless they are hostile to you and if they wanted to fight it should be against ISIS in Syria.

---

[102]   R. 61;R. 102; Ex. C (Defense Translation).
[103]   Ex. C at 4.
[104]   *Id.*

*Federal Defender Services
of Wisconsin, Inc.*

Steve responded by claiming ISIS was Masonic and asked why not fight them here.

Hamzeh pushed back:

> **Samy:** Because I told [you] what will happen here. I told you this operation will be considered Haram [religiously forbidden]. He the Sheikh told me this plan will be forbidden because people will not trust and they will kill and slaughter Muslims and all this will be because of what you did and will be your fault.[105]

When Steve continued to debate Hamzeh about his decision, Hamzeh responded:

> **Samy:** This country let you in, and have taken a pledge from you that nothing happens here unless they become hostile to you, and no one has become hostile or enemy [to] you, in this country.[106]

Steve said he was planning on martyrdom, and Hamzeh told him it was Haram, forbidden.

Hamzeh then offered to have Steve talk to the Imam, but Steve complained that he hadn't wanted Hamzeh to talk to anyone—a clear effort at isolating him and an important point to consider later. Then, as Hamzeh had predicted, Steve needled Hamzeh for being "hesitant."[107] Hamzeh then explained what the Imam had told him, and urged Steve "to listen to someone who understands religion." Hamzeh said they should still get the weapons as a precaution for what might happen under a new president, but reiterated that it was Haram to conduct any attack.[108]

---

[105]  *Id.* at 7.
[106]  *Id.* at 8.
[107]  *Id.* at 10-11.
[108]  *Id.* at 12.

*Federal Defender Services of Wisconsin, Inc.*

Steve continued to try to persuade Hamzeh that the attack was a good idea, but Hamzeh resisted. Steve added that maybe the Imam "told you this because he is fearful" they would die.[109] Hamzeh then explained (at length) the Imam's reasoning and why they could not carry out an attack. In response, Steve insisted he was still ready if Hamzeh wanted to go through with the plan, but Hamzeh maintained that such an attack would be wrong.[110]

The three men then talked about the dangers that awaited Muslims. Hamzeh told them that the Imam had said there could be threats from the new president, including that "Muslims will be banned from everything, weapons banned, all IDs will be Muslim, each one carrying an ID, his identification will indicate he's a Muslim in a big stamp, that's what he told me. He said Muslims will be marked throughout America, and there is a possibility that they might put them all in one state."[111] Hamzeh continued: the Imam told him that next year, "there is a possibility that they might attack us, and at that time, we will be ready." But he also emphasized that if "you attack them that is wrong."[112]

Steve then said that they would get the weapons the next day and Mike said he too was ready to get them. Hamzeh agreed with getting the weapons, reasoning

---

[109] *Id.* at 15.
[110] Id. at 17.
[111] *Id.* at 18-19.
[112] *Id.* at 19.

*Federal Defender Services of Wisconsin, Inc.*

that Mike's friend, who was providing the guns, might be reluctant to trust them in the future if they backed out.[113] Hamzeh elaborated on the Imam's reasoning, emphasizing that "what he said is very logical 100%."[114] Steve again said he was ready if Hamzeh was willing and again Hamzeh said no, referring him to the Imam's logic.

After this, Steve brought up getting the weapons again and Hamzeh said that he had no objection to getting them. Hamzeh also said that they can go practice shooting "but to attack, to get this out of your thinking. Take it off your head." A while later, Hamzeh again encouraged them to go see the Imam personally to hear for themselves. Hamzeh also told them that if they want to do Jihad, it must be against ISIS.[115] That's right, Hamzeh says that if they are going to do any sort of violence it has to be *against* ISIS. Yet again Steve indicated that he was "ready for the plan," but he was again rebuffed by Hamzeh.[116]

After more discussion, Steve again brought up going to get the weapons and that the seller wouldn't get them weapons in the future if they didn't follow through. They then talked about going target shooting and Hamzeh said that they didn't need a silencer for the machine gun.[117]

---

113 *Id.* at 21.
114 Id. at 31.
115 *Id.* at 38.
116 *Id.* at 51.
117 *Id.* at 56.

*Federal Defender Services of Wisconsin, Inc.*

The men then decided to drive to the south side to play pool.[118] They agreed to pick up the guns in the morning and to go see the Imam in the afternoon. On the drive, Mike said that he became "sad" when Hamzeh cancelled the operation and three times he said that he wanted to go.[119] Hamzeh responded by telling Mike to see the Imam and ask him his questions.

After playing pool, Hamzeh asked Mike if there is a place they can practice, and Mike said they can go up north, outdoors in the forest, to practice shooting.[120] After they left the pool hall Steve took another run at getting Hamzeh to agree to an attack despite Hamzeh's repeated statements that he is not interested:

> **CHS1:** Each of you should provide his own opinion, I think we should do Jihad, I should go carry out the operation on Friday. I am seeking Martyrdom; I am seeking Martyrdom.
> **SAMY:** We must figure out what is right, or what is it that we can do right.
> **CHS1:** We have been planning this for a year, and after all the discussions we did, each one of us has to be ready and not hesitate.
> **SAMY:** Not the issue of hesitation, you don't know if this is Haram or Halal. What are we going to do, you don't know? Someone must guide us, give you the proper wise word.[121]

---

[118] *Id.* at 63-64.
[119] *Id* at 70.
[120] *Id.* at 80-81.
[121] *Id.* at 87-88.

*Federal Defender Services of Wisconsin, Inc.*

Hamzeh then told them he believes in the Imam, but Steve again says he is ready.[122] Hamzeh responded that they can consult his uncle as well, who also is an Imam.

As Hamzeh resisted their overtures to continue with the plan, his voice began rising. As the following exchange took place, he was clearly frustrated and angry:

> **CHS2**: Too many conflicting information, coming from so many Sheikhs. Don't know whom to believe.
> **SAMY**: I take the trusted words, my uncle. Don't be nervous.
> **CHS2**: I got nervous for nothing.
> **SAMY:** There is nothing else. What do you want me to do, God Damn your religion [Samy screaming] go talk to the Sheikh.
> **CHS2**: I ask for forgiveness from the mighty Allah [referring to Samy's curse] [Samy loses his temperament]
> **SAMY:** Why are you talking like this (UI) I can't have you do this, then we all go to hell. [Referring to operation].
> **CHS2**: I ask for forgiveness from the mighty Allah. You curse the religion like this Samy?[123]

After taunting Hamzeh about his cursing, Mike questioned Hamzeh about why he'd accept the word of an Imam who only recently converted.[124] Hamzeh responded that he told him what he needed to know. Hamzeh then called his uncle, an Imam in Jordan, and asked for his opinion. His uncle also confirmed that the operation was verboten.  Still Mike pressed on, asking Hamzeh if he was,

---

122  *Id.* at 87-89.
123  *Id.* at 91-92.
124  *Id.* at 94.

*Federal Defender Services of Wisconsin, Inc.*

indeed, confident in the advice he had received. Hamzeh says, "of course," and that "it's over."[125] When Steve indicated he still wanted to proceed, Hamzeh questioned how he could say this after two Imams told him not to. As Hamzeh got out of the car to go home, he said, "get me out of this, and do as you please." Hamzeh won't do anything that is Haram and he certainly won't be part of the informants' plans.[126]

### H. January 25: The plan is called off, but Hamzeh agrees with the informants to still purchase a gun for $270.

Although Hamzeh called off the plan, he still went with his friends to get the guns Mike had arranged to buy. Hamzeh, however, still was short on money. He had $200 but needed to borrow the rest from Steve so he'd have $300.[127] This exposed his earlier posturing that he had $7,000 or more to travel to the Middle East as mere bluster and Mike's claim that Samy had money to get weapons in Texas as questionable. On January 25, the three of them met at Steve's hotel room to hang out while waiting for the call from Mike's gun contact. As they prepared to leave, Hamzeh asked if he would be able to register the weapon he was going

---

[125] *Id.* at 102.
[126] *Id.* at 104.
[127] R. 62.

*Federal Defender Services of Wisconsin, Inc.*

to buy.[128] Mike told him that they were illegal and he couldn't register them. Although apprehensive, Hamzeh agreed to still get the guns.[129]

When he met with Mike's source (the undercover FBI agents) and saw the guns, Hamzeh asked if they had any smaller guns. The agents said that they didn't; they had only brought the two guns, both automatic with extended clips. One gun had a silencer. Hamzeh inspected the weapons, asked if the silencer could be removed, and the agents told him they wanted $1000 for both weapons. That was more than Hamzeh or Steve had, so the agents brought the price down to $570 for both; $300 for Steve's weapon and $270 for Hamzeh's. That is, Hamzeh still couldn't raise the $300 that was originally agreed upon even though it was hundreds less than a handgun and thousands and thousands less than a machine gun would cost.

After the money exchanged hands, Hamzeh tried to go to the car and get a bag for the weapons. But the agents told him to just put both guns into the green bag that they'd brought. Hamzeh did. And Steve then had Hamzeh carry the bag to the car. Once the guns were placed in the trunk, Hamzeh was arrested. He was charged with three counts of failing to register a weapon: one count for the gun he bought, one count for the gun Steve bought and he carried to the car, and a third

---

[128] R. 63.
[129] R. 104 at 3.

*Federal Defender Services*
*of Wisconsin, Inc.*

count for the silencer that was with the rifle. All of the weapons were provided by the government, at the government's suggestion, and for a price that was fraction of the going rate.

## II. Weighing the relevant considerations under the Bail Reform Act, Hamzeh is entitled to bond pending trial.

This Court is very familiar with setting bond and the relevant factors that often distinguish a case that allows for release from one where detention is the only appropriate means of assuring the defendant's appearance and protecting the community. 18 U.S.C. § 3142(f); *see also United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (noting "the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community, and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight."(quotation omitted)). Clear and convincing evidence means proof that the particular defendant actually poses a danger, not that a defendant in theory poses a danger. *United States v. Patriarca*, 948 F.2d 789, 792 (1st Cir. 1991) ("Essentially, the judge found that although *in theory* a Mafia Boss was an intimidating and highly dangerous character, the government had not demonstrated that *this* Boss posed a significant danger, or at least not a danger that could not be overcome given appropriate conditions."). Here, the defense has laid out the case's history because it's relevant: he backed out of the informants'

*Federal Defender Services of Wisconsin, Inc.*

nascent plan and worked to convince them that they should also abandon it—if they acted with violence their souls were in danger.

But that's not all. The investigation in this case was, again, massive. It uncovered every detail about Samy Hamzeh's life, including interviewing the doctor who delivered him twenty-five years ago—the doctor did not remember Hamzeh. And while the investigation uncovered Hamzeh's bank accounts and employment history and birth records, it is worth considering what the investigation did not uncover. First, there is no evidence that Hamzeh was ever a member of any terrorist organization, engaged in activities supportive of any such organization, or even had conversations with any such organization. What's more, on several occasions he expressed his antipathy for ISIS as the enemy of Islam.

Second, there is no evidence that Hamzeh ever previously owned a gun, attempted to purchase a gun, or even had shot a gun before Mike's arrival.[130] Hamzeh expressed legitimate reasons for wanting a *handgun*, but he lacked the initiative (and likely means) to even do that. As Hamzeh talked about legally purchasing a handgun, Mike pushed for him to get something more powerful, but Hamzeh repeatedly insisted he only needed a handgun. This point will be critical at trial: Hamzeh, who questioned whether he could even come up with a few

---

[130] At one point Hamzeh claimed to have shot bottles as a child, but there is nothing to support the truth of that claim.

*Federal Defender Services*
*of Wisconsin, Inc.*

hundred dollars for a pistol, was led to believe Mike could obtain much better guns for less money. In fact, the inducement was extraordinary as Mike claimed he could get guns for a few hundred dollars that would cost $10,000 or more. And Hamzeh had neither the connections nor the money to ever actually purchase a machine gun. He also had no preexisting interest in that type of weapon—the transcripts make clear that it's Mike who's pushing a machine gun. All of that speaks to whether Hamzeh is a dangerous person who this Court can't trust or whether conditions of release can be fashioned.

As important as those and other points discussed below are in the calculus of release or detention, the Court cannot ignore these principal points that go beyond this conduct and speak to the general sense of the person who has sat in county jail for 16 months and whether he should have to sit for a total of 25 months before a jury is sworn: Hamzeh has no criminal record; he has strong family ties; he has always had a job; and he has a job waiting for him upon his release. That is, even with *all* of the publicity that has surrounded this case, an employer still thinks highly enough of Hamzeh, his character, and his work ethic, that they are willing to hire him. That speaks volumes. And when those points are coupled with the fact that by the time a jury is seated, he will been incarcerated in a county jail for

43

the length of a guideline sentence and that he can be monitored with GPS tracking, the Bail Reform Act would seemingly demand release.

Yet those common-sense points are not the only consideration that this Court has to deal with. This is a very high-profile case, with additional scrutiny, so the defense will march through the other points that this Court must weigh in deciding whether to release Hamzeh. To that end, the Court must consider "the nature and circumstances of the offense charged," the "weight of the evidence," and "the history and characteristics of the person." *See* 18 U.S.C. § 3142(g)(1)–(3). Much of the detailed history of the investigation speaks to the nature and circumstances of the offense charged, and part B of this section offers additional insight into Hamzeh's troubling speech. In addition, Part C contains excerpts of the psychiatrist's memo on Hamzeh's evaluation. While the weight of the evidence is often considered the least important factor; s*ee United States v. Motamedi,* 767 F.2d 1403, 1408 (9th Cir. 1985); it is still relevant, and it speaks to why Hamzeh should not have to sit in county jail the case gets to trial.

*Federal Defender Services of Wisconsin, Inc.*

### A. The weight of the evidence cannot be divorced from how strongly it supports an entrapment defense.

As noted, Hamzeh was not financially in a position to pursue any of the plans he boasted about, nor did he have any source for such funds. And every time his compatriots pushed for more concrete details about his plans, Hamzeh found an excuse for not moving forward. Indeed, if not for Steve's and Mike's exploitation of their friendship with Hamzeh and their clever manipulation of him, there is no evidence indicating that Hamzeh would ever have attempted to procure a semi-automatic rifle, let alone a machine gun or a silencer. That was done entirely at the behest of Mike, because if Hamzeh simply possessed a handgun that would not have been illegal.

And, of course, all of that is relevant to the issue of whether Hamzeh was entrapped. In prior filings, the defense has indicated that it will present that issue to a jury. The relevant inquiry in an entrapment case is whether the government can prove *beyond a reasonable doubt* that law enforcement officers and their agents did not persuade or otherwise induce the defendant to commit the offense; or that the defendant was predisposed to commit the offense before he had contact with law enforcement officers or their agents. *United States v. Hollingsworth,* 27 F.3d 1196, 1203 (7th Cir. 1994); *United States v. Ellis*, 23 F.3d 1268, 1271 (7th Cir. 1994);

*Federal Defender Services of Wisconsin, Inc.*

*United States v. King*, 75 F.3d 1217, 1223–24 (7th Cir. 1996). To that end, the jury is to consider eight factors:

1. The defendant's background, including his prior criminal history;

2. Whether the informants first suggested the criminal activity;

3. Whether the defendant engaged in the criminal activity for profit;

4. Whether the defendant was reluctant to engage in criminal activity;

5. Whether law enforcement officers or their agents merely invited or solicited the defendant to commit the offense;

6. The nature and extent of any pressure or persuasion used by law enforcement officers or their agents;

7. Whether law enforcement officers or their agents offered the defendant an ordinary opportunity to commit a crime or instead offered the defendant exceptional profits or persuasion; and

8. The defendant's ability to commit the crime without the assistance of law enforcement officers or their agents.

Seventh Circuit Pattern Jury Instruction 6.05 (entrapment factors); *see also United States v. Mayfield*, 771 F.3d 417, 434–35 (7th Cir. 2014) (en banc) (discussing same).

None is dispositive, and under this Circuit's precedent the list isn't even exclusive because jurors can look at "other conduct" by the government:

> The "other conduct" may be repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts.

46

*Mayfield,* 771 F.3d at 441. In this case, all of the government's other conduct will factor into whether Hamzeh was induced into engaging into criminal activity—namely possessing the weapons charged in the Indictment.

Even a cursory matching of the factors listed above with the recitation of the facts contained in the discovery provides a strong showing of entrapment. After all, Hamzeh has no criminal history; the machine guns were brought up (and doggedly pursued) by Mike; Hamzeh didn't seek the guns for profit but for protection; he was reluctant to engage in illegal activity—by both backing out of the informants' plan and over and over again asking for a pistol; planting two confidential informants into a man's life, ███████████████████, and meeting with him daily, is conduct that can hardly be described as "merely inviting" Hamzeh along; from the transcripts, the pressure applied to Hamzeh is patent; and there is no way that Hamzeh, who had only expressed an interest in getting a pistol, tries to buy a machine gun absent the opportunity provided by the government. Thus, this is not a case where the evidence is overwhelming and the possibility of prevailing at a jury trial is small, bordering impossible. This motion isn't an effort to try the case on the pleadings, but to show why Hamzeh should not have to sit in jail any longer pending trial. He has already sat in jail for 16

*Federal Defender Services of Wisconsin, Inc.*

months; he should not have to sit an additional eight months until his trial—especially when the guidelines on this offense are 24–30 months.

**B.    Hamzeh's character and the nature and character of this offense support releasing him on bond.**

With the dynamics of the investigation and potential trial laid out, the issue becomes a matter of whether there is a combination of release conditions that will ensure Hamzeh's appearance and the safety of the community. *See* 18 U.S.C. § 3142(e)(1). This is not a presumption case, so the government bears the burden of establishing by clear and convincing evidence that no combination of conditions will protect the community or by a preponderance of the evidence that no combination of conditions will assure his appearance. 18 U.S.C. § 3142(f); *see English*, 629 F.3d at 319.

When it comes to Hamzeh's character, it's not easy to separate his words from who Hamzeh is. On paper, he's a 25 year-old man who has never been in trouble before. He's got a solid work history.[131] And he gave most of his check to his parents, using it to support them. A fact that speaks well to his character, as does his lack of criminal conduct. While smoking marijuana is criminal behavior,

---

[131] If released on bond, the defense has a job lined up for him. Understandably, the employer does not want this disclosed publicly.

48

*Federal Defender Services of Wisconsin, Inc.*

it is not a reason to think that Hamzeh is predisposed to criminal conduct in a way that pretrial supervision couldn't curtail.

The big question is whether the government can establish Hamzeh is going to do something on release that puts people in danger. To that end, the government has the likely rejoinder of Hamzeh's words—only a sick individual would speak that way. And there's a visceral appeal to that argument. But of course, many people (sadly) engage in hateful or violent rhetoric without ever acting on their empty claims.[132] And his speech cannot be divorced from the context of which it was uttered: surrounded by two FBI informants who are trying to get him to commit a crime and over time inflame his feelings about (of all groups) the Masons. While the defense doesn't deny the concern that Hamzeh's words raise, they are not a true indication of his risk to the community.

Rather, they are best understood as a product of the investigation and the informants. To be clear, Hamzeh has a low threshold for making bombastic

---

[132] *See, e.g.,* Jourdin Hermann, No One Cried For Help: The Integration of Groupthink into Modern Rape Culture, Research Journal of Justice Studies and Forensic Science, Vol. 2: Iss. 1, Article 3 (2014), available at http://scholarworks.sjsu.edu/cgi/viewcontent.cgi?article=1012&context=themis (assessing the impact of groupthink dynamics on general public perception of sexual assault); Gabe Ulla, Life After Castro at Miami's Most Famous Cuban Restaurant, The New Yorker (Dec. 10, 2016), http://www.newyorker.com/culture/culture-desk/life-after-castro-at-miamis-most-famous-cuban-restaurant (highlighting a Miami café notable for anti-Castro sentiment, up to the point of hypothetical planning of his assassination hundreds of times). Political speech in the U.S. has taken on more violent overtones as political polarization has intensified in recent years. Jonathan Allen, Violent Rhetoric on the Trail, Politico (Oct. 22, 2010, 9:44 AM), http://www.politico.com/story/2010/10/violent-rhetoric-on-the-trail-044011.

*Federal Defender Services of Wisconsin, Inc.*

statements about Israel. He lived in Jordan for most of his life and his family is of Palestian dissent, so it's not uncommon to imagine there being engrained resentment and talk of violence that comes to nothing. It's safe to say that Hamzeh poses no threat to Israel while on location monitoring in Milwaukee.

Here, Hamzeh is around two "friends" who both share the sense of security to make statements about hating Israel and what they would do the Israeli soldiers. Within that circle words are uttered and threats are made that would never be acted upon. And after four months of building that trust and rapport, the target of their impotent vitriol shifts to the Masons—who, Hamzeh is told (by the informants), are affiliated with ISIS and the enemy of Islam. And that shift doesn't have the normal strictures that polite society would place on a person's speech— upon hearing such words most people would walk away, express their disgust, and end the friendship. That sort of governor didn't exist within this dynamic. Instead, it is a closed environment where the two other speakers have an incentive to encourage the speech.

Circling back to how this weighs in the calculus of release or detention, the government's likely rejoinder of "listen to Hamzeh's words," is not as strong as it first seems. And it should not control whether Hamzeh is released. Rather, his words, were *all* said within an environment controlled by the informants and

*Federal Defender Services*
*of Wisconsin, Inc.*

geared to the specific purpose of entrapping Hamzeh. And those are only the words that were recorded — we have no idea how coercive the informants were in the scores of unrecorded conversations, including the critical ones where Mike connected the Masons to ISIS. So while Hamzeh's words provide little in the way of a basis to find that *no* combination of conditions can ensure the public's safety, the defense submits that the best measure of whether he'll act violently is reflected in his refusal to move forward with the plan.

### i. Hamzeh's actions speak to his ability to comply with the conditions on bond.

The only thing that would or should keep Hamzeh locked up is his danger to the community. But Hamzeh is not a danger, and the evidence in support of that statement comes from two sources: his actions and the opinion of professionals. What are Hamzeh's actions? Well, after being worked on for months by two FBI informants, he says he won't engage in any violence. He's been pressured for months by two "friends" and he won't give in. Instead, he does what we want from a person. In the midst of a real crisis and confusion, he seeks counsel (spiritual counsel) outside the echo chamber Mike and Steve created. That's not a small thing. Certainly, Hamzeh's decision not to engage in any violence is much more important than any words he uttered.

*Federal Defender Services of Wisconsin, Inc.*

But recognizing that Hamzeh's words raise safety concerns, the defense reached out to clinical psychiatrists to try to understand that impact of having two confidential informants working on Hamzeh at the same time and to the same end would have. Most cases have one CI and they can be persuasive enough as it is, but with two who are constantly around a person and affirming each other's views they create an environment that can be difficult bordering impossible to see clearly in. And that's not just common sense. The clinical psychiatrists pointed us to the literature that has documented this phenomenon.[133]

So Hamzeh's actions in refusing to follow through with any violence and actively trying to persuade his "friends" against such a plan speaks to his character and whether if released there is a risk to the community. It goes almost without saying that the sort of environment that Mike and Steve created between September and January, will not be repeated on bond. The proposed conditions of electronic monitoring and leaving only for work, religious services, and medical

---

[133] *See*, *e.g.*, Jacob Hallgarth, A FRAMEWORK FOR VIOLENCE: CLARIFYING THE ROLE OF MOTIVATION IN LONE-ACTOR TERRORISM, Calhoun Institutional Archive of the Naval Postgraduate School, 50-51 (2017) ("confidential informants may be able to influence lone actors who are otherwise unable to form social connections, and who may not have been receptive to other intervention efforts"); John Mueller, Terrorism Since 9/11: The American Cases, 25 (2017), available at http://politicalscience.osu.edu/faculty/jmueller/SINCE.pdf ("confidential informants "seem to have acted as [a] 'psychological accelerant' for would-be terrorists."); Ramón Spaaij and Mark S. Hamm. "Key Issues and Research Agendas in Lone Wolf Terrorism." Studies in Conflict & Terrorism 38, 12 (March 2015), available at http://static1.squarespace.com/static/56bab5eb20c64753944c8bb2/t/572fe2fa60b5e9083251a8c1/146 2756094154/Spaaij-and-Hamm-Key-issues.pdf. (Separating law-enforcement controlled terrorism cases from other cases because informants can influence and motivate suspect to further his plan).

*Federal Defender Services of Wisconsin, Inc.*

and legal appointments will not allow anyone so nefarious to have such access to him. *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) (noting "courts cannot demand more than an "objectively reasonable assurance of community safety").

> ### ii. The psych evaluation provides a clear insight into Hamzeh's thinking and the risk or lack thereof that he poses on bond.

Another consideration that should give the Court assurance that Hamzeh will not be a risk on bond stems from the attached evaluation. Dr. Ken Robbins, who was given access to the protective order in this case and much of the discovery including the transcripts. He also met at length with Hamzeh and in anticipation of a final report, he has submitted a memo highlighting his findings about Hamzeh.

1. Mr. Hamzeh does not have a psychiatric disorder or substance use disorder.

2. Mr. Hamzeh is not a psychopath. Throughout our interview, he demonstrated his struggles with guilt about the impact his actions would have on his family. He spoke of how difficult it has been to have to live with the knowledge he has humiliated his family, when he had always tried so hard to make them proud. He made clear by the way he talked about what has transpired, that he has a strong sense of empathy for other people, a strong conscience, and no history of violence. He appeared to be genuinely puzzled as to how anyone could believe he would actually take a weapon and hurt other people. He described this as "all talk," the kind of talk that took place every day when he would get together with peers in Jordan. He feels betrayed by friends who tried to persuade him to perform acts of violence and without his knowledge, recorded the conversations.

53

*Federal Defender Services of Wisconsin, Inc.*

3. Mr. Hamzeh is an immature, naïve young man who has struggled all his life to keep up with friends. He has never been a leader, rather he has always been on the periphery of his more popular peers. He felt he had connected with Jordanian friends in the United States and said he tried his best to appear to be one of them when they approached him with violent ideas. He said he spoke to his family and Imam when they asked him to be violent, not because he ever struggled with a decision about whether to commit violent acts. Rather, he felt he was in a corner. He wanted to keep his friendships, but knew these friends wanted him to commit violent acts. He said he spoke to his family and his Imam so he would have an excuse for his friends. He felt he would be able to tell them that just like them he wanted to commit violent acts against Israelis and Masons, but his Imam and family forbade him. He said he hoped they would accept that excuse and would stay friends.

4. Mr. Hamzeh does not fit the profile of people who would kill strangers. He has a strong moral code with a very prominent conscience and empathy; he has always wanted to make his family proud and he is well aware acts of violence do not accomplish that; and he has not been violent in the past…It is talk that is loyal to the community, but cannot be taken literally.

Exhibit D.

Thus, when Hamzeh's words and the context in which they were uttered are balanced against his actions and the opinion of trained professionals, Hamzeh is an appropriate candidate for bond. We don't diminish that his words are distasteful and shocking, but as the Seventh Circuit has noted, the speech and character defects that they reflect in Hamzeh aren't grounds for criminal liability: "The defense of entrapment reflects the view that the proper use of the criminal

*Federal Defender Services of Wisconsin, Inc.*

law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character." *United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir. 1994).

That is, the government cannot show that by placing Hamzeh at his parents' home with electronic monitoring that society will not be safe. Notably, agents searched Hamzeh's parents' home after his arrest, and with their consent examined all the electronic devices in the home. No weapons were found, nor was there any evidence of ties to extremist organizations. While there is no guarantee, the risk that Hamzeh's words suggested are belied by the context they were uttered in and his behavior—telling his friends no and convincing them not to engage in violence. Thus, the government cannot establish by clear and convincing evidence that Hamzeh is a danger to the community, and he should be released on bond.

### C. Hamzeh has neither the means, nor a reason to flee—he's staying put to fight his case.

While Hamzeh is not originally from Wisconsin, his family is here. For almost a decade, he's called Milwaukee home. Now, family ties are only part of the analysis: the others concern the means to flee and the impetus to flee—i.e., the penalties that he faces. Hamzeh has no means to flee. He has no liquid assets, nor does his family.

*Federal Defender Services of Wisconsin, Inc.*

What's more, Hamzeh has little reason to flee. As of the filing of this motion, he will have sat in jail for 17 months. He currently faces three charges, and while the Court *could* sentence him to the statutory maximum for each offense, that is not likely happening. What's more, just because Hamzeh conceivably faces 30 years imprisonment, that alone is not dispositive. *United States v. Eischeid*, 315 F. Supp. 2d 1033, 1036 (D. Az. 2003) ("In light of the defense proffer that the defendant has lived a responsible, crime-free life, the Court cannot conclude that the Government has met its burden merely by the charge contained in the Indictment."). In *Eischeid*, the court noted that it "is reluctant to conclude that a serious flight risk must be found in an otherwise stable life solely because the charge asserted by the Government *carries the death penalty*. The nature and seriousness of the charge is only one factor to be considered under the Act." *Id.* at 10 (emphasis added).  The potential of stacked sentences is not enough to find Hamzeh a flight risk, and that's especially true in this district, where 98% cases are guidelines or below.[134] The guidelines in this case are 24−30 months. It's worth noting that if Hamzeh doesn't get bond, and he loses at trial by the time he's sentenced, even a top-end of the guideline sentence will result in his immediate release.

---

[134]  http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2015/wie15.pdf

*Federal Defender Services of Wisconsin, Inc.*

This length of delay also presents a due process problem. In *United States v. Salerno,* 481 U.S. 739, 746–47 (1987), the Supreme Court recognized that a defendant's prolonged pretrial detention may violate the defendant's due process rights when the detention becomes punitive rather than regulatory. There is no definite number where sixteen months becomes permissible but sixteen months and a day stands as a due process violation. *United States v. Gelfuso,* 838 F.2d 358, 359 (9th Cir. 1988) ("Like the Second Circuit, we find that the due process limit on the length of pretrial detention requires assessment on a case-by-case basis."). In one case, the Seventh Circuit found that two years between indictment and trial was not a violation, but remanded the case with instructions to determine whether release on electronic monitoring would satisfy the Bail Reform Act. *See United States v. Infelise,* 934 F.2d 103, 104 (7th Cir. 1991). The inquiry is simply weighing "the length of confinement in conjunction with the extent to which the prosecution bears responsibility for the delay." *Gelfuso,* 838 F.2d at 359. *See also United States v. Ailemen*, 165 F.R.D. 571, 579 (N.D. Cal. 1996) (reviewing cases nationwide that address length of pre-trial delay and bond).

Given Hamzeh's ties to the community, the availability of GPS, and the high profile of this case and added scrutiny of Hamzeh, flight is not a serious concern—he's not going to O'Hare and getting on a plane to Jordan. And the danger he poses

*Federal Defender Services*
*of Wisconsin, Inc.*

to the community can be ameliorated through the proposed conditions. Thus, weighing the government's need to detain Hamzeh until trial against the cost of further delay, the defense submits that this comes very close to violating Hamzeh's due process rights. Indeed, any court should be uncomfortable having a defendant detained through trial when even if he loses, under the guidelines he would get immediate release. Those points only reinforce why bond is appropriate in this case.

###    D.    Hamzeh's right to prepare for and participate in his defense.

In all the discussion about danger to the community and flight risk, it's easy to lose sight of a point that implicates the essential aspects of the Sixth and Fourteenth Amendment and why Hamzeh should be released: Hamzeh's right to participate in his defense. For sixteen months, he has sat in county jail, where he has limited access the discovery, and his ability to meet with and confer with his attorneys for long periods (the type of time that's needed to prepare for trial) is almost non-existent. Instead, the preparations have been piecemeal and frustrating. But now, as plea negotiations have broken down and this case is definitely headed to trial, the concern that a man who is presumed innocent is needlessly locked up is trumped by an equally important concern—that he be able to help with his defense. That is best done with him on the outside, at his parents'

*Federal Defender Services
of Wisconsin, Inc.*

home, where he can meet his attorneys and pore over these recordings as we work to show his innocence and clear his good name.

### III. Conclusion

When Hamzeh was first arrested and brought before this Court the topic of bond was premature. But as this case has unfolded, as the defense has come to understand the case, and importantly as the verbatim transcripts have been prepared, many of the dynamics in this case have come to light establishing that bond is appropriate. Not only is Hamzeh presumed innocent and he has a good defense at trial, he is also not a flight risk or a danger to the community, such that no combination of conditions could be fashioned to assure his appearance and the public's safety. Thus, the defense respectfully requests that this Court release him on the proposed conditions.

*Federal Defender Services*
*of Wisconsin, Inc.*

Dated at Milwaukee, Wisconsin this 22nd day of May, 2017.

Respectfully submitted,

/s/          *Craig W. Albee*
Craig W. Albee, WI Bar #1015752
Joseph A. Bugni, WI Bar # 1062514
Gabriela A. Leija, WI Bar # 1081823
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Avenue - Rm 182
Milwaukee, WI 53202
Tel.: (414) 221-9900
E-mail:       craig_albee@fd.org
              joseph_bugni@fd.org
              gabriela_leija@fd.org

*Counsel for Defendant*, Samy M. Hamzeh

*Federal Defender Services
of Wisconsin, Inc.*