UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

     v.                                Case No. 16-CR-21

SAMY MOHAMMED HAMZEH,

                Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR RELEASE ON BOND

### Background

      Defendant Samy Mohammed Hamzeh is charged in each count of a three-count indictment. He is charged in Count One with possessing a machinegun, in Count Two with possessing another machinegun, and in Count Three with possessing a silencer. Each of these counts allege a violation of 26 U.S.C. § 5861(d). The charges stem from Hamzeh's purchase of two machineguns and a silencer from undercover law enforcement officers on January 25, 2016. Hamzeh has been in federal custody pending trial on these charges since he was arrested immediately following his purchase of the firearms. He now has filed a motion seeking release pending trial.

### Analysis

      The issue for the Court is whether any conditions of release "will reasonably assure the appearance of the person as required and the safety of any other person and the community. . . ." 18 U.S.C. § 3142(e). The government bears the burden of proving by clear and convincing evidence that there are no conditions that will assure the safety of the community, and bears the

burden of proving by a preponderance of the evidence that no conditions will assure the defendant's appearance. *United States v. Portes*, 786 F.2d at 764 (7th Cir. 1986).

In making this determination, the Court must consider (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger that would be posed by the defendant's release. 18 U.S.C. § 3142(g). Each of these factors weighs in favor of Hamzeh's pretrial detention.

A. Nature and circumstances of the offense

> *1. Hamzeh is charged with an offense that involves a firearm, a factor that weighs in favor of detention.*

In requiring the court to consider the nature and circumstances of the offense, the Bail Reform Act identifies a number of especially dangerous offenses and directs the court to consider whether the charged offense is one of those types. The exceptionally dangerous offenses identified in the Act are those that involve a firearm; those that involve explosives or destructive devices; crimes of violence; child sex-trafficking; terrorism; offenses that involve a minor victim; and controlled substance offenses. 18 U.S.C. § 3142(g)(1).

> *2. The number and types of firearms Hamzeh possessed weigh especially heavily in favor of detention.*

Hamzeh's offenses involved not just one, but multiple firearms.[1] And the firearms were not ordinary, but rather were types that are particularly dangerous and that present an acute threat to public safety. *See RSM, Inc. v. Herbert*, 466 F.3d 316, 318 (4th Cir. 2006) (characterizing machineguns and silencers as "especially dangerous weapons"); *United States v. Metze*, 2012 WL

---

[1] The term "firearm" is defined for purposes of 26 U.S.C. § 5861(d) to include machineguns and silencers. 26 U.S.C. § 5845(a).

976159 at *2 (M.D. NC March 22, 2012) (describing machineguns and silencers as "highly dangerous firearms" that "raise significant concerns about danger to the community. . . .")

Machineguns are weapons of war, specifically designed and intended to inflict maximum destruction and devastation. *See United States v. Jennings*, 195 F.3d 795, 799 (n.4) (5th Cir. 1999). S*ee also United States v. O'Brien*, 560 U.S. 218, 230 (2010) (noting the "immense danger posed by machineguns."). "A modern machinegun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. Short of bombs, missiles, and biochemical agents, . . . few weapons . . . are more dangerous than machine guns." *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (internal citation omitted).

Silencers are also exceptionally dangerous, but in a way that is different from machine guns. Silencers are employed principally to conceal the sound of illegal firearm use – that is, to conceal either that an illegal firearm (such as a machinegun) is being fired or that a firearm is being fired for an illegal purpose (such as a firearm being used in an armed assault).

3. *Hamzeh's intended use of the machineguns and silencer further heighten the seriousness and danger of the offense and weigh even more heavily in favor of detention.*

The danger that Hamzeh presents is not only a function of the types of firearms he possessed, but also is heightened by the specific uses to which he intended to put those firearms. Hamzeh explained, in recorded conversations with confidential human sources (CHSs),[2] as well as in a post-arrest confession, why he wanted machineguns and silencers and what he intended to do with them. Hamzeh detailed, in graphic terms, plans that he had to commit a mass shooting at a Masonic temple in Milwaukee. And it is clear from the recorded conversations with the CHSs,

---

[2] To remain consistent with the defense submission, this Response will adopt the defense's convention of referring to the two CHSs as "Steve" and "Mike."

3

from Hamzeh's post-arrest confession, and from witness statements that it was Hamzeh, and not Steve, Mike, or anyone else, who devised the plan and lead the effort.

Hamzeh carefully planned the shooting and recruited people to join the attack. He believed that a four-person team would be optimal and, to that end, he enlisted both Steve and Mike to assist, and attempted (unsuccessfully) to recruit two additional people (neither of whom was cooperating with law enforcement) to join as the fourth member of Hamzeh's team.

Hamzeh was deliberate and calculating. He arranged to have a guided tour of the temple, during which he, Steve, and Mike learned the temple's meeting schedule and physical layout. Learning those things allowed Hamzeh to plan an attack that would inflict maximum casualties. Hamzeh reminded Mike and Steve after the tour that their guide had said that there usually are 30 people at the temple's weekly meetings. Hamzeh then told them:

> Thirty is excellent. If I got out, after killing 30 people, I will be happy 100%. . . . 100% happy, because these 30 will terrify the world. The mother fuckers will know that nobody can play with Muslims.

During that same post-tour conversation (all of which was recorded), Hamzeh explained to Steve and Mike how the group would carry out the attack. Believing (incorrectly) that Mike already had a machinegun, Hamzeh told him:

> We want two machineguns, you now have one, so we want two more, and we need three silencers, that's it. Find out how much all together these will cost, then we will march. . . . [If] each one has a weapon, each one has a silencer gun, the operation will be one-hundred percent successful. I am telling you, to go without silencer gun, you will be exposed from the beginning.

During that same recorded conversation, Hamzeh told Steve and Mike that, when they arrived to attack the temple, one of them had to shoot and kill the receptionist (or both receptionists if there were two). Hamzeh said that the receptionist should be shot two or three times in the stomach, and then should be pushed forward in her chair so it would appear that she was sleeping. In Hamzeh's words:

4

[A]ll three of us go in together, one will go to the one that is staying at the reception. . . . If she was alone, it is okay, if there were two of them, shoot both of them, do not let the blood show, shoot her from the bottom, two or three shots in her stomach and let her sit on the chair and push her to the front, as if she is sleeping, did you understand?

Hamzeh told Steve and Mike that the team member who kills the receptionist would then stay downstairs and serve as a lookout at the front door of the temple, where he was to shoot and kill anyone who tried to enter or leave. Hamzeh said that the other two team members would take the elevator (or "lift") up to the third floor, where they would shoot and kill everyone who was present in a meeting room there. In Hamzeh's words:

After shooting the receptionist, the lookout was to "stay downstairs, the other two will take the lift, to the third floor, go directly to the room, open the door, shoot everyone.
. . . .

One of us will stay at the door at the entrance and lock the door down, he will be at the main door down, two will get to the lift up, they will enter the room, and spray everyone in the room. The one who is standing downstairs will spray anyone he finds. We will shoot them, kill them and get out. . . .
. . . .

As long as the one on the door understands he has bigger responsibility than the others. For your information, he has to take care of everyone around him, the comers and the one that wants to go, he has to annihilate everyone, there is no one left, I mean when we go into a room, we will be killing everyone, that's it, this is our duty. . . .
. . . .

Hamzeh told Steve and Mike that, after spraying the third floor with bullets and killing everyone there, the two upstairs team members would quickly run down the stairs to the first floor, avoiding the elevator/lift. The three of them would then calmly leave the temple together and, after walking for a while, discard the ski masks they would be wearing. In Hamzeh's words:

[After shooting everyone on the third floor, the two upstairs team members will] move fast even avoiding the lift and take the stairs running down. . . . Using the stairs, the third one on the door will notice us coming down, we will go out together. No one sees anything and no one knows anything. We leave, as if there is nothing, no running, no panic, just regular walking. We'll get three head covers with three holes in them. . . .

5

. . . .

> We will walk and walk, after a while, we will be covered as if it is cold, and we'll take the covers off and dump them in a corner and keep on walking, as if nothing happened, as if everything is normal.

Hamzeh also explained to Steve and Mike why the three of them needed to execute the mass shooting at the Masonic temple:

> They are all Masonic; they are playing with the world like a game, man, and we are like asses, we don't know what is going on, these are the ones who are fighting, these are the ones that needs to be killed, not the Shi'iat, because these are the ones who are against us, these are the ones who are making life living for us like hell.
> . . . .
>
> I am telling you, if this hit is executed, it will be known all over the world. . . . Sure, all over the world, all the Mujahedeen will be talking and they will be proud of us, what is wrong with you, such operations will increase in America, when they hear about it. The people will be scared and the operations will increase, and there will be problems all over. . . . This way we will be igniting it. I mean we are marching at the front of the war.
> . . . .
>
> We are Muslims, defending Muslim religion, we are on our own, my dear, we have organized our own group. We have our own group, not with Hamas, not with my ass, we are here defending Islam, young people together join to defend Islam, that's it, that is what our intention is.
> . . . .

*4. The excuses in mitigation now offered by Hamzeh are not supported by the evidence.*

Hamzeh now contends that, even though he obtained machineguns and a silencer, and even though he had clearly announced what he intended to do with those firearms, his conduct does not suggest that he is dangerous because (a) he ultimately did not carry out the attack on the Masonic temple; and (b) Steve and Mike lead the effort and manipulated Hamzeh to join. Neither of these contentions is supported by the evidence in this case.

*a. Hamzeh's reasons for stepping back from the planned attack*

Hamzeh argues that his "true character was revealed when he adamantly refused to take part in the informant's plan." Def. Memo. at 6. First, it is clear from Hamzeh's own words –

6

including those quoted above and those that follow in Part A.4.b below – that this was Hamzeh's plan, and not the informants'.  And the primary reason that Hamzeh provided for his eleventh-hour change-of-heart was that he feared that they would be caught.  It is true that Hamzeh told Steve and Mike, shortly before the planned attack was to take place, that he had spoken with religious leaders who told him that the attack would be wrong.  But Hamzeh identified the primary reason for not carrying out the Masonic attack at that time as a fear that information about their plan had leaked and they would be caught.  He told Steve and Mike shortly before the attack was to take place:

> [F]irst, I have discovered that there has been something leaked.  [One of Hamzeh's non-informant recruits] hasn't left anybody without telling them.  I'm telling you, [he] has not left anybody without telling them.  He has sent messages to the world.
> Def. Exh. C at 4.
> . . . .
>
> This has been leaked. . . . I swear if we do this anywhere in the United States, they will know, that it is us.  They have eyes, and they will come and investigate us.
> Def. Exh. C at 46.
> . . . .
>
> I swear, even if you would go to New York, or go to the furthest state, Miami, which is at the end of America, and you do an operation there, we the youth here, everyone would know, that Samy, [Steve], and [Mike] were planning to do an operation in a Masonic center.
> Def. Exh. C at 16.
> . . . .
>
> I am saying that information about us has been leaked, in the past two days.
> Def Exh. C at 42.
> . . . .
>
> . . . I felt like our information is becoming well known.  That's point number 1, point 2, I went and I spoke with the sheikh.
> Def. Exh. C at 6.

According to Hamzeh, the Sheikh to whom he had spoken also warned that the group would be caught if they executed Hamzeh's plan.  Def. Exh. C at 8, 13.  Hamzeh said that the Sheikh also had told him that such an attack was forbidden by their religion.  Hamzeh consulted a second

7

religious leader who confirmed that an attack like the one planned by Hamzeh would be against their religion. In his post-arrest confession, Hamzeh admitted that he had fully intended to carry out the Masonic temple attack and that he would have done so if the Imams had said that it was allowed under their religion. Hamzeh said that police, government, and laws did not concern him and that his only concern was religion.

In any event, even though Hamzeh claimed that he had – at least for the time – decided not to attack the Masonic temple, he purchased two machineguns and a silencer from undercover agents the following day, January 25, 2016. Shortly before buying the machineguns and silencer, Hamzeh told Steve and Mike that, while they were not going to attack the Masonic temple as planned, they still would buy the weapons and hide them for a future attack:

> We're going to get the weapons and we'll keep it here.
> Def. Exh. C at 4.
> . . . .
>
> We will get the weapons, normally, and we can train with it, and keep it with us, just as a precaution until the next year as well. You never know what will happen the next year. Next year a new president is taking over and you don't know what will happen with us. Our weapons will come and we'll hide it.
> Def. Exh. C at 12.
> . . . .
>
> Get ready, prepare, buy, be prepared for that day, so that when they attack us, then we can attack them, we must be ready.
> Def. Exh. C at 18.
> . . . .

Hamzeh also told Steve and Mike that following through on the purchase of the machineguns and silencer would reinforce their relationship with their firearms supplier so they could obtain additional weapons from him in the future:

> Why do we go get the weapons? Because we want to make sure about your friend, to ensure that he's on board to trust us, so in the future if we need more, he will be accommodating to us, but if we don't go, he will think, they are dragging their feet. But for the weapons, I am ready to go get it tomorrow.

Def. Exh. C at 21.

. . . .

b. *The evidence does not support Hamzeh's overarching theme that he was manipulated by Steve and Mike and would not have attempted to obtain machineguns or plan an attack absent the pressure they put on him.*

Hamzeh argues that the seriousness of his offense is further diminished because he was manipulated and led by Steve and Mike. It is clear, however, from the evidence that Hamzeh was the leader and motivating force for the attack and that he directed Steve and Mike.

That is clear, perhaps most significantly, from Hamzeh's post-arrest confession, in which he told agents that the attack was his idea, and not anyone else's:

> I got the idea about it. Then I told them [Steve and Mike] about it. I'm the one who told them about it, to be honest with you. I'm the one who told them about it. And I'm the one who stopped it.
> . . . .
>
> The other two guys, they were listening to me. I was telling them everything. . . . I am more religious than them. I know more than them. So they believe me. They do anything I want to do. . . .I'm controlling the thing. I was controlling them.
> . . . .
>
> [When an interviewing agent asked,] You were telling [Mike] and [Steve] what they should do and what they shouldn't do, [Hamzeh replied,] "Exactly."

Hamzeh's acknowledgment that the attack was his idea and that he was the leader of the group is corroborated by the other evidence in the case. It is corroborated, for example, by the recorded conversation of January 19, 2016, in which Hamzeh details the attack and the reasons for it and directs Mike to obtain machineguns and silencers. *See supra,* Part A.3.

Hamzeh's role in leading and directing the planned attack is also clear from statements made by other people Hamzeh attempted to recruit to help carry out the attack.

Nonetheless, contrary to his own prior statements, Hamzeh maintains that, if not for the informants' "clever manipulation of him, there is no evidence indicating that Hamzeh would ever

have attempted to procure a semi-automatic rifle, let alone a machine gun or a silencer." Def. Mem. at 45.

The investigation of this case generated thousands of pages of discovery documenting, among other things, hundreds of hours of conversations among Hamzeh, Steve, Mike, and others over a four-month period. It is not practicable, in the context of a bond motion, to provide a comprehensive discussion of all of that evidence. Hamzeh pulls out selective quotes from recorded conversations and repeatedly characterizes those isolated, comparatively brief exchanges as efforts to "chide", "taunt", "ensnare", and "manipulate" him. Rather than match each defense quote with quotes contradicting it, the effort here is to provide some background and context for Hamzeh's evolving plans to obtain firearms and to commit violent acts. The following several paragraphs attempt to do that by discussing several pertinent and representative conversations.

Hamzeh claims that his obtaining a machinegun was done "entirely at the behest of" Mike. Def. Mem. at 45. In fact, Hamzeh claims that "[t]he first time a machine gun is mentioned, it is by Mike" on December 7, 2015. Def. Memo. at 18. Hamzeh's discussion of machineguns and what he intended to do with them began long before that. On October 13, 2015, for example, Steve met with Hamzeh at the direction of the FBI in an attempt to learn more about Hamzeh's articulated plan to travel overseas. During the recorded conversation, Hamzeh says that his plan is to travel to Jordan, then to the West Bank, and then to Bethlehem, where he will get a weapon and shoot as many Israeli soldiers as he can. Steve asks Hamzeh whether that plan is final, and Hamzeh replies that he intends to execute the plan. Hamzeh also says that he expects to die in the operation and that he wants to kill a large number of Israelis so that he can be a martyr. Hamzeh further explains that, if he isn't able to get to Gaza and join Hamas, he will get an explosive belt and use it in a bus, a restaurant, or a place where Israelis gather. Hamzeh says that another option if he is unable to

get to Gaza would be to get a machinegun and fire it randomly until he is killed; Hamzeh likens this to a person on a suicide mission. At several points during the conversation, Hamzeh reiterates that his decision to become a martyr is final.

On November 2, 2015, Mike met with Hamzeh, and their conversation was recorded. In it, Hamzeh says that he wants to go fight in Palestine and invites Mike to go with him. Mike responds by expressing interest in going, but Hamzeh says that he intends to go regardless of whether Mike goes with him. Later in the conversation, Hamzeh says that he hopes he can kill ten Israelis before he dies. Mike says that he would rather kill 500. Later, Hamzeh says that one should kill as many Israelis as possible in order to get into paradise.

On November 6, 2015, Hamzeh and Mike met and had another conversation that was recorded by law enforcement agents. Hamzeh had discussed a number of different attack plans up to that point, and during the recorded conversation Mike tries to get Hamzeh to specifiy what his current plan is. Hamzeh asks whether Mike is getting cold feet. Mike says that he is not, but that he wants to know whether Hamzeh is serious. Hamzeh explains that he and Mike will shoot Israeli soldiers with pistols and then take the dead soldiers' machineguns. Hamzeh says that they then will use the machineguns to kill as many people as they can – he says that they will kill 50 or 60 soldiers and then will be killed themselves.

In a November 12, 2015, recorded conversation, Hamzeh mentions that he wants to get a pistol for protection at his new job. In that same conversation, Hamzeh talks about his plan for his and Mike's operation in the Middle East. Hamzeh says that they should kill between 20 and 30 Jews. Later in that conversation Hamzeh says that they would use two pistols to kill Israeli soldiers, grab the soldiers' machineguns, and kill about 50 Jews. Hamzeh also says that, if they

are able to escape after that mass shooting, they should conduct another operation and kill more Jews.

Hamzeh focuses a great deal on the recorded conversations of December 7 and December 14, 2015, emphasizing in particular Hamzeh's desire for a handgun and Mike's references to machineguns. By the time of those conversations, Hamzeh had already been talking for months about violent attacks he planned to carry out, including attacks using machineguns. Mike's efforts were simply an attempt to determine whether Hamzeh still planned to carry out those types of attacks. And Hamzeh's mentioning handguns did not, as he now suggests, amount to an abandonment of his plans to commit acts of mass violence. Fairly read, the evidence shows that at various times during the four-month investigation Hamzeh wanted a handgun for protection. The evidence also shows that Hamzeh even more persistently sought a machinegun during that same time period so that he could execute some sort of attack. Most significant is the nature of the attack that Hamzeh ultimately planned at the Masonic temple. That attack – involving as it did spraying bullets and killing 30 people – is consistent only with using a machinegun, and Hamzeh specifically told Mike to arrange the purchase of machineguns and silencers for that attack.

The conversations that Hamzeh had with the informants, as well as Hamzeh's post-arrest confession, show that he aggressively sought machineguns; that he expressed a desire for machineguns before Steve or Mike mentioned them; that Hamzeh pushed Mike to obtain machineguns for the group; that Hamzeh devised and was the architect of the plot to conduct the mass shooting at the Masonic temple; and that Hamzeh directed and considered himself the leader of the group he had put together to conduct the mass shooting.

The seriousness of these offenses is further reflected in the penalties that Hamzeh faces if convicted. The offenses carry a maximum of 30 years of imprisonment (10 years on each of the

12

three separate counts). Hamzeh suggests that the more relevant measure is the sentencing range recommended by the United States Sentencing Guidelines, which Hamzeh identifies as 24 to 30 months. Def. Memo. at 3, 56. The government's calculation is different. The guidelines for a non-aggravated possession of three firearms is 33 to 41 months. If the sentencing court decides that Hamzeh "possessed any firearm or ammunition cited in the offense of conviction [with] intent that it would be used or possessed in connection with another offense," then the range would increase to 135 to 168 months. *See* U.S.S.G. §§ 2K2.1(c)(A), 2X1.1(c)(1), and 2A2.1(a)(1). Moreover, if the sentencing judge finds that the facts surrounding the offenses warrant a sentence above the guidelines, then Hamzeh could be sentenced to a term of imprisonment of up to 30 years. *See* 18 U.S.C. § 3553(a).

The nature and circumstances of the offense weigh heavily in favor of pretrial detention.

B.  Weight of the evidence against the defendant

The elements of the offenses with which Hamzeh is charged are straightforward. To sustain a conviction under 26 U.S.C. § 5861(d), the government must prove beyond a reasonable doubt:

First, that Hamzeh consciously possessed a firearm;

Second, that Hamzeh was aware that the firearm was a machinegun; and

Third, that the machinegun was unregistered (although the government is not required to prove that Hamzeh knew the machinegun was unregistered).

*United States v. Jamison*, 635 F.3d 962, 967-68 (7th Cir. 2011).

The government's evidence as to each of these elements is overwhelming. Hamzeh was arrested in possession of two machineguns and a silencer; his receipt and possession of the firearms was witnessed by law enforcement agents and informants and was captured on video; there are audio recordings of Hamzeh seeking the machineguns and silencer; in those recordings, Hamzeh

13

says that he wants machineguns and silencers specifically because of their qualities – that is, high capacity, rapid fire, and suppressed sound; and, after he was arrested, Hamzeh acknowledged receiving and possessing the machineguns and acknowledged that he knew that the firearms were machineguns. A search of the National Firearms Registration and Transfer Record shows that the machineguns and silencer are not registered to Hamzeh.

Hamzeh does not dispute the government's proof as to any of the elements of the offenses, but instead contends that he has a strong entrapment defense. If a defendant presents evidence of both (1) government inducement of the crime; and (2) lack of predisposition by the defendant to engage in the crime, then he is entitled to an entrapment instruction at trial. *United States v. Al-Shahin*, 474 F.3d 941, 948 (7th Cir. 2007).

Predisposition is the key entrapment inquiry – a jury finding of predisposition is "fatal to [a] claim of entrapment." *United States v. Mayfield*, 771 F.3d 417, 429 (7th Cir. 2014) (quoting *United States v. Russell*, 411 U.S. 423, 436 (1973). This circuit "has long used a nonexclusive list of five factors to determine whether the defendant was predisposed to commit the charged crime." *Mayfield*, 771 F.3d at 435. The test includes the following five factors:

> (1) the defendant's chaeacter or reputation; (2) whether the government initially suggested the criminal activity; (3) whetehr the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government.

*Id.* (internal citations omitted).

> [Inducement] means more than mere government solicitation of the crime; the fact that government agents initiated contract with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement. Instead inducement means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts. The "other conduct" may be repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government

14

agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts.

*Id.* at 434-35.

Entrapment is a "quintessential jury issue." Park, *The Entrapment Controversy*, 60 Minn. L. Rev. 163, 168 (n.16) (1976). "The fact-intensive nature of the entrapment defense often makes jury consideration of demeanor and credibility evidence a pivotal factor." *United States v. Rutgerson*, 822 F.3d 1223, 1235 (11th Cir. 2016).

Hamzeh attempts a "cursory matching" of some of the relevant factors with his version of the facts of this case. Def. Memo. at 47.

a. *Criminal history*

Hamzeh notes that he has no criminal history. While he has no prior convictions, he has engaged in, and in other instances, sought to engage in, serious criminal conduct. On January 16, 2016, law enforcement surveillance observed Hamzeh driving his car on Wisconsin Avenue in Milwaukee. Hamzeh began to drive through an intersection, on a green light, when three young men attempted to cross the street in front of him. One of the individuals kicked Hamzeh's car. Hamzeh jumped out of his car, ran up to the individual, and kicked him in the head. The individual fell to the ground, where Hamzeh jumped on him and punched and kicked him until pulled away by several pedestrians.

Hamza also had a series of evolving plans to conduct mass attacks overseas; for a variety of family, financial, and logistical reasons, he did not follow through on any of those plans. But they did become increasingly specific over time and culminated in Hamzeh's detailed plan to carry out the attack on the Masonic temple in Milwaukee.

15

### b. Mike's role

Hamzeh claims that "the machine guns were brought up (and doggedly pursued) by Mike." Def. Memo. at 47. Hamzeh was the first to mention machineguns, and Mike's "pursuit" of the machinegun issue was simply an attempt to determine whether Hamzeh was still planning a machinegun attack of the sort that he had consistently brought up and described to Mike and Steve.

### c. Hamzeh's purpose in obtaining firearms

Hamzeh claims that he sought guns for protection. Def. Memo. at 47. At times, he did talk about obtaining a handgun for protection. At the same time, as well as before those discussions and after them, Hamzeh also sought machine guns. And the firearms he ultimately obtained were machineguns and a silencer – there is no lawful purpose for either of those types of firearms, and they are consistent with use in a mass attack of the type Hamzeh had planned.

### d. Hamzeh's attitude toward criminal activity

Hamzeh contends that he was "reluctant to engage in illegal activity – by both backing out of the informants' plan and over and over again asking for a pistol." Def. Memo. at 47. Again, the plan was not the informants' – it was Hamzeh's. He made that clear during his post-arrest confession. And, to the extent that he stepped back from his plan to attack the Masonic temple, it is significant that the criminal activity with which he is charged took place *after* that, when he purchased the machineguns and silencer after talking with the Imams and relaying their advice to Stee and Mike. *At most*, Hamzeh had become reluctant to execute the planned attack on the date he had selected. He showed no reluctance, however, in then going ahead and purchasing the machineguns and silencer.

### e. Mere invitation

Hamzeh argues that the conduct of the two informants "can hardly be described as 'merely inviting' Hamzeh along." Def. Memo. at 47. The facts show that it was actually Hamzeh who

16

invited both Steve and Mike (as well as others Hamzeh tried to recruit) along. Hamzeh was anything but passive in this enterprise – he planned and led it.

In the end, the evidence does not support an entrapment defense. Such a defense is particularly hard to square with Hamzeh's confession that he was the leader of this criminal endeavor; that the attack was his idea; that he had planned the attack; that he led and directed Steve and Mike ("[T]hey were listening to me."; "They do anything I want to do."; "I'm controlling the thing."; "I was controlling them."); and that he would have executed the attack had two Imams not told him that it was wrong. And all of this is corroborated by the recorded conversations during which Hamzeh tells Mike to get machineguns and silencers, and during which Hamzeh details the plans for the attack, including assigning Steve and Mike roles in it.

The weight of the evidence in this case is substantial and there is a strong likelihood that Hamzeh will be convicted.

## C. History and characteristics of the defendant

Hamzeh's history and characteristics show that he is both a danger to the community and a flight risk.

### 1. Danger to the community

Throughout the pendency of this investigation, Hamzeh went on at length about his desire to execute a number of increasingly specific mass attacks. He ultimately settled on a plan to obtain machineguns and silencers and to use them to commit mass murder at a Masonic temple in Milwaukee. Hamzeh contends now that his talk was only talk (even though he also recruited accomplices, toured the site of his planned attack, and purchased machineguns and a silencer) and that his words "are not a true indication of his risk to the community." Def. Memo. at 49. Instead, Hamzeh attributes his violent talk to pressure that Steve and Mike put on him. Again, the evidence

17

shows that Hamzeh was the leader of the effort, both when it came to obtaining machineguns and when it came to devising the attack on the Masonic temple.

Hamzeh claims that "the best measure of whether he'll act violently is reflected in his refusal to move forward with the plan." Def. Memo. at 51. The nature of his "refusal," however, does not mitigate his flight risk. Again, Hamzeh ended up not following through at the planned time primarily because he believed that information about the plot had leaked out and he would be caught. He also backed out because of advice he had received from two religious leaders. But Hamzeh made clear in his post-arrest statement that, had the religious leaders indicated that the attack was allowable, he would have carried it out. The danger is that Hamzeh might not seek or receive such advice the next time he is motivated to carry out an attack or otherwise engage in violent conduct.

The incident in which Hamzeh jumped out of his car, kicked a pedestrian in the head, jumped on him after he had fallen to the street, and continued to punch and kick him while he was down – not stopping until being pulled off of the pedestrian – also demonstrates that Hamzeh poses a danger to the community.

### 2. Flight risk

Hamzeh's history and characteristics also show that he is a flight risk. Throughout the investigation, Hamzeh talked of traveling to the Middle East, at times to visit and at times with the intention of committing a mass shooting there. Hamzeh has actually traveled to the Middle East on a number of occasions, and his sister; his brother-in-law; his uncle; and several cousins live in Jordan.

In a number of conversations recorded during this investigation, Hamzeh said that he would rather die than go to jail. And during his post-arrest interview, Hamzeh begged the interviewing

agents to let him return to Jordan: "Please, help me out. And if you guys decide to send me overseas, I'm OK with this."

D.  Nature of the danger that would be posed by Hamzeh's release

Hamzeh has demonstrated not only through his words, but also by his acts that he is violent and dangerous. The danger that would be posed by his release is that he would engage in violence – either on a small scale like the attack he committed on the pedestrian on Wisconsin Avenue, or on a large scale like the machinegun attack he planned to carry out at the Masonic temple. This factor weighs heavily against pretrial release.

## Conclusion

The defense has submitted a report prepared by Dr. Kenneth Robbins, an adjunct professor of psychiatry at the University of Wisconsin School of Medicine and Public Health. Def. Exh. D. The defense argues that Dr. Robbins' opinion supports the view that Hamzeh is an appropriate candidate for release. Dr. Robbins wrote that it was clear from his interview of Hamzeh that he has a "strong sense of empathy for other people," a "strong conscience," and a "strong moral code." That assessment is difficult to reconcile with Hamzeh's acknowledged planned attack on the Masonic temple, which included directions from Hamzeh to shoot a receptionist two or three times in the stomach and to slump her forward in her chair as if she is sleeping and to "spray" everyone in the temple in the hope of killing 30 people. Dr. Robbins' assessment is also hard to square with Hamzeh's confession that he would have carried out the attack if he had not been told by two religious leaders that mass murder is wrong.

Hamzeh claimed in his interview with Dr. Robbins that "this [w]as all talk." That claim, too, offered more than a year after his arrest, directly contradicts his contemporaneous post-arrest confession that he had fully intended to execute the attack.

Dr. Robbins concludes that Hamzeh's "talk of killing Masons or Israelis is the Jordanian version of a boy in Green Bay talking of wanting to 'kill the Vikings.'"  Def. Exh. D.  A boy in Green Bay may use the word "kill" that way, expressing his hope that his team win by two touchdowns.  But if he went farther and made it clear that he was using the word in its literal sense; recruited people to help him murder opposing players; arranged a tour of the opposing team's facilities to learn the layout and team practice schedule; described in detail to his accomplices that certain players should be shot twice in the stomach; described where in the facility to find players to shoot; explained how they would get away with killing the players; explained that they would use machineguns with silencers to kill the players; and then purchased machineguns and a silencer, the young fan would be viewed quite differently.

Consideration of the factors identified in the Bail Reform Act establish, by clear and convincing evidence, that no combination of conditions will protect the public from the danger that Hamzeh would pose if released pending trial.  Those factors also establish, by a preponderance of the evidence, that no combination of conditions would sufficiently mitigate the flight risk Hamzeh presents.  The government therefore requests that the defendant's motion for release pending trial be denied.

Dated at Milwaukee, Wisconsin, this 10th day of July, 2017.

Respectfully submitted,

s/ Gregory J. Haanstad
GREGORY J. HAANSTAD
United States Attorney
Wisconsin Bar:  1036125
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Avenue, Room 530
Milwaukee, Wisconsin  53202
Telephone:  (414) 297-4581
e-mail:  greg.haanstad@usdoj.gov

21