UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff*,

    *vs.*                                Case No. 16-CR-21 (DEJ)

SAMY M. HAMZEH,

    *Defendant*.

## REPLY IN SUPPORT OF RELEASE

Samy Hamzeh, by counsel, files this reply brief in support of bond, addressing the salient points raised last night by the government's submission. Those points could be debated at length in Court (and they likely will be revisited) but it saves everyone time for the defense to submit this brief pointing out some of the more patent flaws in the government's argument.

Before addressing those arguments with more depth, it's important to highlight these five points that the Court should remember in reading all the briefing in this case and deciding whether to release Hamzeh on bond:

- The Court shouldn't lose sight of the fact that the offense charged is possession for less than 30 seconds of machine guns provided by the government and that Hamzeh did not have any source for such guns or the funds to ever obtain them on his own. If he stays in custody

*Federal Defender Services
of Wisconsin, Inc.*

until trial, Hamzeh will have served a guideline sentence before the jury is ever seated.

- The Court should not lose sight of the fact that Hamzeh will defend against the charged offenses by raising entrapment based on the government's repeated and persistent efforts to convince him to get a machine gun rather than the handgun he desired to defend himself and by offering the guns for thousands of dollars less than they otherwise could be obtained for. Hamzeh could lawfully possess a handgun.

- The Court should not lose sight of the fact that the government's claim that Hamzeh intended to use the guns for an attack is not borne out by the evidence. As the transcript of the conversations from the night before Hamzeh's arrest demonstrates, he adamantly refused to follow through with any plan after consulting religious leaders and angrily denouncing his companions for failing to follow the Imam's advice

- The Court should not lose sight of the fact that the government relies primarily on inflammatory statements (admittedly by Hamzeh himself) to argue he poses a danger, but Hamzeh disavowed those statements before his arrest and never attempted to carry them out. Those disavowed words do not demonstrate that he currently poses a danger given the availability of GPS, family support, and the lack of access to weapons.

- The Court should not lose sight of the fact that Hamzeh's post-arrest statements reveal that the decision to obtain guns started with Mike, and that at that time Hamzeh believed that all three had come up with the plan together before he called it off. At the time of the statements, Hamzeh's perceptions were distorted by his lack of knowledge that both of his "friends" had been manipulating him for months. Hamzeh may play portions of the post-arrest statement at the hearing.

**I. The government's best argument is to harp on Hamzeh's words at the expense of ignoring their context and his ultimate actions—backing out and counseling his friends against their "plan."**

Not surprisingly, the government's brief seizes on Hamzeh's words—words that were previously captured in the criminal complaint—as evidence that he is a dangerous person who should not be released to the community. The defense has always acknowledged that the recorded conversations contain powerful and disturbing words. But that's precisely why the defense provided this Court with such detail about the conversations, including tracing their context and development, and supplying the entire transcripts. All of that context and detail lead to the night before Hamzeh's arrest when he angrily denounced the plan to his friends.

In that conversation, he told his "friends" that he would not go through with the plan. And believing they were committed to it, he gave them reasons why they should not follow through. He offered them the spiritual, religious, and moral reasons why it was wrong—Haram. He also laid out the logic of the Imam, and he called a second Imam to verify that the plan was Haram. The government minimizes those points and instead focuses on a different aspect of Hamzeh's argument to the informants for why they shouldn't do it—their self interest. As the opening brief makes clear, Hamzeh was particularly adept at excusing his failure

to *ever* actually take *any* action to back up his bluster, and he exhibited that same talent by telling the friends that they would be caught and that their plan was known and therefore doomed to failure. True. That was part of Hamzeh's argument to the informants, and the defense has never run from that—after all, we gave the Court the entire transcript to read. But it's simplistic to say Hamzeh's motivation was not to get caught. He didn't want to do it—that's why he talked to *two* spiritual leaders for counsel. What's more, it's clear from the conversations that the motivating factor for him personally was that it was wrong and the failure of his friends to acknowledge that drove him to anger, culminating in his desperate exclamation of "god damn your religion."

In response, the government characterizes these as "excuses" crafted by the defense. But an excuse would be the defense speculating about what Hamzeh might have been saying; however, the argument for release isn't built on speculation—it's built on the transcripts. What's more, Hamzeh didn't know he was being recorded, so his refusal to participate and his angry outbursts against his friends must be viewed as genuine. And in that genuine effort to stop his friends from doing this, Hamzeh tried to use every bit of persuasion available to him to convince his friends that the plan should be abandoned. That included religious appeals, moral appeals, and appeals to their self-interest—that they would be caught and punished. In sum,

the government's recasting of Hamzeh's refusal to participate in violence as mere delay until another time presented itself is belied by the transcript, and Hamzeh's actions that night. What's more (and what actually matters), is that his logical appeal to his "friends" self-interest does not make him (16 months later) a danger to the community.

The government would, however, have Hamzeh become a danger based less on his refusal to participate in the "plan" and more on his willingness to still get a gun. Remember: Hamzeh was only getting one gun; the other was Steve's and the silencer was just the government's attempt to make the crime more nefarious—Hamzeh had never asked for one. The defense has never backed away from the fact that Hamzeh still got the guns. That is, the only illegal thing that he is claimed to have done. Because possession of the firearm would not be grounds for finding him a danger, the government points to Hamzeh's statements about still getting the guns in case of a future attack against Muslims. But (again) context matters, and all Hamzeh was reporting is that he'd like to have a gun because he fears that people may attack him and other Muslims in the future because of their religion. To that end, he only desired a handgun for protection until Mike claimed that he could obtain a machine gun for less than the cost of a pistol and at a fraction of what they actually would cost. And when he agreed (the night before his arrest)

to get the guns while abandoning any plans for an attack, Hamzeh was exacting a compromise from his friends that they would not engage in an attack. So his statement that he would keep the gun in case of an attack on Muslims is not grounds for finding him a danger. Plenty of people keep guns in case they are attacked—in fact, the Constitution protects their ability to do that. *See* U.S. Const. Amend. 2. And that does not mean that Hamzeh will not abide by this Court's orders on release and *not* possess a firearm.

### A. The government's counter narrative that it was Hamzeh's idea to get a machine gun demands a close reading of the statement's context.

In the opening memorandum supporting release, the defense went to great lengths to show that Hamzeh didn't want a machine gun and the whole idea was started with and pushed by Mike. In response, the government claims that this plan to get a machine gun was Hamzeh's, not the informants, indicating that this investigation generated thousands of pages of discovery documenting conversations and that it will not go quote-for-quote with the defense. At the same time as it swears off such an exercise, the government provides ample quotes of its own and accuses the defense of cherry picking quotes. But that gripe rings hollow: we have, after all, provided the entire transcripts from the conversations that are most important so that the Court can review them in their entirety, and we have meticulously cited every proposition in the brief.

6

*Federal Defender Services of Wisconsin, Inc.*

Case 2:16-cr-00021-PP   Filed 07/11/17   Page 6 of 14   Document 54

In its counter narrative, the government asserts that Hamzeh supplied the genesis for the machine-gun idea. But much dispels that claim. Fist, the conversation before January 19 and the subsequent deal that Mike makes to get machine guns for less than $600 dispel the idea that Hamzeh was the moving force here. Second, the Court just has to read the transcripts from December and the apathy that Hamzeh had for getting a machine gun, especially when that's contrasted with Mike's zeal. It takes real skill to take an inane conversation about hawks and use it as a pivot point for talking about machine guns.

The third point rebutting the government's claim needs a little more context. It's true that Hamzeh had conversations about going to Israel and attacking soldiers, and in those he makes repeated idle boasts about what great feats he would accomplish in the name of Palestine, such as finding an Israeli solider, taking his "machine gun" away from him, and using that gun against the solider. So we agree that Hamzeh had uttered the word "machine gun" before December. But his boasts are of a different sort from Mike's desire to get one into Hamzeh's hands. Sure, Hamzeh talks a lot, but it's Mike who repeatedly wants to take those boasts and make them something more than bluster and get Hamzeh to actually part with some money to get one.

*Federal Defender Services of Wisconsin, Inc.*

When it comes to arguing about Hamzeh's bluster about machine guns in the middle east, the government notably doesn't dispute that it has *no* evidence (at all) that Hamzeh did anything other than flap his gums about Israel. Indeed, the government's response doesn't refute the defense's claim about what's missing from the investigation

- there are no plane tickets,
- there are no bank accounts,
- there are no conversations with Hamas,
- there is no participation in extremist groups,
- there are no contacts with people in the Middle East about attacks, and
- there are no other details that would support claim that Hamzeh actually intended to do anything.

Rather, all Hamzeh did was talk, boast, and make up stories about his grandiose plans, and then he made excuses as to why he could not do it now. In a word, he's a Palestinian Walter Mitty.

Fourth, any discussions about machine guns in the Middle East has little relevance to the United States and whether Hamzeh can be released on bond. After all, Hamzeh certainly wasn't looking to buy a machine gun here to take overseas. He repeatedly expressed instead that he wanted a handgun to protect himself here, and he never even did that—even though he could lawfully purchase a handgun

*Federal Defender Services*
8 *of Wisconsin, Inc.*

without any help from Mike or Steve. But that would have done Mike and the FBI no good—Hamzeh can't be arrested, detained for 16 months, or have his picture plastered on the front page if he'd bought a handgun to keep him safe on his delivery route. So pressure was applied for Hamzeh to get a machine gun.

Fifth, the government's claim that "Hamzeh even more persistently sought a machine gun" than a handgun throughout the four months has no support in the discovery—none. Rather, the evidence is that Hamzeh never sought a machine gun until acquiescing to Mike's plans during the final week. And the evidence that this Court has (hundreds of pages of transcripts) show that Hamzeh repeatedly said that all he needed was a handgun. Hamzeh's allusions to machine guns in his boasts is not "persistently" pursuing a machine gun. (Govt.'s Br at 12).

On top of that, and this is an important point, throughout the conversations no distinction was made between lawful semiautomatic guns and machine guns. Hamzeh referred to Mike's gun as a machine gun, and Mike implied the guns sold at Gander Mountain were machine guns. So it's not clear whether Hamzeh's use of the term "machine gun" in Arabic was the precise legal definition in 26 U.S.C. § 5845 or the loose reference to a semi-automatic rifle. That point will be addressed at trial.

9

*Federal Defender Services of Wisconsin, Inc.*

In sum, the government's narrative falls apart under even a modicum of scrutiny. What's more, its neither the story of this case nor does it address the questions that should control release or detention. Rather, the real questions raised by the government's response are and the questions that should bother this Court are:

- Where are the conversations in which this plan against the Masons was devised?

- What happened after early January when the entire investigation against Hamzeh looked like a complete waste of time and money after four months of targeting him?

- Why are there no conversations among the hundreds of hours, or texts, or other communications about the developing Masons plan?

- Why wasn't Mike reporting conversations to the FBI or recording them?

- And what was the incentive for Mike to take a job for months just to be close to Hamzeh and to be in his ear 24-7?

It's only at the expense of ignoring those questions that the government can argue that this was Hamzeh's idea and we're all just fortunate that Mike and Steve were there to record it all and supply that machine gun. The reality of this case lies in those questions. Because for four months Hamzeh blustered but did nothing, and then when his "friends" supplied misinformation about the Masons they upped the bluster and the gory details but it remained all talk. When his "friends" seemed to

move beyond talk, Hamzeh backed out and adamantly tried to talk his friends out of it. Those are the facts of this case, and those facts support releasing Hamzeh on bond.

> **B. The government also wades into the particulars of the legal analysis and offers that this could be punished more harshly and a jury could find Hamzeh guilty.**

In its brief, the government points to the weight of evidence and the potential penalties as grounds for detaining Hamzeh. The defense acknowledges that the government has a strong case for proving the basic elements of a crime that carries (even with its analysis) three years under the guidelines. Yet this much has to be clear: there is no guideline enhancement based on mere speech. So the idea that a cross-reference could be applied is unlikely, nearing inconceivable. What's more, this is not a case where the entrapment defense is just a fanciful dream. Given the four-month campaign of manipulation by not just one informant, but two, and Hamzeh's reluctance to engage in criminal conduct, make this trial anything but a sure thing for the government. And this point can't be lost in all this, as Hamzeh sits in court tomorrow and hears attorneys on both sides argue about his release, he carries the presumption of innocence. That is, he is an innocent man. And the law assumes, and this court must as well, that he was entrapped and that in February, he will walk out of the federal courthouse with a cleared name.

In its brief, the government also suggests that this crime is more serious because it involves multiple firearms. But the number of firearms was determined by the government and it must be remembered that one gun was for Steve and that Hamzeh asked if they could buy the other gun without a silencer. In addition, in terms of seriousness, it is worth considering that multiple firearms don't give rise to multiple counts under 18 U.S.C. § 922. It is only because Hamzeh failed to pay taxes on multiple guns (at least one of which wasn't his) that he is subject to multiple counts under § 5845.

With respect to danger to the community, what is required is that the government show by clear and convincing evidence that Hamzeh presently poses a danger to the community. With electronic monitoring, and under the watchful eye of his family and the community, he does not pose such a risk. Hamzeh has a good work history and no criminal convictions. He has never owned a firearm and the search of his home after his arrest uncovered nothing that raises dangerous concerns. Recognizing that there is no real indication that Hamzeh would pose a danger if released, the government points to a fight that was observed after a man struck Hamzeh's car. There was no arrest and apparently no injuries from this altercation. In any event this disorderly act, if charged, would likely result in a signature bond in state court. And this one incident is hardly the type of danger

that would prevent pretrial release with location monitoring and other conditions. When it comes to flight risk, there is none. Hamzeh will relinquish his passport and can be monitored by GPS. Given the notoriety of this case there is no realistic likelihood that he would be able to flee.

## II. Conclusion

At the end of the day, the government bears the burden of establishing that no combination of conditions can be fashioned to ensure his appearance and the community's safety. And the government can't meet that burden. The defense offered this Court a full view of the pertinent parts of this case. We attached the transcripts and we tracked the investigation from its inception to Hamzeh's arrest and even added in a psychiatric evaluation. While the government has the rejoinder of "listen to his words," "who speaks like that," and "he's dangerous," the defense has the facts of this case. And those facts keep the government from meeting its burden and instead establish that this is the sort of case where Hamzeh should be released, so he can work and help assist his attorneys prepare for trial.

*Federal Defender Services of Wisconsin, Inc.*

13

Case 2:16-cr-00021-PP   Filed 07/11/17   Page 13 of 14   Document 54

Dated at Milwaukee, Wisconsin, this 11th day of July, 2017.

    Respectfully submitted,

    */s/    Craig W. Albee*
    Craig W. Albee, WI Bar #1015752
    Joseph A. Bugni
    FEDERAL DEFENDER SERVICES
     OF WISCONSIN, INC.
    517 E. Wisconsin Ave - Rm 182
    Milwaukee, WI 53202
    Tel.: (414) 221-9900
    E-mail: craig_albee@fd.org

    *Counsel for Defendant,* Samy M. Hamzeh

14     *Federal Defender Services of Wisconsin, Inc.*

Case 2:16-cr-00021-PP   Filed 07/11/17   Page 14 of 14   Document 54