UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION


UNITED STATES OF AMERICA,      )     CASE NO:  2:16-CR-00021-PP
                               )
                Plaintiff,     )         CRIMINAL
                               )
       vs.                     )       Milwaukee, Wisconsin
                               )
SAMY MOHAMMED HAMZEH,          )     Monday, December 4, 2017
                               )     (2:01 p.m. to 4:10 p.m.)
                Defendant.     )


BAIL REVIEW HEARING


BEFORE THE HONORABLE PAMELA PEPPER,
UNITED STATES DISTRICT JUDGE


Appearances:            See next page

Deputy Clerk:           Kristine Wrobel

Court Reporter:         Digital Recording

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, Texas 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>

Plaintiff:                      PAUL L. KANTER, ESQ.
                                United States Department of Justice
                                Office of the U.S. Attorney
                                517 E. Wisconsin Avenue, Room 530
                                Milwaukee, WI 53202

Defendant:                      CRAIG W. ALBEE, ESQ.
                                Federal Defender Services
                                 of Wisconsin, Inc.
                                517 E. Wisconsin Ave, Room 182
                                Milwaukee, WI 53202

                                JOSEPH A. BUGNI, ESQ.
                                Federal Defender Services
                                 of Wisconsin, Inc.
                                22 E. Mifflin Street, Suite 1000
                                Madison, WI 53703

U.S. Probation:                 Lisa Cyrak
                                517 E. Wisconsin Ave, Room #001
                                Milwaukee, WI 53202

1        <u>Milwaukee, Wisconsin; Monday, December 4, 2017; 2:01 p.m.</u>

2                    (Call to Order)

3                    **THE COURT:**  Court calls Criminal Case 2016-

4   CR-21, United States of America versus Samy Hamzeh.  Please

5   state your appearances, starting with the attorney for the

6   Government.

7            **MR. KANTER:**  Yes, good afternoon, Your Honor, Paul

8   Kanter on behalf of the United States.

9            **U.S. PRETRIAL SERVICES OFFICER CYRAK:**  Liz Cyrak

10  present on behalf of Pretrial Services.  Good afternoon, Your

11  Honor.

12            **MR. ALBEE:**  Good afternoon, Your Honor, Craig Albee

13  and Joe Bugni, appearing on behalf of Samy Hamzeh, who's here

14  in person.

15            **THE COURT:**  Good afternoon.  Good afternoon,

16  Mr. Hamzeh.

17            **DEFENDANT HAMZEH:**  Good afternoon.

18            **THE COURT:**  We're here this afternoon, as you all

19  know, I think, because Mr. Hamzeh moved for release on bond,

20  and Judge Jones had an evidentiary hearing on that issue, and

21  there was also extensive briefing on it and at the end of the

22  hearing and after the briefing denied that motion and ordered

23  that Mr. Hamzeh remain in detention until his trial, which is

24  scheduled for February, and Mr. Hamzeh appealed and asked that

25  I conduct the de novo review of the bond determination, the

1    question of whether or not he should obtain bond.

2           Mr. Albee and Mr. Bugni filed a motion asking for

3    some expedited briefing ahead of this hearing, and I did grant

4    that.  And there was a document filed, I think, on Friday,

5    which I've reviewed, just a five-page document.  I did note in

6    that pleading that because a lot water had already passed under

7    the bridge, there had been a lot of documents, a lot of

8    information filed and provided to Judge Jones and all of that

9    is on the record.  I did ask that whatever those filings might

10   be be truncated because I have looked at the information that's

11   already on the docket.  So I've also reviewed what the defense

12   filed on Friday.

13          And, Mr. Kanter, I think the Government hasn't filed

14   anything in addition; is that correct?

15          **MR. KANTER:**  That is correct.

16          **THE COURT:**  All right.  So that is where we are.

17   This is a de novo hearing on the question of whether or not

18   Mr. Hamzeh should be released on bond under any conditions,

19   pending the February trial, and I guess I'll ask how the

20   parties wish to proceed.

21          **MR. ALBEE:**  Your Honor, we're happy to go ahead and

22   make our arguments.

23          **THE COURT:**  Okay.

24          **MR. ALBEE:**  Judge, I have probably about five or six

25   main minutes that I want to make here today.  I realize the

1    Court has had the opportunity to review the extensive  briefing

2    in this case, and there's probably much more in the way of

3    submissions in terms of transcripts than in the usual case, so

4    we're certainly relying on those things, and I won't cover all

5    those -- all those things again.  I hope to hit about five or

6    six particular points.

7              First of all, I think it is important to keep in mind

8    that this is a gun case, not a terrorism case.  That's

9    significant for at least three reasons.  First of all, the

10   legal standards are different.  There's no presumption of

11   detention in this case because it's a gun case.  The law that

12   comes to us, Dominguez, is probably the leading Seventh Circuit

13   case, but several significant points would include that doubts

14   must be resolved in a defendant's favor; second, that the

15   Government has the burden of proving by clear and convincing

16   evidence that Mr. Hamzeh would currently pose a danger, not

17   just that -- it's not enough to show that there had been some

18   dangerous conduct in the past, yet the clear and convincing

19   burden is to show that he would pose a danger now if released.

20             And also, again, that burden would also require the

21   Government to show that there aren't conditions that would

22   reasonably assure the safety of the community.  It's not -- in

23   no case can there ever be certain assurance in all.  What they

24   have to show is clear and convincing evidence that the

25   conditions would not reasonably assured safety, which is a high

1   burden to meet.

2           Another significant difference because this is a gun

3   case, is that the sentences are different.  I'll talk a little

4   bit more later, but the guidelines in this case, if there were

5   acceptance of responsibility, would be 24 to 30 months without,

6   I think, 33 to 41, I think, if you went to trial and lost.

7           And third, the safety concerns are certainly

8   different.  This is a gun case, technically a tax -- a failure

9   to pay tax on a gun case.  And while the criminal Complaint

10  certainly drew a lot of attention because of an alleged plot

11  that at one time supposedly existed, as Judge Jones found, that

12  that was entirely abandoned and Mr. Hamzeh had took affirmative

13  steps to dissuade anybody from even considering such a plan

14  because it was wrong; and so really the focus has to be on

15  what's the danger involved, given the only offenses that are

16  charged in this case.

17          My second point that I wanted to talk to the Court

18  about is that, you know, oftentimes when we come to court, you

19  don't know much about what the defendant you'd say has really -

20  - has been up to.  We don't -- you know, they may be charged

21  with, okay, they bought cocaine on this particular date, and,

22  you know, we have some general information about what they are,

23  but we can't say with any specificity, you know, where they've

24  been or what particular things they've been doing during the

25  last few months, and that's fine.  Again, the burden is on the

1    Government to show things.

2         This case is really different.  We have -- the FBI

3    gathered so much data on Mr. Hamzeh over the course of several

4    months that we really can say that we know that he wasn't doing

5    things independently on his own that would cause us great

6    concern on his own.  As we've -- in our submission on Friday,

7    we had learned in supplemental information from the Government

8    that they conducted 64 days of surveillance.  Sixty-four times

9    there was surveillance.  We've only been provided one of those

10   64 reports.  Apparently, it's the Government's theory that that

11   isn't Brady material.  I don't get that, and we'll file a

12   motion moving forward, but the fact that they had eyes on him

13   64 times and only one of those reports was deemed significant

14   enough to turn over would suggest that on those other

15   occasions, he's doing nothing that would give them pause, that

16   would give them reason to write up a report to provide to the

17   defense that would be potential trial evidence.  So he's not --

18   again, I presume -- I don't have the reports, but I would guess

19   that it would be turned over if he were on his own going to

20   purchase guns, going to meet with people who are dangerous,

21   what have you; and instead, we have one report out of 64.

22        The informants appear to be meeting with him daily.

23   And again, there's little to indicate that he's doing anything

24   other than the conversations, which again, we've acknowledged

25   are alarming and we've addressed, but that there are particular

1  actions being taken by Mr. Hamzeh.  They searched his home

2  after his arrest.  Again, it's not a situation where there's a

3  stockpile of weapons or other things of concern.  We didn't get

4  anything in the discovery that you'd look at and say, oh, you

5  know, that gives me danger concerns.

6          They took his phone and PlayStation, which can act as

7  a computer, and searched those things, and we haven't received

8  information that would cause anybody concern about what might

9  happen if he were released.

10         And they interviewed him after his arrest for a

11  significant period of time, three hours, and, you know, there's

12  nothing that was -- that developed additionally there.  What we

13  do know is he's not doing anything on his own that's not with

14  these two informants.  He's not involved in guns at any time.

15  He's not involved with extremist groups.  He's not in chats

16  with people we'd be concerned about.  His confederates are the

17  informants.  He doesn't appear to be communicating overseas

18  with people to be concerned about.  The plan only existed with

19  these informants.

20         And I know the Government at times has tried to

21  characterize this as a lone wolf, but a lone wolf acts alone.

22  He didn't act alone; he only acted with these other informants.

23  In those kind of cases, at least those that publicized in the

24  news where somebody does something, it seems like invariably

25  they search the home and find all sorts of things that would

1    have been alarming if somebody had searched the home earlier.

2    That's not the case here at all.

3          And as Judge Jones found, Mr. Hamzeh  abandoned this

4    plan by the time of his arrest.  I'll come back to this, but

5    also it's -- it's significant.  These informants start working

6    for the FBI on Mr. Hamzeh in September 2015.  There's not one

7    thing before September 2015 that would suggest Mr. Hamzeh had

8    been a significant danger, committed criminal offenses in his

9    life or been involved in any -- or had any interest in

10   terrorism or anything else before September 2015, when these

11   informants start working on him on a daily basis.

12         That kind of segues into my next issue.  I did want

13   to just lay out a little bit for the Court why we think

14   entrapment is such a strong defense at trial, but also to point

15   out for the Court's consideration that entrapment is also a

16   sentencing issue in the event Mr. Hamzeh were convicted in this

17   case.  It's mitigating because he didn't act on his own, and it

18   was only at the behest of these government informants pushing

19   him that these things occurred.  So to have at least a little

20   bit of background on the facts there, I think, is important,

21   again, on the issue of guilt, but also on sentencing.

22         And so we've submitted the documents to the Court

23   that demonstrate that the informant Mike was working to get

24   Mr. Hamzeh to agree to get a machine gun.  Mr. Hamzeh

25   repeatedly said he wasn't interested in getting a machine gun.

1    He might want a pistol because he was a delivery driver and

2    defending himself seemed like a good idea.  That, of course,

3    wasn't illegal.

4         During the course of these conversations where

5    Mr. Hamzeh is saying I don't need a machine gun, that he

6    doesn't want one, and there's -- we have no evidence.  Again,

7    they searched his computer, they searched his home, we have

8    nothing that says he's ever shopping for guns, other than

9    mentioning it to Mike on the occasions that are identified in

10   the pleadings; but it's really significant, Mr. Hamzeh says,

11   you know, at some point he's clearly pushed over the edge.  He

12   says, you're stupid, you keep asking me the same stupid

13   questions over and over, you're stupid and a mother.  And, you

14   know, because he's so frustrated that Mike keeps on raising the

15   same kind of things that he keeps on pushing him off and

16   deflecting him from, but that doesn't stop him.

17        That becomes particularly important because as I'll

18   talk about a little bit later, we have many, many conversations

19   that are unrecorded, and we have no idea what goes on during

20   those, but we can assume that they're at least as pushy as the

21   ones that are recorded where Mike knows that he is being

22   recorded.

23        Those -- and that shows that Mr. Hamzeh resisted.

24   That's relevant to entrapment.  We submitted in the submission

25   on Friday to show how many phone calls were being made.  Only a

1   fraction of those calls appear to be recorded.  We don't have

2   the other ones.  We don't -- we don't have recordings of all

3   sorts of daily meetings at work, so there's -- there's much

4   that -- there's much here that went on that we don't have any

5   information about.

6            In terms of whether there were any extra incentives

7   to get Mr. -- Mr. Hamzeh interested in what the informants were

8   selling, we do have the extraordinary inducement on cost with

9   this machine gun, which is, you know, below -- well below

10  rock-bottom price.  I mean, it's just not real world in any

11  way, shape or form that somebody could buy one of those for

12  $300.

13           Further, Mr. Hamzeh had no ability to do it on his

14  own.  He didn't know anybody purporting to sell machine guns.

15  He didn't go out looking for anybody selling machine guns.

16  There's nothing to show that he wanted the machine gun other

17  than as finally giving in to Mike's persistence over a period

18  of two months with respect to the machine gun, and longer than

19  that with respect to other things.

20           Mr. Hamzeh doesn't have a criminal history, which is

21  relevant to entrapment; and we have the fact that we have a

22  paid informant, which I think will be significant for a jury.

23           Other evidence supportive of our position here,

24  Judge, is the contemporaneous recordings made in the week

25  before Mr. Hamzeh's arrest, when, of course, he has no idea

1    he's being recorded, while the informants always do.  But even

2    then, when he's speaking to Steve about Mike, he says he

3    brainwashes you.  He says that the Masonic plan was Mike's

4    idea.  Again, he has no -- there's no benefit to him saying --

5    saying that and he has no idea he's being recorded, so it would

6    appear to be a contemporaneous state of mind statement.

7         He also notes at that time that Mike is telling him

8    that his life is in ruins.  It's an appeal to sympathy by Mike.

9    Again, a manipulative type thing.  He talks at length about all

10   the videos that he's been shown where he's been deceived,

11   manipulated, and exploited, where he comes to believe this

12   craziness about them, the Mason's being ISIS, something he had

13   never ever talked about before and which he says only came up

14   in the last month.

15        Notably, from December 14th, I think until January

16   19th, even though Mike has many contacts with Mr. Hamzeh, those

17   -- there are no recordings during that period, and that's when

18   after all this time of resisting his overtures, somehow this

19   Masonic plan allegedly comes together, which ultimately

20   Mr. Hamzeh rejects in its entirety; but how that came about, we

21   don't know, because it wasn't recorded, which is extremely,

22   extremely problematic.

23        In terms of other things that are more relevant, just

24   the sentencing, if there is such a thing.

25             **THE COURT:**  Mr. Albee, do you want a peppermint or a

1  cough drop?

2        **MR. ALBEE:**  Mr. Bugni got me some water.

3        **THE COURT:**  Okay.

4        **MR. ALBEE:**  I don't know if that will help.

5        **THE COURT:**  I know you've got a --

6        **MR. ALBEE:**  Thank you.

7        **THE COURT:**  Sure.

8        **MR. ALBEE:**  But as to sentencing, the -- the

9  Government chose what type of weapon would be -- or chose how

10  many weapons would be here.  There's a considerable amount of

11  confusion during the course of these contacts about -- there's

12  mentions of AK-47s or Kalashnikovs, and, apparently, Mike has

13  one of his own, a semiautomatic assault weapon, which is legal,

14  and there's certainly confusion about what weapon this might be

15  and whether it could be registered, and some other things.

16        There's an extra count here, Judge, for the --

17  according to the Government's allegations, Mr. Hamzeh was

18  buying one gun and Steve was buying one gun.  And they got

19  Mr. Hamzeh to carry the bag, you know, I don't know, 30 feet,

20  or something like that, and then they arrested him and they

21  charged him with possession of both guns for carrying it for 30

22  feet.

23        One thing we intend to explore in more detail is the

24  fact that these machine guns, you can go to Las Vegas and take

25  possession of one of these guns and shoot -- and shoot the

1   guns, and nobody gets charged for possession of the gun. They

2   don't get a transfer tax -- they don't pay a transfer tax to

3   use the gun or to use a silencer in those kinds of situations.

4           There are local places in Waukesha, and actually, I

5   went skeet shooting in September, I think it was, and I could

6   hear somebody shooting a machine gun. They let people use them

7   at these ranges, so there's nothing that appear to be deemed

8   illegal about somebody taking a momentary possession of such a

9   gun. And -- but again, either way, it's a sentencing

10  manipulation to have Steve buy a gun and have Mr. Hamzeh carry

11  it for a few feet and say you possessed that without paying a

12  tax.

13          And the last thing I guess I would say about

14  entrapment is I think Judge Jones did get it wrong in the sense

15  that he thought there were credibility issues to be resolved.

16  I think that's true at trial, but those have to be resolved at

17  this juncture in Mr. Hamzeh's favor. The Government hasn't put

18  a -- put together -- or shown a case here that says that

19  Mr. Hamzeh doesn't have a viable entrapment case at trial. And

20  I think Judge Jones also, instead of focusing on the gun case,

21  focused on the abandoned Masonic center claim, without thinking

22  through the enormous psychological pressures that would have

23  existed in that case. Anyway, I guess that's all I'll say

24  about that at this point.

25          I think the next point I wanted to make is that we

1    think without bail that there's a likelihood of irreparable

2    harm here.  We think that because we think we have a viable

3    entrapment defense and so all this time that Mr. Hamzeh has

4    spent incarcerated would be lost time if he's found not guilty,

5    he  will have spent almost two years in custody for not

6    committing any offense.

7         Beyond that, the guidelines, as we pointed out, are

8    approximately 24 to 30 months.  At the bottom end of that

9    range, I think he would have already served his sentence.

10        Another concern we have about fairness and

11   irreparable harm is Mr. Bugni and I really need Mr. Hamzeh

12   available to us to prepare for this trial.  It is about the

13   transcripts and recordings.  Let me tell the Court it's a tall

14   task for us to -- even working with translators, to work with

15   these Arabic recordings and really just figure them out.

16   Mr. Hamzeh, even though he's -- he's not -- his English isn't

17   particularly great and it's certainly good enough to

18   communicate -- even with that, he would be able to help us

19   enormously in trying to understand the transcripts and which

20   ones that we should focus on.

21        So we'd certainly much rather have him in our office.

22   It's not really feasible to go down to Kenosha on a regular

23   basis to try to have him assist us with those transcripts.

24        Next is there are conditions here, Judge, that would

25   minimize any -- any minimal risks that exist here.  We've

1    offered up that there's third-party custodians, his parents and

2    his sister, who he  would live with, are here in the courtroom.

3    GPS certainly will ensure that he doesn't flee, but also, he'll

4    know that his location will be monitored at all times; and so I

5    think anybody under those conditions would know they can't go

6    places where they shouldn't or that would be problematic.  He

7    could turn in his passport.  He has a job waiting for him that

8    he can work at.  As the Court knows, he has a decent employment

9    history in the past.

10           You know, frankly, Mr. Hamzeh's case is fairly

11   notorious at this point.  I don't think he's going to be able

12   to go anywhere without being identified.  Certainly, the

13   Government, having surveilled him for 64 days and invested all

14   these resources, I would guess would continue to keep an eye on

15   him no matter what.  As I said, we have all these data points.

16   They searched his computer, they searched his house.  We have

17   the fact that there's nothing before September 15 -- or

18   September 2015, and none of those things indicate that he's a

19   danger.  He can report to Pretrial Services.  So all those

20   things are there to minimize the risk.

21           The last thing I wanted to touch on, Judge, is really

22   what the Court has to look at in making the ultimate decision

23   about whether there's any danger here, and that is not to

24   decide whether, based on the allegations of the Government,

25   there was something dangerous in the past that would concern

1  us, but whether there's something dangerous moving forward.

2  And it can't be just some speculation about, you know, I have a

3  little discomfort about Mr. Hamzeh; it has to be clear and

4  convincing evidence that the conditions would not reasonably

5  assure safety.  I think that requires the Government to say

6  this is specifically the crime that we're worried about him

7  engaging in if he were released, and there is nothing that they

8  can point to that they have evidence of that would rise to the

9  level of clear and convincing.

10        I guess the two things we look at are whether there's

11  some worry about him being involved in anything relating to

12  terrorism, at least that's been the Government's theory that

13  they've been pushed.  We can look at how firmly he disavowed

14  and how adamantly he refused to go through with this plan.  The

15  Court has seen his words, he got so frustrated and upset and

16  desperate at one point that he said, "goddamn your religion,"

17  because the informants kept fighting back against him and

18  trying to bait him into going through with this, but he was

19  adamant.

20        He was so adamant that he had the courage to go see

21  an imam and to go to these folks and use every bit of

22  persuasion that he could possibly have.  He argued about their

23  self-interest, about why they  clung to it, he argued on moral

24  grounds, he argued on religious grounds, and became angrier and

25  angrier as they resisted him.

1          But that was -- given the psychological information

2   we've provided to the Court and we'll provide at trial, I mean,

3   things like the electric shock experiment that we all know

4   about or Stockholm syndrome or all -- the Stanford prison

5   experiment, all sorts of things we know that the social

6   influence factors when one person is being manipulated by

7   multiple people and how susceptible human beings are to that,

8   that Mr. Hamzeh standing up and saying I won't do that is a

9   very strong reason to believe that he won't consider anything

10  if he's released.  Not only does he have two years in jail to

11  show him that, he had already figured it out before being

12  arrested.  He has his family who he's very close to that will

13  be putting that message in his ear on a regular basis.  He has

14  the community, many of whom are in this courtroom today and

15  many of whom were at the last hearing.  They're going to give a

16  resounding response against any such thing.  He's got his

17  lawyers in his ear, and this is all punctuated by the two years

18  he's spent in jail.

19          So there's just nothing that would show that he would

20  be involved in that kind of thing.  He doesn't have any

21  confederates other than the confidential informants.  He's not

22  a member of any organization.  He doesn't have any opportunity

23  to be involved in any of that kind of activity.  At the end of

24  the day, when we look at all the surveillance and everything

25  else, they didn't have him do anything to anybody to cause

1  harm.  There were even times where he was talking to the

2  informants and he's like, let's go tear down that flag, either

3  like a French flag or an Israeli flag, and then he'd say, nah,

4  I don't want to do it.  I mean, he just -- he talked big but

5  did nothing.

6        And the other thing we know from his computer and

7  from the search of his house is he never researched -- he never

8  researched guns.  And that's the second -- that's the second

9  thing, is the only other crime they might point to is do we  a

10 worry about him having guns.  He never had them before, never

11 bought them before, never shot them before Mike took him to the

12 range.  Never -- he's got third-party custodians.  The family

13 didn't have any in the house.  He doesn't have money for guns.

14 He knows the consequences.  There's absolutely no reason to

15 believe he would be able to acquire a gun or have any desire to

16 if he's released in this -- in this case.

17       Again, instead of two CIs in his ear all the time

18 trying to get him to do the wrong thing, he's got family,

19 community, and his lawyers telling him to do the right thing,

20 and I have every reason to believe Mr. Hamzeh would be a model

21 pretrial release candidate.

22       So in closing, I just again point out that before

23 September 2015, before these informants started working for the

24 FBI, there's nothing to show in those 23 years that Mr. Hamzeh

25 was engaged in serious criminal conduct, and there's no reason

1    to believe that if released, he wouldn't be the person he was

2    for those 23 years but more mature, somebody who works,

3    somebody who's with his family, somebody who plays video games

4    in his spare time, and somebody who's not a danger to the

5    community; and after two years in custody and facing a

6    guideline sentence that's about two years, we think he should

7    be released so he can help his lawyers in this case and be with

8    his family, because there's no showing that he is a danger if

9    released in this case, Your Honor.

10           **THE COURT:**  Thank you, Mr. Albee.

11           Mr. Kanter.

12           **MR. KANTER:**  Thank you, Judge.  As the Court has

13    already noted, this matter has been rather extensively briefed.

14    I think there's probably been more briefing and more evidence

15    submitted in this particular bond hearing than in perhaps any

16    other such hearing that has ever been heard, certainly in this

17    district and maybe in most others around the country.  And so

18    the Government, as you noted, did not file any additional

19    briefing because we're comfortable in relying on the brief that

20    we filed before the magistrate, which was filed on July 10th of

21    this year, as well as the submission of the post-arrest

22    interview, which was provided to the Court, and I believe that

23    you have available to you -- I hope that you have available to

24    you.

25           I realize that it's about three hours long, and the

1  Government -- and I'm sure the defense would agree with this,

2  is more than willing to provide you with time references to

3  that if you would like it.  On the other hand, Judge, I would

4  encourage you to take the time, if you can find it, to review

5  the entirety of that, because I'd be the first to tell you that

6  I think context for statements that are made in that

7  post-arrest interview are important, as opposed to just pulling

8  out words or maybe brief phrases, so I would encourage you to

9  do that.

10         And, of course, the Government also does rely on

11  the -- on the conclusions and the decision, ultimate decision,

12  that the magistrate judge came to in his October 26th decision

13  of this year.

14         That having been said, Judge, at the risk of taking

15  too much of the Court's time, I would like to review some of

16  the evidence and set forth the Government's argument as to why

17  the Government still maintains -- continues to maintain and,

18  quite frankly, always will maintain until a decision at trial,

19  that Mr. Hamzeh should remain detained, for both risk of flight

20  and, more particularly, for danger to the community.

21         I -- before getting into my prepared remarks, I would

22  like to just respond to a couple of things that were raised

23  here in open court by Mr. Albee.  I can't -- I'm not going to

24  tick off an answer to each one of them.  There were a couple of

25  them that struck me, and most of everything else that he

1  addressed, I believe, will be addressed or covered in my

2  prepared remarks, but he made the -- he opened his remarks by

3  saying that this is not a gun case.  Judge, with all due

4  respect to Mr. Albee or to anybody else, that's rather like

5  saying that this -- excuse me, this is just a gun case.

6          **THE COURT:**  Right.

7          **MR. KANTER:**  That's rather -- this is just a gun

8  case.  That's rather like saying that Al Capone was prosecuted

9  on just tax charges, which we all know is not true, or more

10  currently, that Mr. Flynn is being prosecuted just on making

11  false statements to the FBI.  We all know that that is not

12  true.

13          You, as a former prosecutor, know that we have a

14  limited number of charges to pick from, and we have to work

15  with the -- with the criminal defenses that Congress has given

16  us to work with.  In this particular case, because of the way

17  the case unfolded and because of the technicalities, legal

18  technicalities of this case, we do not have a material support

19  prosecution available to us.

20          For example, the reason for that is very clear.  In

21  his post-arrest statement, Mr. Hamzeh says, "We're doing this"

22  -- excuse me, actually, it was in a recorded statement shortly

23  after their tour of the Masonic Center, where Mr. Hamzeh says,

24  "We're doing this for us."  And I'll refer to that in more

25  detail in a little bit, but we're referring -- we're doing this

1    for us, we're not associated with anybody else.

2              That's a technical requirement of Section 2339(b),

3    that we be able to relate material support to an identified and

4    named foreign terrorist organization.

5              I raise that not to get into an argument about it

6    with Mr. Albee or anybody else, but just to say that we use the

7    criminal offenses available to us to address what we

8    perceived -- what we believe, we submit to you and to a jury

9    not long from now, is a very serious criminal situation here.

10             The second thing that I -- I would just like to touch

11   on, and again, I will cover it but not directly, necessarily,

12   in my prepared remarks, is the suggestion that because there

13   was all this surveillance done and the FBI didn't see anything

14   through all of these periods of surveillance or there was this

15   search that was done and the FBI didn't find anything during

16   this detailed search that they did of the home, the parents'

17   home, by the way, is somehow indicative that there was no

18   criminal activity afoot.

19             As you might guess just from what you probably

20   already know about this case, cases like this, and this case

21   specifically, are dependent upon what we refer to as

22   operational security.  And, in fact, one of the reasons, as I

23   will get into here in a few minutes -- one of the reasons why

24   Mr. Hamzeh called off this particular attack is because he

25   perceived that there was a breakdown in their operational

1   security, that there was a leak, and that other people in the

2   community were suddenly aware of -- aware of what was going on,

3   and that they were going to be discovered and arrested,

4   prosecuted and punished.  And so it's not surprising, quite

5   frankly, that the FBI didn't find a lot because the criminality

6   that was afoot required operational security and extreme

7   secrecy.

8           Having said that, let me get into a couple things

9   that I'd like to cover with the Court and, hopefully, I won't

10  be too long, but I think these --

11          **THE COURT:**  Mr. Kanter, you all have as much time as

12  you want.

13          **MR. KANTER:**  Thank you, Judge.  I think that these

14  things are important, and I would like to take exception, with

15  all due respect, to a statement that was included in the

16  defense's motion for review of the magistrate's bond

17  determination.  And in -- in that motion it is said --

18  actually, it said four times on page 11 of the November 22nd

19  motion for review that the magistrate had found or concluded or

20  identified a, "viable entrapment defense."  I can tell you,

21  Judge, that when I first read that in the motion, I was

22  surprised.  It bothers me -- it bothered me a lot, and I spent

23  a great deal of time reading and rereading the magistrate's

24  decision.  I probably read it more than any other document so

25  far in this case, at the least with regard to the documents

1    filed with regard to release.  And I can assure you that there

2    is no finding, no reference, no suggestion by the magistrate

3    judge whatsoever that Mr. Hamzeh possesses a viable entrapment

4    defense.  It is not in that finding.

5            The magistrate's reference -- there are two, and I'm

6    going to reference both of them.  The magistrate's only

7    reference to the entrapment defense is actually found on page

8    13 and 14 of his decision, and he's talking about the weight of

9    the evidence.  In a paragraph or two above that, he talks one

10   view of the weight of the evidence is this, and in his only

11   reference to entrapment, he says in -- and I'm quoting:

12           "In another view, the view of Mr. Hamzeh, the weight

13           of the evidence favors release because it establishes

14           that federal agents entrapped Mr. Hamzeh.  As the

15           United States points out, the entrapment defense is

16           for the jury and it rests on the demeanor and

17           credibility of evidence, precisely the type of

18           evidence that I have not had an opportunity to

19           review."

20           That is true, entrapment is not for this hearing,

21   it's for the trial.  It's for a jury to decide at trial.

22           What is fair to say at this point in this proceeding,

23   is that at this point, at this stage, all the defense has done

24   is put forward nothing more than what the magistrate referred

25   to in his only other reference to entrapment in his decision,

1    which is on page 20, that, "There's an intriguing entrapment

2    argument."   That's it.   So there is no viable entrapment

3    defense that the magistrate identifies, finds or deals with.

4          I would note, and in case there's any doubt about it,

5    Judge, that the defense -- excuse me, that the Government

6    specifically denies entrapment in this case.   We are fully

7    prepared to defend our investigation and all the actions we

8    took during the course of that investigation at trial; and if

9    it is appropriate, and only if it is appropriate, based on your

10   determination that it is appropriate, will that question ever

11   be submitted to the jury to determine.   It's for you to decide

12   in the first instance whether or not there's an issue of

13   entrapment to be even presented to the jury.   If you do that,

14   we are fully prepared for the jury to deal with that particular

15   issue.

16         Now, in that same motion for review that the defense

17   filed here back on November 22nd, there is a statement in

18   there, it's on page nine, that the Government completely does

19   agree with, and I'd like to read it to you.   On page nine, they

20   say,  "Facts, not fear, must control the detention decision."

21         Indeed, let's talk about the facts.   Let's put aside

22   what is at this point in time nothing more than an entrapment

23   theory developed from the counsel by counsel and look at the

24   facts that are before the Court.

25         Now, it's interesting, I want to state, that I

believe that the facts that I'm about to recite are actually undisputed, because unless I misunderstand the filings that the defense has made up until this point in time, arguments that have been made in court, I don't believe that they are going to disagree or dispute anything that I'm about to say. They might have a different spin on it, they might have a different argument, but I don't believe that they disagree with any of these facts. So let's go through them.

First, we begin in the fall of 2015. During that time, in the fall of 2015 and leading up to -- into December, roughly, of 2015, Mr. Hamzeh talked repeatedly, repeatedly, recording recorded conversations, about traveling to Jordan, Israel and Palestine. He talked about attacking Israeli soldiers and citizens. He described using a handgun to kill Israeli soldiers and then take the soldier's machine gun and kill as many people as possible before he expected and fully anticipated to be killed himself. He said that he expected to die, he expected to be a martyr. He wanted to die and be a martyr.

At one point he even talked about donning an explosive vest -- if he wasn't able to get either a handgun or a machine gun, donning an explosive vest and exploding that vest on either a bus or in a restaurant. This is in the fall of 2015, leading up to the events of January of 2016.

Now, it is true that Mr. Hamzeh talked about

1    acquiring a handgun.  There's no doubt about that, it's

2    recorded.  Talked about a handgun for self-defense because he

3    was a delivery person at that time.  He was delivering food

4    around the city for a restaurant, and he talked about getting a

5    handgun, and he talked to one of the cooperators about getting

6    a handgun for self-defense.

7            We come now to January of 2016, and Mr. Hamzeh is

8    focused by this point in time, early part of January of 2016.

9    He's  focused, he's obsessed, you might say, with the Masons.

10   In his post-arrest statement, he says that his obsession was

11   his idea, it came from him, it originated with him, and he got

12   it from watching YouTube videos.  Specifically, these are

13   quotes taken from the recording.  I'm going to read them to

14   you.  This is what he said:

15           "I got the idea about it.  Then I told them" --

16           meaning the cooperators.  "Then I told them about it.

17           I'm the one who told them about it, to be honest with

18           you.  I'm the one who told them about it, and I'm the

19           one who stopped it.  The other two guys" -- this is

20           still a quote.

21           "The other two guys, they were listening to me.  I

22           was telling them everything.  I am more religious

23           than them.  I know more than them, so they believe

24           me.  They do anything I want to do.  I'm controlling

25           the thing.  I was controlling them."

1           Those are Mr. Hamzeh's words.

2           On January 19th of 2016, Mr. Hamzeh took a tour,

3    admittedly with the two cooperators, of the Masonic Center here

4    in Milwaukee.  Actually, it's only about two blocks, a little

5    north and east, of where we sit right now.  You can probably --

6    I guess you can't see it through this window, we're not high

7    enough.

8           During that particular visit to the Masonic Center,

9    which I think it is fair to characterize as a reconnaissance

10   operation, he learned the schedules and the lay -- schedules of

11   meetings, he learned the layout of the building, he learned

12   that approximately 30 people were present at the meetings.  And

13   after touring the center, Mr. Hamzeh is recorded saying the

14   following, and I quote -- it's specifically in reference to the

15   30 people that he anticipated encountering:

16           "Thirty is excellent.  If I got out after killing 30

17           people, I will be happy, 100 percent, 100 percent

18           happy, but these 30 will terrify the world.  The

19           motherfuckers will know that nobody can play with

20           Muslims."

21           He went further in that same conversation after the

22   tour about detailing his attack plan.  This is what he said

23   about the attack plan:

24           "We want two machine guns" -- this is Mr. Hamzeh

25   speaking.  It's recorded.

1         "We want two machine guns.  You now have one" --

2         He's referring to one of the cooperators who he

3    believed had a gun.

4         "You now have one, so we want two more.  We need

5              three silencers, that's it.  Find out how much

6              altogether these will cost, then we will march.  If

7              each one has a weapon, each one has a silencer gun,

8              the operation will be 100 percent successful.  I am

9              telling you to go without silencer gun, you will be

10             exposed from the beginning."

11        About the actual attack, quote, Mr. Hamzeh, recorded:

12        "All three of us go in together.  One will go to the

13             one that is staying at the reception.  If she is

14             alone, it is okay.  If there were two of them, shoot

15             them both.  Do not let the blood show.  Shoot her

16             from the bottom, two or three shots in her stomach,

17             and let her sit on the chair and push her to the

18             front as if she is sleeping.  Do you understand?"

19        He goes on, "After shooting the" -- Mr. Hamzeh,

20    quoting, recorded:

21        "After shooting the receptionist, the lookout  was to

22             stay downstairs.  The other two will take the lift to

23             the third floor, go directly to the room, open the

24             door, shoot everybody.  One of us will stay at the

25             door at the entrance and lock the door down.  He will

1          be at the main door down.  Two will get to the lift

2          up.  They will enter the room and spray everyone in

3          the room.  The one who is standing downstairs will

4          spray anyone he finds.  We will shoot them, kill them

5          and get out.  As long as the one on the door

6          understands he has bigger responsibility than the

7          others.  For your information, he has to take care of

8          everyone around him.  The comers and the one that

9          wants to go.  He has to annihilate everyone.  There

10         is no one left.  I mean, when we go into a room, we

11         will be killing everyone.  That's it, this is our

12         duty."

13         Hamzeh continued to explain his escape plan.

14    Quoting:

15         "Move fast, even avoiding" -- excuse me, "Move fast,

16         even avoiding the lift and take the stairs running

17         down.  Using the stairs, the third one on the door

18         will notice us coming down.  We will go out together.

19         No one sees anything and no one knows anything.  We

20         leave, as if there is nothing.  No running, no panic,

21         just regular walking.  We'll get three head covers,

22         three holes in them.  We will walk and walk.  After a

23         while, we will be covered as if it is cold, and we'll

24         take the covers off and dump them in a corner and

25         keep on walking as if nothing happened, as if

1        everything is normal."

2        And finally in this conversation, he explains his

3   motivation for this attack that he's talking about.  Quote,

4   Mr. Hamzeh, recorded:

5        "They are all Masonic.  They are playing with the

6        world like a game, man, and we are like asses.  We

7        don't know what is going on.  These are the ones who

8        are fighting.  These are the ones that needs to be

9        killed, not to the Shia, because these are ones who

10       are against us.  These are the ones who are making

11       life living for us like hell.  I am telling you,

12       if this hit is executed, it will be known all over

13       the world.  Sure, all over the world.  All the

14       Mujahideen will be talking, and they will be proud of

15       us.  What is wrong with you?  Such operations will

16       increase in America when they hear about it.  The

17       people will be scared and the operations will

18       increase, and there will be problems all over.  This

19       way we will be igniting it.  I mean, we are marching

20       at the front of the war.  We are Muslims defending

21       Muslim religion.  We are on our own, my dear.  We

22       have organized our own group.  We have our own group,

23       not with Hamas, not with any ass.  We are here

24       defending Islam.  Young people together joined to

25       defend Islam, and that's it.  That is what our

1          intention is."

2          Those are the words of Mr. Hamzeh.

3          After the tour and after these conversations,

4  Mr. Hamzeh sought, through cooperation with one of the

5  cooperators, the acquisition of automatic weapons, that being

6  machine guns and silencers.  On January 24th of 2016,

7  Mr. Hamzeh met with the two cooperating witnesses and canceled

8  the attack, but Mr. Hamzeh provided two reasons for canceling

9  his attack.

10         First, as I mentioned before, the plan was leaked.

11 Let me read you a recorded -- parts of a recorded conversation

12 that he said about that.  These are Mr. Hamzeh's words again

13 recorded:

14         "First, I have discovered that there has been

15         something leaked.  This has been leaked.  I swear if

16         we do this anywhere in the United States, they will

17         know that it is us.  They have eyes and they will

18         come and investigate us.  I am saying that

19         information about us has been leaked in the past

20         two days.  I felt like our information is becoming

21         well known.  That's Point Number One.  Point Two, I

22         went and I spoke with the Sheikh."

23         So let's talk about Point Number Two.  He did consult

24 with an imam, and the imam here in Milwaukee, at a mosque here

25 in Milwaukee, and that imam, very thankfully, told him that if

1  he went through with his plan, he would go to hell.  Later that

2  evening, at the urging of the other two individuals, the two

3  cooperators, he decided to consult with a second imam, and he

4  called his uncle in Jordan and consulted with his uncle; and he

5  was told the same thing, that if he carried through with the

6  attack, he would go to hell, and as a result, the attack was

7  canceled.

8          And yet, on January 25th, the very next day, and

9  completely according to the plans that they had laid out,

10 Mr. Hamzeh went ahead with the purchase of the weapons, as

11 previously had been arranged.  Before going to that purchase,

12 however, he explained to the cooperators why, despite the fact

13 that the attack had been canceled, he was going ahead and

14 purchasing these weapons.  It's recorded.  These are

15 Mr. Hamzeh's words:

16          "We're going to get the weapons and we'll keep it

17          here.  We will get the weapons normally and we can

18          train with it and keep it with us, just as a

19          precaution until the next year as well.  You never

20          know what will happen the next year.  Next year a new

21          president is taking over, and you don't know what

22          will happen with us.  Our weapons will come and we'll

23          hide it.  Get ready, prepare, buy.  Be prepared for

24          that day so that when they attack us, then we can

25          attack them.  We must be ready.  Why do we get the

1          weapons?"

2          Still quoting Mr. Hamzeh.

3          "Why do we get the weapons?  Why" -- excuse me, "Why

4          do we go get the weapons?  Because we want to make

5          sure that your friend" -- the supplier -- "to ensure

6          that he's on board to trust us so that in the future,

7          if we need more, he will be accommodating to us.  But

8          if we don't go, he will think they are dragging their

9          feet. But for the weapons, I am ready to go get it

10         tomorrow."

11         Again, those are the words of Mr. Hamzeh.

12         Now, during his post-arrest interview, which you have

13    a copy of, Mr. Hamzeh, during that interview, admitted the

14    following, and you can check it by reviewing the interview.  He

15    admitted purchasing the weapons, knowing that the weapons

16    purchased were two fully-automatic machine guns and a silencer.

17    Knowing -- he admitted knowing that the purchase was illegal.

18    He admitted conducting an illegal gun purchase because he

19    couldn't afford to buy the weapons legally.

20         He admitted that he planned and intended an attack on

21    the Masons.  He admitted that he believed the Masons to be

22    devils, based on YouTube videos that he had reviewed; and that

23    as devils, they were the enemy of Islam.

24         He admitted that he became concerned about offending

25    God, and as a result, he consulted two imams, who told him, no,

don't go through with this attack. It's against Islam.

He admitted -- and this is critical, he admitted that he had no concern for government, the police, or laws. He admitted that his only concern was God and whether or not he would get to heaven and avoid hell.

And finally, and most importantly, he admitted that if the imams had told him that it was all right, he would have executed the plan. Let me repeat that, he admitted to the interviewing agents that if the imams had said his plan was all right, he would have gone ahead and executed the plan. Those are the facts.

And again, from my understanding, from what I've read from the defense, what I've heard them say, I don't think that they have any disagreement with those facts.

So the question then becomes, based on those facts, what conclusions can we draw, should we draw, from those facts in making the decision that you have to make today. So I'd like to submit some conclusions based on those facts.

First, we can conclude that Mr. Hamzeh simply was not entrapped. He simply was not entrapped. During his post-arrest interview, he took responsibility for everything, personally he took responsibility. It was his opportunity to throw up his hands and say, huh, thank God you guys got me, thank God you're here, I'm so relieved, these guys have been pressuring me into this conduct, and I didn't know how to get

1   out of it, I went along with them only because they scared me,

2   thank God you got me, I'm sorry, I'll help you any way I can.

3   He didn't say any of that. He accepted full responsibility,

4   said it was his plan, said he had developed the information

5   from which he concluded, based on viewing YouTube videos, that

6   the Masonic Center needed to be attacked, his plan. So we can

7   conclude that there was no entrapment here whatsoever.

8          We can also conclude that Mr. Hamzeh clearly knows

9   the difference between defensive weapons and weapons of war.

10  Handguns, by his own word, are guns for self-defense. Machine

11  guns are weapons of war, they are designed specifically for a

12  mass casualty attack. So depending on your purpose, depending

13  on what you want to accomplish, guides, compels the type of

14  weapon that you need. Driving around making deliveries in the

15  inner city requires a handgun. In fact, it would be quite

16  ridiculous to try and self-defend oneself in that situation

17  with a fully-automatic weapon. So we can conclude very clearly

18  that Mr. Hamzeh knows the difference between defensive weapons

19  and weapons of war.

20         We can also conclude that Mr. Hamzeh is fully willing

21  to engage in illegal conduct when it suits his purpose, when he

22  deems it to be necessary. Why do I say that? Because on

23  January 25th of 2016, Mr. Hamzeh decided that he wanted those

24  weapons, and he knew that purchasing them was illegal, and he

25  went ahead anyway. And so he's fully willing to engage in

1   criminal conduct, illegal conduct, that suits his purpose,

2   whenever it suits his purpose.

3          We can also conclude that Mr. Hamzeh went ahead with

4   the purchase of the firearms to have the weapons available to

5   him if required for a future attack.  Those are, in fact, his

6   words.  He went on to say that he wanted to practice, he wanted

7   to train, he wanted to be ready for a future attack.  And he

8   wanted to keep those gun dealers happy, because if they needed

9   more guns in the future, he wanted to make sure that that

10  source of cheap, illegal, untraceable guns was available to him

11  if he decided that he needed them, if he deemed it necessary.

12         We can also conclude that Mr. Hamzeh has absolutely

13  no respect for the law, for government, and for this Court

14  because that, again, is his words.  That's what he said.  You

15  can hear them on the recordings.  His loyalty and his respect

16  is -- by his words, is only to God, and his only motivation is

17  to avoid hell and to get to heaven.  And yet, he needed to

18  consult on that.  He needed to consult a religious leader on

19  that, two of them, because he had some doubt about the fact

20  that mass murder might be okay under certain circumstances.

21  That's the only conclusion that one can draw.

22         The magistrate was, in fact, correct when he wrote in

23  his decision, it should not take the spiritual guidance of two

24  religious leaders to dissuade a person from committing mass

25  murder, and yet Mr. Hamzeh felt a need to do that because maybe

1    that imam would have said, go for it.

2         And the other thing we can conclude from that is that

3    you can expect him to apply that same attitude to whatever

4    order you enter.  Whatever conditions of release you might

5    enter, he'll take that same attitude.  I don't care about the

6    government, I don't care about the law, I don't care what that

7    judge told me, I'm only going to do what I think God wants me

8    to do.

9         And finally, and I submit most importantly, we can

10   conclude that Mr. Hamzeh abandoned a target, not a plan.  Let

11   me repeat that.  He abandoned a target and not a plan.  Twice

12   during that interview with the agents after his arrest, when he

13   had every opportunity to say otherwise, he told the

14   interviewing agents that if the imams had told him his conduct

15   was acceptable to God, he would have carried out the attack.

16        Again, the magistrate judge was quite correct in what

17   he wrote in his decision.  It's interesting what he wrote.

18   It's interesting the words he chose.  He did it twice.  I'm

19   going to read it to you.  On page 3 of his decision, toward the

20   bottom, in the last paragraph, he writes -- the magistrate

21   writes:

22             "The recorded conversations indicate that there were

23             a number of motivations to proceed with the purchase

24             of the weapons, but none of them involved current

25             plans to conduct offensive or terrorist activities."

1          Indeed, current plans, he abandoned a target.  Later

2   on, on page 18, the magistrate wrote much the same.

3          "I am convinced that he," meaning Mr. Hamzeh, "had

4          firmly resolved not to engage in an offensive attack

5          at the time he purchased the weapons."

6          At the time he purchased the weapons.  The magistrate

7   got it right, because all Mr. Hamzeh did was abandon a target

8   and not a plan.  Going through with the purchase of the weapons

9   on the 25th of January of 2016 is proof of that because by his

10  own words again, he's stockpiling weapons.  He's wanting to

11  practice.  He's preparing to train, and he is keeping his

12  suppliers happy because he might need them again for a future

13  attack.

14          Now, the defense counsel has raised, and I think they

15  even raised it here in open court, they've raised it a number

16  of times, they've raised the case of United States  versus

17  Dominguez, 783 F2d. 702 at 707, a 1986 decision of the Seventh

18  Circuit Court of Appeals.  And the quote that they give I think

19  is important, because what the quote says is that the

20  Government's burden and the Court's finding of dangerousness,

21  "cannot be based on evidence that he has been a danger in the

22  past."  But then it goes on, "Except to the extent that his

23  past conduct suggests the likelihood of future misconduct."

24          "Except to the extent that his past conduct suggests

25  the likelihood of future misconduct."  Indeed, that's exactly

1   what we have here.  We have every reason to distrust

2   Mr. Hamzeh's current statement that he isn't going to carry out

3   an attack, to distrust and disbelieve any statement that he

4   makes that he didn't really mean it at the time.  And

5   primarily, that distrust -- almost exclusively that distrust

6   comes from not witnesses, not third parties, not physical

7   evidence, but from his own mouth, from his own words, both

8   before and after his arrest.

9           Judge, the United States has satisfied the respective

10  burdens that Mr. Hamzeh remains a danger to the community and

11  is a risk of flight, and I ask you, most respectfully, to

12  affirm his pretrial detention.

13          **THE COURT:**  Thank you, Mr. Kanter.

14          Mr. Albee, your rebuttal.

15          **MR. ALBEE:**  Judge, prior to September 2015, the

16  Government hasn't identified one thing that Mr. Hamzeh ever did

17  wrong in his life, not until it inserted these two informants

18  into his daily life, including having one to go work with him

19  and deal with him on a daily basis.  Every single day, these --

20  these informants would listen to Mr. Hamzeh, they would -- not

21  literally applaud but applaud any outrageous statement, promote

22  any outrageous statement.  He would get some approval from them

23  anytime he had something to say that suited their needs, their

24  needs being to collect outrageous statements.  And they thought

25  they had a big one on the line.

1          In October, just one month into this thing, they

2     thought they had Mr. Hamzeh traveling to the Middle East.  He

3     was full of  BS.  He didn't have the money he said he had.  He

4     didn't have the arrangements that he said he had.  He didn't

5     have any of that.  And that was his MO throughout this time, is

6     to talk and to do nothing.

7          These outrageous statements he made, which to all of

8     us in this room, in this area, probably sound more outrageous.

9     I didn't grow up in a Palestinian/Israeli conflict that goes on

10    decade after decade.  And -- now, I know from here, when this

11    country's been in war, I hear people say outrageous things when

12    the Persian Gulf War was going on.  I hear people say

13    outrageous things about Iraqis.  I've seen movies where they

14    said outrageous things about Japanese after World War II.  I

15    grew up with people who talked about the IRA and had outrageous

16    things to say about what they'd do to the British.  But these

17    people don't act on these things.  People talk a lot more than

18    they act, and Mr. Hamzeh did nothing.  There's not even any

19    evidence about him talking before September 2015 and these

20    informants being in his ear, but there's certainly no evidence

21    of any action on his part.

22         And then what happens after he -- after he -- he just

23    BS's Steve about this supposed plan to which there's no

24    evidence of him doing anything other than talking about it.

25    They continue monitoring and pushing him for the next couple

1    months.  And Mike, Mike alone introduces machine guns.

2    Mr. Hamzeh has never -- there's no indication that he ever shot

3    a gun.  Mike, after working with him for a couple of days,

4    brings a gun to work, shows it to him, says look at this cool

5    gun, starts talking in these trumped-up terms, inflammatory

6    terms, to get Mr. Hamzeh to talk about things.

7           You hear in the conversations of the translations

8    that many times they're just laughing.  They're just saying

9    outrageous things to be outrageous.  But Mr. -- Mike takes him

10   shooting, again starts saying, well, do you want a machine gun?

11   And he's always like, no, I want a pistol.  Stop -- you're

12   always asking the same stupid questions over and over and over

13   again, and he does nothing.

14          This operation -- this FBI operation, when it hits

15   early January, is at a stand-still.  They have nothing.  They

16   have invested three months of -- of manpower, of paying

17   informants, of all these things during that time and they have

18   nothing on Mr. Hamzeh; and they've stopped even recording

19   conversations with Mike, even though he's seeing him on a daily

20   basis.  And then all of a sudden on January 19th, after 35

21   days, Mike's recording again.  And we see in the -- we see in

22   the -- in Mr. Hamzeh's post-arrest statement, we see in the

23   contemporaneous recordings that he's saying Mike introduced

24   these videos, that it was Mike's idea.

25          Well, your Honor, Mr. Kanter, with all due respect,

1   took a lot of things -- a lot of things out of context, a lot

2   of things for which there's contradictions in the words that

3   are said.  And certainly Mr. Hamzeh, in that post-arrest

4   interview, you can see he's protective of his friends.  He does

5   not know he's been duped, exploited and manipulated daily for

6   four months, he has no idea, so he's protective of these

7   people.  What he's adamant about is that he wasn't going to do

8   it.

9           And the question is why is it not recorded when this

10  plan is developed and created at the behest of Mike, who's

11  showing these videos.  Mr. Hamzeh didn't come up with some

12  ideas that Masons were ISIS on his own.  There's no indication

13  he ever knew of the Masons or anything about it until something

14  happens where they're having conversations that aren't recorded

15  for some reason, even though it's a paid FBI informant.  So why

16  is that?  Because they're using the psychological manipulation

17  that, you know, the experiments that we've shown the Court

18  exist, they work.

19          And Mr. Hamzeh, in that post-arrest -- the

20  post-arrest statement, I'll just find, you know, a few -- a few

21  spots, he tells them like -- for like the guns:

22              "Since I met Mike, he put the idea in my mind.  Like

23              he told me about guns and about stuff like that.  So

24              I saw his gun, I was like, oh, that's cool, I should

25              carry one for delivery too to defend myself, and I

1          asked him about guns."

2          Mr. Hamzeh tells them:

3          "After this, I was sitting, like staying home, not

4          sleeping, I couldn't sleep.  I was thinking about

5          this all the time, like I'm allowed to do this?  Is

6          this okay?"

7          He's -- what he clearly communicates and what is

8  demonstrated in the recorded statement to Mike and Steve is

9  that he is torn up about this.  He's torn up about it because

10  his moral compass is straight.  Theirs is not and they've been

11  exploiting him for these two months.  He is absolutely adamant

12  that he won't do it.

13          How Mr. Kanter can suggest that it's about being

14  caught is beyond me when you read the words of that -- of that

15  recorded statement when he's talking to Mike and Steve.  What

16  he's doing is that he's using every bit of persuasion with

17  these people because he knows it's wrong.  He knows it's

18  morally wrong, he knows it's against his religion, and he wants

19  -- he's using those things.  He's also telling them that you'll

20  get caught because he knows that's another way to persuade them

21  to do the right thing.  And I think, frankly, when he gets the

22  guns, that that's a lesser evil that's going to keep -- that

23  will pacify these folks because they keep on pushing, pushing,

24  pushing during this -- during this argument -- during the

25  discussion.

1        I don't understand the notion of going to the imam

2   being a negative thing when he goes there to support with his

3   supposed friends what he's doing.  Because he says over and

4   over, come see the imam with me.  They respond by saying, why

5   did you go see him, we told you not to.  They're trying to

6   isolate Mr. Hamzeh so that all he hears is their words so he

7   doesn't get good advice, so he doesn't do the right thing.

8        I'm a little mystified by this notion of, well, he

9   was relying on his religion or he relied on his imam.  If we

10  were talking about Christians, we'd be talking about what a

11  good thing that would be.  It was -- why would we expect

12  anything else from that imam other than don't do this?  That's

13  exactly what we would expect.  It's exactly what Mr. Hamzeh

14  expected, and that's what he told -- said in his after -- his

15  interview afterwards.  At one juncture he says -- he says that

16  if he hadn't gotten the right word from him, he would have

17  looked for another one, but he fully expected that that's what

18  he was going to get because he was struggling with this issue.

19  He went to the imam so he could get his friends to see the

20  imam.

21        That he called the second one wasn't -- wasn't at his

22  friends' instigation.  It was his suggestion so  he could prove

23  to them that he was right in this -- in this situation.

24        We have before his arrest -- as I said earlier, he's

25  telling Steve that Mike is brainwashing him and has been

1  showing him these videos for a month, so it's not something

2  that Mr. Hamzeh found on his own.

3         In terms of another -- one more thing in terms of

4  Mr. Hamzeh's state of mind, and we did submit the psychological

5  report of Dr. Robbins, who did not believe that Mr. Hamzeh

6  posed a -- posed a danger.  What the Government hasn't shown is

7  that -- again, there's nothing before September 2015.  Where's

8  the evidence that Mr. -- Mr. Hamzeh desires to harm anyone

9  moving forward?  It's completely -- it's completely absent.  I

10  couldn't find the section about his concern not being police.

11  I don't believe him to say -- and he was completely respectful

12  during this interview, is one thing to note, with the police,

13  but I don't understand him to say his concern is not with the

14  police.  I think he's saying, I'm going to do what's moral

15  because that's right for my religion.  It's not that he's not

16  concerned with police, but he's going to do the right thing

17  because that's consistent with his religion, and he knows at

18  that point that the right thing is not to do anything like an

19  attack.

20         In terms of entrapment, again, the Court well knows

21  predisposition is something that the Government has to prove

22  beyond a reasonable doubt.  That's difficult when there's

23  nothing going on before these informants get into his life.

24  And the other thing is the -- is the Government giving any

25  inducement.  And they're doing that by their persistence, by

1  repeatedly going back to him and asking him the same stupid

2  questions over and over again, by offering him a machine gun

3  for a fraction of the price that it would -- that it would

4  cost, by isolating him, by only having these two informants get

5  in his ear over -- over and over again.

6          And again, that's what we know, based on what's

7  recorded.  Why these things -- why the FBI stops recording

8  these conversations when the main event takes place, why is

9  that?  When they are -- when this thing has come to a

10 standstill and then the recordings come to a stop before being

11 resuscitated.  That's completely unexplained by Mr. Kanter, who

12 wants -- again, wants doubt during that period of time.  When

13 they had the opportunity to record it, he wants that doubt

14 resolved against Mr. Hamzeh, and that's what the case law says

15 we cannot do, is that doubt has to be resolved in favor of

16 Mr. Hamzeh.  That's particularly true when it was within the

17 FBI's means to record that at that time.

18          One moment, Your Honor.

19          **THE COURT:**  Sure.

20     **(Pause)**

21          **MR. ALBEE:**  And last, this is in our original brief,

22 Judge, at page 31, where we summarize some recordings from

23 January 19th, and at that time, again, Mr. Hamzeh, not knowing

24 he's recorded, told Steve and someone else that Mike had come

25 to him two weeks earlier and started talking about the Masonic

1   Temple and how the Masons spread negative propaganda about

2   Islam and the prophet Muhammad.

3           As the conversation continued, he again described how

4   Mike had approached him a week or two earlier and began

5   denigrating the Masons.  He said Mike, after bearing his soul

6   about his life being in ruins, had told Hamzeh the Freemasons

7   were ISIS, our enemies, anti-Islam, and always tarnishing the

8   prophet's image.  And then after that, he said he's not to be

9   trusted and the guy brainwashes you.

10          Finally, he says that Mike was the one who came up

11  with the idea of attacking the Masonic Center.  Again, all

12  recorded at a time when he had no idea that he was being

13  recorded or that that would be potentially later to his

14  benefit.  And why Mike wasn't recording those conversations or

15  that developed, I think is some of the strongest evidence that

16  Mr. Hamzeh was entrapped as to that.  We have the December

17  conversations which show he was entrapped as to the gun.

18          So, Judge, for all those reasons, again,

19  considering -- considering guidelines in this case, the

20  viability of the entrapment defense, viability -- I'm not --

21  we're not claiming the magistrate judge said we win, but he's

22  saying it's feasible.  I mean, he recognizes that there's

23  limited information about predisposition, there's -- there's

24  clearly plenty of evidence of inducement that's in the

25  transcripts that have been submitted and the evidence already

1    submitted, 64 surveillance times show that Mr. Hamzeh on his

2    own isn't doing anything, as does the search of his house, the

3    search of his computer.  We have conditions that are strict

4    that we have proposed that would ensure the safety -- the

5    safety of the community.  There's absolutely nothing to

6    indicate that  Mr. Hamzeh, without the influence of these two

7    people, would ever do anything -- would ever do anything that

8    would be problematic on pretrial release.

9            **THE COURT:**  Thank you, Mr. Albee.  I want to start

10   out by saying that I'm going to give you a ruling this

11   afternoon, and I want to be clear that I wouldn't probably,

12   under normal circumstances, in a case like this do that,

13   because there's a lot of information here.  We've listened to a

14   lot of it and there's a lot more that hasn't even been brought

15   up today that's in the moving papers, in the transcripts, and

16   I'm sure there's more in the discovery that no one's even --

17   it's not on the docket.

18           The reason that I am in a position to give a ruling

19   today is because, as the parties have pointed out and I think

20   I've commented on in allowing some brief filings before the

21   hearing, that there has been a tremendous amount already filed.

22   I have the benefit, I suppose, in terms of expediency, of

23   seeing everything that was filed before Judge Jones.  I have

24   the benefit of seeing the transcript of the hearing in front of

25   Judge Jones.  I have the benefit of Judge Jones' decision.  And

1    by using the term "benefit," I simply mean that that puts me in

2    a different position in terms of having information than I

3    would be in if this was the first time that I had heard any of

4    this.

5            The second thing that I want to note, and I want to

6    be very clear about this with greatest respect to both of the

7    parties, and I do mean that, I am not proceeding on this

8    hearing on the belief or the assumption that Mr. Hamzeh would

9    do anything other than show respect for any order that this

10   Court might issue.  I have no evidence in front of me to

11   indicate to the contrary.  I have no reason to think from

12   anything that I've seen in any of the transcripts relating to

13   the hearing in front of Judge Jones that Mr. Hamzeh has done

14   anything other than act respectfully when he's been in court or

15   that he did anything other than act respectfully when he was

16   interviewed after he was arrested.

17           So I appreciate what Mr. Kanter was arguing with

18   regard to some of the statements that Mr. Hamzeh was recorded

19   as making, but I don't interpret any of those statements, and I

20   think it would be highly inappropriate of me to make a decision

21   on some sort of assumption that Mr. Hamzeh was going to be

22   disrespectful of any order that I might issue, and I am not

23   assuming that and I'm not proceeding on that basis.

24           The third thing that I want to point to is something

25   that -- this case is unusual in many ways, but I want to point

1  out one thing that's critical to note.  Both of the attorneys

2  have talked extensively about the standards that apply, and I

3  just want to articulate them clearly because I think there are

4  a couple of places here where it's a little bit confusing or

5  contradictory or  different to get one's head around, for me as

6  well as anybody else.

7          The statute that I am proceeding under is 18 U.S.C.

8  3145(b).  That statute says that if a person is ordered

9  detained by a magistrate judge or some other sorts of people,

10  the person may file with the court that has original

11  jurisdiction over the offense, a motion for revocation or

12  amendment of that order, and the motion must be determined

13  promptly, or shall be determined promptly.  That's a directive

14  to me, that I have to make a prompt decision.  So because Judge

15  Jones ordered that Mr. Hamzeh should be detained, he filed that

16  motion with me.  That's why we're here.

17          But the next piece I think can be very confusing, at

18  least it often is to me.  Seventh Circuit case law and case law

19  from this District indicates that I have to conduct a de novo

20  review of Judge Jones' decision.  De novo, in some respects,

21  makes it sound like, okay, Judge, pretend like you don't know

22  anything, go back and start from the very beginning, pretend

23  like you've never heard of anything that Judge Jones said,

24  pretend like you've never heard any of this before and start

25  from square one.

1          That's not exactly what the law means by de novo.

2     What the law means by de novo is that even though Judge Jones

3     has already issued a reasoned decision, I don't have to defer

4     to it.  I guess in technical terms, oh, that decision no

5     deference, I'm not required to defer to it.  It does not mean

6     that I can't and shouldn't review it.  It doesn't mean that

7     what is in that decision may not be something that I agree or

8     disagree with.  It simply means that I don't have to defer to

9     it.  I could have come in here and not read it and simply made

10    my own determination without seeing what Judge Jones wrote and

11    what he reasoned.

12         I didn't do that.  I didn't think that was

13    appropriate.  I'm being asked to consider whether or not to

14    revoke his order or amend his order, and so I did read it, and

15    I'll comment on that in a minute.

16         The parties have already talked about the fact

17    that -- that this is not a case that gave rise to a

18    presumption, so there's no presumption of detention.  So what I

19    am left with is the typical bond standard in all of the cases

20    that come before me that don't have a presumption.  Those

21    factors come from Section 3142(g) of Title 18.  The Government

22    has to show by clear and convincing evidence that there's no

23    set of conditions or condition that would reasonably assure the

24    safety of the public, or the Government has to show by a

25    preponderance of the evidence, two different standards, that

1    there's no set of conditions that would reasonably assure the

2    defendant's appearance.  A finding of either one of those

3    factors by either one of those standards is sufficient to

4    detain a defendant awaiting trial.  I don't have to find both.

5    That is from the United States versus  Hester, which is a

6    Northern District of Illinois case from January of 2011, which

7    cites to the Daniels decision from the Seventh Circuit.

8              Now, the parties went through in far more detail than

9    they did in their written pleadings the factors that I have to

10   look at  under 3142(g), that they are, first of all, the nature

11   and circumstances of the offense that's charged, including

12   whether it's a crime of violence; second of all, the weight of

13   the evidence against the person; third, the person's history

14   and characteristics, including their character, physical and

15   mental condition, family ties, employment, financial resources,

16   length of residence in the community, community ties, past

17   conduct, history relating to drug or alcohol abuse, criminal

18   history, and the record concerning appearances at court

19   proceedings.  And then finally, I have to take into account the

20   nature and seriousness of the danger to any person or the

21   community that could be posed if I released the defendant, or

22   at least Mr. Hamzeh.

23             So those are the factors that I have to take a look

24   at.  That's the standard that I'm required to follow.

25             I want to comment briefly on a couple of things with

1    regard to Judge Jones' decision.  There's been a lot of

2    argument about what Judge Jones did or didn't find.  And

3    probably I've not read the decision as many times as the

4    attorneys have, but I have read it several times, and the first

5    thing I want to note is that I, like the Government, don't find

6    anything in the report  or in his decision that indicates that,

7    "Mr. Hamzeh has a viable or a valid entrapment defense."  The

8    line of the decision that I looked to in trying to -- when I

9    saw that asserted in the defendant's brief, the line of the

10   decision that I looked to is on page 20 of Judge Jones'

11   decision.  It is the penultimate paragraph before you get to

12   the order section.

13           And what Judge Jones says is:

14           "Defense counsel has put forward an intriguing

15           entrapment argument that may, in the end, prove

16           persuasive, and the factual recitation in this

17           decision has not been tested by cross-examination."

18           All of us are trying to interpret the words of

19   someone else, but as I read that language, as I understood it,

20   Judge Jones simply was noting that the defense has expressed an

21   intent to put forward an entrapment argument, that they've

22   explained in great detail the facts that they think would

23   support that entrapment argument; and he says, as is the case

24   with many arguments that parties make, it may end up being

25   persuasive, but he's not making that decision because that's

1   not an appropriate decision for him to make, and it's not an

2   appropriate decision for me to make right now.

3          So with regard to Judge Jones having found that fact

4   or made some sort of conclusion or finding as to the validity

5   or lack thereof, the entrapment defense, I simply don't see

6   entrapment.  I don't see it in this decision.

7          The second issue that the parties have talked about

8   several times is what Judge Jones concluded about whether or

9   not Mr. Hamzeh had abandoned the notion of the attack on the

10  Masonic Lodge.  And I think again, the language that I look to

11  in the decision was on page 18.  Mr. Kanter referred to some

12  other sections in the decision, but the one I looked to was

13  page 18, the first full paragraph at the top of the page, Judge

14  Jones says:

15          "In Mr. Hamzeh's favor, I'm convinced that he had

16          firmly resolved not to engage in an offensive attack

17          at the time he purchased the weapons."

18          Mr. Kanter emphasized the last portion of that

19  sentence, and it was the last portion of that sentence that I

20  looked to.  I think Judge Jones says several times that he

21  understands that Mr. Hamzeh ended up saying to Mike and Steve,

22  not only should we not do this, but let me try to tell you all

23  the reasons that we should not do this, and that as things were

24  left at the time of the gun purchase, there wasn't any date or

25  time or anything scheduled for conducting any attack on the

1    Masonic Lodge.

2          I did not read that to say, necessarily, that

3    Mr. Hamzeh may have abandoned any plans ever.  And in point of

4    fact, I think that goes to one of the real issues that Judge

5    Jones identified in his decision and that, quite frankly, has

6    been, to me, the sticking point here.  This case is unusual in

7    this sense, not because of what allegedly did or didn't happen.

8    I believe what's unusual about this case is that, as Probation

9    correctly pointed out in the bond study that it prepared and as

10   Mr. Albee has emphasized any number of times, up until the time

11   that Mr. Hamzeh began talking with the informants and they

12   started recording these conversations in September of 2015,

13   Mr. Hamzeh didn't have any prior criminal history, he's clearly

14   got a very caring and supportive family, and presumably always

15   has had.  He has worked, which many folks we don't see in other

16   cases as having a factor.

17          And so in almost a 180, we go from that situation to

18   a situation in which someone ends up in possession of two

19   extremely dangerous weapons and a silencer, and those weapons

20   are preceded -- the possession of those weapons is preceded by

21   the conversations that Mr. Kanter has read and the events that

22   have been described.  Very frequently, under those factors in

23   the statute, when I see somebody who doesn't have a prior

24   criminal history, that's a pretty strong indicator in terms of

25   dangerousness to the community.  Very frequently I see somebody

 1    who has a supportive family.  That is frequently an indicator

 2    of whether or not someone is a danger to the community.  It's

 3    not a guarantee, lack of prior history is not a guarantee, but

 4    those are strong indicators and often they'll weigh in favor of

 5    release on some kind of condition.

 6              The issue here that is troubling is one -- and where

 7    I think Judge Jones was -- was focused most and where I have

 8    been focused most, is the evidence that the record contains of

 9    Mr. Hamzeh's inconsistency in the way he dealt with a number of

10    these issues and in the things that he expressed, particularly

11    around the Masonic Center.

12              If we go back to September of 2015, and there's been

13    a lot of discussion about all of these conversations with Mike

14    and Steve about going to Jordan, which is where, by the way,

15    Mr. Hamzeh is from, been there before.  But going to Jordan or

16    going to Israel or going to Palestine and talk about doing

17    things to people in Israel, and the defense argument is that

18    that's talk, and particularly it may be talk that is generated

19    by folks who are familiar with and have lived in an intensely

20    conflict situation for a long time, and the Government's

21    argument is that that is evidence that, you know, Mr. Hamzeh

22    already had expressed a willingness to do harm and do injury to

23    other people.

24              I didn't see Judge Jones focusing a lot on that and I

25    have focused far less on that in my thoughts than the events

1  that directly surround the Masonic Lodge incident.  Mr. Albee
2  is correct as far as I understand the evidence, which is after
3  all this talk about going to Jordan and after all of that,
4  there was a substantial lag time in which it appeared there was
5  nothing going on, or at least there's nothing having been
6  recorded, there's nothing up until January of 2016, there seems
7  to be some radio silence there.

8          But if we simply start by looking at January of 2016,
9  if we just start there, with none of the predecessor
10  conversations,  there are some very disturbing things that I
11  don't think I can ignore, and I think that Judge Jones was
12  persuaded by these.  The first is that the evidence shows
13  regardless of whose idea it was that YouTube videos somehow
14  indicating that Masons were either eating people's hearts or
15  that they were devils or that they were doing something evil,
16  that they were against Islam, those videos, apparently
17  according to both parties, seemed to have played some role in
18  Mr. Hamzeh becoming involved in what eventually led to his
19  purchasing these guns.

20          That's a concerning factor that I believe I have to
21  take into account.  If one of the things that I'm called upon
22  to do is to consider someone's character and personality and
23  history in determining whether or not their future behavior is
24  likely to comply with the requirements of a Court order or
25  society's expectations, the fact that somebody can be persuaded

1   by a series of YouTube videos to start having conversations

2   about brutally killing a number of people is a factor that I

3   have to take into account.

4           There's another piece of information that occurs

5   after January 16th of 2016.  The defense has said several times

6   that Mr. Hamzeh was a talker, talked a lot, talked about things

7   he was going to do or not do, and that those comments should be

8   taken with a grain of salt.  And the defense has said, you

9   know, but Mr. Hamzeh didn't do anything, he didn't do any of

10  these things he said he was going to do.  He didn't get on an

11  airplane and go to Jordan.  He stayed here with his mother who

12  wasn't doing well.  He didn't do any of these things.  Except

13  that he did.

14          He did do one thing that we know for sure; in fact,

15  two.  But the first one that I'm talking about is that after

16  this discussion about Masons and the impression or belief that

17  Mr. Hamzeh got that Masons somehow were against Islam or

18  against the prophet or whatever they might be, he did take the

19  next step of actually going to the Masonic Temple and touring

20  it, and -- and not just swinging by to look at the outside of

21  it.

22          And by the way, as an aside, the fact that it happens

23  to be near here or not near here I don't think is relevant.

24  Perhaps the fact that it's in a large urban area may be more

25  relevant.

1        But went in, got a comprehensive tour, got fairly

2   detailed and substantial information about how frequently the

3   meetings took place, how many people usually attended each

4   meeting as a routine, where the various entrances or the floor

5   plan, the layout, where did receptionist sit, how many people

6   were there, there's an elevator, how many floors are in this

7   building, where does the elevator go, where do the meetings

8   take place, from the ground floor, on a higher floor.  That's

9   not information that someone collects if someone is going to

10  visit a site as a cultural point of interest.  And in fact,

11  Mr. Hamzeh's recorded conversations don't give any indication

12  that that was the reason for going to some Masonic Temple.

13       After that visit, another thing takes place, another

14  step takes place.  Mr. Kanter read into the record Mr. Hamzeh's

15  detailed comments about how the alleged attack would take

16  place, down to who would stand where; down to how many times a

17  receptionist should be shot and then how her body should be

18  positioned to make sure that if anybody comes -- came in, it

19  would look as if she were sleeping; down to what the person

20  upstairs was responsible for as opposed to what the person

21  downstairs was responsible for; down to making certain that

22  everybody understood how important it was to have silencers,

23  because if you didn't have a silencer, if you began firing

24  indiscriminately; without one, you'd be immediately discovered.

25       To the extent that I looked at conversations prior to

1   January 2016 and considered them relevant, the main thing that

2   I thought -- the main thing that struck me about the

3   conversations about this attack were that they were extremely

4   detailed compared to some of the other conversations that were

5   recorded.  The other conversations prior to January 2016 were

6   more general, you know, if I go to Israel and if I got ahold of

7   a gun I'd do this, or if, if, if, if, if.  These were detailed

8   plans, and chilling detailed plans, that thought through

9   various scenarios.

10        There's been a lot of discussion about who was in

11  charge just around this incident, and I understand the

12  defense's argument about entrapment, and I'll get to that in a

13  second.  But during that conversation, Mr. Hamzeh was doing the

14  talking.  Mr. Hamzeh was telling everybody else how this thing

15  had to play out.  And indeed, in his post-arrest statement,

16  when he was talking to the officers or the agents who arrested

17  him, he again emphasized that he was in charge, that he was the

18  person who was giving the directions.  The defense has argued

19  that maybe Mr. Hamzeh thought he was in charge, but he had been

20  under the influence of these two informants for a long period

21  of time, and really he wasn't pulling the strings the way he

22  thought he was, the two informants were pulling the strings.

23  That, I think, is a question that the jury will have to decide

24  obviously among others if the entrapment defense is submitted,

25  but at least I think that that argument is beside the point.

1   Mr. Hamzeh appears to have believed and acted as if he were in

2   charge, even up to the date after he was arrested.

3            The next thing that happens is that -- that

4   Mr. Hamzeh decides to consult with an imam here in Milwaukee.

5   There are obviously different interpretations that one can put

6   on that, was he consulting with the imam because he needed a

7   way to get out of this, and to have an authority who says, no,

8   you're not supposed to do that would give him the ability to

9   argue with the informants, I think that's one of the arguments

10  perhaps that the defense has handed up, as well as seeking

11  spiritual guidance and seeking assistance in easing his own

12  troubled mind.

13           And, you know, I don't know what was in Mr. Hamzeh's

14  head, but to Judge Jones' point, this is not a situation in

15  which the idea of a brutal mass shooting was raised and

16  Mr. Hamzeh said are you out of your mind, are you out of your

17  mind, get away from me, I'm never associating myself with you

18  again; you talk to me again, and I'm going to go tell the

19  police what it is you're talking about here.  That wasn't the

20  reaction.  The reaction was that one can -- actually, if we're

21  talking about different interpretations, one can look at

22  Mr. Hamzeh's visit to the imam -- and I think to Mr. Albee's

23  point, this may be the negative context, this is someone who's

24  seriously considering doing a horrifying thing, considering it

25  so seriously that before he commits himself to the completion

1  of the act, he goes to his most trusted source in terms of his

2  religious beliefs.

3          There's a sense in which that's an indication that

4  Mr. Hamzeh was really thinking about this, or certainly at

5  least he believed other people were really thinking about it,

6  and he took steps to try to settle himself.  Judge Jones said

7  that it shouldn't take the persuasion of two influential

8  religious leaders to convince somebody that going into a closed

9  room and killing up to 30 people isn't a good thing.

10         I think that was Judge Jones' way of saying, perhaps,

11 so you sort of thought this was a good thing until you were

12 told otherwise?  And even after the last act that we have is

13 that even after, for whatever reason it may have been, whether

14 it was because he thought he was going to get caught or because

15 he never planned to do it in the first place or because the

16 imams both advised him that this would be haram, even after all

17 of that, Mr. Hamzeh still goes through with the purchase of the

18 guns, or at least the gun that he was attempting to purchase.

19 I realize there will likely be a dispute over that at trial as

20 well.

21         And again, there's argument about was he buying them

22 for future acts, was he buying them just in case, was he buying

23 them -- that, again, is a decision for the jury to make.  But

24 it is another step in what has been a process of talking about

25 doing a terrible thing.  This is not a terrorism case.  I

1    understand that.  It has not been charged as a terrorism case,

2    for whatever reason.  Mr. Kanter gave one reason.  It hasn't

3    been charged as a terrorism case.  It is a gun possession case,

4    I absolutely agree.

5         But let me posit this:  We have, as most people in

6    this room know, there's a statute that prohibits a person

7    that's been convicted of a felony from having a gun, from

8    possessing a gun, and that's illegal.  It's a crime of what we

9    call status.  If you're a felon, you can't have a gun.  And yet

10   quite frequently I see people who have been arrested for being

11   a felon in possession, one of the first things their attorney

12   might say to me, understandably, is, but Judge, he didn't use

13   it on anybody, he didn't talk about using it on anybody, he

14   didn't point it at anybody, he kept it in a box in his bedroom.

15   It was still illegal for him to have the gun, but one of the

16   things that people will argue at a detention hearing is, but

17   Judge, there's no evidence he was going to do anything with it,

18   there's no evidence that he was going to hurt anybody with it,

19   and so that shouldn't be -- just the fact that he had the gun

20   shouldn't go toward keeping him detained.

21        And I listen to those arguments, of course, and

22   sometimes I agree and sometimes I don't, depending on the

23   circumstances.  Here is a case where we don't simply have gun

24   possession, or in this case possession of a firearm that one

25   must report and pay tax on, and the transfer tax wasn't paid.

1    This is possession of a gun, for however briefly, and briefly

2    because Mr. Hamzeh was arrested immediately upon putting the

3    guns in the back of the car, so we don't know one way or the

4    other what would have happened to them if Mr. Hamzeh hadn't

5    been arrested, but this is a possession case that is preceded

6    by the events that I've just described.

7            So even if one sets aside whatever happened prior to

8    January 16th and whatever conversations there were prior to

9    January 16th, we are left with a series of statements and

10   actions, not just talk, but action indicating that -- that

11   something far more problematic than simply having a firearm in

12   one's possession and not paying the transfer tax was something

13   that Mr. Hamzeh was contemplating.  And that goes directly to

14   one of the factors that I have to consider in the statute,

15   which is someone's disposition or someone's character in terms

16   of whether or not one can rely on them not to engage in

17   dangerous activity in the future.  And again, this goes to

18   danger to the community.

19           The fact that Mr. Hamzeh has said he's going to do

20   things and then doesn't, said he's not going to do things and

21   then does, said he doesn't believe that -- that people ought to

22   participate in the attack because the imams have said it was

23   wrong, and besides, we might get caught, or whatever, and then

24   goes ahead and buys the guns anyway.  That, I think, those were

25   the issues that concerned Judge Jones, and those are the issues

1    that concern me.  I am not here today to make a finding on

2    entrapment.  In fact, I think the weight of the evidence

3    against the defendant, as the parties have pointed out, is one

4    of the weaker factors for a Court to consider.

5            However, I'll note something else, the defense has

6    turned itself inside out and done its usual extremely thorough

7    job of providing not just the facts of the case and going

8    through that, but also providing a lot of information with

9    regard to psychological studies and psychiatric studies in

10   support of the entrapment argument.

11           For example, the defense has referred to the

12   phenomenon of the Stockholm syndrome, which many of us are

13   familiar with, given some past high-profile kidnapping cases,

14   in which a kidnapping victim, when they're exposed to their

15   kidnapper long enough, starts to have some sort of a strange

16   almost bond with that kidnapper, starts to empathize with that

17   kidnapper, eventually may start to do what the kidnapper tells

18   them to.  The Patty Hearst case is probably one of the most

19   prominent examples of that.

20           The electric shock treatments, those tests that

21   Mr. Albee mentioned where someone receives a shock if they do

22   something that the person on the other end of the button

23   doesn't approve of and eventually that person learns to try to

24   avoid the shock, and so they start to try to please the person

25   on the other side of the buzzer in order to avoid that shock.

1          The -- those are certainly studies and there are many

2   others that show that people can be influenced to do things

3   they wouldn't otherwise do with enough pressure, but I note

4   that in those two instances in particular, victims of the

5   Stockholm syndrome are, in fact, victims, they have been

6   kidnapped, they've been held in custody, they've been deprived

7   of contact with their family, their friends and their

8   communities.  The electric shock people, to a much lesser

9   extent, are in fear or at risk of harm to themselves and

10  danger, and they're trying to avoid it and they're trying to do

11  whatever they can to avoid that danger and that risk.

12          Perhaps more on point, but still I think not, is the

13  Swarthmore study that the defense referred to and in its

14  written pleadings, and I don't mean to be academic, but I think

15  it bears discussing, where college students were shown two

16  lines, and they said the college students were asked which of

17  these lines is longer; and left to their own devices all by

18  themselves in a room, 90 percent of the college students or 95,

19  I can't remember, it was a high percentage, correctly picked

20  the longer line from the shorter one.  But if you brought two

21  or three students into the room and said to everybody, which

22  line is the longest, that certainty decreased, and more and

23  more and more, the students started to get it wrong because,

24  perhaps, student A says, oh, the line on the right is

25  definitely longer, and then student B goes, well, are you sure

1   because they look pretty close to me, and pretty soon people

2   start to get tilted off their axes.  So that was another study

3   that the defense pointed out in arguing that people succumb to

4   influence.

5          I indicated that that case might more be on point,

6   and reason I said it might more be on point is because I don't

7   have any evidence in front of me, even after all of this

8   briefing, all of these transcripts, all -- I don't have any

9   evidence in front of me that Steve or Mike were threatening

10  Mr. Hamzeh, that they took him into custody, that they told him

11  they were going to do something bad to him if he didn't

12  participate in these conversations.

13         I understand the defense's argument that having

14  somebody nag you and nag you and nag you and nag you over and

15  over again, may eventually sort of weaken your disposition

16  somewhat.  All you need to do is have a teenager to learn that.

17  But I don't have any indication that there was anything going

18  on here that Mike and Steve were doing, other than raising

19  issues over and over again, raising topics over and over again,

20  talking about them over and over again.

21         In point of fact, as the defense has pointed out,

22  contrary to being sort of cowed by Steve and Mike, Mr. Hamzeh

23  seems to have gotten frustrated, particularly with Mike, and

24  angry with Mike on several occasions, and said, you know, why

25  do you keep asking me the same thing over and over again, just

1    shut up about it, stop.  This doesn't seem to be the behavior

2    of somebody who felt like if I don't go along with these guys,

3    something bad's going to happen to me.

4         The same thing when he consulted with the imams and

5    then went back to Steve and Mike and said, no, I don't want to

6    do this anymore, I don't believe we ought to do this anymore,

7    there's no indication that this was something he was scared to

8    do or concerned about doing, rather he was trying to exercise

9    his persuasion.

10        The reason that I  think the Swarthmore study is also

11   off point is because there's a difference, I believe, in trying

12   to convince somebody succumbing to influence that maybe your

13   powers of deduction and persuasion are not as good as you think

14   they are.  In other words, that someone's questioning the

15   metric by which you make a decision.  If I guess how far away

16   that door is, I think I'm pretty darn right, until somebody

17   else says to me, I don't think you have a very good sense of

18   depth.

19        This situation is not a neutral question that

20   somebody's trying to determine whether or not they're

21   perceiving things correctly, physical things.  This situation,

22   as Judge Jones pointed out, has a different component, and that

23   is a moral and ethical component.  To argue that somebody can

24   convince you that one line looks shorter than the other if they

25   just kind of talk to you long enough is a very different

1    argument than saying somebody can convince you even if you

2    have, as Mr. Albee said, a straight moral compass that killing

3    a large number of people is right if they just talk to you long

4    enough.

5            So I appreciate the studies and I appreciate the

6    point, and I'm not making a decision today, because I'm not in

7    a position to, about whether or not I will allow an entrapment

8    defense.  That's an issue for later.  But in considering what

9    the defense has focused a great deal of its argument on, I

10   raise those issues in that regard.

11           So for all of those reasons, I do find that even

12   though Mr. Hamzeh has no prior history and even though I know

13   he has family and community support for -- which I'm sure he is

14   grateful and anybody would be, and I realize this case is

15   unusual in that sense, even though I understand that this is

16   not charged as a terrorism case and is not being -- I don't

17   know how it's being prosecuted -- if it's being prosecuted that

18   way, but it's certainly not being charged that way.

19           I think the judgment that's shown here, the

20   willingness to engage in this kind of detailed planning,

21   including going to the location, the willingness to have the

22   kind of detailed instruction conference, if you will, that

23   Mr. Hamzeh had with Steve and Mike about how this would play

24   out, the willingness to go ahead and purchase the guns, even

25   after saying, well, we're not going to go through with it at

1 this place at this time, although it was not worded that way,

2 and I don't mean to say it was  Those  things are factors that

3 Judge Jones had to take into account and that I have to take

4 into account in determining dangerousness to the community.

5    A couple of other things, the defense has argued that

6 under the sentencing guidelines, that the sentencing guidelines

7 are 24 to 33 months or somewhere in that neighborhood, and so

8 that he may have served his -- Mr. Hamzeh may have served his

9 time by the time we get to the jury, it is not lost on me the

10 concern that the defense has and that every judge ought to

11 have, that if after trial Mr. Hamzeh is acquitted, he will have

12 sat in custody for two years for something that the jury found

13 he didn't do.

14    Mr. Kanter pointed out the fact that at one point in

15 my career I was a prosecutor and so I know things about how

16 prosecutors work.  There was another point in my career in

17 which I was a defense attorney, and as a defense attorney, I

18 suspect I'm not alone in having lost a lot of sleep over the

19 course of my career worrying that if I did not do my job right

20 and if I didn't do it well, some man or woman would end up

21 being in custody for something they did not do.  So that point

22 is not lost on me, and it troubles me, as well it should, but I

23 also have to consider the other factors, and as I've indicated,

24 I've stated what some of those factors are that concern me.

25    Finally, the Government has also argued risk of

1  flight because Mr. Hamzeh has -- still has family in Jordan and

2  has been overseas before and particularly to the Middle East

3  before and that there's no combination of conditions that would

4  ensure that he would stay.  The defense has put forward several

5  combinations -- several conditions, including location

6  monitoring, including the fact that his parents are willing to

7  act as a third-party custodian for him, a number of other --

8  and I think Mr. Albee's right -- stringent conditions, and I do

9  have to take those into account.

10 But again, that circles back to the issue that I raised

11 earlier, which is a concern about judgment.  It's easy to

12 argue, and I think the defense has, that it would be ridiculous

13 and stupid now for Mr. Hamzeh to try to go out and commit a

14 crime or try to go to O'Hare and get on an airplane, because

15 given his status, he would probably be caught before he could

16 get anywhere, and people know who he is and people know about

17 his case.

18         It would -- but there are many people who probably

19 also would argue it's pretty foolish to go visit a Masonic

20 temple and collect all the information about it and then talk

21 to people about going in and killing everyone who's in there,

22 and go so far as to negotiate the purchase of weapons and then

23 to actually buy them, even when the immediate plans have fallen

24 through.

25         That's what I keep circling back to, is -- is that

1  kind of behavior, what I have seen and heard on the recording
2  and on -- in the transcripts and in the pleadings -- that is
3  the kind of behavior that should, I think, cause a judge to
4  question.  If I let someone out on the assumption that they
5  won't do anything foolish and that they'll comply with all the
6  requirements, how safe is it for me to rely on that assumption?
7  And for any judge it's always an assumption.  There's no
8  guarantee that if someone is released, the next day they won't
9  go out and do something terrible or make it off to the Ukraine;
10 but it's a sliding scale and I have to take into account all of
11 the factors in the statute in looking at that sliding scale and
12 weight those factors as I see appropriate, and here I agree
13 with Judge Jones that those factors weigh in favor of continued
14 detention pending trial.

15         I note, however, as the parties have indicated, that
16 the trial is coming up shortly.  We're two months away from
17 trial.  The parties have already submitted a stipulation, and I
18 appreciate that in terms of timing for submit -- making
19 pretrial submissions, and I plan to issue an order approving
20 that stipulation, and I thank you all for working together on
21 that.  But the one thing that I did want to address briefly
22 today while we're all together, is both parties have alluded to
23 motions that they'll be filing or responding to around some of
24 the legal issues in this case, including whether or not
25 presenting the entrapment defense -- whether I'll allow

1    presenting the entrapment defense.

2            I want to have time to look at those motions and to

3    look at the responses, and unlike a typical motion in limine,

4    which parties can submit a few days before trial and I can look

5    at and I can make an evidentiary ruling either at trial or

6    final pretrial conference, these are weightier issues.  It's

7    evident that these are weightier issues and they're issues of

8    more concern to the parties, and so I wanted to take just a

9    couple of minutes and ask, and perhaps I'll start with

10   Mr. Albee.  I don't want to make you be doing 8,000 things, but

11   at the same time, I'm hoping to get whatever motions are filed

12   in time for the Government to respond, for you to reply if you

13   want to, and for me to give them due consideration.

14           So Mr. Albee, given where we are now, do you have a

15   sense of when you might be prepared to file any motions you're

16   prepared -- you're thinking about filing?

17           **MR. ALBEE:**  Well, it's kind of a broad question --

18           **THE COURT:**  I know.

19           **MR. ALBEE:**  -- in a sense that there's a -- and

20   there's a lot of different kinds of motions.  We received a

21   small bit of discovery on Friday, I think it was, and it's an

22   emphasis on "small" in our view; so we do have some concerns

23   about the discovery that's been produced, and we would hope to,

24   I guess, file motions -- I think we still haven't really had a

25   chance to talk to the Government about that entirely.  I don't

1    want to dump this all on the Government, and we've been working

2    very collegially going back and forth, I'm just -- you know,

3    and --

4              THE COURT:  Well, maybe the other thing I should do,

5    Mr. Albee, sorry, to save you any more sort of heading where I

6    think --

7              MR. ALBEE:  Yeah.

8              THE COURT:  -- you're heading, is ask you all to talk

9    about it.

10             MR. ALBEE:  That would probably be the better -- the

11   better -- better idea.  Because that's one issue and that

12   probably relates to, you know, putting together some of the

13   other issues in this case.  I think both -- both parties too --

14   the transcripts are an onerous process and both parties have

15   been working hard on that, but I think both parties also see

16   we've got a little ways to go on that, so we'll keep talking.

17             And I don't mean to -- the -- again, my complaints

18   about what we got last week, it's not the end of the process.

19   We've -- you know, and we've been in contact the whole time, so

20   I guess that probably makes more sense if we're -- try to work

21   it out for the time being and then propose something to the

22   Court.

23             THE COURT:  And I appreciate that.  And I -- I mean,

24   I should say, again, having been in both pairs of shoes, and to

25   your earlier reference, Mr. Albee, I know what a difficult

1    thing it is to try to work with somebody to prepare for trial

2    when they are in custody, and just the fact that there are

3    tapes and that they're in a different language makes it all

4    that much harder, and I'm not insensitive to that as well, I

5    understand that.  And so I'm perfectly happy -- what I'm,

6    basically, looking for is a bit of heads up only so that I can

7    plan to have sufficient time to do what I hope is a thorough

8    job of going through all of your arguments, so that's all I'm

9    asking.

10            **MR. ALBEE:**  Yeah.  No, we'll do everything we can on

11   that front.  Thank you, Judge.

12            **THE COURT:**  Thank you.  Mr. Kanter, is there anything

13   from the Government today that we need to take up other than

14   what we've already discussed?

15            **MR. KANTER:**  There is not, thank you.

16            **THE COURT:**  Ms. Cyrak, anything from Probation?

17            **U.S. PRETRIAL OFFICER CYRAK:**  No, Your Honor, thank

18   you.

19            **MR. ALBEE:**  Judge, I did have -- there was one other

20   thing I had intended to bring up.  I would expect that we'll

21   ask the Court to submit a jury questionnaire.  And again, we'll

22   try to work with the Government to get an agreement on

23   questions, but I was wondering if the Court had any idea in

24   terms of timing of how far in advance of trial would be --

25   would be necessary, just so we can work with the Government and

1    get that done in a timely manner.

2         **THE COURT:**  Yeah.  And -- and I can try to nail this

3    down with the jury coordinator when I get off the bench to make

4    sure, but I would say at least three weeks ahead of the trial

5    date.  I know that, you know, I mean, it -- because at two

6    weeks they're starting to decide how many folks to bring in for

7    the voir dire, depending on what's on the calendar, so if

8    there's a way to get it by that point, but let me -- I'll

9    double check and I'll let both of you all know what that timing

10   should be optimally.

11        **MR. ALBEE:**  And if I could just talk to Mr. Bugni for

12   one second.

13        **THE COURT:** Uh-huh.

14       **(Pause)**

15        **MR. ALBEE:**  All right, nothing else, thank you.

16        **THE COURT:**  Okay.  All right, thank you, everyone.

17   Thank you to all the people who came to support Mr. Hamzeh

18   today.

19        **THE CLERK**:  All rise.

20       **(Hearing adjourned at 4:10 p.m.)**

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
entitled matter.

_____          January 12, 2018_


TONI HUDSON, TRANSCRIBER