UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff*,

*vs*.                               Case No. 16-CR-21

SAMY M. HAMZEH,

    *Defendant*.

## HAMZEH'S REPLY IN SUPPORT OF MOTION
## FOR PRODUCTION OF *BRADY* MATERIAL

The government has identified five areas of dispute on discovery which Hamzeh addresses below. The government has agreed to provide some items of discovery and says that there are other items that are not in its possession. As to the items it asserts are not in its possession, Hamzeh seeks an order requiring the government to produce these categories of information if the government learns of them. Such an order is necessary so that Hamzeh doesn't have to return to this Court with repeated requests and also because much of the discovery that has been produced was originally classified. Accordingly, it is essential that the government disclose the requested information as soon as it is received to avoid any delay from the need to declassify materials.

It also bears mentioning that when the defense requests a category of documents and the government doesn't know whether it exists, "the Government has an affirmative obligation to employ reasonable efforts to determine the existence, or nonexistence, of the requested documents." *United States v. Ashley*, 905 F.Supp. 1146, 1169 (E.D. N.Y. 1995).

Not only that, but when the government learns of requested evidence, it should immediately advise the defense so the Court can revisit the issue. *Id*.

### A. Policy manuals, etc.

Hamzeh is seeking internal manuals, guidance, memoranda, and other documents bearing on government policies and procedures for conducting investigations like this one or that were relied upon by the agents in this case. The reason for Hamzeh's request for these materials is hardly a mystery—if the agents violated their guidance as set forth in these materials, that's exculpatory, or, at the very least, producible under Rule 16(a)(1)(E) because these documents are in the government's possession and material to the defense. The guidance in these materials is designed to ensure accuracy and accountability in investigations, and to avoid mistakes. For example, there are rules governing how agents should handle informants given the well-known risks of using informants, including that they will lie, commit crimes, frame people, or exceed their authority. There also are rules governing sting operations that are designed to limit the risk of entrapment. The jury should know when agents violate these rules so it can determine whether any of the risks might have come to pass in this case. They also should be able to consider whether a government agent followed his rules to assess his credibility, competence, and lay and expert opinions. An agent's concerns that they may be discovered for violating the rules also provides bias and motive when testifying.

The government seems to demand that Hamzeh identify specific instructions in the manuals, memoranda, etc., that have been violated by agents before the materials are

produced. Of course, Hamzeh can't do that without first knowing what information is in the materials. Nevertheless, Hamzeh has some idea as to how the agents should have conducted themselves and, based on the government's discovery response, it appears that in some instances agents may have acted contrary to their guidance.

Hamzeh's concern is that he doesn't know whether he has the Attorney General Guidelines that were in effect at the time of this investigation. If the manual he has is outdated, the agents may seek refuge by denying knowledge of the particular manual or use of that particular manual. Hamzeh seeks the specific policies that governed this investigation to prevent agents from using that tactic and to show how the agents failed to abide by their standards. The procedures set forth in these materials for FBI agents were adopted in part to ensure the agents' accountability. There is no reason that they should not be produced.

One manual previously identified by the defense is the "Attorney General's Guidelines Regarding the Use of FBI's Confidential Human Sources," which was submitted to the Court. D.E. 82, Ex. D ("Guidelines"). The purpose of these guidelines is "to set policy for all Department of Justice (DOJ) personnel regarding the use of all confidential human sources." *Id*. at 1. These guidelines are "mandatory." *Id*.

The manual provides that each FBI confidential human source must be subjected to the validation process which requires, among other things, a background investigation that identifies the person's motivation for providing information or assistance and whether they are the subject or target of any pending investigations. All this information

3

*Federal Defender Services of Wisconsin, Inc.*

Case 2:16-cr-00021-PP   Filed 02/16/18   Page 3 of 12   Document 105

and other information must be documented in the CHS file, along with the specific instructions provided to the CHS. *Id*. at 12-14.

There are four instructions that must be given to every informant—the four identified by the government as the only instructions these informants received. *See* D.E. 93 at 3. An FBI agent and another official must be present when these instructions are reviewed with the informant (we request identification of these individuals). But additional instructions shall also be given if applicable. Guidelines at 14. These instructions include that the informant must pay taxes from payments received as an informant and that no promises can be made regarding an alien's right to remain in the United States except by the Department of Homeland Security. *Id*. at 16.

Immediately after instructions are given to the informant, the informant must acknowledge his receipt of those instructions in writing and the witnesses must document that the instructions have been given to the informants. *Id*. Instructions must be repeated annually and each informant shall be annually validated. *Id*. at 16-17.

With respect to payments, rewards shall be commensurate with the value of the work and "reimbursement of expenses incurred by a confidential human source shall be based upon actual expenses incurred." *Id*. at 28. Payment shall be witnessed by one FBI agent and another government official. *Id*. at 29. The informant must immediately sign a receipt and acknowledge that the payments may be taxable. *Id*.

There should also be documents and authorizations relating to the FBI's permission for CI Steve to engage in unlawful activity. *See* D.E. 93 at 5. The procedures

4

*Federal Defender Services
of Wisconsin, Inc.*

for granting the authorization are in the Guidelines at page 30-40. These documents are material to the defense as they will identify the motivations of agents and the informant, identify witnesses, include statements of witnesses, and the underlying documents will be exhibits at trial and used in cross-examination.

These Guidelines reveal that there should be an FBI file documenting a significant amount of information about the informants that hasn't been produced and is material, including, but not limited to, (1) each informant's expressed motivations for working as an informant, (2) identification of who exactly gave instructions to the informants, (3) documentation signed by the informants and agents that instructions were given, (4) identification of specific expenses, (5) signed receipts, (6) notices of tax obligations, and (7) the authorizations to engage in illegal activity. Nonetheless, the government has indicated that some of these documents don't exist or that there were no itemized expenses. As the Second Circuit has recognized, the documents showing that certain instructions or payments were given are material or exculpatory for three reasons: they are admissible in whole or in part, they could lead to admissible evidence, and they would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise. *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).

What's more, the FBI appears to have violated the requirement that expenses must be based on the actual expenses of the informants. For example, CI Mike received three $2,000 payments for his expenses. That round number doesn't sound like actual expenses.

In addition, CI Mike should have been validated annually at least four separate times by now, so his motivations and receipts of funds should be well documented, but that information hasn't been provided.

Hamzeh also has identified the "Attorney General Guidelines for Confidential Undercover Activities," as another set of guidelines that are relevant to this investigation. The version Hamzeh has was published in 2002. These guidelines emphasize the importance of protecting innocent persons from entrapment. *See* Hamzeh Discovery Motion, D.E. 82 at 22-23. Hamzeh assumes there is further guidance about what agents and informants must do to avoid entrapment in other FBI documents. If not, the absence of such guidance also should be known and is material and exculpatory.[1]

The government's response spends a page explaining that policies and guidelines don't create enforceable rights. D.E. 104 at 5. But that misses the point because Hamzeh isn't seeking to foreclose this prosecution or suppress evidence for guideline violations. The violation of guidelines is a proper subject of cross-examination for the reasons supplied above. Since the government will bolster the agents' credibility by eliciting their training and experience, the defense should also have access to materials that may show the agents did not act consistently with that training.

---

[1] The FBI's Domestic Investigation and Operations Guide, §18.5.5.1 (2011), available at https://www.documentcloud.org/documents/3416775-DIOG-Redactions-Marked-Redacted.html, permits the use and recruitment of informants "in conformity with" the Attorney General Guidelines Regarding the Use of Confidential Human Sources, the FBI Human Source Program Guide, and the FBI Confidential Human Source Validation Source Manual. All these manuals should be produced. Although Hamzeh has found these manuals online, there may be questions of completeness, authenticity, legibility, and currency with these materials.

6

*Federal Defender Services*
*of Wisconsin, Inc.*

**B.     Rough notes**

The government's resistance to producing the rough notes is puzzling. If they merely reflect what is in the agent's reports, they don't help Hamzeh or prejudice the government. If they differ from the reports, that makes them material or exculpatory to Hamzeh. In addition, comments by the government at the motion hearing revealed two concerns. First, it was clear that the prosecutors had not reviewed the rough notes so they have no idea whether they are material or exculpatory or whether there are variances which make them *Brady* material, including whether the notes mention machine guns or the Masons at an earlier point in time. Second, the government protested that it would have to declassify these rough notes before producing them.

Since declassification of documents has taken many weeks in this case, that declassification process should take place immediately to avoid further delays. Accordingly, Hamzeh requests an order for the production of the rough notes or *in camera* review to determine whether there are discrepancies between the rough notes and the reports that were turned over. Hamzeh further requests the production of all notes that differ from the final reports. The Court also could initially require the government to make that comparison in the first instance and then produce any notes that differ and submit to the Court any notes that the government is unsure about. In any event, the declassification process should take place immediately.

7

*Federal Defender Services*
*of Wisconsin, Inc.*

### C. Receipts and paperwork for payments made to confidential sources.

The government does not dispute that the payments received by informants and the instructions they received from agents are producible. But it does not want to provide the underlying documentation showing those payments. The documents are material and must be produced so that Hamzeh can confirm their accuracy, identify and investigate other witnesses to the transactions, and use these materials as exhibits and in cross-examination. As noted above, such documents are an "effective tool" for disciplining witnesses. Hamzeh should be able to present the actual materials to the jury rather than relying on hearsay summaries prepared by the adversary party.[2]

One other note regarding payments to informants that also bolsters Hamzeh's request for manual and guidelines is that, under FBI policy, agents may pay informants lump sums after a case is over. *See* FBI Confidential Human Source Policy Guide (9/21/15) at §17.14, available at http://www.documentcloud.org/documents/3422065-CHS-FINAL-Redacted.html. Informants can be paid tens or even hundreds of thousands of dollars after-the-fact. *See id*. at § 17.3. This is important given that the government may attempt to minimize the financial incentives at play here. It also is relevant to the material at issue in the next section because specific information about the informants work on other cases may be relevant to the informants' knowledge that they could profit handsomely from their work for the government.

---

[2] Finally, as noted, actual expenses were supposed to be documented by the informants, but no such specifics have ever been produced.

8

*Federal Defender Services*
*of Wisconsin, Inc.*

**D. Specification of other cases in which the informants have assisted the government.**

Hamzeh has no doubt that the two informants in this case will try to testify in a manner that assists the government at trial. Thus, it will be important for the defense to demonstrate the bias and motive of these informants. One way that can be done is by exposing the reasons the informants want to curry favor with the government as revealed by the number and degree of contacts between the informants and government agents. This includes showing how many cases the informants have worked on with the government, what their motivations were for working for the government, what benefits they have received for working for the government, what benefits they requested from the government, what benefits they expected to receive from the government, whether they expect to receive benefits in the future from the government, whether they feel insulated from civil or criminal liability as a result of their work for the government, and how much money they have received in total from the government. Further, the reasonableness of the benefits received by the informants is relevant to the question of the degree to which they have been "bought off." For all those reasons, Hamzeh seeks specific information about what cases the informants had worked on, when, and what they received for their work.

**E. Unredacted reports**

The government says that "[a]lmost all of the redactions are of administrative markings, classification markings, names of innocent third parties, and personal identifying information." One of these things is not like the others. The third

9

*Federal Defender Services*
*of Wisconsin, Inc.*

parties are witnesses to interactions between Hamzeh and the informants or are persons Hamzeh and the informants were discussing. Obviously, the names of witnesses are important and should be disclosed. But the identities of persons discussed also are material so that Hamzeh can investigate the accuracy of what was said in conversations. There is no privilege against disclosing the names of third parties. Beyond that, Hamzeh has provided a sampling of redacted reports to the Court. It is apparent that more than markings and identification information have been redacted. The government provides no basis why Hamzeh and the Court should have to engage in the cumbersome process of sorting through hundreds of pages of reports identifying every possible problematic redaction and then vetting it. Events and identities in the reports should be unredacted without further litigation. As it stands now, Hamzeh can't tell for sure who was present at critical meetings because of the redactions. That's also not consistent with the open file policy.

**F.  Remaining Issues**

**1.  Text Messages.**

The government's response indicated that it would provide all text messages in its possession. D.E. 93 at 2. The government has not indicated, however, whether there were text messages that were not preserved. Hamzeh requests an order requiring the government to identify what texts were not preserved. *See* Hamzeh Discovery Motion, D.E. 82 at 13-15 (citing *United States v. Suarez*, 2010 WL 4226524 D. N.J. 2010)).

10

*Federal Defender Services of Wisconsin, Inc.*

### 2. Identification of efforts to link Hamzeh with extremists (See D.E. 82 at 20-22).

The government claims all material in its possession responsive to this request has been turned over. Hamzeh has grave doubts about that and requests an order specifically requiring the production of this information.

### 3. Information regarding the genesis of the Mason plot and the effort to obtain machine guns.

If one relies solely on the FBI reports, the Mason plot and the decision to get machine guns from CI Mike's fictional associates arose out of thin air just prior to January 19. Somehow CI Mike knew that FBI agents could set up a sting with machine guns using African-American undercover agents, even without any prior discussions with the agents overseeing the investigation. This defies common sense. So while the government denies the existence of any such information, Hamzeh still requests an order specifically requesting the government to provide:

> All reports, memorandum, rough notes, text messages, or any other form of communication between the FBI agents and the informants be turned over concerning the following topics:
>
> - All information about machine guns and direction given to the informants about machine guns;
>
> - All information about the Masons and direction given to the informants about the plan to attack the Masons or any other domestic target; and
>
> - All information provided to the informants that falsely portrays the Masons in league with ISIS and enemies of Islam.

**4. Mental health records.**

The government asserts it is not in possession of any mental health records, but has not indicated whether it has access to them. If so, they should be acquired and produced. But given the government's assertion, Hamzeh will subpoena the records for *in camera* review. *See*, *e.g.*, *United States v. Robinson*, 583 F.3d 1265 (10th Cir. 2009).

Dated at Milwaukee, Wisconsin this 16th day of February, 2018.

Respectfully submitted,

/s/       *Craig W. Albee*
Craig W. Albee, WI Bar #1015752
Joseph A. Bugni, WI Bar #1062514
FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
517 E. Wisconsin Ave. - Rm 182
Milwaukee, WI 53202
Tel. (414) 221-9900
e-mail: craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh