UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

       *Plaintiff*,

       Case No. 16-CR-21 (PP)

*vs*.

SAMY M. HAMZEH,

       *Defendant*.

## HAMZEH'S MOTION TO PRODUCE INFORMATION SUBMITTED UNDER CIPA

### I. Introduction

This case began when Samy Hamzeh's friend, Steve, who has mental health issues and was seeking a way to stay in this country, told the FBI that Hamzeh was making some outrageous and potentially dangerous statements. Within days, the FBI had a paid informant, Mike, take a job at the same restaurant where Hamzeh worked so he could befriend Hamzeh. And for the next four months these two "friends" were in nearly daily contact with both Hamzeh and FBI agents. The informants recorded some, but nowhere near all, of their conversations with Hamzeh. During this time, the informants encouraged Hamzeh to take an interest in guns and to prattle on about attacking Israel. Ultimately, the informants introduced the idea of a plot against the Masons, which Hamzeh adamantly rejected in the end. But Hamzeh was arrested on January 25, 2016, when one of the informants arranged for the purchase of two machine guns for $600 and the three men took possession of them from undercover FBI agents.

*Federal Defender Services*
*of Wisconsin, Inc.*

Hamzeh has telephone records, surveillance records, FBI reports, and text messages showing the informants' near daily contact with Hamzeh. The informants admitted as much to their FBI handlers. But while the government has produced dozens of hours of conversations between Hamzeh and the informants, many meetings and conversations were not recorded. Most notably, Mike did not record a single conversation from December 14, 2015, to January 18, 2016, despite the daily contacts — and this is the time frame in which the supposed Masonic plot and plan to obtain machine guns developed. This gives rise to some obvious and important questions — why weren't these conversations recorded? Who made that decision? What was said during these unrecorded conversations? Who proposed the plot? Who suggested getting a machine gun? Because the government didn't record these conversations,[1] the credibility of the agents and the informants is of extraordinary importance and, regardless of CIPA, any such information should be produced.

In addition to discovery relating to the credibility of agents and informants, Hamzeh also is seeking information supporting his claim that he lacked predisposition. As in all entrapment cases, the government must prove that Hamzeh was predisposed to commit the crime. The government has produced no evidence showing Hamzeh manifested an interest in guns or had committed any crimes before the informants began working as agents for the government and, other than Steve's initial report to the FBI in

---

[1] The other informant, Steve, only recorded a handful of telephone conversations during the same 35-day period. Yet at the time the FBI agents were still in contact with the informants and investing significant time conducting surveillance of Hamzeh.

2

*Federal Defender Services*
*of Wisconsin, Inc.*

September, there's no information about Hamzeh even talking inappropriately before the informants became involved. But even with respect to statements attributed to Hamzeh by Steve (which were not recorded), within a week of his initial report Steve had told the FBI that Hamzeh had retracted his statements and admitted it was all "bullshit."

During the ensuing four-month investigation the government spent enormous resources in search of damning information about Hamzeh and came up with little apart from what was generated by the two informants. This strongly rebuts any claim that he was predisposed to the activities that the government induced him into engaging. But Hamzeh wants to know if the government conducted still other investigative activities of which Hamzeh is currently unaware. Any investigation into Hamzeh's life, his communications, or his movements in which nothing incriminating was uncovered is most certainly relevant and helpful to Hamzeh in further establishing that he lacked predisposition to engage in the charged crimes. It also supports the defense position that Hamzeh did not have present connections that would have allowed him to engage in these activities without government assistance.

Of course Hamzeh doesn't know exactly what information the government has submitted under CIPA so he is hamstrung in explaining to the Court precisely how certain pieces of information would help him. And the Court is hamstrung in identifying what information may be relevant and helpful to the defense because it is not privy to the voluminous discovery, Hamzeh's conversations with counsel, or the defense investigation. Nonetheless, this memo constitutes an effort to explain to the Court why certain types of information are helpful to the defense and why they should be produced.

3

This memo also addresses why the Court should not accept the government's claims about the importance of the secrecy of this information at face value. After all, there is no involvement of any foreign government or terrorist organization. Hamzeh himself isn't privy to any classified information, and the identities of the informants are not much of a secret. In the end, the Court should produce, in original form, the evidence submitted by the government to the Court under CIPA to protect Hamzeh's rights under Rule 16 and *Brady*.

## II.  CIPA[2]

Nearly two years ago, the government submitted a lengthy memorandum of law explaining CIPA procedures. R. 17. For the most part, Hamzeh does not take issue with the accuracy of the memo, although the memo is not a neutral rendering of the law. In terms of CIPA procedure, Hamzeh will briefly outline the procedure and emphasize a couple key points.

The government's CIPA memo emphasizes that CIPA doesn't create any new right of discovery nor expand the rules governing the admissibility of evidence. R. 17 at 4. That's true, but the memo fails to note that CIPA also does not limit the government's obligation to produce discovery under Rule 16, *Brady*, or *Jencks*. *United States v. Yunis*, 867 F.2d 617, 621 (D.C. Cir. 1989). Rather, CIPA "contemplates an application of the general law of discovery in criminal cases to the classified information area with limitations imposed based on the sensitive nature of the classified information." *Id*.

---

[2]  Hamzeh's CIPA discussion tracks the analysis presented in Cory, Singer, and Latcovich, FEDERAL CRIMINAL DISCOVERY at 375-78 (ABA 2011).

4

*Federal Defender Services*
*of Wisconsin, Inc.*

When the government submits evidence to the Court under CIPA, the Court's first task is to determine whether the information is discoverable without regard to its classified nature. If so, then the Court must determine whether the government has asserted a colorable national security interest. *United States v. Mejia*, 448 F.3d 436, 455 (D.C. Cir. 2006). A government invocation of privilege based on the classified nature of the material must be "lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953); *United States v. Stewart*, 590 F.3d 93, 131-32 (2d Cir. 2009).

If the national security claim is not "colorable," the information should be produced. If the Court finds that it is colorable, then the Court must determine whether the classified material is "relevant and helpful to the defense." *Yunis,* 867 F.2d at 622. This "relevant and helpful" standard is akin to the *Roviaro* standard, but lower than the materiality standard under *Brady*, as "information can be helpful without being 'favorable' in the *Brady* sense…." *Mejia,* 448 F.3d at 456-57. *See also United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012) ("the 'favorable' materiality standard of *Brady* is much more difficult to satisfy than the 'relevant and helpful' standard of *Yunis*").

If there is a colorable national security interest and the evidence is relevant and helpful to the defense, the Court then must balance these competing concerns based on the particular circumstances of the case. *United States v. Smith*, 780 F.2d 1102, 1107 (4th Cir. 1985). This requires the court to balance the usefulness of the classified information to the defense against the government's "interest in protecting sensitive sources and methods of gathering information." *Id*. at 1108. In resolving these competing concerns,

5

*Federal Defender Services of Wisconsin, Inc.*
Case 2:16-cr-00021-PP   Filed 09/26/18   Page 5 of 14   Document 185

the Court has the option of fully disclosing the helpful information to the defense, providing a summary of the information contained in the classified documents, or substituting a statement admitting relevant facts that the classified information would tend to prove. 18 U.S.C. App. 3, §4.

For the reasons that follow, Hamzeh seeks the disclosure of all Rule 16, *Brady*, and *Jencks* material submitted to the Court under CIPA and asserts that summaries or other substitutes of original material are inadequate to protect his rights under the Federal Rules and to a fair trial and to present a defense. The material at issue is important to the defense and any interests the government has in the secrecy of this information is minimal, contrary to the interests to Hamzeh and the public, and insufficient to outweigh Hamzeh's right to production of the material.

### III. Discovery at issue

Hamzeh doesn't know precisely what material the government will be submitting to the Court under CIPA, but here are some of the categories of information that the Court ordered produced and that the government has not produced, relying on CIPA. Because the Court already has ordered this evidence produced, there is no issue concerning whether the evidence is discoverable in the first instance. The questions for the Court are whether the material implicates national security, whether it is relevant and helpful to the defense, whether it should be turned over, and in what form.

####    A.    Magistrate Judge Duffin's March 8, 2018 Order

1.    The Court ordered the government to produce the underlying documentation regarding the payments the government made to the informants as part

of their work so that Hamzeh could identify which funds were paid for reimbursement and which were related to expenses. R. 107 at 9. The Court found that these documents are material to the preparation of the defense. *Id*. The Court also ordered the government to provide the defense with the amount of compensation paid to the informants in other cases besides Hamzeh's. R. 107 at 11.

    **B.**    **Magistrate Judge Duffin's July 25 Order**

    1.    The Court ordered production of "any requests by any informant for immigration assistance of any type or any immigration benefits offered or received or contemplated." R. 150 at 2. Although the government previously indicated that no immigration benefits were conferred, in a letter to defense counsel on August 10, 2018, the government indicated that it would be relying on CIPA.

    2.    The Court ordered the government to identify "all money paid in total for any purpose to the CHS including both expenses and services." *Id*. The government has indicated it will rely on CIPA.

    3.    The Court ordered that the government provide "the amount of money paid related strictly to the Hamzeh case (services plus expenses broken out separately)." *Id*. The government has indicated that it will rely on CIPA.

    4.    The Court ordered the government to provide "the most recent criminal history for the informants." *Id*. The government indicated that it would rely on CIPA.

    5.    The Court ordered the government to provide "copies of the front portion of every ELSUR envelope (commonly referred to as the 1D envelope or FD-504

envelope for all digital recordings. Include copies of an ECs documenting justification for late submission." *Id*. at 3. The government indicated it would rely on CIPA.

   6.  The Court ordered the government to provide the "Sentinel index/listing of all electronic recordings from the 'ELSUR' (1D) section of the file." *Id*. at 4. The government indicated it would rely on CIPA.

   7.  The Court ordered the government to produce all "FD-302's regarding obtaining custody of the recording devices from the CHS or undercover agents, the downloading and chain-of-custody for the digital recording devices and the production of the original CDs form those recording devices for every recorded conversation." *Id*. Again, the government indicated it would rely on CIPA.

  **C.**  **Third and Fourth Motions to Compel**

In addition to the above material that the Court ordered produced, Hamzeh has requested the following material in his third and fourth motions to compel. R. 179, R. 177. Hamzeh believes that the government will rely on CIPA regarding some of this information:

   1.  All documentation relating to the calls that are on discs 118, which appear to have been intercepted by the government.

   2.  The file for each informant, to include, the initial suitability report, the informant's reported motivations for cooperating, identification of all benefits, including travel to and from the United States, the documentation underlying those benefits, annual reviews of the informants and identification of any violations or deviations from guidelines, instructions, or policies by any informant or agent.

8

*Federal Defender Services*
*of Wisconsin, Inc.*
Case 2:16-cr-00021-PP   Filed 09/26/18   Page 8 of 14   Document 185

3. All instructions given to the informants.

4. All chain-of-custody documents, ELSUR envelopes, information concerning when informants had recording devices checked out to them, what types of recording devices were used, and what instructions were given as to when to record Hamzeh;

5. All information and documentation relating to intercepted communications, GPS, stingray, pole cameras, or other undisclosed surveillance or interception techniques.

## IV. Reasons for Production

The discovery Hamzeh believes has been submitted under CIPA falls roughly into four categories: (1) informant benefits and other information relevant to credibility; (2) instructions to informants; (3) information regarding the recording of conversations; and (4) surveillance. Hamzeh will briefly explain the defense need for each category of discovery.

**A. Informant Benefits/Credibility**—Hamzeh has explained why the credibility of the informants is a big deal in this case—many conversations at critical junctures were unrecorded so the jury will have to assess the truthfulness of the informants' accounts about who suggested activities, when that happened, and what words were used by whom. Indisputably, the benefits that were discussed, promised, or hoped for by the informants is critical to their credibility and the Court already has found them material. Everyone knows the FBI compensates informants and the defense (as well as the public) has a strong interest in knowing exactly how the informants received,

expect to receive, or will receive compensation. This Court already has determined as well that the underlying documentation relating to benefits must be turned over so that Hamzeh can assess what compensation was a reward versus and expense reimbursement. Hamzeh seeks the original documents because they may be admissible evidence and will serve as "an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).

Another type of benefit potentially at issue relates to immigration. Informant Steve is not a citizen and he apparently had previously married in an effort to gain citizenship. Earlier the government represented that there were not any immigration benefits to disclose, but it now says it's proceeding under CIPA. The information is important as Hamzeh believes Steve was seeking the FBI's help with his immigration issues. Moreover, the government has a duty to correct the record if immigration benefits are in play, given that it told the defense the contrary.

Shockingly, the government also has indicated that it will only respond to Hamzeh's request for an updated criminal history under CIPA. This evidence plainly is relevant and helpful to the defense and there is no security interest at stake. More troubling is that Hamzeh has learned from his own investigation that Mike was charged with felony battery involving a gun in June yet the government still has not notified the defense or turned over documents relating to that prosecution.

Hamzeh also has requested the informants' FBI files. FBI policy requires an initial suitability report for each informant, including their criminal history and motivations for

cooperating. Informants are to be reviewed annually and violations of instruction are to be documented. The motivations of the informants are especially important to the defense as Hamzeh is confident that they were not acting out of the goodness of their hearts as the government might seek to portray it at trial. After all Mike took a delivery job at a restaurant just to befriend Hamzeh. His motivations and compensation for doing so are critical to the defense, as are Steve's motivations.

### B. Instructions to Informants

The government has been stonewalling Hamzeh on what instructions were given to its informants. First it reported to this Court that four instructions were given by the agents. But then some of the agents' texts were produced and there was one emphasizing to Steve the necessity of recording every conversation with Hamzeh. Then on July 30, 2018, Special Agent Adkins wrote a report detailing still other instructions he gave to the informants. According to the government, these additional instructions hadn't been produced because they hadn't previously been memorialized.

The instructions given to the informants are critical to gauge the credibility of the agents and the informants which is why it's FBI policy to document instructions in the file. *See United States v. Suarez*, 2010 WL 4226524, *5 (D.N.J. 2010) (stating that "whether an informant abided by the agent's instructions [is] fertile grounds for cross-examination"). The instructions provide a basis to assess whether agents and informants are following FBI protocol, to determine whether there is supervision and accountability, and to assess whether rules may have been bypassed to entrap Hamzeh. The dangers of using informants are well-known and the failure to properly instruct them or to enforce

11

*Federal Defender Services*
*of Wisconsin, Inc.*

policies increases the risk of rogue informants. *See United States v. Brumel-Alvarez*, 991 F.2d 1452, 1463-64 (9th Cir. 1992) (reversible error not to disclose government memo written to government agent "highly critical" of key government informant). As with the other credibility information, there is little national security interest at play here. In many ways this is a run-of-the-mill sting operation as it involves no foreign governments, no terrorist organization, and no sophisticated target. It involves informants acting in their own interest and the jury must have all available information relevant to credibility to be able to determine whether to believe the informants as in any other informant case.

### C. Information Concerning Recording Devices

The Court ordered production of the ELSUR envelopes, the Sentinel Index of all electronic recording devices from the CHS's, and the downloading and chain-of-custody for the devices and recordings for every recorded conversation. The government has indicated it is proceeding under CIPA, although it's hard to imagine why chain-of-custody information for materials already produced would be classified. The original envelopes should be produced so that the defense can assess whether there are gaps in the chain, delays in placing recordings in evidence, problems with storage, or opportunity for alteration. Further, as explained in Hamzeh's Fourth Motion to Compel, there have been serious issues with mislabeling disks and with identifying how recordings were captured.

### D. Surveillance

At the very least, Hamzeh was misled about the existence of surveillance in this case. It was nearly two years into the case before the government acknowledged 64

12

*Federal Defender Services*
*of Wisconsin, Inc.*

occasions of physical surveillance of Hamzeh. At first the government denied these surveillance reports would be of value to Hamzeh, but they have proved essential to the defense, demonstrating additional meetings between Hamzeh and the informants that weren't documented, confirming how often Hamzeh worked, showing that Hamzeh was not meeting with others engaged in criminal activity, and highlighting the enormous government resources invested in the case that turned up nothing. Those surveillance reports also underscore the deficiencies of CIPA—although the defense quickly identified the value of those surveillance reports, a court reviewing the same reports may not have seen their value.

In addition to the physical surveillance reports described above, that Hamzeh now has, it appears that the government intercepted phone calls, used pole cameras, and perhaps engaged in other surveillance. As outlined in Hamzeh's Third Motion to Compel, Disk 118 appears to contain intercepted phone calls, but Hamzeh never has been told that and only discovered it recently on his own. He has received no documentation relating to wiretaps. This wiretap presumably extends beyond the 14 calls on Disk 118 and may be crucial in telling the defense what happened during the 35 days Mike stopped recording communications. That information should be produced as the government's failure to uncover incriminating information through any wiretaps is exculpatory, Hamzeh has a right to his own statements, and he should have the opportunity to challenge the lawfulness of any such activity. Further, the content of the calls doesn't implicate national security.

Likewise, for other surveillance techniques, like GPS or stingray. If the government tracked Hamzeh's conversations or movements in any way and uncovered no criminal activity, connections to guns or terrorists, or other inculpatory information, it supports his claim that he was not predisposed. Repeatedly the government has contended that information like texts or surveillance reports would not aid the defense, but after their production the defense finds them extremely helpful. The information should be turned over to avoid an issue later. *E.g.*, *United States v. Pelullo*, 105 F.3d 117. 122-23 (3d Cir. 1997) (finding a *Brady* violation where rough notes and surveillance tapes would have undermined informants claim that he met with defendant at particular location).

## Conclusion

For the above reasons, Hamzeh requests production of the information submitted under CIPA. He also requests a hearing to further elaborate on his need for this material.

Dated at Milwaukee, Wisconsin this 26th day of September, 2018.

Respectfully submitted,

/s/ Craig W. Albee
Craig W. Albee, WI Bar #1015752
Joseph A. Bugni, WI Bar #1062514
Gabriela A. Leija, WI Bar #1088023
FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee, WI 53202
Tel. (414) 221-9900
E-mail: craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh

14