UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

*Plaintiff,*

Case No. 16-cr-21-PP

*vs.*

SAMY M. HAMZEH,

*Defendant.*

---

**SECOND MOTION IN LIMINE:**
**ATTORNEY CONDUCTED *VOIR DIRE***

Samy Hamzeh, by counsel, moves under Fed. R. Crim P. 24(a) and his constitutional right to a fair and impartial jury, to allow attorney-conducted *voir dire*. In support of this motion, Hamzeh invites the Court's attention to the following.

The right to a fair and impartial jury is a cornerstone of American jurisprudence. U.S. Const. amend. VI. Many, in fact, consider *voir dire* "the most significant part of any trial." Herald Price Fahringer, "*Mirror, Mirror on the Wall…*": *Body Language, Intuition, and the Art of Jury Selection*, 17 AM. J. TRIAL ADVOC. 197 (1993). And others declare that there is no aspect of a trial more important to the ultimate outcome than the jury selection. *See, e.g.*, Margaret Covington, *Jury Selection: Innovative Approaches to Both Civil and Criminal Litigation*, 16 ST. MARY'S L.J. 575, 575 (1985). ("Experienced trial lawyers agree that the jury selection process is the single most important aspect of the trial proceedings…"); Fahringer, *supra* at 197 ("Acknowledged experts in the field believe that eighty-five percent of cases litigated are won or lost when the jury is selected[.]").


Case 2:16-cr-00021-PP Filed 09/04/19 Page 1 of 11 Document 257

When it comes to jury selection in federal court, Rule 24(a) provides that attorneys be involved in the *voir dire* process by either conducting the *voir dire*, asking follow up questions, or by providing a list of follow-up questions to be asked by the court. *See* Rule 24(a)(1) – (2). Although Rule 24 gives trial courts broad discretion to regulate the jury selection process, the Supreme Court has recognized that adequate *voir dire* is critical to the protection of a defendant's Sixth Amendment right to a fair trial. For example, in *Morgan v. Illinois*, the Court emphasized: [P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored." 504 U.S. 719, 729-30 (1992). The Court continued: "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.*

While Fed. R. Crim. P. 24 gives wide discretion to the trial court, *voir dire* may have little meaning if it is not conducted, at least in part, by counsel. After all, it is the parties, rather than the court, who are immersed in the nuances of the case and most aware of its strengths and weaknesses. In this case and as discussed below, follow-up questions will be critical, and they will necessarily have to be tailored to the juror's answer. And those answers are more likely to be truthful if asked by an attorney instead of a judge. Thus, allowing for attorney-conducted *voir dire* will be more time efficient and more likely to provide a fair and unbiased jury than *voir dire* that is simply conducted by the Court. On that point, it's worth stressing the words of United States District Court Judge Mark

Bennett, when he explained that because attorneys know the case better, they "are in the best position to determine how explicit and implicit biases among potential jurors might affect the outcome," and they have greater incentive to develop strategies to ferret out these biases. Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions,* 4 HARV. L. & POL'Y REV. 149, 160 (2010).

Judge Bennett isn't the only one to recognize that reality. The Fifth Circuit has similarly recognized that even the most diligent judge will not be as familiar with the nuances of the case as the parties and therefore will not have the same insights as to what questions or follow-ups are necessary: "[W]e must acknowledge that *voir dire* examination in both civil and criminal cases has little meaning if it is not conducted by counsel for the parties. *A judge cannot have the same grasp of the facts, the complexities and nuances as the trial attorneys entrusted with the preparation of the case*. The court does not know the strength and weaknesses of each litigant's case. *Justice requires that each lawyer be given an opportunity to ferret out possible bias and prejudice of which the juror himself may be unaware until certain facts are revealed*." *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977). Indeed.

Here, as it is in any case, the parties are in the best position to determine what sorts of questions are required to adequately determine juror bias. If the proper questions are asked, peremptory challenges will be made based upon a thorough examination of juror responses to questioning, ensuring a fair and impartial jury. *See United States v. Dellinger*, 472 F.2d 340, 368 (7th Cir. 1972) (recognizing that if the right to peremptory challenges is

"not to be an empty one," *voir dire* must allow sufficient inquiry into the background and attitude of jurors to enable defendants to intelligently exercise their peremptory challenges). Experience teaches that especially in a case like this, general questions about whether a juror can be fair and impartial are inadequate because a prospective juror is not "so alert to his own prejudices." *Id.* 364-68 (quoting *Swain v. Alabama,* 380 U.S. 202, 219 (1965)). Indeed, research indicates that jurors are more likely to respond truthfully to questions posed by an attorney than those posed by a judge, whom they perceive as an authority figure. *See Susan E. Jones, Judge vs. Attorney-Conduced Voir Dire: An Empirical Investigation of Juror Candor*, 11 LAW AND HUMAN BEHAVIOR 131 (1987).

Similarly, in one of the largest empirical studies of *voir dire*, funded by the U.S. Department of Justice, researchers found that in the employment context, the degree of self-disclosure varies based on the interviewer's perceived status within the employment organization. Frank P. Andreano, *Voir Dire: New Research Challenges Old Assumptions*, 95 ILL. B.J. 474, 475 (Sept. 2007) (citing Deirdre Golash, *Race, Fairness, and Jury Selection*, 10 BEHAV SCI & L, 155-177 (1992)). As a result, employees were more willing to self-disclose to interviewers within their own hierarchical level rather than to more authoritative superiors. *Id.* It follows that research concerning employees would have a similar finding with jurors, and it supports the contention that individual attorneys are best suited to uncover honest responses from prospective jurors during *voir dire*. This body of research also reveals one of the biggest concerns regarding judge-conducted *voir dire*: that "during a judge-conducted *voir dire*, jurors attempted to report not what they truly thought or felt about an issue, but instead what they believed the judge wanted to hear." *Id*. at 476.

That's because most jurors are sensitive to "social comparison information" and therefore are reluctant to deviate from the socially acceptable response. Robert M. Arkin, et. al., *Social Anxiety, Self-Presentation, and Self-Serving Bias and Casual Attribution*, 38 JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY 23 (1980). In short, the higher the status of the person asking the questions the more likely the juror is to give the answer that he or she believes that the questioner wants to hear. If a judge asks the question, you get the socially appropriate answer. If an attorney asks the question, you may get something closer to the truth. And the parties are entitled to truthful answers from the potential jurors.

Beyond that, it's worth noting two important points in support of allowing attorney conducted *voir dire*. First, it's not unusual for courts to allow for some attorney-conducted *voir dire* in high profile cases. In notorious cases, it is more common for *voir dire* to be conducted equally by judge and attorney or for *voir dire* to be conducted primarily by attorneys than it is in routine cases. Paula L. Hannaford-Agor, *When All Eyes Are Watching: Trial Characteristics and Practices in Notorious Trials*, 91 AMERICAN JUDICATURE SOCIETY 197, 198 (2008). And second, studies have shown that there is no significant increase in jury selection times in cases that involved attorney-conducted *voir dire* from those that did not. Valerie P. Hans & Alayna Jehle, *Avoid Bald Men And People With Green Socks*, 78 CHI KENT L REV. 1179, 1185 (2003) (citing 1994 memorandum of survey of federal judges conducted by Federal Judicial Center).

Beyond the fact that high-profile cases often feature attorney conducted *voir dire* and that it will not increase the amount of time spent selecting a jury, another reason for

attorney-conducted *voir dire* is the necessity of inquiring of the jury on their views on race, religion, ethnicity, and any other biases they may have, explicit or implicit. *See generally* Samuel R. Sommers & Phoebe C. Ellsworth, *White Juror Bias: An Investigation of Prejudice Against Black Defendants in the American Courtroom*, 7 Psychol. Pub. Pol'y & L. 201 (2001). A wealth of research has convincingly shown that race influences the way individuals perceive and behave even when those individuals are unaware of the influence of race.[1] Such research has demonstrated that "[b]ias is largely unconscious and often at odds with conscious beliefs."[2] The Implicit Association Test (IAT), a social psychology test taken by over fourteen million people, has found that "[s]eventy-five percent of those who have taken the race IAT have demonstrated implicit racial bias in favor of Whites."[3] Without attorney directed *voir dire*, addressing jurors' views on the sensitive subjects, peremptory challenges are more likely to rely on stereotypes than a juror's actual ability to remain and decide the case impartially—to do so with integrity. "Integrity" is, of course, fundamental to "the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). Nothing is so essential to the "integrity" of the jury right as the requirement that "verdict[s] 'must be based upon the evidence developed at the trail'" in light of "calm and informed judgment," rather than upon pre-existing bias, prejudgment, or passion. *Id*.

---

[1] Peter Joy, *Race Matters in Jury Selection*, 109 N.W. U. L. REV. COLLOQUY, 181 (2015).

[2] Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 U.C. IRVINE L. REV. 843, 860 (2015).

[3] Cynthia Lee, Making Race Salient: Trayvon Martin and Implicit Bias in a Not Yet Post-Racial Society, 91 N.C.L. REV. 1555, 1572 (2003).

To that end, the Supreme Court in its groundbreaking decision in *Pena-Rodriguez v. Colorado*, recognized the obligation of courts "to confront racial animus" and that "the Constitution at times demands that defendants be permitted to ask questions about racial bias during *voir dire*." 137 S. Ct. 855, 867–68 (2017). The Court also emphasized that the "familiar and recurring evil" of racial bias, if left unaddressed, "risk[s] systematic injury to the administration of justice." *Id*. at 868. If bias isn't adequately explored during *voir dire*, the situation that arose in *Pena-Rodriguez*—a juror expressing racial, religious, or ethnic animus during deliberations—is much more likely to arise.

When those aspects of a juror's character are disclosed in *voir dire* everyone benefits. The failure of jurors to disclose potential bias impugns the fairness and integrity of the trial process, and it threatens public faith in the fundaments of our justice system. Not only does the social science research support the defense's premise that jurors will disclose more relevant information in attorney-conducted *voir dire* rather than judge-conducted *voir dire* but also the best way to avoid those potential pitfalls and provide Hamzeh his constitutional right to a jury that is not biased against him on account of his religion or ethnicity is to allow attorneys to conduct *voir dire*. From the defense's perspective, there are several major areas of concern in jury selection in this case, including: exposure to pretrial publicity; pro-law enforcement bias; strong feelings about terrorism; and strong feelings about guns. But by far the most significant concern is that Hamzeh, as a Muslim and Palestinian, born to immigrants, has to face the reality that he is subject to enormous prejudice in this country. For that reason, the defense (and the Court) cannot simply rely on the Court questioning prospective jurors about whether

they agree that they can be fair. As expressed below, when it comes to biases towards Muslims such questioning is unlikely to reveal much about the juror's true inner thoughts.

In counsel's experience, an extensive juror questionnaire combined with attorney-conducted *voir dire* are most likely to produce relevant information from jurors that will allow the parties to make appropriate strikes for cause and intelligently exercise their peremptory challenges. In a prior case in this district, *United States v. Rahman,* Case No. 11-cr-103, a significant number of jurors responding to a questionnaire expressed some level of discomfort with Muslims. These jurors were questioned individually in chambers and several were struck for cause based on their feelings about Muslims. One juror, having revealed her discomfort with Muslims in her questionnaire, disclosed during questioning in chambers that because there were Muslims in the gallery during jury selection she worried about possibly being shot when she left the building. The juror was pleasant and didn't appear hostile, but obviously harbored fears that disqualified her from serving as a juror. Without the questionnaire and follow-up, this would not likely have been exposed. It would have been unlikely that she would have spoken up in response to a perfunctory question about whether she could be fair knowing the defendant was a Muslim. And she wasn't the only juror who disclosed feelings that disqualified the juror from serving based on bias against Muslims.

Counsel's concerns are not merely anecdotal. Many studies and news stories reveal that a significant percentage of Americans view Muslims (at best) with suspicion. One law review article looking comparatively at prejudice against African-Americans

and Muslims observed that while there's evidence that there's less (but still significant) unconscious bias against Muslims than African-Americans, "there is some evidence to suggest that bias against Muslims is more likely to be expressed explicitly." Sheryll Cashin, *To Be Muslim or "Muslim-Looking in America: A Comparative Exploration of Racial and Religious Prejudice in the 21st Century,* 2 DUKE F.L. & SOC. CHANGE 125, 127 (2010). The author based this conclusion on the level of defamation of Muslims and Islam in television, radio, websites, newspapers, and print. *Id.* at 128. The article also noted that a 2007 Pew research survey found that 35% of survey participants claimed an unfavorable view of Muslims (as compared to 8% for African-Americans). *Id.* at 128. That is not an insignificant difference.

Beyond that, a few quick examples of surveys or articles that raise concern about prejudice against Muslims include:

- 82% of American adults believe Muslims are subject to some discrimination and 56% say they are discriminated against a lot. 63% believe that being Muslim hurts someone's chances for advancement in American society at least a little and 31% say a lot.[4]
- Half of Americans say Islam is not part of "mainstream American society," and 41% say Islam encourages violence more than other faiths.[5]
- Only 66 %of Americans would vote for a Muslim presidential candidate.[6]
- Muslims are viewed more unfavorably than almost all other groups and unfavorable views are held by a significant number of Americans about Muslims, including that Muslims are insufficiently American, Muslims are more violent and

---

[4] https://www.pewresearch.org/fact-tank/2019/05/17/many-americans-see-religious-discrimination in-u-s-especially-against-muslims/

[5] https://www.theatlantic.com/politics/archive/2017/07/American muslims trump/534879/

[6] https://www.newsweek.com/republicans-vote-muslim-president-poll-1424108

less trustworthy than other groups, and 16% even express agreement with denying the right to vote to Muslims who are American citizens.[7]

- Muslims accused of plotting violence receive seven times more media attention, the government recommends three times longer sentences, and the sentences imposed are four times longer than for non-Muslims.[8]

- Even among Americans who report no personal prejudice toward Muslims, one-third say they have an unfavorable opinion about Islam.[9]

Hamzeh is a Muslim, of Palestinian heritage, and the son of Jordanian citizens. Hamzeh's religious and ethnic identity presents a significant threat to Hamzeh's constitutional guarantee of a fair trial due to the bias many Americans hold against Muslims, Palestinians, people from the Middle East, and immigrants. This Court has a duty to dispel juror bias during *voir dire*. A judge simply asking whether the defendant's religion is an issue is not enough to confront the potential of religious and ethnic animus amongst jurors. *See Dellinger*, 472 F.2d at 368. The best way to ensure that religious and ethnic biases are meaningfully addressed is through a combination of a juror questionnaire, judicial questioning, and attorney-conducted *voir dire*. Without such measures, the likelihood of a *Pena-Rodriguez*-like situation are likely to increase—significantly. After all, the defense has reason to believe that avoiding racial disparity in the jury-selection process is especially important in this District, which is

---

[7] John Sides & Dalia Mogahed, Muslims in America: Public Perceptions in the Trump Era, (Democracy Fund Voter Study Group June 2018) https://www.voterstudygroup.org/publication/muslims-in-america#fn-5

[8] Murtaz Hussein, Muslims Accused of Plotting Violence Get Seven Times More Media Attention and Four Times Longer Sentences, The Intercept (April 4, 2018), https://theintercept.com/2018/04/05/muslims-violence-media-attention-prosecution/

[9] Gallup, Islamaphobia: Understanding Anti Muslim Sentiment in the West, https://news.gallup.com/poll/157082/islamophobia-understanding-anti-muslim-sentiment-west.aspx

overwhelmingly White. Beyond that, there is evidence suggesting that the jury selection plan in this District effectively excludes one minority juror on average from each jury by underrepresenting minorities as a whole by approximately 8 percent, and perhaps more, in the jury pool. *See United States v. Ganos, et al*, 18-CR-62 (E.D. Wis.) R. 116 at 8-10. Thus, the defense respectfully requests that in accordance with both the Sixth Amendment and Rule 24, that the Court allow attorney-conducted *voir dire* in this case.

Dated at Milwaukee, Wisconsin this 4th day of September, 2019.

Respectfully submitted,

*/s/ Craig W. Albee*
Craig W. Albee, WI Bar #1015752
Joseph A. Bugni, WI Bar #1062514
FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee, WI 53202
Tel. (414) 221-9900
E-mail: craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh