## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

  *vs.*                                    Case No. 16-cr-21-PP

SAMY M. HAMZEH,

        *Defendant.*

---

## THIRD MOTION IN LIMINE:
## OMNIBUS MEMORANDUM LIMITING EVIDENCE AND ARGUMENT

Samy Hamzeh, by counsel, files this third motion in limine to exclude or limit certain evidence and argument from trial. This memorandum addresses eight specific subsets of evidence and argument.

1. Excluding or limiting evidence and argument related to conversations about Israel and the Masons.

2. Excluding or limiting unduly prejudicial evidence concerning (among other things) Hamzeh's propensity to speed and him getting into a fight.

3. Excluding or limiting the government's characterizations of Hamzeh.

4. Preventing the government from arguing that the entrapment defense is a mere technicality or in any other way disparaging it as a defense to the charges.

5. Preventing the government from arguing that the inducement had to be extraordinary.

6. Preventing the government from speculating about Hamzeh's positional predisposition.

7. Preventing the introduction of any evidence from the computer, Play Station, phone, or the pole camera.

8. Preventing the government from challenging the defense's translations.

For ease of reading and reference, all the arguments and authority are combined into a single brief, with each argument having its own point heading.

### I. Excluding or limiting evidence and argument related to conversations about Israel and the Masons.

The government has charged Hamzeh with possessing unregistered machine guns and a silencer. The issue at trial will be whether Hamzeh was entrapped. He is not charged with terrorism, for making threats, or for making sickening or outlandish statements. But the government has made clear throughout this prosecution, and most recently in its brief in opposition to presentation of the entrapment defense,[1] that one of its trial strategies will be to smear Hamzeh with his statements, hoping the jury will be so disgusted that it won't consider the evidence in the case or apply the law to that evidence fairly. And while it's unfortunate that Hamzeh provided the government with fodder for its strategy with his boastful, disgusting rhetoric, that doesn't entitle the government to exploit those statements in ways that will deny him a fair trial.

---

[1]  The government entrapment memo did not identify any evidence that Hamzeh ever sought a gun, let alone a machine gun, until after the informants worked on him for months. Instead, it suggests he had violent tendencies by relying on fabulist conversations between Hamzeh and the informants about their disdain for Israel and his fantasies about retaliating for attacks against Palestinians. *See* R. 255 at 9, 12, 20-21, 26, 27. Despite the boasting about taking on Israeli soldiers single handedly, Hamzeh never had any plan or took any action and the government has no evidence that it wasn't just all talk.

Federal Defender Services
of Wisconsin, Inc.

Accordingly, Hamzeh moves to bar the statements because they are not relevant, are unfairly prejudicial, likely to confuse the jury, and will waste considerable time. Alternatively, Hamzeh seeks an order from the Court that curbs the government's use of this evidence and bars the inflammatory and cumulative language.

This motion will first address why statements about Israel should be off limits because they aren't relevant to what's charged here, there was never any plan to do any of the things Hamzeh talked about, and the claims he was making were preposterous on their face. But their admission would cause extreme prejudice and result in an extraordinary waste of time as the parties debate the significance and intent of the statements and present evidence to provide context about the Israeli-Palestinian conflict.[2] By the same token, the defense also seeks to exclude or limit the discussions concerning the Masons and any potential violence associated with them.

## A. Legal Principles

The government has not charged Hamzeh with any terrorism-related offense—it can't. And instead, it has charged him with the possession of unregistered firearms. Yet it is seeking to introduce evidence of Hamzeh's empty boasts. These boasts are beyond inflammatory. They deal with suicide vests, killing Jews, and attacking Masons. They are sickening and horrific. And they are equally irrelevant and must be excluded under Rules 402 and 403.

---

[2] The government has provided a 54-page, single-spaced expert report, R. 259, Ex. 2, that is largely devoted to issues touching on the Israeli-Palestinian conflict and conversations about it that took place more than two months before the alleged offense–an offense that has no connection to that conflict.

3

With certain (inapplicable) exceptions, all relevant evidence is admissible, and evidence which is not relevant is not admissible." Fed. R. Evid 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Klebig*, 600 F.3d 700, 710 (7th Cir. 2009); *see also Huddleston v. United States*, 485 U.S. 681, 687 (1988) (Rules 401 and 402 establish the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable—is admissible unless the Rules of Evidence provide otherwise). And, of course, Rule 403 bars the introduction of otherwise admissible evidence, when its probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, misleading the jury, wasting time, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403; *See also Old Chief v. United States*, 519 U.S. 172, 181 (1997) (noting "'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged").

When it comes to entrapment, there are two points to keep in mind that are foundational for this motion and case. First, "[t]he defense of entrapment reflects the view that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, *rather than to purify thoughts and perfect character*." *United States v. Hollingsworth,* 27 F.3d 1196, 1203 (7th Cir. 1994) (en banc) (emphasis added). Second, in evaluating whether a defendant was predisposed to commit *the crime charged*, the inquiry is narrow. *See United States v. Mayfield*, 771 F.3d 417,

4

Federal Defender Services
of Wisconsin, Inc.

438 (7th Cir. 2014) (en banc) ("[T]he principal element in the defense of entrapment [i]s the defendant's predisposition to commit *the crime—not just any crime*." (emphasis currently added)). Predisposition refers to the likelihood that a defendant "would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means." *Id.* at 436. And to be predisposed, "[t]he defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so." *Hollingsworth,* 27 F.3d at 1200.

In deciding whether a person is predisposed, courts and juries consider the following: a defendant's criminal history; whether the government initially suggested the criminal activity; whether the defendant engaged in the criminal activity for profit; the nature of the inducement or persuasion that was used; and whether the defendant showed a reluctance to commit the crime that was overcome by the agents' persuasion. *See Seventh Circuit Federal Crim. Jury Instruction* 6.05 (2019 Ed.). Absent from that list is whether the defendant acted like a jackass at some point in the past, made inflammatory comments or expressed disdain for a certain country, or made empty threats about terrible things. Instead, that list focuses on the defendant's willingness to commit *the charged crime.* *Mayfield*, 771 F.3d at 438; *Hollingsworth,* 27 F.3d at 1200. Again, the issue is this: without the government's intervention did Hamzeh actively want to obtain machine guns and was he so situated by training or experience that it's likely that without the government's intervention he would have done so. *See id.* Evidence that doesn't bear on that question isn't relevant and should be excluded.

Federal Defender Services
of Wisconsin, Inc.

### B. Commentary about Israel is irrelevant and risks inflaming the jury

Hamzeh's statements about Israel don't speak to whether he was predisposed to obtain a machine gun. They are not relevant to his criminal history, they aren't relevant to whether the government initially suggested possessing unregistered firearms, they aren't relevant to whether he possessed the firearms for profit, they aren't relevant to the nature of the inducement or persuasion that was used, and they aren't relevant to whether Hamzeh was reluctant to commit the crime. Indeed, his statements are divorced from the crime. Yet the government's entrapment memo shows its attempt to use those inflammatory statements to overcome an utter lack of evidence that Hamzeh was predisposed. The government, in fact, has no evidence that Hamzeh had an interest in getting unregistered firearms or the ability to obtain such a weapon, "prior to first being approached by Government agents." *United States v. Jacobson*, 503 U.S. 540, 549 (1992). And, for that matter, the government has *no* evidence that Hamzeh was situated by training and experience that he could purchase unregistered firearms. *Hollingsworth,* 27 F.3d at 1200.

Notably, the government also has no evidence of internet searches or other research or inquiries by Hamzeh for machine guns—including on his phone or computer, both of which were searched and turned up nothing that linked Hamzeh to firearms, let alone machine guns or silencers. *See Jacobson*, 503 U.S. at 547 (noting that a search of the defendant's home after his arrest revealed, "no other materials that would indicate that petitioner collected, or was actively interested in child pornography"). It has no text messages or phone calls with Hamzeh discussing attempts to purchase them before the

6

Federal Defender Services
of Wisconsin, Inc.

informants approached him and outside those calls with the informants. And it has no evidence of Hamzeh having any connections that would allow him to get them—apart from the informants. *United States v. Pillado*, 656 F.3d 754, 767 (7th Cir. 2011) (noting "prosecutors will bear the burden to prove beyond a reasonable doubt that Lara was predisposed to committing the crime by identifying 'preinvestigation evidence' bearing on this issue"). That is, it has no evidence that Hamzeh was predisposed to possess unregistered firearms.

So what the government lacks in evidence, it's attempting to make up for with inflammatory statements about actions outside the United States. Actions that are not tied to or connected with the crime charged. Again, it's worth repeating: "[T]he principal element in the defense of entrapment [i]s the defendant's predisposition to commit the crime—not just any crime." *See Mayfield*, 771 F.3d at 438. Hamzeh's antipathy towards Israel and empty boasts are not relevant to his predisposition to commit this crime. They may or may not be indicative of bad character, a desire for attention, or a way to let off steam over built-up rage about his perceptions about Israel's treatment of Palestinians. But again, the concern of the entrapment defense is not to "purify thoughts and perfect character." *Hollingsworth*, 27 F.3d at 1203. Instead, the entrapment-inquiry is focused on the elements listed above. Hamzeh's statements about Israel don't bear on those factors. Thus, they are not relevant and should be excluded.

Even if the statements made in September, October, and November are potentially relevant to Hamzeh's propensity, they are far more prejudicial than they are probative. At the root of Rule 403's analysis is the concern that the evidence will induce the jury to

Federal Defender Services of Wisconsin, Inc.

decide the case on an improper basis rather than on the evidence presented." *United States v. Conner*, 583 F.3d 1011, 1025 (7th Cir.2009). Put a slightly different way, under Rule 403, relevant evidence may be considered unfairly prejudicial when it has the capacity to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. *United States v. Coleman*, 179 F.3d 1056, 1062 (7th Cir. 1999). That includes facts that "invite the jury to decide the case based on their fear or dislike of [a defendant] rather than on the real issues in the case." *United States v. Klebig*, 600 F.3d 700, 714 (7th Cir. 2009). Thus, courts have held that evidence of a defendant being "overly concerned about security, . . . to the point of threatening visitors at the door with an ominous sign," was improperly admitted; it invited the jury to decide the case on fear of the defendant rather than the precise legal issues. *Id.* at 713-14. And courts have been particularly cautious about admitting evidence that would suggest the defendant's danger or threatening tendencies or of general bad character. *See also Old Chief*, 519 U.S. at 181 (noting that such evidence may allow prosecutors to secure a "preventive conviction even if [the defendant] should happen to be innocent momentarily"); *see also United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982) (Breyer, J. ) (cautioning that "[a]lthough in propensity evidence is relevant, the risk that a jury will . . . convict anyway because a bad person deserves punishment–creates a prejudicial effect that outweighs ordinary relevance.").

That is, however, precisely what the evidence of Hamzeh's statement's about Israel and disarming soldiers and defending Palestine will do. The straightforward demands of what the jury is told to consider for predisposition don't weigh those fabulist statements. Instead, those statements will obscure the jury from evaluating whether

Federal Defender Services
of Wisconsin, Inc.

Hamzeh was "so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so." *Hollingsworth,* 27 F.3d at 1200. And the statements will "invite the jury" (if not push it) to convict him based on how scary he sounds. *Klebig*, 600 F.3d at 14.

There is one additional concern with admitting the evidence regarding conversations about Israel—they will result in extended testimony and argument about the Israeli/Palestinian conflict that have nothing to do with Hamzeh's guilt but will be necessary to put the conversations in context. If the government wishes to present testimony about Hamzeh's hostility toward Israel that produced his outrageous and horrific boasting, then Hamzeh must explain why, as a Palestinian, his emotions on the issue run so high and cause him to run his mouth in the company of people he thought were his friends. And the government has already provided notice that it seeks to present extensive testimony about Israel and Palestine as well as other subjects with no relevance to the issues in this case, such as the history of organizations (Hamas and ISIS) Hamzeh has never been affiliated with.

The government may claim it can bring in Hamzeh's statements about Israel because they are inextricably intertwined with the government's story of the case. And, indeed, it used to be the case that "[a] defendant's bad act may be only tangentially related to the charged crime, but it nevertheless could 'complete the story' or 'incidentally involve' the charged offense or 'explain the circumstances.'" *United States v. Taylor*, 522 F.3d 731, 734 (7th Cir. 2008). But the Seventh Circuit has explicitly rejected that as a basis

9

Federal Defender Services
of Wisconsin, Inc.

for admitting evidence: "If evidence is not direct evidence of the crime itself, it is usually propensity evidence simply disguised as inextricable intertwinement evidence and is therefore improper, at least if not admitted under the constraints of Rule 404(b)." *United States v. Gorman*, 613 F.3d 711, 718–19 (7th Cir. 2010); *see also United States v. Miller*, 673 F.3d 688, 695 (7th Cir. 2012) (noting "the inextricable intertwinement doctrine has outlived its usefulness, and we instructed district courts to stop using it"). Yet Hamzeh's statements don't evince a plan or modus operandi; they are simply irrelevant and inflammatory evidence that threatens to confuse and outrage the jury. Indeed, the statements will allow the government to backfill with inflammatory statements what it lacks in the way of evidence of predisposition in hopes they will miss the issue—was Hamzeh predisposed to commit this crime and was he induced to do so by the informants' actions.

### C. Extended commentary about violence towards the Masons is both irrelevant and risks inflaming the jury.

This is a relatively straight-forward case. And in the midst of it all, there are six facts that cannot be lost.

o First, on November 2, Hamzeh is told that Mike's gun is a semi-automatic rifle. Mike says: "Yes It has a big valve installed in the front Steve liked it so much He says he wants one *but he wants an automatic one*." Tr. at 83 (emphasis added).

o Second, Hamzeh and the informants use the terms machine gun and semi-automatic rifle interchangeably. *See, e.g.,* R.234:8.

Federal Defender Services
of Wisconsin, Inc.

- Third, Mike told Hamzeh on 12/7 that they could take his rifle shooting up north—they had exclusively gone to indoor shooting ranges. Mike; "The shooting range thing my dear is when you go to shoot man there is an open field and well go shoot there you and me without without fucking having all people all around us . . . . Up north I'm telling you an hour and a half two hours." Tr. 12/7 (Part 4) at 15.

- Fourth, Hamzeh had disavowed any violence towards the Masons and told his friends (despite their pushback) that it was forbidden. *See, e.g.,* R.234:18–23.

- Fifth, Hamzeh was still willing to buy a weapon with his friends. *Id.* at 22–23.

- Sixth, he wanted a weapon like Mike's, he was assured it would be like Mike's, during the exchange he questioned whether it was like Mike's, and back in the car afterwards he protested that it was not like Mike's. *Id.* at 23–24.

Within that timeline and what the jury must consider for entrapment, the statements about the Masons and fabulist and disgusting (but abandoned) talk associated with them are of no bearing. They all occur *months after* Hamzeh was approached by the informants, so they don't speak to predisposition. They also aren't relevant to inducement.

When it comes to inducement, the jury is told to consider: "(1) if the agents solicit the defendant to commit the crime, and (2) does something in addition that could influence a person to commit a crime that the person would not commit if left to his own devices." *See Seventh Circuit Federal Criminal Jury Instruction* 6.05 (brackets and alterations removed). That additional conduct that could influence a person to commit a crime include: repeated attempts at persuasion; fraudulent representations; promises of reward

11

Federal Defender Services
of Wisconsin, Inc.

beyond what is inherent in the usual commission of the crime; threats or coercive tactics and harassment; pleas based on need, sympathy, or friendship; or any other conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the efforts of the agents. *Mayfield,* 771 F.3d at 434 (noting "an illegitimate inducement . . . creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's persuasion"). Hamzeh's statements about the Masons are irrelevant to those points.

That's especially true when they're taken in tandem with the fact that he disavows any violence towards them. The day before buying the weapons, he says he won't do it. In fact, despite saying that and in the face of increased pressure from the informants, Hamzeh leaves them with this: "let me out of it, and I'm telling you this thing is not permissible, it is not permissible." DD97:68. Once Hamzeh withdraws from the stated plan, his violent statements on the 19th through the 23rd have no bearing on whether he was induced. They surely don't have any bearing on predisposition. And inducement is not measured on whether Hamzeh makes outrageous statements, but on what influence was placed on him by the informants. Hamzeh's outrageous statements are, in other words, irrelevant. The issue for the jury to decide is not whether Hamzeh is (again) acting like a jackass and crass and ignorant; it's whether months of the government agents applying subtle pressure and other tactics on him got him to the point where he was willing to possess an unregistered firearm. After all, the inquiry is set on what changed from Hamzeh's adamant and repeated no! on December 7 and 14 to his willingness to get the weapon on January 25. To that end, the government must prove beyond a reasonable

12

doubt that it wasn't the informants' actions. And Hamzeh's statements do not bear on that issue.

Admittedly, they would if the night before he had not convinced Mike and Steve to abandon the plan. But the fact that he wasn't following through with the plan means that the speech associated with it is irrelevant. Indeed, it doesn't speak to any of the factors that the jury must weigh. Instead, it threatens to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. *Coleman*, 179 F.3d at 1062. Indeed, those conversations will "invite the jury to decide the case based on their fear or dislike of [a defendant] rather than on the real issues in the case." *Klebig*, 600 F.3d at 714. Thus, whatever marginal relevance the government could propose is substantially outweighed by the risk of having Hamzeh convicted for his lack of character and nothing more.

Thus, under Rule 402 and 403, this Court must either exclude or greatly limit much of the violent statements that the government intends to introduce into evidence.

13

Federal Defender Services
of Wisconsin, Inc.

## II. Excluding or limiting unduly prejudicial evidence concerning (among other things) Hamzeh's propensity to speed and him getting into a fight.

This investigation spanned five months and generated a large amount of information and discovery, so it's impossible to know all that the government plans to introduce. But certain pieces of information that have been produced are undoubtedly irrelevant to the case and even if plausibly relevant, the presentation of evidence about them would be unduly prejudicial. This information includes:

- Any testimony about Hamzeh's propensity to speed;

- Any testimony about Hamzeh getting into a fight on Wisconsin Avenue on January 16, 2016;

Concerning the first two points, Hamzeh is not on trial for his bad driving or getting into a fight with a random stranger. Those events are not relevant to whether he possessed a machine gun, nor are they relevant to whether he was predisposed to possess a machine gun or induced by the government to possess it. Thus, their testimony should be barred under 402. And if these acts are deemed relevant, then the risk of unfair prejudice and confusion of issues substantially outweighs any minimal probative value. *Klebig*, 600 F.3d at 714.

Federal Defender Services of Wisconsin, Inc.

### III. Excluding or limiting the government's characterizations of Hamzeh

This case has been litigated for over three years and in that time there have been hundreds of filings. Some of them have an advocate's flair that are permissible in arguments to the Court but have no bearing in a trial before a jury. While more may be revealed the closer this gets to trial (or during trial) for now, the defense seeks to exclude the following:

- Any characterization of Hamzeh as a lone wolf;

- Any characterization of Hamzeh as a terrorist;

- Any characterization of Hamzeh as a mass murderer.

The reasons for excluding each are self-evident, but it's worth briefly mentioning why.

They are all loaded terms that invokes connotations of a truly dangerous individual and which when repeated over and over again in trial will obscure the issues. Indeed, courts have often noted the need to avoid such inflammatory labels. And here, the same will only serve to inflame the jury and keep them from focusing on the issues at hand: has the government proved beyond a reasonable doubt that Hamzeh was not predisposed to commit *this crime*, and whether the informants induced him to do so. Thus, under Rule 403, the government should be precluded from referring to Hamzeh with any of those (or similar) labels and from arguing as much to the jury. Accordingly, Hamzeh requests an order prohibiting the government from presenting arguments concerning these three labels or their equivalent.

Federal Defender Services
of Wisconsin, Inc.

**IV.     Preventing the government from arguing that the entrapment defense is a mere technicality or in any other way disparaging it as a defense to the charges.**

The question of entrapment goes to the basic guilt or innocence of the defendant. As the Supreme Court has explained entrapment is based on "the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of an offense but who was induced to commit them by the Government." *United States v. Russell*, 411 U.S. 423, 435 (1973); *see also Mayfield,* 771 F.3d at 417 (noting "because the Court ultimately grounded the defense in statutory interpretation—the premise that Congress could not possibly have intended to criminalize conduct instigated by government agents—a different test emerged, one that placed decisive weight on the defendant's predisposition"). That is, the entrapment defense is not a technicality where the defendant is actually guilty but he gets off because the informants did this or that. Rather, the entrapment defense goes straight to the heart of the matter—namely, that the defendant is not guilty. *See United States v. Yater*, 756 F.2d 1058, 1062 (5th Cir. 1985) ("The concern [in entrapment cases] is thus that the accused is not guilty, since he had no criminal intent not implanted by the government, rather than that he is guilty but may avoid the consequences of his criminal conduct because of the government's undue inducement."). Thus, the government should be precluded from arguing to the jury that entrapment is a technicality or just a way for Hamzeh to avoid responsibility or escape the consequences of a crime.

Federal Defender Services
of Wisconsin, Inc.

## V. Preventing the government from arguing that the inducement had to be extraordinary.

In its response to the motion in limine, the government posits that the inducement was not extraordinary—"[o]ffering Hamzeh $1billion to buy a machine gun." R.255:8. But that's not the law. In *Pillado*, 656 F.3d 754, 766 (7th Cir. 2011), the Court was clear:

> We use the term "ordinary" in this context to mean something close to what unfolds when a sting operation mirrors the customary execution of the crime charged. For example, federal agents offering to sell illegal guns to our hypothetical arms distributor at the going rate on the streets have simply created an "ordinary" inducement to commit the crime. In contrast, it would be "extraordinary" for the agents to approach the same person with an offer to sell as many guns as the buyer wanted for only one penny per piece. In the latter scenario, the defendant would be entitled to present an entrapment defense to the jury even though he was predisposed to buy guns, because the government employed extraordinary inducements to get him to commit the crime. This is because there is a good chance that the government's out-of-the-ordinary offer induced the buyer to purchase guns when he may have refrained from crime on that occasion.

*Id.* at 765. That is, there is no general requirement for a defendant to show that he was presented with an "extraordinary inducement" such that only a billion dollars will do. *Id.* at 766. Instead, the Court in *Pillado* explained, "the term 'extraordinary inducement' has been used only in conjunction with a finding that the defendant was predisposed to commit the crime charged and thus had a higher burden to prove entrapment." *Id.* But in the absence of predisposition, no "extraordinary inducement" is necessary; to the contrary, even a "minor inducement" suffices. *Id.* And the term "extraordinary" does not mean a billion dollars or close to that. Instead, its applied when "a defendant is so "situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some

Federal Defender Services
of Wisconsin, Inc.

criminal would have done so," then he may be required to point to "extraordinary inducements" to raise the entrapment defense. *Id.* at 764 (quoting *Hollingsworth,* 27 F.3d at 1200).

## VI. Preventing the government from speculating about Hamzeh's positional predisposition.

In this Circuit, predisposition is chiefly probabilistic, not psychological. *Mayfield*, 771 F.3d at 441. Under *Hollingsworth*, the government has a high burden:

> The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so; only then does a sting or other arranged crime take a dangerous person out of circulation. A public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales. For these and other traditional targets of stings all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements; ability can be presumed. It is different when the defendant is not in a position without the government's help to become involved in illegal activity. The government "may not provoke or create a crime, and then punish the criminal, its creature."

27 F.3d at 1200. Perhaps to meet that burden, in its response to the first motion in limine (re: presenting the entrapment defense), the government made many arguments about steps Hamzeh could have taken—such as acquiring a kit to convert a semi-automatic rifle into a machine gun. R.255:35. Arguments like this are improper and the government should be precluded from making any mention of that to the jury. The government must address the evidence it has of Hamzeh's predisposition and ability (as he was) to purchase a machine gun; it cannot speculate to other ways that Hamzeh could have done it.

18

Federal Defender Services
of Wisconsin, Inc.

VII. **Preventing the introduction of any evidence from the computer, Play Station, phone, or the pole camera**.

The defense previously moved to compel the government to disclose early what (if any) evidence it would use from the electronic devices seized in this case and from the pole camera used as surveillance on Hamzeh's residence. The reason being it was too voluminous to work through close to or during trial. In R.219, the Court granted that request:

> IT IS FURTHER ORDERED that Hamzeh's "Superseding Discovery Motion" (ECF No. 214) is granted in part and denied in part. If either party seeks to introduce at trial any evidence obtained by use of pole cameras or any data obtained from a post-arrest search of Hamzeh's mobile phone, MacBook laptop, or PlayStation, the party shall identify the evidence not less than 45 days before trial.

R.219:21. For its part, the defense noticed and turned over twenty photos and two videos to the government from the devices. No information was identified by the government. Thus, it should be precluded from entering any such exhibits into evidence at trial.

19

Federal Defender Services of Wisconsin, Inc.

## VIII.   Preventing the government from challenging the defense's translations.

This trial was continued twice over issues with the translations. The parties have worked on getting an accurate set of translations for trial. That has included the defense sending multiple corrected versions to the government and at least two lengthy memos outlining various problems with the translations. There remain, however, two sets of transcripts that the defense has turned over to the government that the government has not indicated whether it agrees with. These concern Disks 104–106 (January 25) or Defense Translations Bates 1–51 and Defense Translations Bates 272–465. These were given to the government on July 10, 2018 and December 7, 2018, respectively. So they were turned over fourteen months ago for the first set and nine months ago for the second.

Despite repeated inquiries, the defense has never received any corrections or comments on these to make sure that they are ready for trial. We are now roughly five weeks away from trial and we don't know where we stand with these two sets of translations. Editing and responding to corrections in these translations is a tedious and difficult process. It is not a matter that if there are significant changes can simply be done overnight or (possibly) at all before trial. The defense does not want to move this trial (again) because of the transcripts. Nor, given the length of time that was provided to the parties to work this out, should this become a trial with dueling translators doing it from the stand — this was meant to be worked out well before trial. The government has been given more than adequate time to respond and provide what (if any corrections) it wants. It's failure to do so, should preclude any objection to their accuracy at trial.

20

Federal Defender Services
of Wisconsin, Inc.

Dated at Milwaukee, Wisconsin this 13th day of September 2019.

Respectfully submitted,

/s/    *Craig W. Albee*
Craig W. Albee, WI Bar No. 1015752
Joseph A. Bugni, WI Bar No. 1062514
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee, WI 53202
Tel. (414) 221-9900
E-mail: craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh

Federal Defender Services
of Wisconsin, Inc.