UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                             Case No. 16-CR-21

SAMY HAMZEH,

      Defendant.

**UNITED STATES' RESPONSES TO THE DEFENDANT'S "THIRD MOTION IN LIMINE: OMNIBUS MEMORANDUM LIMITING EVIDENCE AND ARGUMENT"**

*I.    Response to the Defense Motion in Limine Entitled "Excluding or limiting evidence and argument related to conversations about Israel and the Masons."*

Hamzeh asks this Court to exclude from evidence certain broad categories of his statements. He does not identify any particular statements he believes should be excluded, but instead organizes the categories of statements by the groups of people Hamzeh said he wanted to kill with weapons of war – Israelis and Masons. That motion should be denied.

The United States would use very few of Hamzeh's recorded statements in the lead up to his possession of machineguns and a silencer if Hamzeh is not permitted to raise an entrapment defense. Some may be necessary to show his motive or lack of mistake with respect to acquiring the illegal weapons, but that would be all. If, however, Hamzeh raises an entrapment defense, then the United States will have to prove to a jury

beyond a reasonable doubt that he was not induced to acquire illegal weapons or that he was predisposed to possess them. Every statement the United States identified in its Consolidated Motions in Limine Regarding Hamzeh's Recorded Statements is relevant to that inquiry and therefore admissible. *Compare Sorrells v. United States*, 287 U.S. 435, 451 (1932) ("If the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue.").

The defense cannot have it both ways. If it puts predisposition to a jury, the government will have to prove it. Hamzeh's statements will be highly relevant, admissible evidence of his predisposition. The defense may attempt to identify with particularity which of Hamzeh's statements are inadmissible, but it has not done so here. That, alone, should be the end for this motion. The Court cannot rule without the defendant actually identifying the statements he believes should be excluded.

A. The Evidence Is Admissible Under The Federal Rules.

It is black letter law that the defendant's own statements, when offered into evidence by the United States, are nonhearsay statements of a party opponent, Fed. R. Evid. 801(d)(2); *Tolliver*, 454 F.3d at 665 (holding that a defendant's "statements on the tapes constitute admissions by a party-opponent, and, as such, those statements are, by definition, not hearsay under Federal Rule of Evidence 801(d)(2)(A)"). That is equally true when the defendant's statement was recorded by a CHS without the defendant's knowledge. *See id.; see also United States v. Hicks*, 635 F.3d 1063, 1068 (7th Cir. 2011) (upholding admissions of a surreptitiously recorded conversation with a government

2

informant because the defendant's statements were admissible statements of a party-opponent) (vacated on other grounds); *United States v. Woods,* 301 F.3d 556 (7th Cir. 2002) (same).

B. The Evidence Is Relevant To Predisposition.

The predisposition inquiry that would be required by an entrapment defense focuses on the defendant's mental state "at the time the government first proposed the crime." *United States v. Blitch*, 773 F.3d 837, 845 (7th Cir. 2014), as amended on denial of reh'g and reh'g en banc (Jan. 27, 2015). In cases in which the defendant only encountered a government agent at an actual sting, this has been described as the commencement of the investigation and the first contact by a law enforcement agent. As stated in the Seventh Circuit Pattern Jury Instruction, "a defendant is 'predisposed' to commit the charged crime if, before he was approached by government informants . . . he wanted to commit the crime but had not yet found the means." Seventh Circuit Pattern Jury Instructions, 6.04 Entrapment – Elements.

The defense relies on a statement from *United States v. Pillado* that would seem, at first glance, to indicate that only evidence that predates the investigation itself can show predisposition. Defense Omnibus Motions in Limine at 6-7 (citing 656 F.3d 754, 767 (7th Cir. 2011) ("prosecutors will bear the burden to prove beyond a reasonable doubt that Lara was predisposed to committing the crime by identifying 'preinvestigation evidence' bearing on this issue"). The characterization in the defense motion is not correct. "Preinvestigation evidence" does *not* require evidence that was gathered before the investigation ever began. Indeed, such evidence rarely exists; by definition, law

3

enforcement begins gathering evidence when their investigation begins. Instead, "preinvestigation evidence" refers to evidence that reflects the defendant's mental state before the alleged entrapment took place. That evidence can include statements made before, during, or after the investigation.

The Seventh Circuit's decision in in *Mayfield* makes clear this common-sense point: a defendant's "actions or statements during the planning stages of the criminal scheme— also may be relevant to the determination of predisposition" – even though those actions or statements come after government contact with the defendant. That is because those statements in particular can show whether the defendant *was* predisposed to commit the offense before any illegal activity is suggested. *United States v. Mayfield*, 771 F.3d 417, 437 (7th Cir. 2014).

The Seventh Circuit is not alone in this analysis. As the Second Circuit put it in *Cromitie*, "of course, what a defendant *says* after contacted by agents is generally admissible to prove predisposition because, although some post-contact *conduct* might be the product of inducement, it will be a rare situation where a defendant can plausibly claim that the inducement caused him to *say* something that evidenced predisposition." *United States v. Cromitie*, 727 F.3d 194, 209 (2d Cir. 2013) (emphasis added). *See also United States v. Mohamud*, 843 F.3d 420, 433 (9th Cir. 2016) (holding that "the government can rely upon Mohamud's statements to prove predisposition even though he made them after the initial contact by the government"); *United States v. Tucker*, 133 F.3d 1208, 1217 (9th Cir. 1998) (holding that "[t]o prove the defendant's predisposition, the government can rely upon evidence occurring after the initial contact with a government agent");

4

*United States v. Cummings*, 431 F. App'x 878, 880 (11th Cir. 2011) (stating that "a predisposition finding is supported by the defendant's post-arrest statements and evidence that the defendant failed to take advantage of opportunities to back out of a transaction"). *Mayfield* cautions that "all this evidence must be considered with care, of course; by definition, the defendant's later actions may have been shaped by the government's conduct." But again, his *statements* are different. *Id*.

Applying that law to this case is straightforward. If, for example, one week into the investigation, Hamzeh had said, "I have wanted to buy a machinegun for years," that would be probative of his mental state at the time of the commencement of the investigation (and before it) and therefore relevant to predisposition. And sure enough, not long after Hamzeh meets Mike, Hamzeh says he wants to kill Jews and acquire Kalashnikovs and then says, "Yeah. It was my intention a long time ago, [Mike], by God, a long time ago." Exhibit A at 47.[1] That is precisely the type of evidence that reveals the defendant's pre-investigation predisposition – the statements need not be backward-looking, but they certainly can be. Hamzeh himself said he had wanted to acquire Kalashnikovs, which are machineguns, long before he met Mike (and before Steve reported his potential terrorism to the FBI). Statements like these – indicating Hamzeh wanted weapons and had been planning to commit a mass killing for years – were

---

[1] For the Court's and defense's convenience, Exhibit A to the United States' September 13, 2019 Motion in Limine Regarding Hamzeh's Recorded Statements (Dkt. No. 272) is attached to this filing as well, again as "Exhibit A."

5

collected during the investigation are admissible, probative evidence of his pre-existing mental state.

Hamzeh's statements that he wanted machineguns between October 2015 and January 2016 are also highly probative of his mental state before any claimed inducement may have occurred. For example, on October 13, 2015, Hamzeh had the following exchange with Steve about Hamzeh's desire to acquire a machinegun and kill Israelis:

> HAMZEH: I am telling you, I will get a weapon and hunt as many as I can by the will of God, I mean a number…till I die, I'll keep on doing that till I die. [UI].
> STEVE: Are you going to hunt soldiers or...
> HAMZEH: Of course.
> STEVE: Machine gun?
> HAMZEH: By Almighty God, I'll keep on shooting as much as I can, if I am caught, of course, I am not going to let them catch me. If they try to catch me, I'll keep on shooting at them so they will shoot at me. Do you follow me? Because if I get caught, by almighty God, by almighty God, I would be tortured all my life, the rest of my life.
> STEVE: But why, Samy? You were not like this, what made you do this, and you want to [UI]?
> HAMZEH: Your Lord, your Lord guides whoever He wants.
> STEVE: Wow!
> HAMZEH: Yup.

Exhibit A at 2-3. These unequivocal statements are probative of Hamzeh's predisposition to possess a machine gun. Hamzeh could not be clearer about his mental state: he wants, by the grace of God, to acquire a machine gun. He made the statement to his best friend, who plainly was not talking him into wanting one. This was in October 2015, and Mike was not even there. That Steve was recording him at the time does not, as matter of law or logic, render these statements irrelevant or inadmissible to proving predisposition.

6

Similarly, Hamzeh's repeated statements about his plans to acquire weapons to kill Israelis and Masons show his predisposition to commit the charged offenses. *See, e.g,  id.* at 46 (HAMZEH: "Do you understand me? You shoot both of them, take their weapons and leave. They carry the best kind of weapons. Jews carry the best Kalashnikovs. So if we shoot two and get two Kalashnikovs, it will be it."); *id.* at 56 ("HAMZEH: If both of us go in with handguns and shoot the four, we will take the Kalashnikovs and go in, spray as much as you can. A lot of people are inside and they are all Jews."); *id.* at 71 ("HAMZEH: [OV] if you brought the Kalashnikov, then we [UI] would have gone spraying"); *id* at 85 ("HAMZEH: How are they going to do it? They are not going to have a chance to make it man, we have silencers"); *id.* at 97 ("HAMZEH: We want two machineguns, you now have one, so we want two more, and we need three silencers, that's it. Find out how much all together these will cost, then we will march."); *id.* at 99 ("HAMZEH: I'm telling you if we don't, if we keep it a secret, if each one has a weapon, each one has a silencer, and the operation will be one hundred percent successful. I am telling you, to go with a weapon without a silencer; we will be exposed from the beginning."); *id.* at 107 (HAMZEH; "We want two machineguns like the one you have . . . . And we need two silencers."); *id.* at 130 ("HAMZEH: My dear-- my dear; I swear that if the three of us were to carry machineguns we would finish them off in 10 minutes, so why don't you just be quiet."); *id.* at 138 ("HAMZEH: Tell him that we need two weapons, we need two weapons, and three silencers. That is the only thing we need. That is the only thing we want. STEVE: What are the two weapons that we need? HAMZEH: Two Machineguns! STEVE: Single bullet at a time or what it is called, uh? HAMZEH: No, two

7

machineguns."); *id* at 175 ("HAMZEH: [Lowering voice] Listen, what we need is from those people, two machineguns, and three silencers and three magazines.").

If Hamzeh wishes to raise an entrapment defense and require the government to prove Hamzeh's predisposition to possess machineguns and silencers, the government must present statements like those detailed above.

C. Hamzeh's Statements Reflecting Predisposition Are Closely Related To The Charged Crime.

It is true, as the defense points out, that the government may not rely on Hamzeh's predisposition to commit *any* crime in order to convince a jury that he was predisposed to commit the charged offenses. If Hamzeh had recorded a statement saying he intended to cheat on his taxes, for example, that would not show he was predisposed to possess machineguns and a silencer. But the statements at issue here *are* closely related to the charged crime, as they reflect a common motive (mass murder) that would be enabled by the possession of illegal weapons. *See, e.g. United States v. Swiatek*, 819 F.2d 721, 728 (7th Cir. 1987) ("Evidence of other bad acts is also admissible to prove predisposition in an entrapment case, because in such a case the defendant's predisposition to commit the charged crime is legitimately at issue."). *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011) (to prove predisposition in an entrapment case the past conduct need not be identical to the crime charged. Rather, the conduct need only be "*similar enough* and close enough in time to be relevant to the matter at issue.") (emphasis added); *see also United States v. Moschiano*, 695 F.2d 236, 244 (7th Cir. 1982) ("Here, the nature of the activity was *substantially similar* to the indicted offenses.") (emphasis added); *United States v. El-Gawli*,

8

837 F.2d 142, 148 (3d Cir. 1988) ("[if government inducement is shown] the question of predisposition is paramount and the government must prove beyond a reasonable doubt that its inducement merely facilitated the defendant who was ready and willing to commit a *similar* crime") (emphasis added); *Cromitie*, 727 F.3d at 205 (explaining that one way to show predisposition is by reference to prior "*similar* criminal conduct") (emphasis added); *United States v. Mendoza-Prado*, 314 F.3d 1099, 1103 (9th Cir. 2002) ("predisposition [can only be shown when] prior bad acts are *similar* to the charged crime.") (emphasis added).

Hamzeh made a series of statements indicating a wish to commit an evolving set of mass killings that was escalating in seriousness. First in Israel, then stateside but out of Wisconsin, then in Wisconsin. Like a jagged stock ticker rising, he would move closer to committing the offense, withdraw a little, then move even closer, then withdraw a little, then move even closer, until he eventually actually bought the weapons. Those statements are relevant to explain his predisposition to acquire illegal weapons, which were necessary for his mass-killing plans.[2]

D.  The Defense's Positional Predisposition Arguments Also Fail.

Hamzeh also raises the issue of positional predisposition in this motion. As described below in response to his dedicated positional-predisposition motion in limine,

---

[2] The defense states "the day before buying the weapons, he says he won't do it." Defense Omnibus Motions in Limine at 12. This is misleading. Hamzeh never said he did not want to buy weapons or withdrew from his plan to do so. Instead, he hesitated with regard to the specifics of the killing he had planned; but was still intent to commit the offense charged. As the defense puts it in its "six facts that cannot be lost": "Hamzeh was still willing to buy a weapon with his friends." *Id*. at 10-11 (citations omitted).

9

those arguments fail. Hamzeh's central claim is that he did not have the "training and experience" necessary to commit the offense. Hamzeh Motions at 5 (twice), 6, 9, 17, and 18. He relies on cases in which, for example, a farmer was charged with arranging a fraudulent complex international financial transaction – a crime that required training and experience in being an international financier. *See generally United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994). Hamzeh, by contrast, was charged with possessing weapons, a crime that requires neither training nor experience. As this Court sees regularly, defendants can just buy a gun or a silencer, or steal them, or buy materially similar devices. As noted below, for under $20, anyone with an internet connection could buy a device online that qualifies as a "machinegun" under the charging statute *in this case* at the time of the charged offense. The training/experience positional predisposition analysis may be useful in some cases, but this is not one of them. Hamzeh was positionally predisposed to commit the offense.

   II.   *Response to the Defense Motion in Limine Entitled "Excluding or limiting unduly prejudicial evidence concerning (among other things) Hamzeh's propensity to speed and him getting into a fight."*

The United States will not offer in its affirmative case at trial any evidence regarding Hamzeh's propensity to speed when driving. As to Hamzeh getting into a road rage incident, getting out of his car, and kicking another person in the head (described in his filing as "getting into a fight"), the United States does not intend to introduce any evidence of that assault in its affirmative case. If, however, the defense is permitted to put before the jury, through any means (including cross-examination), evidence or argument

10

attempting to persuade the jury that Hamzeh was easygoing, or peaceful, or had a character for nonviolence, the defense will open the door to rebuttal evidence to the contrary. The fact that Hamzeh kicked someone in the head because of a traffic dispute would be a natural, admissible example of the type of rebuttal evidence that would have to come in if he opens the door. *See* Fed. R. Evid. 405(b).

   III. *Response to the Defense Motion in Limine Entitled "Excluding or Limiting The Government's Characterizations of Hamzeh."*

The United States will not refer to Hamzeh as a "Lone Wolf." He was not one; he recruited his friends to help him commit a mass killing. And, as discussed above, if the defense does not raise an entrapment defense, the United States will put in only limited evidence of his escalating plans to commit a mass murder. But if Hamzeh claims he was not predisposed to acquire weapons, the United States must present evidence that Hamzeh was predisposed to do so, and why. His own statements referring to his wish to commit a mass murder with weapons like those he illegally possessed are relevant, admissible evidence of his guilt. They are necessary to show his predisposition.

The defense also objects to characterizations of Hamzeh as a would-be "terrorist." The evidence indicates that Hamzeh wished to scare people, to disrupt civil society, to inspire other attacks, and to generally undermine the way people in the United States live there lives. His own words make that clear:

> HAMZEH: Sure, all over the world, all the Mujahidin will be talking and they will be proud of us, what is wrong with you, such operations will increase in America, when they hear about it. The people will be scared and the operations will increase, and there will be problems all over, because more than one problem

11

>> took place already, and this will be the third problem, this will lead to people clashing with each other. This way we will be igniting it. I mean we are marching at the front of the war.

Exhibit A at 101.

After touring the Masonic Center, Hamzeh and the CHSs are discussing how many people the tour guide said were usually in the building at meetings at any given time. Then Hamzeh states plainly how many people he would like to kill, and why he wanted to do it:

> HAMZEH: Thirty--thirty is excellent. If I got out, after eliminating thirty people, I will be happy 100%. . . . 100% happy, because these 30 will *terrify* the world. They will know that Muslims are mother fuckers nobody play with them.

*Id.* at 117 (emphasis added).

As defined by Merriam Webster, terrorism is "the systematic use of terror, especially as a means of coercion." Hamzeh described his own plans in these terms. Killing people to terrify other people is terrorism.

The evidence indicates that terrorism was his primary motive for possessing the charged illegal weapons. As a result, the government may use the word "terrorist" or "terrorism" in describing Hamzeh's offense to the jury. And if Hamzeh is permitted to raise an entrapment defense, then his stated motivation to commit an attack with illegal weapons is even more relevant.

> IV. *Response to the Defense Motion in Limine Entitled "Preventing the government from arguing that the entrapment defense is a mere technicality or in any other way disparaging it as a defense to the charges."*

The United States will not argue that the doctrine of entrapment is a mere technicality. It is not one. To the contrary, entrapment is a very serious issue; a person

12

who was truly entrapped is an authentically innocent person. The United States will not disparage the idea of entrapment in general. But the United States will most certainly disparage *Hamzeh*'s entrapment defense *as applied to this case*, because it is not an accurate representation of reality or the defendant's culpability.

V. *Response to the Defense Motion in Limine Entitled "Preventing the government from arguing that the inducement had to be extraordinary."*

If a person is offered a substantial sum of money in exchange for taking possession of a gun he does not want, he might take the gun even though he does not want the gun – because he wants the money. He has then been induced to possess the gun, despite not being predisposed to want the gun.

If, however, a person is offered a chance to buy a gun at a discount, he will only buy the gun if he wants the gun. Because he does not get anything other than the gun. If he did not want the gun, he would not buy it, because it still costs him something, and he gets nothing else he wants in exchange for taking it. In the latter scenario, the buyer wanted the gun enough to part with his own money to obtain it. Thus a reasonably discounted sale price is not an inducement under Supreme Court or Seventh Circuit law. That is the core of the government's inducement argument.

The defense asks this court to preclude the United States from stating that inducement must be "extraordinary" in order to establish entrapment. In *United States v. Mandel*, the Seventh Circuit described inducement as follows: "Inducement must be extraordinary to establish entrapment, the sort of promise that would blind the ordinary person to his legal duties." 647 F.3d 710, 718 (7th Cir. 2011) (citing *United States v. Haddad*,

13

462 F.3d 783, 790 (7th Cir. 2006) (quoting *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991)). That seemed to conflict with *Pillado* (which the defense cites heavily in its motion). In *Mayfield*, the Seventh Circuit attempted to clean this apparent contradiction up by holding that "inducement means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement." *United States v. Mayfield*, 771 F.3d 417, 434 (7th Cir. 2014) (*en banc*). *Mayfield* thereby defined what constituted "extraordinary" inducement; it did not disapprove of the characterization of inducement as "extraordinary." This Court should not preclude use of that word; the Seventh Circuit did not.

The defense also objects to the use of a hypothetical by the United States reflecting that if Hamzeh were offered a huge sum of money to take possession of a machine gun, he might do it even if he did not want the machinegun. He would do it, then, because he wanted the money. That could be inducement. By contrast, offering someone a discount on an item he still has to pay for does not reflect inducement He is still only going to buy it if he wants the item itself.

To support its argument, the defense cites a hypothetical from *Pillado*, stating that a gun dealer would be entitled to present an entrapment defense if he was offered, for one penny each, a limitless supply of guns that he could, in turn, sell.[3] Defense Omnibus

---

[3] *Pillado* is factually and legally remote from this case. In *Pillado*, "three persons ensnared in the sting operation had no prior connection to the illicit cargo. They were merely laborers who happened to be working on-site when they were persuaded to unload the truck. Unload it they did, and after the cargo was on the ground, police raided the scene"

14

Motions in Limine at 17 (citing 656 F.3d at 766). That *Pillado* hypothetical appears at first glance to be similar to the facts of this case, implying that Hamzeh should be allowed to argue he was entrapped. But in reality, it is much more closely related to United States' hypothetical example of inducement by offering Hamzeh a lot of money to buy a machine gun. Under the *Pillado* court's hypothetical, a gun seller is offered *infinite profits* (unlimited re-sellable guns for a penny each), permitting him to argue to a jury that he was induced by the offer of infinite profits to accept guns he otherwise would not have. (Note, the government would still be able to argue he was not entrapped.) Thus *Pillado* tracks the United States' argument on inducement: An unpredisposed person who is offered a substantial sum of money in exchange for possessing illegal weapons would probably do it.

In this case, by contrast, the discount on the machineguns and silencer sold to Hamzeh does not reflect inducement because Hamzeh was not acquiring them for resale. The magnitude-of-profit hypothetical in *Pillado* is, accordingly, inapposite, except as an example of the kind of thing that did not happen in this case. In this case, the question is whether a discount on a machinegun would induce an ordinary person, one not predisposed to want to possess a machine gun, to buy it. Hamzeh was not offered infinite wealth to take possession of guns he did not want; instead, he was asked whether he was

---

and they were charged with possession with intent to distribute narcotics. *Id*. at 757. If there were months of recordings of the men saying they wanted to and were making plans to unload a truck of narcotics that could then be sold, the case would have more in common with this one.

15

willing to pay every dollar he had for illegal weapons, and he was. Then, after he was arrested, he said he did so because he liked the weapons.

The defense makes clear in this motion that it intends to argue to the jury that Hamzeh was entrapped by the discount on the machineguns and silencers he bought. That cannot be correct under the law and will only confuse the jury. He should not be allowed to make the argument that the discount on the weapons means he was (1) induced or (2) somehow indicates his purchase of the weapons does not show he was predisposed to want them. And the United States should certainly not be precluded from arguing the contrary if the defense is allowed to make this argument.

VI. *Response to the Defense Motion in Limine Entitled "Preventing the government from speculating about Hamzeh's positional predisposition" Should Be Denied.*

Hamzeh had access to machineguns, as defined at 26 U.S.C. § 5845, without the government making them available to him. He was, therefore, positionally predisposed to commit the offense under Seventh Circuit case law.

26 U.S.C. § 5861(d), the statute Hamzeh is charged with violating, defines the term "machinegun" by reference to the statutory definition of machinegun at 26 U.S.C. § 5845. That definition includes parts that convert a weapon into a machinegun:

> *The term "machinegun" means* any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

16

26 U.S.C. § 5845 (emphasis added).

As the United States described in its Response to Hamzeh's entrapment motion, aftermarket parts that convert semiautomatic guns (which a person can buy at any sporting goods store) into automatic weapons, like Glock switches, are gallingly inexpensive and accessible. Contrary to Hamzeh's claim in his motion, he could easily have acquired a simple, fully-automatic converter. These parts are *still* available for purchase online – not only on the dark web, but also on websites like wish.com. For $16, Hamzeh could have converted a cheap semiautomatic handgun into precisely the small automatic weapon he wanted. *See* High Quality Semi Full Auto Switch for Handgun Glock G17 G19 G22 G23 (*available at* https://www.wish.com/product/high-quality-semi-full-auto-switch-for-handgun-glock-g17-g19-g22-g23-5b0f8e805cfaae22ceaa73fa?&hide_login_modal=true).

At the time of the charged offense, Hamzeh could quite literally have bought one on Amazon.com. Thousands and thousands of them have been shipped into the United States, for under $20 each. *See* Scott Glover, CNN, ATF ON THE HUNT FOR THOUSANDS OF ILLEGAL MACHINE GUN CONVERSION DEVICES SMUGGLED INTO US (*available at* https://www.cnn.com/2019/05/23/us/atf-agents-hunting-down-illegal-machine-gun-device-invs/index.html).

And crucially, as indicated by the statutory definition above, the fully-automatic conversion parts that were and are universally accessible online for $20 *are* themselves

17

machineguns. Possession of them without registering them is a violation of 26 U.S.C. § 5861(d). He was, as we all disturbingly are, in a position to buy a machinegun.

Positional predisposition analysis sometimes focuses on training and experience because those issues are relevant in cases where training and experience are actually necessary to commit an offense (like setting up an international financial transaction, as in *Hollingsworth*). Buying an item on amazon.com or wish.com, or borrowing one from a friend, or stealing one, does not take any training. Hamzeh, an American in his early 20s who had some college education, cannot credibly claim he could not himself, and did not know a single acquaintance who could, buy an item on Amazon.com. The defense asks this Court to extend *Hollingsworth* very substantially without any guidance from the Seventh Circuit that it should. *United States v. Hall*, 608 F.3d 340, 345 (7th Cir. 2010).

"In *Hollingsworth*, [the Seventh Circuit] explained that *Jacobson* did not . . . add an "ability" element to the entrapment formulation. 27 F.3d at 1199. But even if it had, Hamzeh most certainly had the ability to possess a machinegun. A converter *is* a machinegun. And this is to say nothing of the plain fact that there are fully functional machine guns in Milwaukee at this very second, and it is perfectly plausible that Hamzeh could have bought, borrowed, or stolen one. This is not a farmer and a complex international financial transaction, it was a man who wanted a weapon.

VII. *Response to the Defense Motion in Limine Entitled "Preventing the introduction of any evidence from the computer, Play Station, phone, or the pole camera."*

The United States will not offer in its affirmative case at trial any evidence obtained via a pole camera or obtained from Hamzeh's mobile phone, laptop, or PlayStation.

18

VIII. *The Defense Motion in Limine Entitled "Preventing the government from challenging the defense's translations."*

The defense refers to three sets of translations it commissioned: (1) Defense Bates 1-51; (2) Defense Bates 154-200; and (3) Defense Bates 212-465. The conversations translated at Defense Bates 1-51 were translated by the United States and produced to the Defense at Discovery Disk 104/FBI 105. Excerpts from that translation are included at pages 181-187 of Attachment A to the Recordings Motion. The conversations translated at Defense Bates 154-200 were translated and produced to the Defense at Discovery Disk 73, parts 1-5, 7/FBI 72, parts 1-5. Excerpts from that translation are included at pages 73-96 of Attachment A to the Recordings Motion. The United States' translations of these audio recordings are correct. It is unclear whether there is any dispute over material terms in admissible portions of those recordings.

The translations at Defense Bates 212-465 were substantially correct but were of conversations that appeared to be manifestly immaterial. The defense will soon respond to the United States' identification of its proposed recordings exhibits with the out-of-court statements it believes it may admit under the Rules. If the defense identifies in its submission some section of Defense Bates 212-465 that it believes is actually material and admissible, the United States will most certainly respond immediately if there is a material mistranslation. To the undersigned's understanding, though, there is little dispute over what Hamzeh was saying. The parties merely dispute its legal significance. The parties are in continued correspondence over this issue.

19

Dated at Milwaukee, Wisconsin this 20th day of September, 2019.

        Respectfully submitted,
        MATTHEW D. KRUEGER
        United States Attorney

By:    */s/ Benjamin Taibleson*

        Benjamin Taibleson
        Adam Ptashkin
        Assistant United States Attorneys
        United States Attorney's Office
        Eastern District of Wisconsin
        517 East Wisconsin Avenue
        Milwaukee, Wisconsin 53202
        (414) 297-1700
        benjamin.taibleson@usdoj.gov