UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff*,

                                                                                     Case No. 16-cr-21

*vs*.

SAMY M. HAMZEH,

    *Defendant*.

**RESPONSE TO GOVERNMENT'S BRIEF. R.302**

Samy Hamzeh, by counsel, files this response to the government's brief regarding the relevance of Hamzeh's statements about Hamas, Israel, and ISIS, and the testimony of Dr. Levitt on these subjects. (R.302).

### I.    Introduction

On January 25, 2016, undercover FBI agents delivered machine guns to Samy Hamzeh after two informants spent at least four months working on him. The government wants to introduce portions of four conversations from mid-October with Steve (who won't be available for cross-examination) and early-November with Mike in which Hamzeh made fantastic claims about disarming Israeli soldiers like he was Jean Claude Van Damme or Rambo. These empty boasts were disturbing, bigoted, and ugly, but they were just words. Yet the government wants to present snippets of these conversations in which Hamzeh blustered to an enthusiastic audience even though the statements were months removed from the charged offense, referred to matters 6000

Federal Defender Services
of Wisconsin, Inc.

miles away from the charged offense, and related to a decades-long conflict having nothing to do with this case. These inflammatory conversations have minimal, if any, relevance when predisposition is evaluated properly under *Mayfield* and *Jacobson* but they are enormously prejudicial and create a grave risk of confusion for the jury and force the Court to wade into a quagmire of a mini-trial.

On top of all that, the government wants to call an expert to elaborate on the topics Hamzeh passingly remarked about months before the charged offense. For example, he only mentioned Hamas in four of the conversations the government cites. If the Court allows any reference to these conversations, there's no need for an expert to explain every term or reference made in the conversations given how divorced in time and subject matter they are from the charged offenses. While Levitt may be a terrorism expert, this isn't a terrorism case; and the government shouldn't be allowed to make it appear that it is or put an expert's gloss on conversations whose gist is easily understood by the jury.

The government's brief largely copies points it previously made in other briefs, *see* R. 284, 285:1–10, but there are three points worth responding to. The first concerns the government's misunderstanding of *Jacobson* and *Mayfield* and the timing relevant to the jury's predisposition decision. The second addresses the fact that the government's cases concerning Rule 403 don't support its position and should be scrutinized. And the third explains why Dr. Levitt's testimony is unnecessary and unhelpful to the jury.

Federal Defender Services
of Wisconsin, Inc.

I. **The Israel statements have marginal, if any, relevance to the charged crime.**

Even before considering that the probative value of its "Israel" evidence is substantially outweighed by its unfair prejudice and other Rule 403 considerations, the government's argument for introducing the statements suffers from two flaws,. First, the government suggests that Hamzeh's boastful (but unacted upon) remarks about seizing Kalashnikovs from the hands of Israeli soldiers parallel his ultimate $270 purchase of an unregistered machine gun in southeastern Wisconsin. But that's not accurate. This case is entirely about unregistered machine guns, not material support or some other claimed terrorist plot. What's more, there's nothing showing that Hamzeh's early boasts are anything more than talk: he didn't take any steps to make those boasts a reality but rather made excuses to back out and save face; there was nothing illegal about his remarks; he certainly didn't try to get any machineguns at that time; and any hypothetical Middle East thoughts of avenging Palestine he had had nothing to do with acquiring machine guns or guns of any kind in Wisconsin. And it's important to keep in mind that "the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character." *United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir. 1994) (en banc). That all renders the "Israel statements" an irrelevant and highly prejudicial diversion from the real issues in the case.

The second flaw is that the government's argument ignores that it must prove not only that Hamzeh was predisposed to commit *the crime charged* (and not some general

3

Federal Defender Services
of Wisconsin, Inc.

predisposition to boast about horrific crimes), but it also has to prove that he was predisposed to commit the crime charged (he had it all worked out) before first contact with the informants. That first point is *Mayfield*. *United States v. Mayfield,* 771 F.3d 417, 438 (7th Cir. 2014) (en banc) ("[T]he principal element in the defense of entrapment [i]s the defendant's predisposition to commit the crime—not just any crime."). The second point is *Jacobson*. The oft-quoted line from *Jacobson* is "the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by [g]overnment agents." *Jacobson v. United States*, 503 U.S. 540, 549 (1992) (emphasis added). In earlier briefs, we have pounded positional predisposition and the fact that it has to be the crime charged and not just any crime, so its not worth repeating those points. But in reading the government's brief, getting the point about timing is critical and worth spending a page on specifically addressing.

To understand the quote from *Jacobson* and what that means for this case, it's good to grab three other quotes from the opinion. First, it's important to remember in *Jacobson*: the "Government began its efforts *in January 1985* when a postal inspector sent petitioner a letter." *Id.* at 544 (emphasis added). So the first contact Jacobson has with an agent is January 1985. Second, the Court observed that when Jacobson ordered the magazine (26 months later) that his predisposition at that point wasn't the issue, it was what was Jacobson predisposed to do in January 1985: "the Government did not prove that this predisposition was independent and not the product of the attention that the Government had *directed at petitioner since January 1985*." *Id.* at 550 (emphasis added). So the statements *after* meeting the agents does not circumvent what the government has to

4

prove: predisposition *before* Jacobson's *first* contact with the agents. Third, the Court commented on the evidence of Jacobson's predisposition: "The sole piece of preinvestigation evidence is petitioner's 1984 order and receipt of the Bare Boys magazines. But this is scant if any proof of petitioner's predisposition *to commit an illegal act*." *Id.* at 550. The same must be said here.

That is, to be very clear, predisposition is viewed by whether Hamzeh had a desire to get an unregistered machine gun and was so situated in August 2015 or September 2015 and that he had it "all worked out and lacked merely the present means to commit it, and if the government had not supplied [the means] someone else very well might have." *Mayfield,* 771 F.3d at 436 (7th Cir. 2014) (quotation omitted). In order to prove that, the only evidence that the government has is Hamzeh's statements all of which come over a month *after* meeting the informants—statements that are irrelevant and refer to a conflict 6000 miles away. The government has less in the way of pre-investigation evidence about Hamzeh's interest in machineguns than it did in *Jacobson,* where the Court was quick to note that "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." *Jacobson*, 503 U.S. at 550–51. The same applies to Hamzeh's boasts about Israel. And this is the central point that can't be lost in any argument or discussion about the statements the government seeks to enter: the Israel statements don't bear on Hamzeh having it all worked out to get an unregistered machine gun *before* being approached by the informants. Instead, they are *all* empty boasts about Palestine and what he might do

5

there, not here. These boasts, of course, are just empty boasts; and they are critically not about the charged crime—acquiring unregistered machine guns in the United States.

But even if they're part of the predisposition calculus, they have to be measured with care. As the Court in *Mayfield* noted "other evidence of the defendant's conduct after the initial contact by the government's agents—for example, his actions or statements during the planning stages of the criminal scheme—also may be relevant to the determination of predisposition. *All this evidence must be considered with care, of course; by definition, the defendant's later actions may have been shaped by the government's conduct.*" 771 F.3d at 437 (emphasis added). The government has cited that quote a few times, arguing that the second sentence cautioning that "all this evidence must be considered with care" only applies "to the defendant's actions. But again his statements are different." R. 285:5; R. 298:15. The admonition in *Mayfield* to measure post-initial contact behavior (after August or September 2015) with care clearly applies to words—*i.e*, his statements. The fact that "words" was left out of the second sentence in *Mayfield* just means that among Judge Sykes many virtues, she is a good writer, who doesn't needlessly repeat words when the context is clear. Thus, everything after contact with the informants—words, actions, looks, thoughts—has to be measured with care because it's been infected by the government's actions. *Jacobson*, 503 U.S. at 550. Thus, not only are the statements that the government seeks to introduce measured with care, they are also irrelevant to the question the jury has to answer: was Hamzeh predisposed to commit this crime before first contact with the informants.

6

In sum, the statements that are supposed to be measured with great care—the statements that the government wants to use (about Israel and the Masons)—come between at least 27 to 157 days *after* predisposition was measured.[1] The statements are not relevant to whether Hamzeh had it all worked out before meeting the informants. Yet those statements are of a highly inflammatory nature, and that will lead the jury to convict based on how scary Hamzeh sounds. Indeed, if the court of appeals reversed in *United States v. Klebig*, 600 F.3d 700, 714 (7th Cir. 2009) because the Court allowed in an "ominous sign" on Klebig's door, how much more so for these statements. *Id.* This irrelevant evidence will likely inflame the jury, obscure the issues, and force the Court to wade into the hornets' nest of Palestinian-Israeli conflict and how decades of fighting and tension affect a young man and the statements he makes. In other words, these statements are not relevant, they are highly prejudicial, and should be kept out. The government's new brief does nothing to change that fact.

II. **The government's case law does not support its position.**

At the end of its brief, the government deals with whether this evidence should be excluded under Rule 403. It doesn't develop a theory of "how" these statements factor into the entrapment analysis of whether Hamzeh was predisposed to commit the crime charged—that is, how they're relevant. Instead, it settles with the idea that speaking of violence in general (gory and graphic) terms isn't unfairly prejudicial when the defense

---

[1] Attached as Exhibit A is a chart showing when each statement in the government's brief occurred after first contact with Hamzeh. And the chart also matches the statements in R.302 with the previous statements and the defense's objections to them.

7

Federal Defender Services
of Wisconsin, Inc.

raises entrapment, and it cites a few cases. R.302:14–16. It's worth explaining how those cases don't support its position.

First, the Third Motion In Limine sets out the case law and the standard for excluding the statements. R. 277. Rather than tackling those cases, the government plucks out a line from the Tenth Circuit that exclusion of evidence under 403 is an extraordinary remedy. R.302:16" (exclusion under Rule 403 "is 'an extraordinary remedy [that] should be used sparingly.'" (quoting *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014)). But experience teaches the opposite—in virtually every trial evidence is excluded under Rule 403. What's more, the government's quote from *Watson* has to be taken in context. There, the evidence that the defendant complained about was testimony of his co-conspirator that they had grown marijuana in the past. *Id.* at 1242 ("Watson challenges the admissibility of Mr. Shuck's testimony regarding their prior outdoor growing activity."). That testimony is pretty relevant, and it's hard to see how it could "provoke an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *Id.* at 1242. Prior acts of growing marijuana with a co-conspirator are a far cry from talking about violent attacks in Palestine.

The Government's cite to *Watson* isn't the only case that doesn't help its position. The citation to *United States v. Earls*, 704 F.3d 466, 471 (7th Cir. 2012) follows an accurate statement about a sliding scale approach: "as the probative value increases, so does our tolerance of the risk of prejudice." *Id.* Indeed, this evidence has no relevance to Hamzeh's predisposition to commit the crime charged and the risk of prejudice is patent. The *Earls*

8

Federal Defender Services
of Wisconsin, Inc.

case actually gives that point some perspective. There, the defendant fled the country and obtained a false passport. His motive: he was facing charges of assaulting a six-year-old. The judge excluded the fact that the allegations were for assaulting a six-year-old, and instead let the jury know that he faced penalties of 0–60 years. A reasonable place to land. The Seventh Circuit affirmed, noting this wasn't a scenario where "there was a real danger that such evidence, dumped without restraint into the record, can lead a jury to *convict a defendant not on the basis of proof of the crime with which he has been charged, but for simply being a bad person.*" *Id.* at 471 (emphasis added). Yet that is precisely what the government seeks to do with these statements. They don't speak to whether Hamzeh had it all worked out to get an unregistered machinegun in Wisconsin; they only speak to his bigotry and empty, violent boasts about a generations-long conflict 6000 miles away.

Beyond *Watson* and *Earls*, the government's other cases don't support its argument. Indeed, the *Boswell* case (like *Earls*) shows how careful courts are with this evidence and how exclusion isn't extraordinary, but moored to how probative the evidence is and what risks that attend to its admission. *See United States v. Boswell*, 772 F.3d 469, 476 (7th Cir. 2014). In *Boswell*, the defendant took the stand and testified he had no interest in and hated guns, and on cross-examination the prosecutor asked him three questions about his neck tattoo—he had a neck tattoo of a gun. *Id.* The question was reviewed for plain-error, and the Court was quick to note that while the tattoo was relevant because Boswell had put his credibility at issue, "the government's inquiry regarding Boswell's firearm tattoo *did contain a significant prejudicial element.*" *Id.* (emphasis added). If the Seventh Circuit is quick to note the "significant prejudicial

9

Federal Defender Services
of Wisconsin, Inc.
Case 2:16-cr-00021-PP   Filed 10/07/19   Page 9 of 14   Document 314

element" for a neck tattoo of a revolver, how much more are statements about suicide vests and killing 500 hundred Jews.

Those statements (again) have no relevance to this case and they are extremely inflammatory. That's the point the government brushes away. It simply settles on the idea that this is an entrapment case and so Hamzeh "cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense. " R.302:17 (quoting *Sorrels v. United States,* 287 U.S. 435, 451–52 (1932)). But here's the problem, that quote from *Sorrels* doesn't mean that in entrapment cases, the rules of evidence are thrown away. Not at all. And the cases the government wants to use to support that idea, don't, in fact, support it at all. Indeed, the *Parkin* case is about whether other drug transactions done by the defendant are relevant to predisposition—including "transactions both before and after September 11, 1987." *United States v. Parkin*, 917 F.2d 313, 316 (7th Cir. 1990). Of course, that's relevant. If Hamzeh had bought a machine gun in June or July of 2015, the defense would agree that bears heavily on predisposition. But in no sense can the Court read *Parkin* to mean that in entrapment cases everything goes. *See United States v. Blankenship,* 775 F.2d 735, 739 (6th Cir. 1985). Instead, the question for this Court is straight-forward: what relevance do these statements about Israel and Hamzeh's boasts about what he'd do there, made (between 27 and 157 days) after contact with the informants bear on whether Hamzeh was predisposed in August or September of 2015 to possess an unregistered machine gun. The answer is they aren't relevant. And whatever miniscule value could be squeezed

10

Federal Defender Services
of Wisconsin, Inc.

out of them is outweighed by the danger of unfair prejudice. Nothing in the cases cited by the government changes that. Finally, even if the Court deems this evidence admissible, there must be reasonable limitations on its use to reduce the unfair prejudice and other Rule 403 issues. This could, for instance, be allowing Mike to testify that Hamzeh made statements about Israel but not introducing the statements themselves.

### III. Dr. Levitt's testimony is both irrelevant and unnecessary.

The government's new brief on Dr. Levitt relies heavily on cases where his expertise was relevant because it was a terrorism case. And if this were a different case, then his testimony might be relevant. But it's not. This case is about possession of unregistered machine guns. His testimony has no bearing on the issues at hand. It will simply be irrelevant and a large waste of time, including forcing the defense to call Dr. Sageman. Beyond that, there are four important points to make about the government's brief and Dr. Levitt.

First, the government cites no cases that would make the "background" information that Dr. Levitt would offer (in this case) relevant or admissible under Rule 403. *See United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) ("When background evidence is so removed from the focus of the case, as it was here, even factual, brief, and succinct testimony may be unfairly prejudicial to the defendant."). In fact, the government's brief doesn't grapple with the key concerns expressed by the Court's comments at the hearing—that the non-existent to miniscule relevance of Hamzeh's empty talk about Palestine would consume significant trial time, including two experts and dozens of transcripts and do nothing but confuse and inflame the jury. *See id.* at 908

11

Federal Defender Services
of Wisconsin, Inc.

(noting "because background evidence about ancillary matters has only marginal relevance, it is more susceptible to exclusion under Rule 403's balancing of prejudice and probative value"). The government's new five points don't bridge that gap.

Second, Dr. Levitt's testimony should not just be excluded under Rule 403, his report on the only remotely relevant topic (the Masons and the Middle East) is unfounded. As expressed in the Third Motion In Limine, he not only lacks expertise on the prevalence of Masonic conspiracy theories in the Middle East, his proposed testimony is not probative of anything in this case. That some unknown number of people in the Middle East have been exposed to such theories does not matter here—where the idea of the Masons very clearly comes from Mike. So whether masonic conspiracies exist in the Middle East (a populous and large region with dozens of countries and distinct cultures) has no bearing on how in Milwaukee Mike used that to brainwash or trick Hamzeh into believing ISIS was aligned with the Masons.

Third, Levitt's geography lesson could be done with a stipulation or the Court taking judicial notice of the definition of certain terms. In another case where the government proposed to use Dr. Levitt, the defense believes that the parties stipulated to the definition of relevant terms like al Qaeda. *See United States v. Ftouhi,* Case No. 17-cr-20456, Dkt. # 84 (E.D. Mich.). If the Court allows any "Israel statements" into evidence, a short stipulation defining some terms would save time, serve the ultimate purpose, and limit the risk of confusion.

It's also worth mentioning that the government's repeated point that Levitt's testimony about geography and reference to things like the "Al-Buraq Wall" will show

12

the sophistication of Hamzeh's "plan" should not be credited. For one, the technical name the government invokes "Al-Buraq Wall" is simply the Western or Wailing Wall. A stipulation could make that point clear. What's more, it's worth pointing out that Jerusalem (where the wall is) is 45 miles as the crow flies from Hamzeh's home in Jordan. It doesn't take much sophistication for someone who grew up so close to a place to know about the rules governing travel there. Indeed, Dr. Levitt's proposed testimony about how Hamzeh's statements show sophisticated planning and insight loses sight of reality. Hamzeh's statements are akin to having an expert testify that someone who lived in Wisconsin his whole life would know that driving from Milwaukee to Chicago you'd have to go through tolls—and you'll likely hit construction, too. The government shouldn't be able to use an expert to dress up that fact, especially when it's not relevant to the crime charged.

Fourth, it would seem the government's primary purpose in wanting Dr. Levitt to testify is to slip in item number 3 and similar testimony: "Why do the different security situations in the Gaza Strip and West Bank *have different appeals to someone who wants to commit mass killing there?"* R. 302:4. Obviously, it would be improper for the government to pose a hypothetical that suggests (as a fact) that Hamzeh sought to commit mass killings and then to vouch for that assumption with an expert's testimony. That's not relevant and it's extraordinarily prejudicial. And there's no doubt that questions like these and the others the government seeks to elicit from Dr. Levitt will sink this trial into the quagmire of a mini-trail that should (and can) be avoided.

13

Federal Defender Services
of Wisconsin, Inc.
Case 2:16-cr-00021-PP    Filed 10/07/19    Page 13 of 14    Document 314

IV.  **Conclusion**

This case was charged as under Title 26, possessing an unregistered machine gun that Hamzeh did not pay the tax upon. That charge occurred here in Wisconsin and it occurred in January of 2016. The evidence that the government seeks to introduce with Hamzeh's statements about Israel don't bear on that issue and so they should (along with Levitt) be excluded from trial. That's the bottom line. The defense would also be remiss if it didn't apologize for the length of this filing. It is longer than we wanted and tried very hard to provide the Court with. These points are, however, important for the Court to keep in mind and to rebut the government's arguments.

Dated at Milwaukee, Wisconsin this 7th day of October, 2019.

> Respectfully submitted,
>
> /s/     *Joseph A. Bugni*
> Joseph A. Bugni, WI Bar No. 1062514
> Craig W. Albee, WI Bar No. 1015752
> FEDERAL DEFENDER SERVICES
>   OF WISCONSIN, INC.
> 517 E. Wisconsin Ave - Rm 182
> Milwaukee, WI  53202
> Tel. (414) 221-9900
>
> *Counsel for Defendant*, Samy M. Hamzeh