UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff*,

                                      Case No. 16-CR-21 (PP)

*vs*.

SAMY M. HAMZEH,

    *Defendant*.

**DEFENSE'S SUR-REPLY TO GOVERNMENTS' BRIEF CONCERNING HAMZEH'S STATEMENTS (R.315)**

Samy Hamzeh, by counsel, files this sur-reply in support of admitting the transcripts marked as Exhibits 3041-3153. The brief has two parts. The first addresses the government's argument concerning predisposition in footnote one and that it's measured at the time the government first proposed the crime. It only takes three paragraphs to address that. Second, the brief addresses the government's specific objections both in the text of its brief and in the table that followed. Attached as Exhibit A and under seal is the additional text that the government wants admitted under the rule of completeness. For clarity's sake, the highlighted text is what the defense intends to put in, and the rest of the exhibit is what the government proposes to add.

1

## I. The government's reading of *Mayfield* can't be squared with *Jacobson.*

The government makes some of its relevance arguments based on a misunderstanding of when predisposition is measured. It argues that

> [t]he defense contradicts *Mayfield* when it argues: 'predisposition had to predate the first contact by the informants.' *Mayfield* is clear; in the Seventh Circuit: 'The defendant's predisposition is measured at the time the government first proposed the crime.' The 'first contact' statement might be true if the government proposed the crime the first time they were in contact with the defendant—in this case, that would be the relevant analysis if Hamzeh were asserting that the UCEs entrapped him, because they offered to sell him illegal weapons the first time they met.

R.315:2, n.1 (citation omitted). This is an important point for trial, so it's worth spending two paragraphs on making sure it's clear and why the defense's argument is consistent with the rule from *Jacobson* and why that sentence from *Mayfield* does not (and cannot) overrule the Supreme Court's holding.

Predisposition is not measured when the informants first proposed the specific crime; it's measured at Hamzeh's point of first contact with the informant. The oft-quoted line from *Jacobson* is "the prosecution must prove beyond a reasonable doubt that the defendant was *disposed to commit the criminal act prior to first being approached by [g]overnment agents.*" *Jacobson v. United States*, 503 U.S. 540, 549 (1992) (emphasis added). Three other quotes from the opinion illuminate what the Court meant by that and what it means here. First, in *Jacobson*: the "Government began its efforts *in January 1985* when a postal inspector sent petitioner a letter." *Id.* at 544 (emphasis added). So the first contact Jacobson has with an agent is January 1985, and the first letter was not soliciting him to order child pornography but a membership application to "the American Hedonist

Society." *Id.* at 543. Second, when he ordered the magazine in response to the government's solicitation 26-months later (which is when the government would measure predisposition) the Court measured Jacobson's predisposition in reference to January 1985: "the Government did not prove that this predisposition was independent and not the product of the attention that the Government had *directed at petitioner since January 1985.*" *Id.* at 550 (emphasis added). That is, predisposition is not measured at the point of solicitation but of contact. The Supreme Court put it plainly: "the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by [g]overnment agents." *Id.* at 549. And if any doubts linger about that point, footnote 2 in the *Jacobson* opinion settles it; there, the Court rejects the dissent's argument that predisposition is measured at the moment before solicitation: "the proposition that the accused must be predisposed prior to contact with law enforcement officers is so firmly established that the Government conceded the point at oral argument." *See id.* at 549, n.2.

That is, to be very clear, under *Jacobson* predisposition is viewed by whether Hamzeh had a desire to get an unregistered machine gun and was so situated in August 2015 or September 2015 and that he had it "all worked out and lacked merely the present means to commit it, and if the government had not supplied [the means] someone else very well might have." *United States v. Mayfield*, 771 F.3d 417, 436 (7th Cir. 2014) (quotation omitted). *Jacobson,* from the Supreme Court, controls and it dictates that predisposition is not measured from the time Mike proposes the criminal activity (November or December), but upon Steve approaching Hamzeh (August or September).

3

To look upon predisposition at the point of when the informant proposes the crime overlooks all the subtle and persistent behavior that laid the groundwork. *See id.* at 442 ("As a logical and legal matter, Mayfield's active engagement in the scheme after the government's extended efforts to procure his participation has limited bearing on his predisposition when the government first proposed it."). Here, that would be, among other things, Mike cultivating a friendship with Hamzeh and introducing guns into Hamzeh's life in an effort to get him to one day possess an illegal firearm. Indeed, there is no other reason for Mike showing Hamzeh his gun during the first week of working together except to normalize gun possession.

## II. The government's specific objections to the statements the defense intends to introduce.

With that point settled, the issue is the government's other objections. The chart below addresses the government's specific objections to the statements made in the government's chart. But the government also has a few objections in the body of its brief, most of it is addressed to the defense translation of disks 104–106. *See* R.315:3–4. To understand the need for the defense's transcript, the Court has to understand that on January 25 (the day they buy the machineguns) there was a recording made by Mike and one made by Steve and a microphone inside the car they drove also recorded the conversation. The government's transcript (104) only picks up one microphone. The defense translator listened to all three and picked up speech that was missed on the government's single microphone. That is, the defense 104–106 is as complete a picture of the conversation that day as can be had. The government has stipulated that it's authentic,

4

and the parties will have another stipulation executed that it's accurate. So there is no bar to admitting it. What's more, the transcript differences are not immaterial. They are, in fact, pivotal. In the defense's transcript, Hamzeh can be heard complaining a second time that the gun is different from what they agreed they were getting—one like Mike's. There is no reason to exclude the transcript because it overlaps at parts with the government's.

The government's other objection is that Hamzeh's statements about the gun being "different" will confuse the jury. It argues that "different" referred simply to the size of the gun. The government can argue to the jury, but competing interpretations of the same event is not a reason for barring an exhibit. And for that matter, the defense has a lot to argue that Hamzeh meant "different" or "not the same," as in: "this is an automatic machine gun, with a silencer, and I was told I was getting a gun like yours, Mike, a semi-automatic with no silencer!" On that point, the defense has numerous statements from Mike that his weapon is a semi-automatic. Exs. 3053, 3073, 3119, 3124. The defense also has Mike's statement that there will be other guns for sale from his contacts. Ex. 3119. The defense has Hamzeh's statement hours earlier that he didn't want or need a silencer. Ex. 3120, 3129. And the defense has the fact that immediately after the transaction Hamzeh yells at Mike that it's a different gun—"I thought it was similar like yours man. We are coming came on the basis, of it being the same man" and "it is not right that we come and find a different weapon." Ex. 3138, 3153:47. People seldom get so angry at being sold a machinegun in a different color or shape than they'd hoped. In sum, there's a substantial basis to argue to the jury that this was a bait-and-switch move by Mike and the defense's

5

Ex. 3153 fully supports that. Furthermore, the government's arguments that this will confuse the jury is not a legitimate argument for excluding it.

As far as the legal argument that this statement is inadmissible as hearsay, the government does not cite any law or explain why. It just says it's not an excited utterance because it took place after he walked away. R.315:4. But that doesn't keep it from being entered in under Rules 801(1)–(3). First, to the extent it's considered hearsay, it is a then existing state of mind, it is present sense impression, and it is an excited utterance. Hamzeh's then existing state of mind is shown by his disbelief in what is happening: "I thought it was similar like yours man. We are coming came on the basis, of it being the same man." Ex. 3553:47.

As spelled out in the brief (R.310), under Rule 803(3), a statement can be admitted when it is "[a] statement of the declarant's then existing state of mind ... but not including a statement of memory or belief to prove the fact remembered or believed." Fed.R.Evid. 803(3); *see United States v. Peak*, 856 F.2d 825, 834 (7th Cir. 1988) (state-of-mind exception to hearsay rule is not limited only to bare assertions of state of mind and does not necessarily prohibit details of conversation). The rule is that the "statement must relate to the declarant's state of mind as it existed at the time it was uttered." *Id.* at 833. And here, Hamzeh's statement in the car that this is a different gun shows what he thought during the buy and seconds later—*i.e.*, it's his then-existing statement of mind. *See United States v. DiMaria*, 727 F.2d 265, 270–71 (2d Cir. 1984) (holding it was error to exclude the defendant's statement "I only came here to get some cigarettes real cheap" because the "statement exhibited the defendant's then existing state of mind").

6

Further, Hamzeh's comments during the buy and in the car are the whole case. They are the culmination of four months of pressure to get Hamzeh to buy a gun and then trick him with a different gun. The statement back inside the car is among the most (if not the most) important fact in the trial. Given the statement's importance and the government's attempt to keep it out, the defense is citing the other potential bases and making a record for appeal, including Hamzeh's constitutional right to present a defense.

To that end, Hamzeh's statements back in the car can come in as present sense impression. *See* Rule 803(1). When it comes to this exception, the Seventh Circuit has succinctly described the rule this way: statement must "describe an event or condition without calculated narration," and "must have been made while the speaker was perceiving the event or condition, or immediately thereafter," and "speaker must have personally perceived the event or condition described." *United States v. Ruiz*, 249 F.3d 643, 646–647 (7th Cir. 2001). That is, the statement must be simultaneous or close to the event. 5 *Weinstein's Federal Evidence* § 803.01 (2019). The statement is simultaneous with the events that they are describing (the recordings are real time) there is also no memory problems when it comes to a recording. *See United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2005) (description of conversation less than a minute after it had concluded constituted present sense impression). And Hamzeh's statement of disbelief and anger reflects his present-sense impression of what just happened: he was pressured or tricked into buying a gun that was different from what he'd been promised.

Finally, the statement would also qualify as an excited utterance. It is a "statement relating to a startling event or condition, made while the declarant was under the stress

7

of excitement that it caused." Rule 803(2). The excited utterance exception "allows for a broader scope of subject matter coverage than the present sense impression. This is because the excited utterance exception includes a statement relating to a startling event. while the present sense impression exception is limited to describing or explaining the event." 5 *Weinstein's Federal Evidence* § 803.04. The requirements for a hearsay statement to constitute an excited utterance are: a startling occasion; a declarant who appears to have had the opportunity to personally observe the events; a declarant who was under the stress of excitement when making the statement; a statement relating to the circumstances of the startling occasion. *Id.* This gun purchase was not a normal trip to the store, but an intense exchange where Hamzeh's nerves were clearly on edge. What's more, the stress of the event did not dissipate until he returned to the safety of the car and could let it out. Even without speaking Arabic, a person simply watching the video (on mute) could tell Hamzeh's extreme agitation at what just happened.

In sum, the Court should not exclude the exhibits under the stated objection. The Court should also reject the government's argument that "Hamzeh's [earlier] statements are substantively more probative." R.315:4. The government may think so and argue that fact to the jury. But that is a question for the jury to determine and not a basis to exclude relevant evidence.

When it comes the final paragraph in the body of the government's argument (not the chart), it cites three other exhibits to exclude. It states: "In Exhibits 3082, 3086, and 3135, Hamzeh is not part of the conversations. These are not Hamzeh describing or even alluding to his state of mind, nor is anything said by anyone else that could affect him.

8

The subject matter of these conversations is not relevant to the offense or entrapment. The statements are inadmissible." R.315:4. But it doesn't explain why they're not admissible or why the stated reasons in the defense's chart don't pass muster. It just objects.

When it comes to 3082, this is a verbal act establishing that Steve was surprised by the Masonic development and that it was tied into the YouTube videos that Mike had been showing people. It shows the course of what has developed. *See United States v. Conn*, 769 F.2d 420, 422 (7th Cir. 1985) (noting "the conversations between Hake and Judge Devine were not hearsay because they were not offered for the truth of the matters asserted" but as "verbal acts" establishing "background and continuity and explanation of the subsequent taped conversations"). As such, they are not hearsay but constitute verbal acts. To quote *Weinstein's Federal Evidence*: "Testimony is not hearsay if it is offered only to show the context within which parties had been acting, or to show a party's motive or intent for behavior." 5 Weinstein's Federal Evidence § 801.11 (2019). What's more, since we can't cross-examine (or call) Steve, it can come in under Rule 806. When it comes to Ex. 3086, the government is likely just mistaken on the number. That exhibit is the three of them at the gun range and Hamzeh is talking throughout—Hamzeh is clearly there and being influenced. Plus, it's being introduced to show Mike as the leader and the way he belittles Hamzeh and controls the friendship. It also shows Hamzeh's ineptitude with the firearm. When it comes to Ex. 3135, this is a verbal act establishing Steve's anxiety about what is about to happen. In reality, that statement will very likely be cut during trial, but for now there is a basis to admit it as non-hearsay.

9

To be clear, the defense over-identified the portions it plans to use for trial, proceeding in an abundance of caution. Of course, depending on how certain rulings go, and how other evidence comes in these transcripts will be narrowed down during trial. But for now, in response to the government's initial motion to keep them *all* out, those identified by the defense should be admitted. What follows is a response to the arguments made in the government's chart on pages 5–7 of its brief.

**A. The response to the government's objections contained in its chart.**

| Exh. | Response. |
|------|-----------|
| 3049 | This statement is part of the narrative of subtle influence that Mike used upon Hamzeh. It is evidence of the friendship he was forming with Hamzeh and the appeals to their shared background. *See Mayfield,* 771 F.3d at 434 (discussing the "subtle and persistent artifices and devices"); *id.* at 435 (discussing appeals to "friendship"). |
| 3050 | Mike's willingness to pay for Hamzeh is way of ingratiating himself to Hamzeh and making Hamzeh indebted to him. Money is, of course, frequently used to manipulate and to acquire friendship and assert power and make someone beholden to another—especially here, where this shows that Mike is leading the way and that Hamzeh's first ever trip to the shooting range was Mike's idea and (importantly) treat. Also, the statement about Mike's available resources shows Hamzeh's desire to "keep up" or fit-in, which explains much of his behavior. Mike is cool, and Hamzeh wants to emulate him. *See Mayfield,* 771 F.3d at 434 (discussing the "subtle and persistent artifices and devices"); *id.* at 435 (discussing appeals to "friendship"). |
| 3052 | The same reason as 3050. |
| 3055 | The statement about sending videos is relevant to show Mike communicates, and it ties in with later sending him videos of the Masons being aligned with ISIS. Also, it will be a subject of cross examination and relevant to whether Mike was following agent's instructions, being held accountable, or taking own unauthorized steps. |

10

| | |
|---|---|
| 3065 | Religious appeals are significant to how Mike got himself into Hamzeh's world and the basis for his appeals. Indeed, religious appeals in this case is no different from the First Amendment appeals in *Jacobson*, 503 U.S. at 552 ("On the other hand, the strong arguable inference is that, by waving the banner of individual rights and disparaging the legitimacy and constitutionality of efforts to restrict the availability of sexually explicit materials, the Government not only excited petitioner's interest in sexually explicit materials banned by law but also exerted substantial pressure on petitioner to obtain and read such material as part of a fight against censorship and the infringement of individual rights."). |
| 3107 | The statement's relevance is tied to Hamzeh is making statement that interferes with moving forward with the plan. It shows not just his reluctance but also the steps he took to frustrate the informants' efforts and the fact that (despite being subject to near-constant surveillance and the FBI intercepting his communications) there is *no* evidence he ever even talked to someone else about going to Washington D.C. That is, it was a lie that he made up to get out of what the informants were pressuring him to do. |
| 3111 | This statement again ties into Hamzeh's reluctance and his lies to frustrate the plans. Page 20 of the transcript also shows the pressure that the informants put on Hamzeh to get it done Monday and not allow him time to back out from even getting the guns. Giving Hamzeh time and space would have let him think the matter more and decide against doing anything with them. Also, page 20 has this critical statement from Mike: "And there are other [tap] weapons he will show us." That explains Hamzeh's belief that there would be other guns to buy and why he asked for smaller ones. And page 21 has Hamzeh's then-existing belief that they would be able to go up north and shoot—a place Mike has told them about for months. |
| 3117 | As stated with exhibit 3107, the Washington trip shows his reluctance; and on page 31 of the transcript, there is even Hamzeh giving himself more space with his lie, when asked if he was coming back that same day. "HAMZEH: It's possible that the papers would be a little late." *Id.* |
| 3121 | Hamzeh clearly looked up to Mike and the power of Mike to extract Hamzeh's willingness to get "weapons" can come in subtle ways—like pouting and manipulating Hamzeh to think he's really damaged their friendship. *See Mayfield,* 771 F.3d at 434 (discussing the "subtle and persistent artifices and devices"); *id.* at 435 (discussing appeals to "friendship"). |

| 3149 | This statement goes directly to influencing Hamzeh and speaks to his friendship with Steve. Additionally, it goes to influencing Hamzeh's belief that during the post-arrest interview he needs to cover for his friend, who wants to stay here despite his immigration problems. |

### B. The response to the government's objections under the rule of completeness.

The statements that are identified below and that the defense objects to are all provided in Exhibit A. The objections that invoke multiple exhibits are all combined into a single transcript, so the Court can easily review it. And the portions that we have originally identified as the defense exhibit are highlighted. The additional portions of text are what the government seeks to admit. Most of the additional text is not, as explained below, germane to the point being made. Nor do the statements identified below need additional text to clarify or undo a distorted impression left by the statement.

| Ex. | Response |
|---|---|
| 3071 | We have no objection to adding the statement, subject to the court's ruling on the Israel comments. Otherwise, we can end it on line 40 |
| 3072 | We object. The additional portions are unnecessary, since the statement is only going to the influence on Hamzeh about there being a shooting place up north. In addition, Hamzeh uses a very offensive racial slur on page 16, line 9 that has no place in the trial. In sum, it doesn't fall under the rule of completeness. |
| 3074 | We object. The additional pages are unnecessary for context. The statement (as is) doesn't give a wrong impression and the only additional parts that the government seeks are about prayer, when the statement the defense seeks to introduce are about the stated source of Mike's weapons. Thus, it doesn't fall under the rule of completeness. |
| 3090-3093 | We object, in part. The government's exhibit does entail this, but the defense is simply highlighting certain portions of its larger exhibit. The government could, of course, choose not to enter it into evidence, so the defense cannot |

12

|  | simply rely upon the government's exhibit. We have no objection to adding the single line at the end of page 7. |
|---|---|
| 3104 | We object. The purpose of the statement is Mike reaffirming and clarifying what he has: a Kalashnikov. The extra information that the government wants added is irrelevant, and the additional information does not clarify the point about the Kalashnikov. In other words, it doesn't fall under the rule of completeness. |
| 3115–3116 | We object. The defense is offering this portion to show Hamzeh's ever-changing plans and the effect of Steve continuing to vouch for Mike. It's for a very specific purpose. The additional information is superfluous and doesn't clear up a wrong understanding or impression from the transcript. Thus, it doesn't fall under the rule of completeness. |
| 3118-3119 | No objection to this. But to keep the numbering, we will end 3118, at line 24 and keep 3119 the same. |
| 3133, 3150 | We object. The proposed additional text is superfluous and it contains a loaded term "terrorist." That tern is connected not with Hamzeh's behavior (getting guns to shoot up north) but with the fear that attaches to Arabic men. Thus, it doesn't fall under the rule of completeness. |

### III. Conclusion

As noted in the original brief about the statements, these transcripts tell the story of this case and just as in a bank robbery case, where the critical evidence will be a contemporaneous video showing what each person did at the time of the robbery, in this case, where machine guns were purchased as the culmination of a five-month effort to get Hamzeh to commit a crime (and the defense is entrapment) the transcripts are the videotape—they show what each person did and how they reacted. And for the reasons expressed above and in the original brief, these transcripts are necessary for the jury and the Court to understand what happened and why Hamzeh was entrapped and they are admissible under the rules of evidence.

13

Dated at Milwaukee, Wisconsin this 10th day of October, 2019.

>Respectfully submitted,
>
>/s/     *Craig W. Albee*
>Craig W. Albee, WI Bar #1015752
>Joseph A. Bugni, WI Bar #1062514
>FEDERAL DEFENDER SERVICES
>  OF WISCONSIN, INC.
>517 E. Wisconsin Ave - Rm 182
>Milwaukee, WI  53202
>Tel. (414) 221-9900
>E-mail:  craig_albee@fd.org
>
>*Counsel for Defendant*, Samy M. Hamzeh