UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                              Case No. 16-cr-21-pp

SAMY M. HAMZEH,

        Defendant.

**ORDER GRANTING DEFENDANT'S MOTION *IN LIMINE* VI (DKT. NO. 277 at 18) PRECLUDING GOVERNMENT FROM SPECULATING AS TO DEFENDANT'S POSITIONAL PREDISPOSITION**

      A little over two months prior to the scheduled October 21, 2019 trial date, the defendant filed a motion *in limine* seeking leave to present the affirmative defense of entrapment. Dkt. No. 234. The government filed a lengthy response, objecting to the request. Dkt. No. 255. In that objection, the government argued that under the Seventh Circuit's decision in United States v. Hollingsworth, 27 F.3d 1196 (7th Cir. 1994), the Seventh Circuit held that predisposition—one of the elements the government must prove to defeat the entrapment defense—requires a showing that the defendant "was not merely mentally predisposed to commit a crime but also in a position to potentially actually commit that crime or some similar crime." Id. at 34. The government noted that in asking to present the entrapment defense, the defendant had asserted that he wasn't in a position to obtain a machinegun at the time the government informants started talking with him. Id. The government disagreed.

1

It first asserted that "machineguns are available for street purchase," claiming that such weapons "are seized in Milwaukee, Chicago, in Texas, and nationwide all the time." Id.

The government made another argument regarding the defendant's "positional disposition," however, one that the court informed government counsel at the final pretrial conference it was inclined to reject. The government argued in its opposition to the entrapment defense that

> Second, and perhaps even more importantly, aftermarket parts that convert semiautomatic guns that a person can buy at any sporting goods store into automatic weapons, like bump stocks and Glock switches, are gallingly inexpensive and accessible. Contrary to [the defendant's] claim in his motion, he could easily have acquired a simple, fully-automatic converter. These parts are *still* available for purchase online (not merely on the dark web, but) on websites like wish.com. For $16, [the defendant] could have converted a cheap semiautomatic handgun into precisely the small automatic weapon he wanted. *See* High Quality Semi Full Auto Switch for Handgun Glock G17 G19 G22 G23 (*available at* https://www.wish.com/product/high-quality-semi-full-auto-switch-for-handgun-glock-g17-g19-g22-g23-5b0f8e805cfaae22ceaa73fa?&hide_login_modal=true).
>
> At the time of the charged offense, [the defendant] could quite literally have bought one on Amazon.com. Thousands and thousands of them have been shipped into the United States, for under $20 each. *See* Scott Glover, CNN, ATF ON THE HUNT FOR THOUSANDS OF ILLEGAL MACHINE GUN CONVERSION DEVICES SMUGGLED INTO US (*available at* https://www.cnn.com/2019/05/23/us/aft-agents-hunting-down-illegal-machine-gun-device-invs/index.html). Just because [the defendant] had not yet available himself of this possibility does not mean he was entrapped under *Hollingsworth*. You cannot buy a nuclear weapon on Amazon.com for $16.

Id. at 34-35.

In his reply in support of the request to present an entrapment defense, the defendant characterized the government's "he could've gotten conversion

2

parts online" argument as "troubling." Dkt. No. 270. The defendant asserted that in both Hollingsworth and United States v. Mayfield, 771 F.3d 417 (7th Cir. 2014), the Seventh Circuit had held that the government had to demonstrate the probability that the defendant was in a position to commit the crime with which he was charged, "not a matter of what other dangerous uses of weapons the government can conjecture about [the defendant] getting . . . ." Id. at 12-13.

The defense was concerned enough about this argument that it filed its own motion *in limine*, asking the court to prevent the government from "speculating about [the defendant's] positional predisposition." Dkt. No. 277 at 18 (motion *in limine* VI). The defendant asked the court to preclude the government from making arguments "about any steps [the defendant] could have taken—such as acquiring a kit to convert a semi-automatic rifle into a machine gun." Id. The defendant asked the court to confine the government to presenting evidence that the defendant was positioned to purchase a machinegun, because that was the crime with which he has been charged. Id.

The government responded by asserting again that "for under $20, anyone with an internet connection could buy a device online that qualifies as a 'machinegun' under the charging statute *in this case* at the time of the charged offense." Dkt. No. 285 at 10. The government recounted that the indictment alleged that the defendant had violated 26 U.S.C. §5861(d); that statute refers the reader to 26 U.S.C. §5845 for the definition of "machinegun." Id. at 16. The government pointed out that included in §5845's definition of a

3

"machinegun" is "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." Id. (quoting 26 U.S.C. §5845). The government then repeated—verbatim—its argument from its brief in opposition to the entrapment defense. Id. at 17.

Next, the government argued that the statutory definition of machineguns includes the conversion parts that the government asserts are "universally accessible for $20 . . . ." Id. For that reason, the government asserted, the defendant was, "as we all disturbingly are, in a position to buy a machinegun." Id. at 18.

The government went on to say that

> [p]ositional predisposition analysis sometimes focuses on training and experience because those issues are relevant in cases where training and experience are actually necessary to commit an offense (like setting up an international financial transaction, as in *Hollingsworth*). Buying an item on amazon.com or wish.com, or borrowing one from a friend, or stealing one, does not take any training. [The defendant], an American in his early 20s who had some college education, cannot credibly claim he could not himself, and did not know a single acquaintance who could, buy an item on Amazon.com. The defense asks the Court to extend *Hollingsworth* very substantially without any guidance from the Seventh Circuit that it should. *United States v. Hall*, 608 F.3d 340, 345 (7th Cir. 2010).

> "In *Hollingsworth*, [the Seventh Circuit] explained that *Jacobson* [*v. United States,* 503 U.S. 540 (1992)] did not . . . add an "ability" element to the entrapment formulation. 27 F.3d at 1199. But even if it had, [the defendant] most certainly had the ability to possess a machinegun. A converter *is* a machinegun. And this is to say nothing of the plain fact that there are fully functional machine guns in Milwaukee at this very second, and it is perfectly plausible that [the defendant] could have bought, borrowed, or stolen one.

4

> This is not a farmer and a complex international financial transaction, it was a man who wanted a weapon.

Id.

As noted, at the final pretrial conference, the court opined that the government's argument stretched the positional character of predisposition out of recognizable shape. The court observed that if the fact that converter kits are available online for $15 or $20 makes one positionally predisposed to possess a machinegun, then the court itself was positionally predisposed to possess a machinegun. The prosecutor responded that the court would not be positionally predisposed to buy a machinegun, because the court did not *want* to buy a machinegun. Concerned that the court wasn't grasping his argument, the prosecutor asked leave to file yet more briefing on the topic. The court allowed the parties to submit further briefs.

In its *third* brief on the topic, the government reiterated the statutory definition of machinegun, and argued that possessing any of a variety of weapons that fit that definition—from 9mm weapons that "automatically shoot more than one shot with each trigger pull" to 10mm weapons that do the same to "Glock switches" that convert a weapon into a machinegun—would violate the statute. Dkt. No. 300 at 2-3. It asserted that possessing any of those things was not just a *similar* crime to the offenses with which the defendant has been charged, "but the very same crime." Id. at 3. It insisted that this argument wasn't just a technicality, reproducing—for the third time—a citation to the CNN article about the ATF hunting down conversion devices. Id.

5

The government concluded this way:

> If the defense will stipulate that [the defendant] was positionally predisposed to possess a machinegun—not that he necessarily wanted one, merely that it was likely he could get one if he wanted to—and does not intend to call expert witnesses to testify otherwise, then the United States might not need to put this evidence to the jury. The same would be true if this Court rules that the defense testimony on this topic is inadmissible because it too is irrelevant (though that might also create appellate issues). But, otherwise, evidence that machineguns were inexpensive and accessible at the time of the charged offense is relevant (no matter which shape or size the machinegun comes in) in light of [the defendant's] entrapment defense. Glock switches are machineguns under the definition of the charged offense.

Id. at 3-4.

The defendant responded first by reiterating that under Hollingsworth and Mayfield, the government had to show predisposition to commit the *charged* crime, not some hypothetical iteration of the crime. Dkt. No. 301 at 2-4. Second, the defense argued that there was no evidence that the defendant had attempted to buy conversion kits or component parts, and questioned whether such parts were as ubiquitous and easy to obtain in the fall of 2015 and early 2016 (the period the defendant was talking with the confidential informants) as the government insists they are today. Id. at 5-7.

The court remains convinced that the government's argument goes too far. The indictment alleges that on January 25, 2016, the defendant received and possessed two Heckler & Koch MP-5 machineguns—one a 9mm and one a 10mm. It also alleges that on the same date, the defendant received and possessed an H&K silencer. It alleges that none of these weapons were registered to the defendant. Dkt. No. 2.

6

The government has not alleged, either in the indictment or in any of numerous pleadings filed over the past forty-four months, that the defendant tried to obtain component parts for a machinegun or expressed a desire for component parts for a machinegun. The government has not referenced any evidence that prior to the date the government began recording the defendant's conversations with Steve (and later with Mike), the defendant had tried to obtain component parts for a machinegun or converter kits to make a machinegun. The government has not identified any portions of the hours of taped conversations among the defendant and the two informants where the defendant spoke of obtaining a converter kit or component parts. The government has not identified a single item of evidence indicating that the defendant wanted component parts or converter kits, much less that he tried to obtain them.

Even viewing the evidence in the light most favorable to the government, the evidence indicates two things—that early in the conversations between the defendant and the informants, the defendant expressed a desire to obtain a handgun, and that the defendant spoke of going to Israel and relieving Israeli soldiers of their Kalashnikovs. As time passed and the conversations among the three continued, they spoke of "machineguns," and the defendant further talked about Kalashnikovs—he appears to have believed that informant "Mike" owned a Kalashnikov, and he spoke of Israeli soldiers having them and of taking Kalashnikovs from Israeli soldiers. There were conversations about buying guns from "Mike's" source in Texas. There was a trip to Gander

7

Mountain, a sporting goods store that sells firearms, where the defendant appears to have looked at a 9mm pistol. Throughout these discussions, the defendant spoke and acted as if he (a) wanted a firearm, not parts with which to build a firearm, and (b) needed to obtain that fully-formed firearm from someone else, whether by taking it off a soldier or buying it from a store or on the black market.

The court noted at the final pretrial conference that if buying a converter kit and making a machinegun had been as cheap and simple as the government has argued, and if the defendant had known it was that cheap and simple, one wonders why he would have argued and discussed and speculated and mulled over buying a gun (of any kind) with the informants for four months before finally purchasing the items with which he is charged. Why go through all of this—arguing with Mike that he wants a handgun for self-protection due to his job, visiting Gander Mountain, talking about getting guns through Mike's connection in Texas, even talking of stealing the guns of Israeli soldiers rather than providing his own? The very nature of the protracted discussions and negotiations is circumstantial evidence that if the defendant did want a machinegun, he wasn't aware that he could have gotten one quickly, cheaply and easily by obtaining a handgun and then buying a cheap conversion kit. As the Seventh Circuit noted when discussing Jacobson, "[a]s far as the government was aware, over the period of more than two years in which it was playing cat and mouse with [Jacobson] he did not receive any other solicitations to buy pornography," so "had he been 'left to his own

devices,' in all likelihood he would 'have never run afoul of the law.'" Hollingsworth, 27 F.3d at 1199 (quoting Jacobson, 503 U.S. at 554). There is no indication that during the four months or so that the defendant was interacting with Steve and Mike, the defendant tried to obtain a conversion kit or component parts (or, in fact, guns) through anyone else, or received offers from anyone else to help him obtain conversion kits, component parts or guns.

The government's reading of Hollingsworth is somewhat tortured. In analyzing the impact of the Supreme Court's decision in Jacobson on the law of entrapment, the Seventh Circuit explained that

> [p]redisposition is not a purely mental state, the state of being willing to swallow the government's bait. It has positional as well as dispositional forced. The dictionary definitions of the word include "tendency" as well as "inclination." The defendant must be so situated by reason of previous training or experience or occupation or acquaintences that it is likely that if the government had not induced him to commit the crime some criminal would have done so; only then does a sting or other arranged crime take a dangerous person out of circulation. A public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales. For these and other traditional targets of stings all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements; ability can be presumed. It is different when the defendant is not in a position without the government's help to become involved in illegal activity. The government "may not provoke or create a crime, and then punish the criminal, its creature." *Casey v. United States*, 276 U.S. 413, 423 . . . (1928) (Brandeis, J., dissenting). Such cases, illustrated by *Jacobson* . . are rare . . . .

Hollingsworth, 27 F.3d at 1200.

There is no evidence that the defendant was situated by reason of previous training, experience or occupation to obtain a machinegun, or to know that he could buy parts to build one. The defendant had had a series of jobs

9

working at restaurants. He had no prior criminal history. He lived with his mother at the time of his arrest. The government argues that one doesn't need training or experience to purchase a machinegun—it is not as if the defendant is charged with committing a complex securities fraud, where he would have had to know something of securities trading in order to pull it off. The court agrees, but Hollingsworth also directed the court to consider whether the defendant was so situated by *acquaintances* that if the government hadn't provided him with the opportunity to buy a machinegun, some other criminal would have. Again, the defendant appears to have believed—even if he was wrong—that in order to get a gun, whether a handgun or a machinegun, he needed help from someone else. He needed to steal it from someone (like an Israeli soldier) or buy it from someone (whether a gun store or a black market dealer). There appears to be no evidence that the defendant had relationships with anyone he believed could have facilitated his receipt or purchase of such a gun prior to the government's investigation. There is no evidence that the defendant was a gun user or gun owner prior to the government's investigation, so this is not a situation in which "ability"—or, in this case, knowledge—can be presumed," as Hollingsworth put it. There is no evidence that, even if converter kits and component parts were available from well-known web retailers such as Amazon in the fall of 2015, the defendant would have known that. All manner of illegal and nefarious things are available on-line and in retail stores that law-abiding citizens wouldn't think of looking or asking for (parents of teens and young adults confront their own ignorance when offspring land in hot water for

10

possessing contraband that, to the parents' shock, the offspring were able to purchase or obtain without going to black market dealers or back-door suppliers).

The government implies that because the defendant expressed a desire for a handgun, and because conversion kits for turning such a legal weapon into a machinegun arguably were cheap and easy to obtain, the defendant's desire for the legal gun made him predisposed to obtain the parts (which meet the statutory definition of a prohibited machinegun) to create the illegal gun. This is a bit like saying that because someone expresses a desire for quick and easy money, and because nail polish remover, fertilizer, lithium batteries, drain cleaner, pseudophedrine diet pills, lye and road flares are available in any drug or home supply store, the person is predisposed to manufacture meth.

The government argued at the final pretrial conference that there was more to the defendant's expressed desire than the desire for a handgun. The government argued that the defendant had stated in the recorded conversations that he wanted a *machinegun*, and that because he had stated a desire for a *machinegun*, the fact that items meeting the statutory definition of a machinegun are cheap and easily obtained shows positional predisposition. This argument again ignores the evidence in the case—that the defendant didn't express a desire for machinegun parts, didn't express a desire to build a machinegun and didn't evidence knowledge that he could do so. The government's argument seems to contradict another of its assertions—that the defendant wanted a Kalashnikov. The government has repeatedly pointed to

11

recorded conversations in which the defendant spoke with the informants about going to Israel and taking Kalashnikovs from Israeli soldiers, because Kalasnikovs were the best. The defendant seems to have thought that Mike owned a Kalashnikov. If the defendant wanted to steal or buy a Kalashnikov, the fact that "Glock switches" are available from online retailers wouldn't help him much.

The government argues that under Seventh Circuit law, it must show that the defendant was predisposed to commit "the charged crime" in order to defeat the entrapment defense, and it asserts that possessing convertor kits or component parts would have constituted "the charged crime." The government challenges the defendant's argument that he wasn't positioned to commit the charged crime given the difficulty of buying machineguns on the street; the government asserts that it is easy to commit the charged crime because it is easy to buy converter kits and component parts online. The government's "charged crime" language comes straight from the Seventh Circuit's decision in Mayfield: "To summarize, then, a defendant is predisposed to commit *the charged crime* if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." Mayfield, 771 F.3d at 438 (emphasis added).

The government is correct that the statute defines converter kits as items which, if possessed and not registered, would constitute a violation of the statute the defendant is charged with having violated. But possessing conversion kits or component parts is *not*, in the defendant's case, "the charged

12

crime." The government cannot defeat the entrapment defense by showing that it would have been easy for the defendant to commit a version of the crime that he never expressed a desire to commit, that he may have been unaware he could have committed and that he did not try to commit during the government's investigation (or, it appears, at any other time).

The government has expressed from day one its belief that the defendant is a dangerous person who intended to commit a horrifying crime. That belief may or may not be well-founded. But that belief does not drive the question of what the law of the Supreme Court and the Seventh Circuit requires the government to show in order to defeat an entrapment defense. The government may present evidence to rebut the defendant's assertion that it is not easy to buy machineguns on the street. But the court will not allow the government to present evidence about the availability of devices that convert semi-automatic firearms to automatic weapons, the cost of these devices or the ease of obtaining them through online retailers.

To that end, the court has reviewed another recent government filing, the government's brief regarding the expert testimony of ATF Special Agent Lindeman. Dkt. No. 308. In that brief (which doesn't request any action from the court, but notifies the defense of the anticipated topics of Agent Lindeman's trial testimony), the government states that

> [w]e expect that Special Agent Lindeman will testify about ATF's seizures' [sic] of machineguns from 2015-**2019** in the United States, in the Midwest, and in Wisconsin. We expect that he will also testify that he has personally worked on cases in Wisconsin during which machineguns were seized. ***We expect that he will testify about ATF seizures of "Glock switches" and other devices that***

13

> ***convert semi-automatic firearms to fully automatic firearms nationally and in Wisconsin and which are, under the charging statute in this case and per ATF definitions, themselves machineguns.*** We expect that he will testify about the national system in place for registration of machineguns and why there is a requirement to register machineguns but not handguns. We expect that he will testify that machineguns, when sold illegally on the street, are regularly sold below the market value of the machineguns when they are legally sold and registered. ***We expect that he will testify about what Glock switches, auto sears, and other types of converters functionally accomplish. We also expect him to testify to the ease with which any person with access to YouTube can convert a semi-automatic weapon to a machinegun. We expect that he will testify as to the availability of these devices over the internet, on the street, and regarding ATF seizures of these devices.*** We expect that he will testify than the Milwaukee Police department also seizes significantly more machineguns annually than the ATF in Milwaukee. Absent a stipulation, we expect that he will testify that the defendant did not register the machineguns and silencer relevant to the indictment prior to January 25, 2016.

Id. at 1-2.

The court concludes that Agent Lindeman may provide the testimony outlined above in regular font. He may not, however, provide the testimony that appears in bold, italicized font. (The court notes that it has bolded and italicized the year "2019" in the second line of the above paragraph. While the number of machineguns seized in the fall of 2015 and January 2016 is relevant to the availability of machineguns on the street during the defendant's interactions with the informants, the number of machineguns seized from

14

February 2016 through the present is not.)

The court **GRANTS** the defendant's motion *in limine* VI. Dkt. No. 277 at p. 18.

Dated in Milwaukee, Wisconsin this 15th day of October, 2019.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**United States District Judge**
