UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                                              Case No. 16-cr-21-pp

    v.

SAMY M. HAMZEH,

        Defendant.

**ORDER RULING ON DEFENDANT'S SIXTH MOTION *IN LIMINE*: POST ARREST STATEMENTS (DKT. NO. 330)**

On October 14, 2019—the day before the final status conference, six days before trial, and a month after the September 13, 2019 deadline for filing motions *in limine*—the defendant filed this motion, asking the court to admit portions of the defendant's post-arrest statements under Fed. R. Evid. 106 ("Remainder of or Related Writings or Recorded Statements), and to exclude one excerpt as irrelevant, inflammatory and unduly prejudicial. Dkt. No. 330. The government responded, it did not object to some of the defendant's proposals but argued that others were hearsay as to the defendant. Dkt. No. 336. In its reply, the defense asked to admit two additional excerpts of the second interview. Dkt. No. 352. The government responded that given the court's exclusion of many of its proposed excerpts of the recorded conversations among Steve, Mike and the defendant, it now objected to the admission of any of the defendant's post-arrest statements presented if offered by the defense. Dkt. No. 355 at 2. The government argued that where the

1

*defendant* sought to admit his own statements, those statements "are instead hearsay, offered for their truth, and offered as substantive evidence to support an entrapment defense." Id.

The court agrees that if a party such as the government seeks to admit a statement made by that party's opponent—in this case, the defendant—against that opponent, the statement is not hearsay under Rule 801(d)(2). If the opponent—the defendant—seeks to admit his own statements, the Rule 801(d)(2) exception doesn't apply, and if the opponent is seeking to admit the statements for the truth of the matters they assert, the statements meet the definition of hearsay under Rule 801(c). That is not, however, the end if the inquiry. The court still must consider whether the defendant offers the statement for the truth, and whether there are any exceptions to the hearsay rule that might apply.

In United States v. Norwood, 798 F.2d 1094 (7th Cir. 1986), the Seventh Circuit held that "[t]estimony" "not offered to prove the truth of the matter asserted, but to establish the statements' effect upon [the defendant's] state of mind" was "not hearsay." Norwood, 798 F.2d at 1097. In United States v. Branham, 97 F.3d 835, 851 (7th Cir. 1996), the court held that "conversations concerning [the defendant's] entrapment defense would not constitute hearsay." The Branham court stated,

> "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Red. R. Evid. 801(c). However, "if the significance of a statement lies 'lies solely in the fact that it was made,' rather than in the veracity of the out-of-court declarant's assertion, the statement is not hearsay because it is not

2

offered to prove the truth of the matter asserted." *United States v. Cantu*, 876 F.2d 1134, 1137 (5th Cir. 1989) (quoting *United States v. Bobo*, 586 F.2d 355 (5th Cir. 1978), *cert. denied*, 440 U.S. 976 . . . (1979)). Here, defense counsel was attempting to offer the parties' conversations as evidence of [the defendant's] state of mind in support of his entrapment defense. Accordingly, the truth of the conversations would be irrelevant for purposes of the defense, because the conversations' significance would exist solely by the fact that they were made. *Id.*

Id. See also, United States v. Partyka, 561 F.2d 118, 125 (8th Cir. 1977);

United States v. Lopez, 147 F.3d 1, 6 (1st Cir. 1998).

The court understands that the government may not have objected to—or may even have agreed to—some of the defendant's proposed excerpts because it assumed that the court would allow it to present more of the recorded conversations than turned out to be the case. The fact that the court has excluded some of the government's evidence does not necessarily mean that any of his own post-arrest statements the defendant asks the court to admit are *per se* inadmissible hearsay.

A.    Fed. R. Evid. 106

Rule 106 of the Federal Rules of Evidences provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." The advisory committee notes to the rule explain that it "is an expression of the rule of completeness."

"Generally, when part of a defendant's post-arrest statement is introduced into evidence, the defendant has the right to have the entire

3

statement introduced." United States v. Smith, 794 F.2d 1333, 1335 (7th Cir. 1986) (citing United States v. Kaminski, 692 F.2d 505, 522 (8th Cir. 1992) (quoting United States v. Wenzel, 311 F.2d 164, 168 (4th Cir. 1962)). "This rule is sometimes referred to as the rule of completeness." Id. The Seventh Circuit has noted, however, that there are limitations on this rule. For example, if portions of a non-testifying defendant's post-arrest statement inculpate a co-defendant, those portions must be excluded to avoid violating the co-defendant's right to confrontation. Id. (citing, among others, Bruton v. United States, 391 U.S. 123 (1968)).

> A further limitation on the rule of completeness, applicable in all cases, arises when the prosecution seeks only to introduce a portion of the defendant's statement. There, the defendant still has the right to introduce additional portions of his statement. But, this right does not entitle the defendant to introduce portions of his statement that are neither explanatory of nor relevant to those portions of the statement introduced by the prosecution. *United States v. Marin*, 669 F.2d 73, 84-85 (2d Cir. 1982) (citing *United States v. McCorkle*, 411 F.2d 482, 486-87 (7th Cir.), *cert. denied*, 423 U.S. 826 . . . (1975)).

Id. at 1335.

United States v. LeFevour, 798 F.2d 977 (7th Cir. 1986) involved the appeal of one of the state-court judges convicted in "Operation Greylord," Richard Lefevour. Among other things, LeFevour proposed a scheme by which police officers, including one named McCauslin, would serve arrest warrants on people with ten or more unpaid parking tickets, then offer to settle with the person for half the fine and pay the "settlement" to LeFevour, who would dismiss the charges and recall the warrant. Id. at 979. McCauslin made a recording of a conversation he had with LeFevour, in which he told LeFevour

that he'd been subpoenaed by a grand jury and asked LeFevour's advice. Id. at 980. LeFevour told McCauslin not to worry and to get in touch with McCauslin's lawyer, a man named Seymour Vishny; McCauslin suggested that he and LeFevour communicate through Vishny. Id. After McCauslin left LeFevour, he spoke with the FBI and said he'd "put on his best scare act" with LeFevour; the recorder was still running, and this statement was recorded. Id. Defendant LeFevour asked the trial court to admit McCauslin's statement about putting on his "scare act," but the trial judge found the statement inadmissible "because it would confuse the jury and was not relevant to impeaching McCauslin's testimony." Id.

On appeal, LeFevour argued that the trial judge should have allowed him to pay the rest of the recording under Rule 106. Id. at 981. The Seventh Circuit first discussed the government's reason for playing the recording:

> The government's purpose in placing the tape recording in evidence was to show that LeFevour knew that McCauslin's lawyer was Seymour Vishny; this was relevant in light of evidence . . . connecting Vishny with LeFevour's efforts to conceal his corrupt practices. If the government had excised portions of the conversation between McCauslin and LeFevour and as a result had conveyed a misleading impression, Rule 106 would have entitled LeFevour to play the rest of the taped conversation to the jury—and to do so right after the government had played its portion of the tape ("contemporaneously"), so that the jury would not be left with a false impression that might prove indelible. But the government played the whole conversation; what it left out was a separate conversation between McCauslin and the agents. If the separate conversation had been on a different tape, the weakness of LeFevour's argument under Rule 106 would be transparent—though not just because of the accident of there being two reels of tape rather than one; a letter and the reply to it are a unit for the purposes of Rule 106, see 21 Wright & Graham [Federal Practice and Procedure], § 5078, at p. 372 and n. 6. But there is no logical connection between the two

5

conversations that McCauslin had, at least given the very limited use that the government made of the first one.

Id.

The court went on to explain,

The purpose of the "completeness" rule codified in Rule 106 is merely to make sure that a misleading impression created by taking matters out of context is corrected on the spot, because of "the inadequacy of repair work when delayed to a point later in the trial." Notes of Advisory Comm. on Proposed Rule 106. An example would be accusing the Biblical David of blasphemy for saying, "There is no God," his full statement being, "The fool hath said in his heart, there is no God." *Trial of Algernon Sidney*, 9 Howell's State Trials 818, 868-69 (K.B. 1683). We are far from that paradigmatic case here. No misleading impression was corrected by stopping the tape before McCauslin told the agents that he had "put on his best scare act." If he had scared LeFevour into saying something incriminating, there might be some point to allowing the jury to hear McCauslin admit having tried to manipulate the conversation. But really the only point of placing the recording of the conversation in evidence was to show that LeFevour knew of Vishny's representation of McCauslin and acceded to the latter's suggestion that Vishny be their go-between; and to that purpose the talk of a "scare act" was irrelevant. If the purpose of the scare act was to get LeFevour to make incriminating statements, if failed.

Although an argument can be made that McCauslin's inability to frighten LeFevour into making incriminating statements is evidence that LeFevour was innocent, the argument is too tenuous to require the admission of the end of the tape. LeFevour himself argues only that the conversation with the agents should have been put into evidence for the sake of completeness. But the only thing the conversation with LeFevour showed—that McCauslin would be dealing with LeFevour through Vishny—was complete in itself, without reference to the "scare act." *See United States v. Garrett,* 716 F.2d 257, 271-72 (5th Cir. 1982).

Id. at 981-82.

Just under a year later, the Seventh Circuit issued an *en banc* decision in United States v. Sweiss, 814 F.2d 1208 (7th Cir. 1987). The defendant was charged with conspiracy to commit arson and aiding and abetting arson. Id. at

6

1209. His co-conspirator Faraj was arrested, and after his arrest, wore a wire and recorded two conversations with the defendant—one in August and one in September 1984. Id. At trial, the government introduced the recording of the September conversation, but when the defense offered the August conversation, the district court refused to admit it. Id.

> . . . During the September conversation, Faraj and Moses [Sweiss] discussed how Faraj could flee to Mexico and how Faraj had been solicited to bomb the One Stop grocery store. Although Sweiss did not say anything in the conversation that directly incriminated himself, the government argued to the jury that his statements implicated him in the crime.
>
> In his opening and rebuttal arguments the prosecutor stressed the importance of the September conversation. He told the jury that "the big evidence against Moses Sweiss is his own words" from the September tape. The prosecutor argued that the September conversation showed that: (1) Moses Sweiss had solicited Faraj to commit the arson; (2) by implication Sweiss admitted that the solicitation conversation occurred; and (3) because Sweiss knew the details of Faraj's plans to flee the country he was a participant in those plans. The government also argued that an individual named Adnan [Eddie] Al-Abbasi had witnessed the solicitation conversation. Abbasi was a key government witness. His testimony fully corroborated Faraj's . . . testimony. Moreover, Abbasi testified that he witnessed Sweiss' offer of $5,000 to destroy the One Stop. Abbasi also testified as to another conversation with Sweiss concerning the destruction of the One Stop.
>
> The defense argues that the conversation recorded on August 14, 2918, shows that these contentions are not true. First, the defense argues that when Faraj initially told Sweiss during the August conversation that "everyone," including his "lawyer and all the Arabs," were pressuring him to name Moses Sweiss as the one who solicited Faraj to commit the arson, Sweiss clearly was shocked and strongly denied any involvement. Second, the defendant protests the prosecution's assertion that in the September conversation when Faraj mentioned a witness who would corroborate the solicitation conversation and Sweiss responded, "Do you mean Adnan?" (referring to Eddie Al-Abbasi's formal name), that this meant Sweiss knew of a witness. The defense argues that it was Faraj who volunteered Eddie as the corroborating witness, and that when he

7

did, Sweiss did not know whom Faraj was talking about. The defense also argues that in the August tape-recorded conversation, when Faraj first told Sweiss he would say there was a solicitation conversation, Sweiss strongly denied that such a conversation had occurred. Finally, the defense argues that in the September conversation Sweiss had knowledge of Faraj's plans to flee the country only because Faraj had told Sweiss of his travel plans during the August conversation. Sweiss' defense was, therefore, partly based on a theory that the information concerning the bombing solicitation, and the escape that he discussed in the September conversation, were told to him by Faraj during the August conversation.

Id. at 1209-10.

On appeal, the defendant argued that Rule 106 required the trial court to admit the recording of the August conversation. Id. at 1211. The court noted that the rule was "circumscribed by two qualifications," which were that "[t]he portions sought to be admitted (1) must be relevant to the issues and (2) only those parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted." Id. at 1211 (quoting United States v. Walker, 652 F.2d 708, 710 (7th Cir. 1981)). Noting that the Second and Third Circuits had "adopted and amplified" the test it had articulated in Walker, the court stated that

> [u]nder the doctrine of completeness, another writing or tape recording is "required to be read [or heard] if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." [*United States v.*] *Soures*, 736 F.2d [87,] 91 [(3d Cir. 1984), *cert. denied*, 469 U.S. 1161 . . . (1985)] (*citing* [*United States v.*] *Marin*, 669 F.2d [73,] 84 [(2d Cir. 1982)].

Id. at 1211-12.

Applying this test, the court held that the excluded August 1984 conversation, "while perhaps useful to the jury, was not *necessary to explain*

evidence already admitted," and thus that "Rule 106 was not implicated." <u>Id.</u> at 1212.

LeFevour and Sweiss involved recorded conversations. The Seventh Circuit's decision in <u>United States v. Velasco</u>, 953 F.2d 1467 (7th Cir. 1992) turned to facts more like the defendant's—Rule 106 applied to a post-arrest statement. In <u>Velasco</u>, the defendant sought to admit his entire post-arrest statement, in contrast to the government's request to admit portions of it, and cited Rule 106. <u>Id.</u> at 1474. The Seventh Circuit concluded that the portions of the statement which the defendant wanted to admit were not relevant to the issues in the case. It explained,

> Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. A fact of consequence critical to the government's case was defendant's guilty knowledge that he possessed cocaine. The prosecution had the testimony of the surveillance team members who observed Garcia-Caban and Velasco look into Garcia-Caban's trunk after Velasco had placed the booster cable box in it, but that alone would not establish that Garcia-Caban knew he possessed cocaine. Thus, the government offered that portion of the defendant's post-arrest statement wherein he stated, "The kilo of coke. [*Bruton* material deleted]. I opened the trunk [*Bruton* material deleted] there was a kilos [sic] there then I locked the trunk." . . . There is nothing in the portions of the defendant's post-arrest statement that he tried to admit under Rule 106 that make the fact of his guilty knowledge more probable or less probable. The unadmitted portions deal solely with the involvement of others, none of whom, with the except of Velasco, were relevant to the government's case. Indeed, the mention of those others might have confused or mislead the jury, which is in fact contrary to Rule 106's purpose to explain, qualify, or place the admitted portion in context.

> Our facts are not unlike those in *United States v. Dorrell*, 758 F.2d 427 (9th Cir. 1985). There, the defendant made a post-arrest statement in which he confessed to the acts charged and explained

his political and religious motivations for committing those acts. At his trial, Dorrell was precluded from offering the necessity defense, after which the trial court granted the government's motion to redact from his statement his explanation for his conduct. All that was left was his confession. Holding that the complete text of Dorrell's post-arrest statement was not required under Rule 106, the Ninth Circuit stated that "removing Dorrell's explanation of the political and religious motivations for his actions did not change the meaning of the portions of his confession submitted to the jury. The redaction did not alter the fact that he admitted committing the acts with which he was charged." *Id.* at 435. Here, the defendant argues that the unadmitted portions were necessary to explain his theory of the case. But as in *Dorrell*, these portions were neither relevant, nor necessary to explain his statement that he knew there was cocaine in his trunk. *See also United States v. Smith*, 794 F.2d 1333, 1336 (8th Cir.), *cert. denied,* 479 U.S. 938 . . . (1986) (Rule 106 inapplicable because unadmitted portions of defendant's post-arrest statement did not explain the facts disclosed through the admitted portion). We conclude, therefore, that the trial judge did not abuse her discretion to disallow the unadmitted portions of Garcia-Caban's post-arrest statement under Rule 106.

Id. at 1475-76.

United States v. Paladino, 401 F.3d 471 (7th Cir. 2005) involved the government's use of a redacted deposition—arguably like a redacted version of a post-arrest statement. A jury convicted Paladino and others of "a variety of federal crimes arising out of a scheme to defraud investors that succeeded in fleecing $11 million from the victims." Id. at 474. Years prior to being charged, the defendant had been deposed in an SEC proceeding, and "in the criminal trial the judge allowed the government to present a severely cropped version of the deposition in an effort to demonstrate his guilty knowledge." Id. at 476. On appeal, the Seventh Circuit found that in allowing the government to present the edited deposition, the trial judge violated Rule 106. Id. The court explained:

. . . An issue of great importance to Paladino's guilt or innocence was whether he knew that money in a certain account was money of

10

investors ("invested money" or "investment money")—which as soon as it was received was checked out to him and the other defendants without ever being invested—or proceeds of legitimate transactions ("trade money"). Asked at the deposition about his knowledge of the invested money, he said: "I learned that this money that's been coming in was investment money, and I was totally surprised because I assumed this whole time that this was trade money." The government put a period after "investment money" and deleted the rest of Paladino's answer. The difference between "I learned" and "I was surprised to learn" is subtle but potentially important; if Paladino wasn't surprised to learn that investor money was being misapplied, this would suggest that he had previous knowledge of the fraud, which he denied.

There were other harmful deletions. For example, handed during his deposition a "secured investor program agreement," Paladino said it "looks familiar" but added that he hadn't seen it until after the scheme had ended and the SEC had filed suit. The judge allowed the government to delete the addition even though, since Paladino's guilt depended on what he knew when, the date on which he first saw the document was crucial.

In permitting the government to make this and other misleading deletions, the trial judge violated Fed. R. Evid. 106, which provides, so far as bears on this case, that when one party introduces in evidence a part of a writing, his opponent "may require the introduction . . of any other part . . which ought in fairness to be considered contemporaneously with it."

Id. (citations omitted).

Six years later, the court again addressed Rule 106 in the context of a post-arrest statement. In United States v. Lewis, 641 F.3d 773 (7th Cir. 2011), an agent testified at trial about the defendant's post-arrest statement. On cross-examination, the defendant tried to ask the agent about portions of the statement to which the agent had not testified, to show that he'd not mentioned certain alleged co-actors in the statement. Id. at 784. The government objected on hearsay grounds, to which the defendant responded that he wasn't trying to admit the statements for the truth of the matter they

11

asserted. Id. "The judge upheld the government's objection, and pointed out that if [the defendant] wanted to advance a defense theory about what he knew or didn't know at the time, he was certainly welcome to do so by taking the stand." Id.

On appeal, the defendant argued that Rule 106 required the trial judge to overrule the government's objection and admit the statements. Id. at 785. The Seventh Circuit explained that

> Under [the doctrine of completeness], a complete statement is required to be read or heard when "it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding. *United States v. Sweiss*, 814 F.2d 1208, 1211-12 (7th Cir. 1987). "The completeness doctrine does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982).

Id.

The Lewis court concluded that the agent had not indicated on direct exam that the defendant had interacted with the co-actors about whom he was concerned, and that his effort to argue that certain portions of the agent's testimony might lead a jury to conclude that he had was "merely explanatory of his theory of the case." Id. The court disagreed that the doctrine of completeness required the trial judge to allow the defendant to elicit hearsay on cross. Id.

In early 2012, the court returned to the context of recorded statements. In United States v. Reese, 666 F.3d 1007 (7th Cir. 2012), the jury found the defendant (a building inspector for the City of Chicago) guilty of conspiracy to

commit bribery and making false statements to federal agents. The government

presented recordings of conversations in the fall of 2006 between the defendant

and a confidential informant. Id. at 1013. It also introduced "a month-by-

month summary of the number and duration of calls between [the defendant]

and his alleged coconspirators during 2005, 2006, and part of 2007." Id. On

appeal, the defendant argued that the trial court should have admitted

recordings from conversations he had in 2007 with one of his co-conspirators,

Romasanta, under Rule 106. Id. at 1019. After reciting the rule, the Seventh

Circuit explained that

> . . . [t]he purpose of the rule is "to prevent a party from misleading
> the jury by allowing into the record relevant portions of the excluded
> testimony which clarify or explain the part already received." *United
> States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996); *see also United
> States v. LeFevour*, 798 F.2d 977, 981 (7th Cir. 1986) (otherwise
> inadmissible evidence may be admissible under Rule 106 to correct
> a misleading impression or else the misleading impression must be
> excluded). Rule 106 also applies to oral, nonrecorded statements.
> [*United States v.*] *Price*, 516 F.3d [597,] 604 [(7th Cir. 2008)].
>
> To admit evidence under Rule 106, a court must find that the
> evidence is relevant to the issues of the case. *United States v.
> Velasco*, 953 F.2d 1467, 1474-75 (7th Cir. 1992). If the evidence is
> relevant, the court considers the following factors: whether (1) the
> proposed evidence explains the admitted evidence; (2) the proposed
> evidence places the admitted evidence in context; (3) admission of
> the proposed evidence will avoid misleading the trier of fact; and (4)
> admitting the proposed evidence will insure a fair and impartial
> understanding of all of the evidence. *Id.* at 1475; *see also United
> States v. Sweiss*, 814 F.2d 1208, 1211-12 (7th Cir. 1987).

Id.

Finally, in United States v. Vargas, 689 F.3d 867 (7th Cir. 2012)

(*abrogated on other grounds*, Burton v. City of Zion, 901 F.3d 772 (7th Cir.

2018)), the defendant evoked the rule of completeness in asking the court to rule that the trial court had erred by refusing to admit part of the video of his arrest in which, in the wake of being caught with a large sum of money at the site of a planned drug deal, he blurted out to arresting officers that he was there buying a truck. Id. at 871, 876. After discussing the rule of completeness, the Seventh Circuit stated that "a party cannot use the doctrine of completeness to circumvent Rule 803's exclusion of hearsay testimony." Id. at 876 (citing Lewis, 641 F. 3d at 785).[1]

B.    The Defense Requests

Against this backdrop, the defense asks the court to admit more of the content of the defendant's post-arrest interviews than the government seeks to admit. Dkt. No. 330. The defendant gave two statements after his arrest. The first began around 3:40 p.m. on January 25, 2016—the day of the machinegun/silencer purchase—as FBI agents Jonathan Adkins and Eric Frazier were driving the defendant from Pleasant Prairie, Wisconsin to Milwaukee. Dkt. No. 332. The second took place around 4:20 p.m. on the following day, January 26, at the FBI office in Milwaukee. Dkt. No. 332-1. Neither party asks to admit the entire transcripts of the interviews. Rather, the

---

[1] The defendant encourages the court to disregard this statement from Vargas, because the Seventh Circuit didn't decide the defendant's argument on Rule 106 grounds, but on whether the defendant's statement was an excited utterance under Fed. R. Evid. 803(2). Dkt. No. 352 at 4 n.1. The defendant is correct that the court didn't rely on Rule 106 to decide whether the defendant's statement about the truck should have come in, but that doesn't render inapplicable the court's observation that a party can't use Rule 106 to get around the fact that hearsay isn't admissible.

government has proposed those excerpts it seeks to admit, and the defendant has asked the court to supplement those excerpts, citing Rule 106 as the basis for its request. This decision addresses only the defendant's requests and how they relate (or do not) to the government's proposed excerpts.

1.   *January 25, 2016 interview*

From pages 9 and 25 of the recording of the January 25 interview in the car, the government has asked to present four short excerpts. The defendant asserts that Rule 106 requires that all seventeen pages—pages 9 through 25—should be played to the jury. Dkt. No. 330 at 7. He argues that if the court admits only the four excerpts the government proposes, it would leave the jury with the impression that the defendant wanted the guns for "offensive" purposes and for a reason other than "having fun," that the idea to obtain the machineguns was "all three of theirs," that the defendant was "in control of Steve and Mike" and that the defendant wanted an automatic rifle. Id. He also says that playing all seventeen pages "goes to why [the defendant] tried to buy the weapons through his friend 'Mike's' connections instead of a store." Id.

The government responds that the majority of the seventeen pages the defense seeks to admit consist of the defendant walking the agents through the gun purchase transaction; the government argues that the excerpts it has proposed are not incomplete, misleading or distorted and that the defendant's additions aren't necessary to explain or clarify its excerpts. Dkt. No. 336 at 3-4. The government did not object to the proposal that it add a few lines to the first excerpt on page 11. Id. at 4.

15

The first excerpt the government proposes is the following:

> MR. HAMZEH:    Because I just like weapons. I like carrying weapons. Like, just having fun, like shooting range and stuff like that. That's it.
>
> MR. ADKINS:    Okay.
>
> MR. HAMZEH:    That's all we planning on doing.
>
> MR. ADKINS:    All right.
>
> MR. HAMZEH:    Like, he told us—Moneser told us, like, we can go somewhere clear, nobody over there, we can shoot, we can just have fun. That's all the—what the idea about. I know we—we bought unlegally weapons, but this is the only bad thing we did.
>
> MR. ADKINS:    What you—so you knew it was not legal to buy it?
>
> MR. HAMZEH:    Yeah.

Dkt. No. 332 at 11, lines 1-17.

The government stated in its response that it had no objection to the defense request to add the next six lines:

> MR. ADKINS:    Why—why do it that way?
>
> MR. HAMZEH:    Why?
>
> MR. ADKINS:    Yeah?
>
> MR. HAMZEH:    Because it's cheaper and I don't have money to buy, like, legally one.

Id. at lines 18-23.

The defense asks to add page 9, lines 6-25 and all of page 10 that preceded this conversation. On those pages, the defendant tells Adkins that he didn't know anything about the men he bought the weapons from, that

16

"Moneser"—Mike—had the whole idea, but that he and Steve bought the weapons. The defendant also says that Mike has a gun, and that he, Mike and Steve went shooting. He reiterates that he and Steve bought the guns, although in response to Adkins' question about what kind of guns they were, the defendant says he didn't know.

These statements are relevant to the issue of whether the defendant intentionally purchased a machinegun. Most of the statements the defendant seeks to admit are relevant, given that most of the interview was about the purchase of the machineguns. The question is whether these preceding statements (1) explain the admitted evidence; (2) place the admitted evidence in context; (3) will avoid misleading the trier of fact; and (4) will insure a fair and impartial understanding of all the evidence.

The statements on pages 9 and 10 do not explain the portion the government will present. The government's proposed statements are clear—the defendant wanted the guns for fun, Mike said they could go shoot them somewhere "clear," the defendant admits buying them illegally, and says he did so because he couldn't afford to purchase them legally. The statements on pages 9 and 10 don't necessarily place those facts in context. The government's proposed statements are not misleading.

The defendant argues that the jury needs to know that buying the machineguns was Mike's idea, and that Mike was the one who had the connections. It argues, therefore, that the defendant's statement that buying

17

the guns was Mike's idea is necessary for the jury to have a fair and impartial understanding of all the evidence.

If the court had not allowed the defendant to present an entrapment defense, the defendant's argument might carry less weight. But because the court has allowed that defense, the parties will be asking the jury to determine whether it was the defendant's idea or Mike's (or Steve's) to buy machineguns, in the context of determining whether the defendant was predisposed to commit the charged offenses. That makes the defendant's assertion that buying guns was Mike's idea both relevant and necessary to a fair and impartial understanding of all the evidence.

***The court grants the defendant's request to include Dkt. No. 332, page 9, lines 6-23. It denies the defendant's request as to Dkt. No. 332, page 9, lines 24-25 and page 10.***

The defendant also asks the court to include page 11, lines 24-25, pages 13 and 14 and page 15, lines 1-12. Much of this is irrelevant (the agent encouraging the defendant to tell the truth) or consists of the defendant describing the transaction step by step. There are some bits, however, that are relevant and necessary to a fair and impartial understanding of the evidence. Page 12, lines 13-25, page 13 and page 14, line 1 include the defendant stating how much he paid for the guns, describing the gun he believed he was purchasing, stating that "we" weren't going to buy automatic weapons but admitting that "he"—presumably, the undercover agent who sold the guns— had explained what automatic weapons and silencers do. ***The court grants***

***the defendant's request as to Dkt. No. 332, page 12, lines 13-25, page 13***

***and page 14, line 1. The court denies the defendant's request as to page***

***14, lines 2-25 and page 15, lines 1-10.***

The next excerpt the government proposes is on page 15.

| | |
|---|---|
| MR. HAMZEH: | Because that's what we have. That's all the money we had. |
| MR. ADKINS: | Oh, you gave him every— |
| MR. HAMZEH: | Yea. That's (overlapping dialogue) that's all the money we have and we gave him all. |

Dkt. No. 332 at 15, lines 13-19.

The court notes that the government left out the question Agent Adkins

asked that solicited this answer. That question is at lines 11-12, and would be

helpful for the jury to understand why the defendant said, "Because that's all

we have." ***The court grants the defendant's request as to Dkt. No. 332,***

***page 15, lines 11-12.***

On the pages that follow, the agent asks the defendant about what the

gun seller explained to him about how the guns worked. In the process, the

defendant described how Mike got into the gun seller's truck and checked the

weapon because "he—he's the only one who knows about weapons . . . ." Dkt.

No. 332 at 17, lines 4-5. The defendant also indicates—contrary to what he'd

said before—that it was Mike who'd explained about how the machineguns

worked, not the seller. These portions of the statement are relevant and

necessary to the jury's understanding of all the evidence as it relates to the

entrapment defense. The lines that follow are a discussion of the undercover

19

agents and their truck, which is not relevant. ***The court grants the defendant's request as to Dkt. No. 332, page 15, lines 21-25; page 16; and page 17, lines 1-25 (the first word of line 25, "right," which is the end of Agent Adkins' statement, "All right."). The court denies the defendant's request as to Dkt. No. 332, page 17, line 25 (the remainder of the line after "right.") and page 18, lines 1-21.***

Starting at the bottom of page 18, the interview turns again to Mike being the "weapons expert," suggesting the purchase, going shooting, training. This is, of course, the defense—that it was all Mike's idea, and that the defendant was entrapped. If the court had not allowed the defendant to present this defense, arguably these lines would constitute inadmissible hearsay as to the defendant and would not be relevant to the question of whether he was guilty of buying the unregistered guns and silencer. But because the court has allowed the entrapment defense, these statements are relevant and necessary to a jury's understanding of all the evidence. ***The court grants the defendant's request as to Dkt. No. 332, p. 18, lines 22-25; page 19; and page 20, lines 1-13.***

The next portion of the interview is the defendant describing how the guns got into a bag, how he put them in the car, explaining how many weapons were in the bag. There also is an interruption when one of the agents receives a phone call. This portion does not clarify prior or upcoming statements. ***The court denies the defendant's request as to Dkt. No. 332, p. 20, lines 14-25; page 21; and page 22, lines 1-4.***

The next portion the government proposes to admit is on page 22.

MR. FRAZIER:     So you carried to the—to Moneser's car?

MR. HAMAZEH:     Yeah.

MR. FRAZIER:     And then where did you put it in the car?

MR. HAMZEH:     In the trunk.

MR. FRAZIER:     In the trunk?

MR. HAMZEH:     In the trunk.

MR. FRAZIER:     Okay. And then what happened?

MR. HAMZEH:     Then you guys came.

MR. FRAZIER:     Okay.

MR. HAMZEH:     Surprised us. Surprised us.

MR. FRAZIER:     Yeah. That is quite a surprise, isn't it?

MR. HAMZEH:     That's a good job, actually.

Dkt. No. 332 at page 22, lines 5-21.

The defendant has asked to present the remainder of page 22, pages 23 and 24 and the portion of page 25 that precedes the government's last proposed portion. In these pages, the defendant explains to the agents that Mike has a gun—a small one, like a handgun—that he carries when he does deliveries, to protect himself from robberies. The defendant denies he was buying machineguns to protect himself, and says that he was buying them to go shooting up north for fun. The agent asks the defendant about training, and the defendant denies that he is training for anything other than learning to shoot. These statements are relevant to the entrapment defense and put the

21

admitted statements in context. ***The court will grant the defendant's request as to Dkt. No. 332, page 22 lines 23-25; pages 23 and 24; and page 25, lines 1-12.***

This covers all the defendant's requests regarding the January 25, 2016 interview in the car on the way to Milwaukee. The government will admit two other portions. One immediately follows the portion the court allowed in the prior paragraph; in it, the defendant explains how he knows Steve and Mike, and what his relationship is with them. Dkt. No. 332 at p. 25, lines 13-25 and p. 26, lines 1-3. The other is a discussion of the defendant's fitness, or workout, routine. Dkt. No. 332 at p. 35, lines 20-25 and page 36, lines 1-3. (The government also will present the first fourteen lines of the recorded interview, dkt. no. 332 at p. 3, lines 1-14, to set the scene and introduce the participants.)

2.    *January 26, 2016 interview*

The defendant has proposed several additional portions of the January 26, 2016 interview that took place in the FBI office in Milwaukee. Some of these portions are adjacent to the government's proposed excerpts. Others are not. Particularly regarding the non-adjacent portions, the government argues that these excerpts can't provide context.

The defendant responded as follows:

> When it comes to the government's argument that these statements don't provide context, this point can't be lost: the government is using the statements in [the post-arrest interviews] to paint a picture of [the defendant], where he appears to take responsibility for the Masons and the weapons. Often the language used by [the defendant] and [Agent] Adkins in the government's

excerpts is vague or ambiguous about what they're talking about—
so it's not clear what they are talking about when they refer to the
idea or plan; was that idea Steve's, Mike's or [the defendant's] or all
three of them? And more importantly what is the "idea" or "plan"
that Adkins and [the defendant] are referring to—the Masons, the
guns, or both? To clarify what [the defendant's] statement
concerning those points mean, we need the audio statements and
video statements that the gun idea was Mike's. [The defendant] was
clear on that in the beginning and then again throughout. But the
government's excerpts could be construed as him claiming equal
responsibility or taking sole responsibility for the guns. Since this
case is about entrapment for a machine gun and not entrapment as
to the Masons's, the additional statements that the defense seeks to
admit are critical to avoid a misimpression about what [the
defendant] was admitting to.

Dkt. no. 352 at 4-5.

The government plans to put in the first eight lines, setting the scene,
and five lines in which the defendant explains to Agent Adkins why he wanted
an automatic weapon. The defendant proposed to add the lines between those
two segments, as well as twenty-one lines after, in which the defendant
explains why he didn't buy the guns from a gun store, states that the "other
guys" would also say they were buying the guns for fun, and asserts that they
were not going to shoot the guns in the city but were going to take them up
north. As noted, the government originally did not object to these additions,
but after the court's October 16, 2019 ruling excluding certain recorded
conversations proposed by the government (dkt. no. 342), the government
objected to the court admitting any of the defendant's statements from the two
interviews if offered by the defendant. Dkt. No. 355 at 2.

The court doesn't know whether this means that the government now
objects to the inclusion of Dkt. No. 332-1, page 2 lines 4-22 and page 3, lines

3-24—portions to which it previously had not objected. But the court will grant the defendant's request as to these portions. One of them—the one on page 2— is another instance of the defendant asserting that he didn't have the money to buy guns legally. The other is a repetition of his claim that he wanted the guns for fun, for shooting out in the woods, and a denial that he was going to shoot them in the city. The government is right that these statements are substantive as they relate to the defendant's theory of the defense, and that the defendant likely is going to argue that the statements are true. But they relate to the defendant's state of mind regarding entrapment. The government is free to argue—as it undoubtedly will—that the statements were untruthful and self-serving and were contradicted by other record evidence.

**The court will grant the defendant's request as to Dkt. No. 332-1, page 2, lines 4-22 and page 3, lines 3-24.**

The government next will admit a portion where the defendant says that he bought the guns because he liked weapons, but tells the agent that his mother would never see it because she would throw it out. The defense proposed to include several lines prior—not completely adjacent, because the parties leave out three lines in between, but on the same topic. In the lines the defense proposes, the agent asks the defendant where he was going to keep the guns. The defendant first says he was going to keep them at Mike's (because Mike has his own house and car), but then says that to be honest, he was going to keep them in his basement. The government objects to the admission of these lines, arguing that they do not clarify the defendant's statements about

24

his mother never seeing the gun. The court agrees. The jury does not need to know where the defendant first proposed to keep the guns, or that he changed his mind, or that he was talking about putting the guns in the basement. The agent asked only how the defendant's mother would react if he brought a weapon "into the house." ***The court will deny the defendant's request as to Dkt. No. 332-1, page 4 lines 19-25 and page 5, lines 1-3.***

The government's next portion involves the defendant telling the agents that he had applied to work for the Army; the defendant has not proposed any additions.

The government next proposes a portion in which the defendant discusses where he went to school and what he studied. The defendant proposed the addition of two lines before the section and five lines after, to clarify that the defendant didn't finish school or earn the degrees or certificates he sought. The government did not object in the first instance, and the court agrees that these statements provide a more complete picture of the defendant's educational situation (relevant because of the defendant's argument that he was particularly susceptible to inducement, given his cognitive abilities and educational level). ***The court will grant the defendant's request as to Dkt. No. 332-1, page 13 lines 21-22; page 14, lines 22-25; and page 15, lines 1-3.***

The government's next excerpt consists of the agent making sure the defendant was comfortable and had water. The defendant proposed no additions.

The defendant asks to admit an excerpt that is not adjacent to any of the government's proposed portions. When the agent enquires whether he's ever purchased a gun before, the defendant says that the first time he shot was with Mike, that Mike took him to the range, that they used Mike's gun, and that the defendant didn't have any weapons of his own. These statements are relevant to predisposition and inducement. The government is correct that they are substantive. It is likely correct that the defendant wants them admitted for the truth, to support his theory of the defense. It may be correct that they are "falsely" exculpatory. If the court had not allowed the entrapment defense, these statements would be irrelevant. Because it has, the statements are relevant and allow the jury to fairly and impartially view all the evidence. ***The court will grant the defendant's request as to Dkt. No. 332-1 at p. 20, lines 21-25; page 21; and page 22, lines 1-6.***

In its October 16, 2019 ruling on the government's proposed portions of the recorded conversations, the court excluded most, if not all, conversations in which the defendant talked about traveling to Jordan, Israel or Palestine using his American passport, and how it was easier to get to those countries with an American passport. The government proposed a segment of the interview that discusses the defendant's passport, and the defendant proposed an additional portion (to which the government did not originally object). Given the court's rulings on the recorded conversation, these portions of the post-arrest statement are no longer relevant. ***The court will exclude Dkt. No. 332-1,***

*page 23 lines 2-25 and page 24, lines 1-13. The court will deny the*
*defendant's request as to Dkt. No. 332-1, page 25 lines 15-25.*

From pages 26 through 56, the government proposes only a few short segments where the agents ensure the defendant's comfort—giving him a restroom break, ensuring that he's still speaking voluntarily and adjusting his handcuffs. The defendant proposed no additions to these portions.

The government proposed a short segment where the agent asked the defendant if he felt "close to Palestine," and the defendant responded that he did because it was his nationality, that "we" lived there since 1948 but left to go to Jordan but that Jordan was not "our" country and that "we" were living here. It is not clear whether by "we" the defendant means his family or people of Arab descent. It is not clear whether his reference to 1948 means that his family lived in Palestine in 1948, or whether he means to refer to people of Arab descent living in the area since 1948 (during the first war of the Arab-Israeli conflict). The court has excluded some conversations in which the defendant talked of going to the Middle East, but not all of them. The court allowed some conversations where the defendant discussed going to Palestine. This comment provides some context for those conversations. The court will not exclude this statement, but it notes that the parties have argued that they need to present expert witnesses to educate the jury on the Israeli-Palestinian conflict and the relationship between persons of Arab descent and Israelis and/or Jewish people. The fact that the court is allowing this brief statement to remain does

not change the court's ruling barring the parties from presenting expert witness testimony on this topic.

The defense asks to present another non-contiguous segment in which the defendant says that Mike put the idea of guns in his head, that he wanted a gun because he saw Mike's, that he asked Mike a lot about the gun and how to buy a gun, and about what Mike told him about buying guns. The defendant includes in this segment the agent's acknowledgment of the defendant's admission that buying the guns was his fault and that he made a mistake. The government reiterates that these statements do not explain anything that comes before or after, and that this is nothing more than a "false exculpatory" statement. While this statement is separated by a page from the next segment the government seeks to admit, it is relevant to that statement. In the next segment the government seeks to admit, the agent asks the defendant why the men didn't just go to a gun store and buy a cheap, legal gun. The defendant responds in the same vein as he does in the segment the defendant asks to admit (albeit without stating that Mike put the idea in his head), talking about the cost of buying legal weapons and the fact that he liked the guns. It is true that the defendant appears to "talk out of different sides of his mouth" in these two excerpts—in one, he says this was Mike's idea and the defendant just wanted a gun to protect him on deliveries, but in the other says he bought the guns on the 25th because he liked them. It will be up to the jury to decide which, if either, of those statements is true. ***The court will grant the***

28

***defendant's request as to Dkt. No. 332-1, page 57 lines 17-25 and page 58, lines 1-11.***

Over pages 59-65, the government proposes two excerpts in which the agent tells the defendant that he's heard rumors that the defendant, Mike and Steve were "planning something." The defendant denies this and reiterates that they wanted the guns to go up north and have fun. The defendant proposed to add six adjacent lines in which the defendant explained that the men were planning to go up north right after buying the guns, and that Mike told them they'd be traveling over six hours north. The government did not object to this addition originally. The additional lines are necessary under Rule 106 to make clear that the defendant wasn't talking about (or claims he wasn't talking about) some hypothetical future someday. ***The court will grant the defendant's request as to Dkt. No. 332-1, page 65 lines 1-6.***

The defendant next proposes a non-adjacent excerpt in which the defendant explains to the agent how he talked to the Imam, related to Steve and Mike what the Imam had told him, how Steve and Mike didn't believe him, how he contacted his uncle on Facebook and how his uncle said going to the Masonic Center was not good. The government argues that this excerpt doesn't complete or explain anything that comes before or after and that it is hearsay that the defendant seeks to admit for the truth. The government sought to present a recorded conversation in which the defendant discusses what he learned from the Imam. See Dkt. No. 342 at 46 (relating to Disk No. 99, page 15 line 2 to page 16 line 19), and the court did not exclude that conversation.

29

The defendant has argued that the fact that the refused to participate in an attack on the Masonic Center after talking to the Imam goes to predisposition.

This portion raises a tangle of issues. The court discussed in its October 16, 2019 ruling (dkt. no. 342) that the government believes that the defendant plotted to commit a mass murder at the Masonic Center, but that the government did not charge the defendant with that plot. It discussed the fact that the government's failure to charge the defendant with the Masonic Center plot was not error or negligence or accident on the government's part; due to the state of federal criminal law the government *could not* charge the defendant with the plot. Acknowledging that, the court nonetheless concluded in the October 16 order that many of the conversations the government sought to admit may have showed predisposition to commit a mass attack, but did not necessarily show a predisposition to commit the *charged* offenses of possessing unregistered machineguns and a silencer. The court also concluded that some of the recorded statements in which the defendant, Steve and Mike discussed the details of the proposed plot were so unduly prejudicial and inflammatory that they would tempt a jury to convict him of an offense with which he had not been charged.

The defendant's argument that he backed out of the attack plot on the advice of the Imam is relevant to whether he was predisposed to go through with the attack. But it is less relevant to whether he was predisposed to buy the machineguns. This is a thin line—the government asserts that the defendant wanted the machineguns so that he could attack the Masonic

Center. But the court has ruled that motive isn't a necessary element and is irrelevant to the charged offenses, so the defendant having changed his mind about the attack is also less relevant to the charged offenses.

That said, the government also seeks to present portions of the interview in which the defendant explains why the men targeted a Masonic center, who made the plan. The government also did not object to the defendant's request to put in a discussion of what the defendant told the Imam, and how the Imam responded. And, as the court noted in its October 16 decision, the jury will know that the defendant participated in plans to attack the Masonic Center, even though the jury will not hear some of the more inflammatory discussions of the details of that plan.

While a plan to attack a Masonic Center may not necessarily show predisposition to buy machineguns, the facts are related. Because the jury will hear—and should hear—that the defendant's participation of the purchase of machineguns related in some way to his discussion of an attack on the Masonic Center, the facts relating to his discussions with the Imam are relevant. There is also far more about the discussion with the Imam in the interview than either party seeks to admit. The discussion starts at page 74, when the defendant explains that before going through with the attack, he wanted to find out whether it was "against our religion" and he decided to go to his mosque. Dkt. No. 332-1 at 74 lines 1-12. It continues through page 90, then comes up again on pages 94 through 99. Throughout these same pages, the defendant discusses the YouTube videos he saw where he learned (he says)

31

that the Masons kidnapped people and were associated with the devil and killed people. Between them, the parties seek to introduce only portions of this extensive discussion that go to the heart of what the government says is the defendant's clear intention to commit the attack, and what the defense says is a wild, misbegotten scheme based on misinformation that the defendant abandoned after talking to a religious leader.

The jury is going to hear about the attack on the Masonic Center, the videos and the defendant's purported change of heart. The excerpts he proposes relate to those issues. They are exculpatory—they may be falsely exculpatory. The government may seek to introduce more of the post-arrest statement given the court's ruling on this issue, and the court will entertain such a request. But the court will allow some of the defendant's additions.

**_The court will grant the defendant's request as to Dkt. No. 332-1, page 76 lines 18-25; page 77; and page 78 lines 1-13._**

**_The court will deny the defendant's request as to Dkt. No. 332-1, page 79 lines 2-12._** (This segment is adjacent to a segment in which the agent asks the defendant, "Why a Masonic Center?" In the preceding lines, the agent asks the defendant "Why—first of all, what Masonic Center?" and the defendant responds, "In Indiana." Id. at lines 2-12. In its October 16 ruling the court excluded the conversation about a possible attack on a Masonic Center in Indiana, at the defendant's request.)

**_The court will grant the defendant's request as to Dkt. No. 332-1, page 82 lines 7-16 and lines 22-25, as well as page 83, lines 1-8._**

32

***The court will deny the defendant's request as to Dkt. No. 332-1, page 85 lines 7-25 and page 85, lines 1-6; this is a cumulative repetition of the above portions.***

***The court will deny the defendant's request as to Dkt. No. 332-1, page 88 lines 17-23.***

***The court will grant the defendant's request (to which the government did not object when first proposed) as to Dkt. No. 332-1, page 88, lines 24-25; page 89; and page 90 lines 1-13.***

In its "omnibus memorandum re: statements" filed on October 18, 2019, the defense proposed another addition that it had not proposed originally. Dkt. No. 352 at 6. It proposed to add several lines from pages 94-95 of the interview, in which the defendant says that he thought if he committed the attack he'd go to heaven, but that he later concluded that it was wrong, and that even if the Imam told him to do it, he wouldn't do it. Id. The defendant says that this is necessary "to clarify the government's Exhibit 16Q, where Adkins asks about the Masons and Hamzeh says 'if we kill it, this is legal.'" Id. The defendant defines "16Q" as "Ex. B. to R. 300 at 79." Id.

Dkt. No. 300 is the government's brief regarding positional predisposition. There are no exhibits attached to it. The government's exhibit list, Dkt. No. 290-2, identifies Exhibit 16Q as "clip #15" of the defendant's post-arrest interview. This portion of the interview appears at page 79, lines 13-22. In this excerpt (which the government will present), the defendant explains that the Masons are the ones who believed in the devil and that that was against

Islam. He tells the agent that "what we thought about the devil in the [Qu'ran] and they talked about it a lot, and if we kill it, this is legal, like, in our—in our religion." Dkt. No. 332-1 at 79, lines 20-22.

The court first notes that the government's proposed segment ends in the middle of a sentence, before a comma. Rule 106 requires that the government put in the full sentence—". . . this is legal, like, in our—in our religion"—rather than ending at "this is legal." Id. at line 22.

Given that, the excerpt the defendant proposes at pages 94 and 95 is cumulative. It is additional explanation for why he originally thought the attack was "legal" in the religious sense—he explains that he thought he'd go to heaven if he did it and he died. Dkt. No. 332-1 at p. 94 lines 14-19. More to the point, however, if the court allows the presentation of this excerpt, it opens a can of worms that the defense itself has asked the court to keep firmly closed. On page 95 at lines 4-5, the defendant tells the agent, "Like even if Iman [sic] told me, like even if he told me go do it, I'm not going to do it." Two pages later, the agent asks the defendant what he thinks would have happened if the Imam had said "that was okay." Dkt. No. 332-1 at 97, lines 11-14. The defendant responds, "I'm going to do it." Id. at line 15. The agent states, "You would have done it." Id. at line 16. The defendant then tells the agent that because the Imam said no, he believed him. The defendant explains that he prays five times a day, tries to live his life in a way that will get him to heaven, and that he would have believed the Imam because the Imam knows more about religion. Id. at lines 17-25; page 98 at lines 1-6.

34

The defendant objects to the admission of the defendant's statement that if the Imam had said it was okay, the defendant would have "do[ne] it." He argues that it is speculative, highly inflammatory and unduly prejudicial. The government says there is no legal basis for excluding the statement, that it goes to predisposition and motive to acquire weapons and that "Hamzeh's desires and plans (even if not brought to fruition) are central to this case." Dkt. No. 336 at 10. The government says that the defendant has put his own predisposition at issue. <u>Id.</u> It also asserts that this statement shows that the earlier statement that the defendant *wouldn't* have done it had the Imam told him to was a lie (even though the government didn't propose to introduce that portion of the interview). <u>Id.</u> at 11. The government says this statement will rebut the defendant's attempt to show that he has cognitive disfunction, and to rebut the claim that the defendant was not serious about committing the attack. <u>Id.</u>

The court will not allow either party to wade into the quagmire of the defendant's post-arrest speculation as to whether he would or would not have committed the attack if the Imam had told him not to. The government will produce evidence supporting its position that the defendant planned to commit the attack. The defendant may try to rebut that evidence, or may produce evidence in rebuttal showing either that he didn't plan to participate in an attack, or that he did but changed his mind. After-the-fact speculation about what the defendant might or might not have done if circumstances had been

different is irrelevant to predisposition or inducement or to whether the defendant is guilty of the offenses with which he's been charged.

**The court will deny the defendant's request as to Dkt. No. 332-1, page 94 lines 14-25 and page 95 lines 1-8.**

**The court will deny the defendant's request as to Dkt. No. 332-1, page 96 lines 20-25 and page 97 lines 1-10.** (This information is cumulative—the defendant again explaining that he was worried about going to hell or heaven, and the Imam and his uncle told him he'd go to hell and his friends didn't believe him.)

**The court will exclude Dkt. No. 332-1, page 97 lines 11-16.**

**Because the court has excluded page 97 lines 11-16, the court will not grant the defendant's request as to page 97 lines 17-25 and page 98 lines 1-6.**

The government will put in an excerpt in which the defendant says that nobody told him "to do this." Dkt. No. 332-1, page 98 lines 7-11. The defendant seeks to put in bookending statements (one of which is not strictly adjacent) where the defendant explains that he decided on the Masonic Center because of videos he saw on YouTube. The government originally did not object to one of these statements—the one on pages 98-99. These statements are relevant to, and provide context for, the defendant's answer that no one told him to attack the Masonic Center.

**The court will grant the defendant's request as to Dkt. No. 332-1, page 95 lines 18-25 and page 96, lines 1-16.**

36

***The court will grant the defendant's request as to Dkt. No. 332-1,
page 98 lines 12-25 and page 99, line 1.***

The government will introduce several lines in which the defendant tells
the agent that Mike and Steve were listening to him, that he was more religious
than they were and that they believed him and did anything he wanted; the
defendant told the agent that he "controlled" Steve and Mike. Dkt. No. 332-1 at
pages 103-104. The defendant asks to put an extended excerpt in which the
defendant again explains about going to the mosque, talking to the Imam,
reporting back to Mike and Steve what the Imam said, Mike and Steve not
believing him, and the fact that if one Imam had told him to do it, he'd ask
another Imam.

The court agrees with the government that the excerpt the defendant
wishes to admit doesn't really address or explain the defendant's statement
that he controlled the informants. The statement the defendant seeks to admit
is repetitive of portions the court already has allowed. Finally, the next portion
the government seeks to admit addresses this issue.

***The court will deny the defendant's request as to Dkt. No. 332-1,
page 104 lines 15-25; page 105; and page 106 lines 1-7.***

The government proposes to admit a segment in which the defendant
says he was a "regular person" before seeing the YouTube videos, then he got
ideas, he told Steve and Mike about the ideas, then he stopped it. He says he
watches videos about how extremist groups kill people and shoot children and
mentions that the videos show a link between ISIS and the Masons. Dkt. No.

37

332-1 at pages 108-109. The defense asks to add eight additional lines, where the defendant says he's seen a lot of videos and that he's 100% against ISIS. The government didn't object originally, and under Rule 106, the additional lines give the defendant's complete statement on the issue.

***The court will grant the defendant's request as to Dkt. No. 332-1, page 109 lines 18-25.***

Finally, the government will admit six lines where the agent questions the defendant about spending his hard-earned money to buy bigger, better guns only for the purpose of going up north. Id. at page 114. These questions were in response to the defendant denying that an attack was ever going to happen and that he just wanted the guns to go shooting up north, and the defendant seeks to add those statements. The government did not originally object, and the statements the defendant seeks to admit put the agent's questions, and the defendant's answers, in context.

***The court will grant the defendant's request as to Dkt. No. 332-1, page 114 at lines 11-17.***

C.      Conclusion

The government asked to adjourn the start of the trial by two days, to give it the opportunity to determine whether it would seek leave to appeal some of the court's earlier evidentiary rulings, particularly the October 16, 2019 ruling. The court provides this ruling pretrial so that the government can consider whether it impacts the decision about whether to seek leave to appeal;

the court assumes that if the government does seek, and receive, such leave, it will include any challenges to this ruling in that appeal.

Dated in Milwaukee, Wisconsin this 21st day of October, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**