UNITED STATES OF AMERICA,

       *Plaintiff*,

                                            Case No. 16-cr-21-PP

*vs*.

SAMY M. HAMZEH,

       *Defendant*.

## BRIEF IN RESPONSE TO THE COURT OF APPEALS' DECISION

Samy Hamzeh, by counsel, files this brief in response to the court of appeals decision.

### I.    Introduction

The court of appeals reversed the Court's order (R.342) and remanded for it to re-examine the statements it had previously excluded. The court of appeals' decision makes six rulings on specific statements or categories of statements that the Court must revaluate. They concern: when Hamzeh formed his intent; that he claimed he wanted to do a mass attack; that he rebuffed Steve's efforts to dissuade him; that he was predisposed to get a silencer; the statements concerning the type of weapon he wanted; and two post-arrest statements. *See United States v. Hamzeh,* 986 F.3d 1048 (7th Cir. 2021). These are the pertinent specific rulings the court of appeals made:

| Short hand description | Seventh Circuit's holding |
|---|---|
| when he got intent | "For example, the court excluded a conversation in which Hamzeh stated it was his 'intention a long time ago' to martyr himself. It found the statement irrelevant concerning predisposition. Under *Mayfield* and its progeny, a defendant's statement about when his intent to use a weapon was formed is certainly relevant." *Id.* at 1053. |
| That wanted to do a mass attack. | "If believed by the jury, the fact Hamzeh wanted to commit a mass attack is evidence he was predisposed to obtain the weapons necessary to do so." *Id.* at 1054. |
| Silencer predisposition. | "The Government can introduce this evidence to show Hamzeh's predisposition to obtain a silencer as evidence bearing on the second element of the offense." *Id.* |
| Type of weapon he wanted | "The court also excluded a passage in which Hamzeh discussed what type of weapons he sought to acquire." *Id.* ("Listen what we need from these people, two machine guns, and three silencers and three magazines," *see* Ex. A, 52.C. 1). |
| Reluctance or that Steve tried to dissuade Hamzeh. | "[T]he court excluded a recording of informant Steve telling Hamzeh he should not simply postpone his plans but should "[g]et the whole idea out of [his] head."…. These statements clearly bear on the governmental inducement prong of the entrapment defense, in which repeated attempts at persuasion is a factor. The Government can introduce this evidence to show Steve attempted to dissuade Hamzeh from carrying out an attack, and necessarily from acquiring the weapons to do so." *Id.* |
| Post arrest statements | "These rulings fall victim to the same evidentiary errors as the rulings regarding recorded conversations with the informants (found in the order entered October 16, 2019)." *Id.* at 1057 |

In response to the decision, the parties have gone through the precise statements cited by the court of appeals and agreed that those should be admitted. There are additional

statements that relate or fall within the same category as those identified by the court of appeals that the parties have also agreed should be admitted. And then there are statements that the parties agree should be excluded. From this back-and-forth there are about eighty statements that the parties agree don't need to be addressed on remand and about fifty that the Court will have to rule upon.

To make it easier for the Court and the parties, the defense has constructed the chart in Ex. A. It breaks down each of the government's proposed transcripts by this Court's prior order. So if in its order this Court divided a proposed statement into three parts, then each was given a letter (16A, 16B, 16C) and on the chart the ruling or objection follows that division. For instance 16A, the parties agree it should be excluded; 16B, the Court previously admitted the statement (so it comes in); and 16C is the parties agree it should be excluded. Here's what it looks like in the chart:

| 16 | D.22 | A | 43:8-14 | • The parties agree to exclude the statement. |
|----|------|---|---------|-----------------------------------------------|
|    |      | B | 43:15-40 | • The court previously admitted the statement. |
|    |      | C | 43:42   | • The parties agree to exclude the statement. |

For those statements where there is a disagreement between the parties, that too is easily identified; it's highlighted and the position is quickly set out. Here's an example:

| 10 | D.22 | 34:30-35 | • Defense: The Court correctly ruled on the risk of unfair prejudice and the lack of relevancy. The statements is a stand-alone statement about his prayer for martyrdom. It has no context and no bearing on predisposition, while being highly inflammatory. |
|----|------|----------|---|
|    |      |          | • Government: Disagree; now admissible per Seventh Circuit. |

3

The chart in Exhibit A should (both sides hope) make this task easy to track and quickly identify the points that the Court has to consider and rule upon. The rest of this brief, simply highlights a few important points (from the defense's perspective) for the Court to consider when making these rulings. The defense shared the final chart with the government before filing this brief, and it agreed that the parties' positions are accurately reflected.

> **II.    The court of appeals opinion does not command that all of the government's statements come into evidence**.

As noted above, the Seventh Circuit identified six statements or groups of statements that it found relevant and that needed to be re-examined. Three of those categories are fully satisfied by the parties' agreement. For instance, using the short-hand descriptions listed above, the statements relating to "the type of weapon Hamzeh wanted," "silencer predisposition" and "reluctance," are now in evidence. *See* Tr. 52.C.1. (type of weapon); Tr. 45.D (silencer); Tr. 5.B (reluctance). That leaves two categories of evidence identified by the court of appeals that are harder to define and where some of the parties' disagreement stems from. Those categories are: "that Hamzeh wanted to do a mass attack" and "when he got his intent." These categories are more inflammatory, more likely to be unfairly prejudicial, and raise concerns about being cumulative. Each category is addressed separately. And at the end of this brief, the defense addresses the sixth category of statements -- Hamzeh's two post-arrest statements that the court of appeals said must be re-evaluated under Rule 403.

4

### A. Statements about a mass attack are already admitted and their abundance means that many are not just cumulative but become unfairly prejudicial.

The Seventh Circuit held: "If believed by the jury, the fact Hamzeh wanted to commit a mass attack is evidence he was predisposed to obtain the weapons necessary to do so." *Hamzeh*, 986 F.3d at 1054. The record is now replete with evidence about Hamzeh's claims about committing a mass attack. From the defense's perspective, the question is where the breaking point lies between the statements becoming cumulative and (more importantly) unfairly prejudicial. There are twelve statements that will be admitted that relate to Hamzeh's claims about committing a mass attack. Here they are:

- "God willing, I'm saying if God facilitates my affairs, and if He does not, at least I will buy a weapon and start hunting them. I am going there to do something. I am not going there to fool around." 1.H.(D.117:1–3).

- "I will start spraying them. Yes I will be a suicide attacker." 1.S (D.16:33–36).

- "If things do not work out, I'll either buy a handgun or find an explosive belt." 1.K (D11:12–13).

- "If both of us go in with handguns and shoot the four, we will take the Kalashnikovs and go in, spray as much as you can. A lot of people are inside and they are all Jews." Tr.22.C (D.25. 17:1–9).

- "Are we going to hunt soldiers . . . . of course." 1.F (D.114:42–46).

- "You spray five or six at the same time" . . . "I am telling you, when you shoot … They walk in groups, the Jews."18B(D.22 53:34–45).

- "If both of us go in with handguns and shoot the four, we will take the Kalashnikovs and go in, spray as much as you can. A lot of people are inside and they are all Jews."22A (D.25:1–9)

- "We kill two and two. You kill two and I kill two; you take their machineguns and go inside, for about from here to that fire extinguisher over there" . . . . "before you

get to the temples and people. You go in, take out the Kalashnikov and go: bang, bang, bang and fuck them all up; all of them." Tr. 23 (D.30 26:9–21).

- "Fuck them, quickly and quietly, quietly. Each one will grab a group, shoot them and get ourselves out walking not even running." Tr. 35

- "My dear-- my dear; I swear that if the three of us were to carry machineguns we would finish them off in 10 minutes, so why don't you just be quiet." Tr. 43. (D.79 80:30–32).

- "The nice thing about those weapons is that you can switch it. You can make it single bullet or multi-bullets. That means if we got in and found 30 or 40 persons, you switch it to auto." Tr. 48. (D.86 18:9–40).

- "You should secure it and put it on your belt and place your blouse on it. As soon as we enter into the building, put the hats and start. Each one will take his weapon and spray those who are in front of him." Tr. 45 (D.84A p. 37).

Once the jury hears that Hamzeh talked about committing a mass attack four or five times, the point has been established: the government has a strong factual foundation to argue he was "predisposed to obtain the weapons necessary to do so." *Hamzeh,* 986 F.3d at 1054. And when it comes to establishing that point, the government has twelve statements coming into evidence not just cementing the point, but reinforcing it with rebar.

Since the government already has evidence of a mass attack to argue predisposition, the question for this Court is when it becomes inadmissible because it is cumulative and unfairly prejudicial. Placing an additional three or five or (in this case) twenty statements about mass shootings will simply overwhelm the jury with evidence that Hamzeh is a bad and scary person who frightens them and that he'll be convicted on that basis alone. "There is a real danger that such evidence, dumped without restraint into the record, can lead a jury to convict a defendant not on the basis of proof of the

6

Federal Defender Services
of Wisconsin, Inc.
Case 2:16-cr-00021-PP   Filed 10/26/21   Page 6 of 12   Document 401

crime with which he has been charged, but for simply being a bad person." *United States v. Earls*, 704 F.3d 466, 471 (7th Cir. 2012) (cleaned up). The Court recognized this in its original order, stating, for example, that while "the defendant's descriptions of killing people were arguably racist, violent and disturbing, the court must try to ensure that a jury would not be tempted to convict the defendant for racist, violent and disturbing talk, rather than focusing on whether the government proved the elements of possession of unregistered firearms and a silencer beyond a reasonable doubt." R. 342:10.

To avoid that, the Court has to balance the needs of the government to establish "that Hamzeh was predisposed to get the weapons to do a mass shooting" with Hamzeh's right to not to be unfairly prejudiced by the evidence. The Court did that throughout many of its original rulings. The Seventh Circuit's focus went to references in the orders where this Court observed that the evidence was of little or no probative value and ascribed error to that holding. But that's only part of the analysis, and for many of these statements, the Court also reached the issue of prejudice. Reviewing these statements (two years later) the defense submits that the same conclusion under Rule 403 should apply as it did originally. After all, the Seventh Circuit's holding that these are relevant, doesn't mean that *all* of the statements about a mass killing have to be admitted. *See Hamzeh*, 986 F.3d at 1056, n. 11; *see also id.* at 1056 ("We leave the Rule 403 determination, consistent with this opinion, in the district court's sound discretion.").

The Rule 403 balancing demands that the Court look at the probative value against the risk of unfair prejudice, and "[t]he probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point."

7

Federal Defender Services
of Wisconsin, Inc.

*Old Chief v. United States*, 519 U.S. 172, 185 (1997). In considering whether to exclude evidence on grounds of unfair prejudice, the availability of other evidence is an appropriate factor to consider. *Id.* at 184. After all, the Supreme Court has observed that where alternative evidence has "substantially the same or greater probative value but a lower danger of unfair prejudice, *sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk.*" *Id.* at 183 (emphasis added). That's precisely why the twelve statements that are already admitted about mass killings are sufficient for the jury to consider that Hamzeh was predisposed. Here, more than anything, the evidence of predisposition is already established with other (less inflammatory) statements than many of the gruesome statements addressed in Ex. A. After all, the government is not entitled to "structure a trial in whatever way would produce the maximum unfair prejudice consistent with relevance." *Id.* And as the Court works through these statements that principle should mandate that many of the statements the government seeks to admit should continue to be kept out under Rule 403's balancing.

    **B. The statements about when Hamzeh got his intent are already admitted and other statements can't be shoehorned into that category.**

The parties agree that the explicit statement that the court of appeals identified about "when his intent to use a weapon was formed" is admissible. *See* Transcript 18C.2. The challenge is in identifying whether anything else is actually covered by that category. This is a harder category to capture than the mass-killing one and the defense has identified statements that come close that category. *See* Transcript 24 (Disk 30 Tr. 29:30–

8

Federal Defender Services
of Wisconsin, Inc.

35) ("He calls me every once in a while. He asks: 'what is going on with you?' 'What is happening with you?' and I keep telling him, my family and stuff like that… *and I am working… a little bit longer, a little bit longer, I keep postponing it, I keep postponing it*. But in doing this I would look like! As if I want to. Are you with me?" (emphasis added)). The problem is that many statements that the government seeks to admit have nothing to do with Hamzeh purportedly forming his intent "a long time ago." *See e.g.,* Transcript 29 (insulting various nationalities); *Id.* 34A (vague statements without context); *Id.* 22B (statements about entering Jerusalem); *id.* 20 (statements about avoiding detection in Israel). They don't fall within any of the categories that the Seventh Circuit identified as needing another look.

Throughout the chart the defense has tried to identify and object to statements that don't fall within the categories addressed by the court of appeals. *See, e.g., id.* Instead, they are just an attempted do-over of the statements this Court originally rejected for reasons as varied as vague, without context, irrelevant, bigoted, and unfairly prejudicial—and those rulings are not disturbed by the Seventh Circuit's decision. *Id.* at 1056, n.11 (noting "[t]he Government argues we should rule all its evidence admissible due to the court's legal errors. But, such a remedy ignores any rulings within the court's discretion—for example, the court was well within its discretion to exclude Hamzeh's racist comments about African Americans and the fact he expected to be considered a terrorist if caught."). Thus, those rulings should stand and do not (in the defense's view) need to be revisited.

9

**C. The Seventh Circuit's decision's effect on Hamzeh's post-arrest statements.**

In its decision, the Seventh Circuit noted two instances in Hamzeh's post-arrest statements that need to be revisited. The first concerns Hamzeh's statements about his passport that appear on R. 332 at pages 71-72. *Hamzeh*, 986 F.3d at 1056. The defense has no objection to these being admitted into evidence. The second concerns Hamzeh's statement about whether he would have "done it." *Hamzeh*, 986 F.3d at 1056–57. In the original briefing, that statement appeared on transcript 16S. *See* R.330:13–16. The defense continues to object to the second statement, but if it is deemed admitted then the other statements related to it should also be admitted. This includes correcting the transcript, where it mistakenly has Hamzeh saying "don't do it" when he actually says "go and do it." R.330, p.15 n.1.

In the Seventh Circuit's eyes, the statement in 16S has some probative value; but it was equally clear to the court that the statement had to be reweighed under Rule 403. *Hamzeh*, 986 F.3d at 1057 ("The evidence is relevant to predisposition and should be reweighed under Rule 403."). In its original order, this Court was quick to note that it wouldn't allow either "party to wade into the quagmire of the defendant's post-arrest speculation as to whether he would or would not have committed the attack if the Imam had told him not to." R.360:35. That should continue to be the case. As outlined in the original briefing, the question of whether Hamzeh would have done it had the Imam given his imprimatur preys upon the biases that many associate with Muslims; it is inherently offensive and prejudicial to introduce whether an Imam would have sanctioned this behavior. *See* R.330:15. Indeed, "[o]ne can't imagine an agent asking a

10

Federal Defender Services
of Wisconsin, Inc.

young Catholic, in a similar scenario, if either the priest and the bishop told you to do it, would you have committed murder. The basic working assumption of all reasonable people is that the Imams (like all other religious leaders) would give the sound advice that any illegal behavior is not tolerated. There is no reason to present the jury with such speculation that an Imam would be any different from a priest." *Id.* Consistent with Rule 403 those sorts of prejudices have to be kept outside the confines of this trial. And if the Court is persuaded that they can come in under Rule 403, then the other statements related to Hamzeh's response and the fact that he would *not do it* would also have to be admitted.

### III. Conclusion.

The Court has already been through these statements with a fine toothcomb; the heavy lifting has been done. Looking at the statements again, no more statements than what the parties have agreed to need to be admitted. The Seventh Circuit's ruling was not a general order to let it all come en masse, but for this Court to appreciate that there is some probative value to the statements and to apply Rule 403 on remand. *See Hamzeh*, 986 F.3d at 1055-56. But even considering that the statements have some probative value, the substance of the evidence is already presented in spades. The jury will hear every time Hamzeh mentions the word machine gun; it will hear about silencers; it will hear about mass shootings (at least twelve times); and it will hear about how Hamzeh's intent was formed long ago. That evidence is already coming in. The question and command on remand remains the same as it was when the Court originally reviewed these statements: "The court has tried to balance the government's right to present its case and

11

Federal Defender Services
of Wisconsin, Inc.

Case 2:16-cr-00021-PP   Filed 10/26/21   Page 11 of 12   Document 401

to try to rebut the entrapment defense with the need to protect the defendant from being convicted for uncharged conduct. The need to continue that attempt at balancing will continue through the trial." R.342:50.

Dated at Milwaukee, Wisconsin this 26th day of October 2021.

Respectfully submitted,

/s/      Joseph A. Bugni
Joseph A. Bugni, WI Bar No. 1062514
Craig W. Albee, WI Bar No. 1015752
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee, WI  53202
Tel. (414) 221-9900
E-mail:  joseph_bugni@fd.org

*Counsel for Defendant*, Samy M. Hamzeh